UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



**FILED**

AUG 1 4 2001

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

| | |
|---|---|
| ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED, | ) ) ) |
| Plaintiff(s), | ) ) CASE NO. ) |
| -vs- | ) ) |
| MARTIN JAMES ALLAMIAN, ANDREW M. ALLAMIAN, JAMES J. MANNING, MARTIN JAMES CAPITAL MANAGEMENT, INC., M.J. DIVERSIFIED FUND, L.P., M.J. FINANCIAL ARBITRAGE, L.P., M.J. SELECT GLOBAL, LTD., ASSET ALLOCATION, L.P., JOHN DOES 1-20 (LIMITED PARTNERS OF ASSET ALLOCATION, L.P.), and OCEAN BANK AND TRUST COMPANY LIMITED, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendant(s). | ) ) |

**01C 6250**

*JUDGE LINDBERG*

MAGISTRATE JUDGE LEVIN

**DOCKETED**
AUG 1 6 2001

## COMPLAINT

Plaintiff ZCM Asset Holding Company (Bermuda) Limited ("ZCM Asset Holding"), by its

undersigned counsel, Boies, Schiller & Flexner LLP, and Jenner & Block, LLC, for its Complaint

alleges as follows:

### I.   SUMMARY OF THE ACTION

1.      This is an action for injunctive and declaratory relief and damages arising from

Defendants' fraudulent offering, conversion, and transfer of limited partnership interests in M.J.

Diversified, L.P. ("MJD") and M.J. Financial Arbitrage, L.P. ("MJFA"), and common shares in

M.J. Select Global, Ltd. ("M.J. Select").

2.      On or about May 31, 2000, Plaintiff ZCM Asset Holding purchased from Martin

James Capital Management Inc. ("Martin James"), limited partnership interests in MJD and

MJFA, and from M.J. Select, under the control of Martin James, common shares in M.J. Select.



The partnership interests and shares are securities under federal and state law. Defendants Martin James, MJD, MJFA, M.J. Select, and Oceanic affirmatively represented in the offering documents that the partnership interests and shares would be readily redeemable on short notice, and Plaintiff relied upon those representations of liquidity in making its investments. The Partnership Agreements for MJD and MJFA also provide that Martin James, as general partner of MJD and MJFA, has "a fiduciary responsibility to the Partnership with respect to the safekeeping and use of all funds and assets of the Partnership, and he shall not employ or permit others to employ such funds except for the exclusive benefit of the Partnership."

3.      On April 4, 2001, after certain underlying investments of the funds had recorded poor performance, Plaintiff first issued instructions to redeem part of its partnership interests in MJD and MJFA. On April 13, 2001, Plaintiff expanded its instructions to demand the redemption of its entire partnership and share interests in MJD, MJFA, and M.J. Select. Despite Plaintiff's repeated demands for redemption of Plaintiff's partnership and share interests – which have continued to the present date – the Allamian Defendants and Oceanic have simply refused to return to Plaintiff the value of its interests, for which it is entitled to complete redemption.

4.      Nearly four months later, on August 2, 2001, Defendants provided Plaintiff with an account statement for MJD from June 2001 which showed that approximately $3 million had been withdrawn from the partnership assets. When Plaintiff demanded an explanation, Defendant Martin Allamian responded that the assets were in a separate bank account for the benefit of MJD. In response to Plaintiff's questions, Defendant Martin Allamian acknowledged that the assets remained assets of MJD which should be shown on MJD's account statement. Defendant Martin Allamian then sent a "revised" account statement in which the $3 million were again reflected as among the partnership assets.

2

5.      The next day, on August 3, 2001, Defendants notified Plaintiff that in fact they had at some point redeemed part of Plaintiff's partnership interests in MJD but no longer had the assets in any account for Plaintiff. Rather than distributing the proceeds from this redemption to Plaintiff, Defendants had actually diverted proceeds, in an amount of at least $3 million, to the limited partners in another limited partnership, Asset Allocation L.P. ("Asset Allocation"). Asset Allocation holds no interest in MJD or MJFA, and neither Plaintiff nor any of its affiliates has any interest in Asset Allocation. Martin James is, however, the general partner of Asset Allocation, which it formed and now controls.

6.      Defendants had no contractual or other right to refuse to redeem ZCM Asset Holding's partnership interests in MJD and MJFA and its shares in M.J. Select, or to convert and transfer the proceeds from ZCM Asset Holding's interest in MJD. Defendants' wrongful conduct, which inures to the benefit of Martin James and its Asset Allocation limited partnership at the expense of Plaintiff, includes: (1) fraudulent misrepresentations regarding the partnership interests offered in MJD and MJFA, the shares offered in M.J. Select, the liquidity and redemption availability of those assets under Martin James' and Oceanic's control, and the diversity of the investments made by MJD, MJFA, and M.J. Select; (2) violations of the Securities and Exchange Act of 1934 and the Illinois Securities Law of 1953; (3) breaches of limited partnership agreements between Martin James and Plaintiff (the "Partnership Agreements"); (iv) breaches of fiduciary duties owed to Plaintiff; (v) unlawful conversion of funds belonging to Plaintiff; and (vi) fraudulent transfer of funds belonging to Plaintiff.

7.      Accordingly, Plaintiff seeks declaratory and injunctive relief to preclude further unlawful and wrongful conversion of Plaintiff's property by Defendants. Plaintiff seeks a declaratory judgment that Defendants' conduct as set forth herein breaches their express and

implied contractual obligations and fiduciary duties to Plaintiff, constitutes fraud, conversion and fraudulent transfer, and violates federal and state securities laws. Plaintiff reasonably expects that Defendants will wrongfully convert and fraudulently dispose of the remainder of its partnership interests and share interests unless immediate injunctive relief is granted to prevent such wrongful acts. On information and belief, Defendants do not possess sufficient assets, without the value of Plaintiff's partnership interests, to satisfy a judgment for recovery of those interests. In addition, Plaintiff seeks the removal of Martin James as the general partner of MJD and MJFA. Plaintiff also seeks monetary damages.

## II.   JURISDICTION AND VENUE

8.      This action arises in part under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 15 C.F.R. § 240.10b-5.

9.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§77v & 78aa and applicable principles of supplemental jurisdiction, see 28 U.S.C. § 1367. The state law claims in this action are so related to the federal claim that they form a part of the same case or controversy.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 15 U.S.C. § 78aa. A substantial part of the events or omissions giving rise to the claims occurred in this district. Except for Defendant Oceanic, the known Defendants may be found in this district and are inhabitants of this district. All Defendants transact business in this district, and are subject to personal jurisdiction in this district. Defendant Oceanic has transacted business in this district at least through its participation as administrator, registrar and transfer agent of M.J. Select, offering documents for which were distributed in the State of Illinois.

11.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, and telephone and wire communications systems.

### III.   THE PARTIES

12.     Plaintiff ZCM Asset Holding is a Limited Liability Company organized under the laws of Bermuda.

13.     Defendant Martin James Allamian ("Defendant Martin Allamian") is the President and a principal of Defendant Martin James Capital Management, Inc., and is, on information and belief, a citizen of the state of Illinois.

14.     Defendant James J. Manning ("Defendant Manning" or "Manning") is the Senior Vice President and a principal of Defendant Martin James Capital Management, Inc., and is, on information and belief, a citizen of the state of Illinois.

15.     Defendant Andrew M. Allamian ("Defendant Andrew Allamian") is counsel and advisor to Defendant Martin James and is, on information and belief, a citizen of the state of Illinois.

16.     Defendant Martin James is a Delaware corporation that has its principal place of business at 1 W. Illinois St., #285, St. Charles, IL 60174.   Defendant Martin James is the general partner in Defendants MJD and MJFA, and the investment manager of Defendant M.J. Select.

17.     Defendant MJD is an Illinois Limited Partnership that has its principal place of business at 1 W. Illinois St., #285, St. Charles, IL 60174.  Defendant Martin James is the general partner in Defendant MJD, and Plaintiff is currently the sole limited partner in Defendant MJD.

18.     Defendant MJFA is a Nevada Limited Partnership that has its principal place of business at 1 W. Illinois St., #285, St. Charles, IL 60174. Defendant Martin James is the general partner in Defendant MJFA. Plaintiff is currently the sole limited partner in Defendant MJFA, except for a minority interest held by defendant MJD for the benefit of Plaintiff.

19.     Defendant M.J. Select is an investment company organized under the laws of the Bahamas. The offering documents for shares of M.J. Select list its place of business as the Euro Canadian Centre, 1st Floor, Nassau, Bahamas. On information and belief, its principal place of business is that of Martin James at 1 W. Illinois St., #285, St. Charles, IL 60174. The shares of M.J. Select were offered for sale in the United States, including in the state of Illinois. Defendant Martin James is the investment manager of M.J. Select.

20.     Defendant Oceanic Bank and Trust Company Limited ("Oceanic") is the administrator, registrar, and transfer agent of M.J. Select, with its principal place of business at TK House Bayside Executive Park, West Bay Street and Blake Road, Nassau, Bahamas.

21.     Defendant Asset Allocation is, on information and belief, an Illinois Limited Partnership. Asset Allocation has its principal place of business at 1 West Illinois Street, #285, St. Charles, IL 60174, at the offices of Martin James. Defendant Martin James is the general partner of Asset Allocation.

22.     John Does 1-20 are all the limited partners of Asset Allocation. Their names and addresses will be alleged once their identities are known. On information and belief, the limited partners may include the individual named defendants to this action and certain of their family, friends and/or colleagues. By participating in the Asset Allocation partnership and wrongfully accepting and retaining Plaintiff's property, the limited partners have subjected themselves to personal jurisdiction in the State of Illinois and this judicial district.

6

23.    At all relevant times, Defendant Martin James, in its capacity as general partner, dominated and controlled Defendants MJD, MJFA, and Asset Allocation, and, in its capacity as investment manager, controlled (among other things) redemptions from M.J. Select, and knew of, condoned, and benefitted from the violations alleged herein.

24.    Defendants Martin Allamian, Andrew Allamian and James Manning have personally engaged, participated in, and benefitted from the fraud, securities law violations, fraudulent transfer, conversion, and breaches of contract and fiduciary duty described herein, and have at all relevant times controlled, directed, authorized and ratified the similar violations and breaches by the other Defendants through their absolute control of Defendant Martin James, and consequently through its absolute control of Defendants MJD and MJFA and its control of M.J. Select as the investment manager.  Accordingly, Defendants Martin Allamian, Andrew Allamian and James Manning are personally liable for the injuries alleged herein.

25.    Martin Allamian, Andrew Allamian, James Manning, Martin James, MJD, MJFA, M.J. Select, Oceanic, Asset Allocation, and its limited partners John Does 1-20, are referred to collectively herein as "Defendants."  Defendants Martin Allamian, Andrew Allamian, James Manning, Martin James, MJD, MJFA, and M.J. Select are referred to collectively herein as the "Allamian Defendants."

## IV.  FACTUAL BACKGROUND

### A.    The Sale of the Limited Partnership Interests to Plaintiff

26.    On or before June 1, 2000, Defendant Martin Allamian provided Plaintiff with private placement memoranda for MJD and MJFA.

27.    The private placement memorandum for MJD provided, inter alia, that, "[t]he Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any calendar month with 30 days prior written notice to the Fund.  Any amount payable to the

7

applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense. Redemptions will be paid by the 30th day of the month following the redemption date." Exhibit B at p. 9.[1]

28.     The MJD Partnership Agreement similarly provides, inter alia, that "[a] Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement," and that "[a] partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar month ('the effective date') by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to Partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a 'Request for Redemption' attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the end of the calendar month." Exhibit D at pp. 36, 37 (§§ 7(e) and 10).

29.     The private placement memorandum for MJFA provides, inter alia, that, "[t]he Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any Quarter with 10 business days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense." Exhibit C at p. 6.

---

[1]  Citations herein to "Exhibit __" are to the Exhibits that accompany the Affidavit of Jonathan Lewis in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction being filed herewith.

642431_1  8/14/01 1:43 pm

30. The MJFA Partnership Agreement similarly provides, inter alia, that "[a] Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement," and that "[a] partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar quarter ('the effective date') by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to Partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a 'Request for Redemption' attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the beginning of the calendar quarter." See Exhibit E at pp. 4, 5 (§§ 7(e) and 10).

31. The Partnership Agreements for MJD and MJFA each provides, inter alia, that "[t]he General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of all funds and assets of the Partnership, and he shall not employ or permit others to employ such funds in any manner except for the exclusive benefit of the Partnership." See Exhibit D at p. 35 (§ 5) and Exhibit E at p. 3 (§ 5).

32. In reliance on the foregoing material representations that it could redeem any investment it might make in the Limited Partnerships on short notice, and that the general partner Martin James would use all funds of the Partnership for the exclusive benefit of Plaintiff, Plaintiff purchased partnership interests in MJD and MJFA.

33. On or about June 1, 2000, in accordance with the Subscription Procedures provided to it by Defendants, Plaintiff executed the Partnership Agreement for MJD, completed

9

the related Subscription Agreement and Offeree Questionnaire, and purchased $4,016,977.85 of partnership units in MJD. Exhibit D. Upon acceptance of the foregoing funds and execution of the MJD Partnership Agreement by Defendant Martin James, as general partner of MJD, Plaintiff became the sole limited partner in MJD as of August 31, 2000. Plaintiff subsequently purchased additional partnership interests in MJD in the following amounts: June 30, 2000, $200,000; July 31, 2000, $1,611,681.99; September 29, 2000, $500,000; January 31, 2001, $500,000; and March 1, 2001, $1,000,000. Plaintiff is currently the sole limited partner in MJD and has been since August 31, 2000.

34.     On or about June 1, 2000, in accordance with the Subscription Procedures provided to it by Defendants, Plaintiff also executed the Partnership Agreement for MJFA, completed the related Subscription Agreement and Offeree Questionnaire, and purchased $4,025,167.78 of partnership units in MJFA. Exhibit E. Upon acceptance of the foregoing funds and execution of the MJFA Partnership Agreement by Defendant Martin James as general partner of MJFA, Plaintiff became the sole limited partner in MJFA. Plaintiff subsequently purchased additional partnership interests in MJFA in the following amounts: June 30, 2000, $200,000; September 29, 2000, $1,800,000; December 5, 2000, $900,000; and February 1, 2001, $511,118.78. The financial statements distributed to Plaintiff by Defendant Martin James show that Plaintiff has at all times since its initial investment been the sole limited partner in MJFA except for a minority interest held by MJD in MJFA from December 2000 through at least March 2001. The MJD interest also reflects Plaintiff's interest because Plaintiff is the only limited partner in MJD.

35.     Plaintiff has at all times properly performed its obligations under both the MJD Partnership Agreement and the MJFA Partnership Agreement.

10

642431_1 8/14/01 1:43 pm

36.    As of July 30, 2001, the estimated approximate values of Plaintiff's partnership interests in MJD and MJFA were $6,835,324.00 and $3,205,711.64, respectively.

**B.    The Sale of Shares in M.J. Select Global, Ltd., to Plaintiff**

37.    On or about May 31, 2000, Defendant Martin Allamian also had provided Plaintiff with a private placement memorandum for M.J. Select, a limited liability, open-ended investment company organized under the laws of the Commonwealth of the Bahamas. Exhibit F.

38.    Defendant Martin James acts as the Investment Manager for M.J. Select. Defendant Oceanic was selected by Martin James as the Administrator, Registrar, and Transfer Agent for M.J. Select and was identified as such in the private placement memorandum for M.J. Select. Exhibit F at p. 7.

39.    The private placement memorandum for M.J. Select provides, inter alia, that, "[t]he shares [in M.J. Select] are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption. However, the administrator shall have the right, exercisable from time to time, to postpone the payment and effective date of any redemption for up to three (3) months if the Administrator determines in good faith that the liquidation of the shareholder's assets or investments in the fund would adversely effect the value of the shares in the fund. Any amount payable to the applicant in connection with the redemption of shares shall be paid by wire upon the applicant's request at his expense." Exhibit F at p. 7.

40.    On or about May 2000, Defendant Martin Allamian also advised representative of Plaintiff that the assets of M.J. Select were invested in Global Arbitrage Development Limited ("GAD"), a British Virgin Islands company, which Mr. Allamian described as a group of traders who invested only in liquid securities.

11

41.     In reliance on the foregoing material representation that it could redeem any investment it might make in M.J. Select on short notice, and on the additional oral representations of Defendant Martin Allamian confirming that the interests in M.J. Select were liquid and that the M.J. Select fund in turn invested in liquid assets, Plaintiff purchased shares in M.J. Select.

42.     On or about May 31, 2000, Plaintiff purchased $4,029,004.73 of Class A shares in M.J. Select through Martin James. Plaintiff made additional purchases of Class A shares of M.J. Select from Martin James in the following amounts: June 30, 2000, $200,000; July 31, 2000, $1,365,000; August 1, 2000, $313,349; September 1, 2000, $100,000; October 2, 2000, $211,414; October 31, 2000, $100,000; December 1, 2000, $250,000; and December 5, 2000, $200,000.

43.     On August 9, 2001, defendant Martin James first disclosed that GAD was invested entirely in a non-liquid venture capital fund and a non-liquid Regulation D fund, contrary to Mr. Allamian's prior representations of liquidity.

C.     The Call Option Transaction Between ZCM
       Matched Funding Corp. and Asset Allocation

44.     Plaintiff purchased the MJD and MJFA partnership interests and the M.J. Select shares on its own account in order to hedge the exposure of its affiliate, ZCM Matched Funding Corp. ("ZCM MFC"), on a call option transaction with Asset Allocation entered into on May 31, 2000. Exhibit A. Plaintiff was not itself a party to the call option transaction, and neither had nor has any obligations of any kind to Asset Allocation.

45.     Under the terms of the transaction, Asset Allocation purchased an option from ZCM MFC to acquire, at the end of a five year option period expiring in 2005, the value (determined at the time of exercise of the option) of certain interests designated in a representative or "Reference portfolio" in exchange for payment of a defined "Strike Price." ZCM MFC retained the right to require Asset Allocation to exercise the option.

12

46.     If the value of the Reference Portfolio interests rises above the Strike Price, Asset
Allocation is entitled to receive the difference between the Strike Price and that value by
exercising the call option.  On the other hand, if the value falls below the Strike Price, ZCM MFC
is entitled to compel Asset Allocation to pay the Strike Price in exchange for the lesser value of
the interests in the Reference Portfolio.  ZCM MFC has no obligation to acquire or deliver to
Asset Allocation any actual interest in the Reference Portfolio, or to make any cash payment to
Asset Allocation, unless and until both of the following events occur:  (1) Asset Allocation
exercises its option; and (2) the value of the Reference Portfolio is above that of the Strike Price.
Asset Allocation can only exercise its option prior to the scheduled 2005 termination date upon (1)
written notice of termination at least seven days prior to the last business day of any calendar
quarter and (2) payment of the prorated Strike Price.  As of the present date, Asset Allocation has
not provided notice or taken any steps required for an early exercise of its option, and the value of
the Reference Portfolio is in any event below that of the Strike Price.  Asset Allocation thus has no
present right to receive any payments or interests on its call option.

47.     The interests in the Reference Portfolio were selected by Asset Allocation, under
the control of its general partner Martin James.  Certain of those interests included MJD, MJFA,
and M.J. Select.  The selected interests had to satisfy agreed-upon criteria for eligibility including
liquidity and diversity of the interests.  For example, no individual interest may comprise more
than 15% of the total value of the Reference Portfolio.

48.     In breach of the terms of the call option transaction, Asset Allocation, under the
control of Martin James, secretly selected interests that did not satisfy the required diversity
criteria.  By January 2001, and possibly earlier, the Reference Portfolio in fact included a
concentration in Six Sigma LLC ("Six Sigma") that exceeded 15% through the combined effect of

13

(1) Asset Allocation's direct selection of Six Sigma as one interest in the Reference Portfolio, and (2) the undisclosed investments of MJFA in Six Sigma, as to which Plaintiff—unlike Martin James, the general partner of MJFA—had no knowledge. Defendants Martin James and Asset Allocation thus breached the call option agreement by selected funds and other interests that resulted in a concentration of Six Sigma exceeding the 15% limit, exposing ZCM MFC and the Reference Portfolio to improper risks of loss due to lack of investment diversification.

49.     The value of the Reference Portfolio has now dropped significantly below the Strike Price because, inter alia, Six Sigma has entered into bankruptcy. Accordingly, Asset Allocation will not receive (or be entitled to receive) any value upon the exercise of its call option. Instead, on termination of the call option transaction no later than 2005, Asset Allocation must pay ZCM MFC the difference between the Strike Price and the lesser value of the Reference Portfolio interests. On information and belief, Martin James, as general partner of Asset Allocation, is now attempting to create a situation in which Asset Allocation may avoid its contractual obligations with ZCM MFC.

### D.     Plaintiff's Unsuccessful Attempts to Redeem Its Partnership Interests in MJD and MJFA and Its Shares In M.J. Select

50.     On March 28, 2001, Defendants Martin Allamian and James Manning informed Plaintiff that they had been advised on March 22, 2001, that Six Sigma was about to fail, and that Six Sigma had actually entered into receivership on or about March 24, 2001. That event plainly materially affected the value of the Reference Portfolio because the Reference Portfolio included direct interests in Six Sigma valued at $7 million. Defendants did not inform Plaintiff that the extent of impairment was even greater than the reduction in value of the direct holdings because Martin James' MJFA partnership was also invested in Six Sigma.

14

51.     Under the terms of the call option transaction, when the ratio of the strike price to the value of the Reference Portfolio exceeds a defined Maximum Strike Ratio (set at 70%), ZCM MFC is entitled to adjust the Strike Price and the Notional Amount of the Reference Portfolio by an equal amount through, in effect, redeeming Reference Portfolio interests until that ratio is a percentage below the Maximum Strike Ratio.

52.     On March 29, 2001, in a letter addressed to Asset Allocation c/o Defendant Martin James, ZCM MFC stated that the maximum strike ratio had been exceeded because the value of Six Sigma had become materially impaired, and indicated that, accordingly, it intended to submit redemption instructions to Defendants with respect to certain of the Reference Portfolio interests that had been purchased by Plaintiff to hedge ZCM MFC's exposure. Exhibit G.

53.     On April 4, 2001, pursuant to the MJD and MJFA Partnership Agreements, Plaintiff instructed Defendant Martin James to redeem $4,500,000 of Plaintiff's partnership interest in MJD and $5,300,000 of Plaintiff's interest in MJFA. Exhibits H; I.

54.     On April 13, 2001, because of the ongoing material impairment of the Reference Portfolio, Plaintiff modified its instructions to require that Defendant Martin James instead redeem its entire Partnership Interests in MJD and MJFA. Exhibits J; K. Defendant Martin James did not redeem Plaintiff's interests but, as alleged below, in fact liquidated and transferred to the limited partners of Asset Allocation at least $3 million of Plaintiff's interest in MJD.

55.     On April 13, 2001, Plaintiff also instructed Defendant Oceanic, the Administrator of M.J. Select, at the next opportunity—which Plaintiff indicated it believed to be April 30—to redeem 2,613.145894 shares in M.J. Select, an amount corresponding to the entire direct interest of the Reference Portfolio in M.J. Select. Exhibit L. Although Oceanic responded that the

position would be liquidated and redeemed as of June 30, 2001, Oceanic did not in fact redeem Plaintiff's shares as of that date or at any time to the present.

56.     On April 18, 2001, Plaintiff provided Asset Allocation with a schedule indicating its valuation of the approximate then-current value of the Reference Portfolio.

57.     The next day, on April 19, 2001, Defendant Martin Allamian informed Plaintiff that Plaintiff had overestimated the value of the Reference Portfolio because MJD and MJFA also had interests in the now bankrupt Six Sigma, and the value of Plaintiff's partnership interests in MJD and MJFA therefore had to be written down.  As alleged above, the Allamian Defendants had known of the bankruptcy of Six Sigma and the consequent need to write down the value of all interests in Six Sigma on or about March 22, 2001.  Investments by MJD or MJFA in Six Sigma obviously were of material importance to assessing the value of Plaintiff's partnership interests. On information and belief, the Allamian Defendants' failure to disclose—until April 19—the additional investments in Six Sigma was an affirmative concealment designed to keep secret the breach by Asset Allocation and Martin James of the call option agreement and its 15% concentration limit.

58.     The following day, Martin Allamian reversed himself as to MJD's investment in Six Sigma, explaining, incredibly, that a $6.5 million investment he thought MJD had made in Six Sigma based on a bank loan had not gone through.  However, he confirmed MJFA's $5.5 million investment in Six Sigma.  As a result of the asset impairment to Six Sigma and at least the MJFA interest in Six Sigma, the value of the Reference Portfolio was significantly below the minimum value required by the call option.

59.     Over the ensuing months, Plaintiff repeatedly demanded, both orally and in writing, that its interests in the MJD and MJFA partnership, and its shares in M.J. Select, be

642431_1 8/14/01 1:43 pm

redeemed. With the minor exception of $350,000 received from Martin James in early May 2000, reflecting liquidation of a small fund previously held by MJD, to date, ZCM Asset Holding has not received the proceeds from redemption of any of its partnership or share interests.

**E.    Defendants Fraudulently Convert and Transfer Funds Resulting From Redemption of Part of Plaintiff's Partnership Interests in MJD**

60.    In May 2001, Defendants Martin Allamian and Martin James represented that certain of MJD's interests, valued at approximately $3 million, had been redeemed and transferred to a bank account. Defendant Martbin Allamian stated that the funds were being held for the benefit of MJD and would be transferred to Plaintiff on June 30, 2001, at the end of the second quarter. Allamian insisted on holding the proceeds until the June 30 redemption date, even though Plaintiff was the sole limited partner in MJD and entitled to the entire amount.

61.    Plaintiff requested that Defendants Martin Allamian and Martin James provide written verification of the deposit of the funds. On June 1, 2001, Defendant Martin Allamian sent a fax representing that the bank statement evidencing the deposit of the funds would be sent later on the same day. No bank statement was ever sent.

62.    On July 30, 2001, Plaintiff again demanded that the Allamian Defendants and Oceanic pay Plaintiff the proceeds from the redemption of its limited partnership and share interests in MJD, MJFA, and M.J. Select.

63.    On August 2, 2001, Defendant Martin Allamian sent Plaintiff an account statement for MJD indicating that $3 million had been withdrawn from the assets of MJD. Plaintiff immediately demanded an explanation for the withdrawal because the payments had not been transferred to Plaintiff and no other parties had any legal interest in the MJD assets. Defendant Martin Allamian indicated that the funds still belonged to MJD but were in a separate bank account. Defendant Martin Allamian did not explain why the funds had been taken off the

17

balance sheet. Defendant Martin Allamian then sent a revised financial statement in which the $3

million was again listed as among the assets of MJD.

64. On August 3, 2001, Defendant Andrew Allamian notified Plaintiff by letter that

Martin James had at some point redeemed part of Plaintiff's partnership interest in MJD but no

longer had the resulting $3 million in redemption proceeds in any account for MJD. Defendant

Andrew Allamian did not explain how the revised MJD balance sheet in fact showed the $3

million asset as still belonging to the partnership as of the prior day. According to Defendant

Andrew Allamian, rather than distribute the proceeds from the redemption to Plaintiff, Martin

James had diverted the proceeds, in an amount of at least $3 million, to the limited partners in

Asset Allocation. Defendant Andrew Allamian proposed that the matter be resolved by having

Martin James make various other payments to Plaintiff, including a cash payment of $500,000, a

transfer of other security interests, and a relinquishment of Defendants' purported and unspecified

claims against ZCM Asset Holding's accounts. Exhibit M.

65. Defendant Asset Allocation and its limited partners have no legal interest in MJD

or MJFA, and no legal entitlement to the proceeds of any of Plaintiff's interests. Moreover,

Plaintiff has no interest in Asset Allocation. Defendant Asset Allocation has not exercised its call

option with ZCM MFC and, in any event, any exercise or termination of the call option

transaction would require Asset Allocation to make payments to ZCM MFC because Asset

Allocation is in a negative equity position.

642431_1  8/14/01 1:43 pm

### F. Without Provisional Relief, Defendants' Finances and Conduct May Render a Judgment for Plaintiff Uncollectable

66.     Defendants MJD and MJFA have no assets apart from the partnership interests of Plaintiff.

67.     Upon information and belief, Defendants Martin Allamian, Andrew Allamian, James Manning and Martin James have insufficient assets to satisfy a judgment in favor of Plaintiff in an amount equivalent to the value of Plaintiff's partnership interests in MJD and MJFA and Plaintiff's stock in M.J. Select.  On information and belief, defendant Martin James is an extremely small, family run business that, together with its limited partnerships MJD and MJFA and its corporation M.J. Select, is dominated and controlled by defendants Martin Allamian, Andrew Allamian, and James Manning.

68.     Defendants' refusal to honor any of Plaintiff's redemption requests, and their wrongful transfer to limited partners in Asset Allocation of the proceeds from a partial redemption of Plaintiff's partnership interest in MJD, comprise a pattern of wrongful conduct that presents a real danger that, without the entry of immediate relief for Plaintiff, Defendants will liquidate, hide or conceal assets, or distribute them to unknown persons with no rights to them, with the intent and effect of frustrating any judgment obtained against them by Plaintiff.

### COUNT I

#### (As to the Allamian Defendants and Oceanic)
#### (Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5)

69.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

70. Count I is brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. 78j(b), and Securities and Exchange Act Rule 10b-5, 15 C.F.R. § 240.10b-5, against the Allamian Defendants and Oceanic.

71. Defendants against whom this Count is alleged made at least the following affirmative misrepresentations and omissions:

    a) Defendants misrepresented that, with respect to the MJD Partnership, "The Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any calendar month with 30 days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense. Redemptions will be paid by the 30th day of the month following the redemption date." Exhibit B at p. 9.

    b) Defendants misrepresented that, with respect to the MJFA Partnership, "The Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any Quarter with 10 business days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense." Exhibit C at p. 6.

    c) Defendants misrepresented that, with respect to M.J. Select, "The shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption." Exhibit F at p.7.

    d) Defendants did not disclose that Plaintiff's partnership and share interests would not in fact be readily redeemable, or that Defendant intended to control, convert, and transfer Plaintiff's interests regardless of demands for redemption.

72. Each of these misrepresentations and omissions was material in the sense that any similarly situated reasonable investor would have considered them important in deciding whether to acquire a Partnership Interest in MJD or MJFA or shares in M.J. Select.

73. Given the substantial size of Plaintiff's investments in MJD, MJFA, and M.J. Select, Plaintiff's ability reliably to redeem its partnership interests on timely notice was of

material concern to it in deciding whether to purchase the partnership interests, as it would have been to any similarly situated reasonable investor.

74.    The representation in the private placement memorandum for MJD that any purchased partnership interests would be redeemable as of the end of any calendar month with thirty (30) days prior written notice to MJD was a representation that would have assumed actual significance in the deliberations of a reasonable investor situated similarly to Plaintiff.

75.    The representation in the private placement memorandum for MJFA that any purchased partnership interests would be redeemable as of the end of any quarter with ten (10) days prior written notice to MJFA was a representation that would have assumed actual significance in the deliberations of a reasonable investor situated similarly to Plaintiff.

76.    The representation in the offering documents for M.J. Select that any shares would be redeemable as of the end of any calendar quarter with thirty (30) days prior written notice to M.J. Select was a representation that would have assumed actual significance in the deliberations of a reasonable investor situated similarly to Plaintiff.

77.    In effectuating the fraudulent sale of securities to Plaintiff, the Defendants acted with scienter. Defendants either consciously or recklessly disregarded the falsity of the material representations in the private placement memoranda provided to Plaintiff concerning the availability of redemption of partnership interests on timely notice.

78.    Defendants had both motive and opportunity to commit fraud because Defendants sought to take advantage of their control over Plaintiff's limited partnership interests and share interests to cover losses sustained by Asset Allocation, a limited partnership in which Martin James is the general partner and, on information and belief, in which the named individual defendants and certain of their family, friends, and/or colleagues are limited partners. Further, by

refusing to redeem Plaintiff's partnership and share interests, Defendants have retained the opportunity to convert and transfer additional funds belonging to Plaintiff to entities connected with Defendants' own interests.

79.     Defendants had and have the opportunity to refuse to redeem Plaintiff's partnership and share interests as Plaintiff has timely and properly instructed, in that the redemption of these interests and the disposal of the resulting proceeds is entirely in Defendants' control.

80.     The misrepresentations and omissions of Defendants were made "in connection with" the purchase or sale of the partnership and share interests to Plaintiff. These misrepresentations were in connection with securities in the sense that they concerned fundamental attributes of these securities: characteristics and attributes that would affect the value of the security and would induce a purchaser to engage in purchases or sales of such investments.

81.     Plaintiff would not have purchased the partnership interests in MJD from Defendants were it not for the representations of liquidity in the private placement memorandum for MJD; namely, that any purchased partnership interests would be redeemable as of the end of any calendar month with 30 days prior written notice to MJD. Accordingly, these representations induced Plaintiff to purchase the partnership interests in MJD, and they were directly enough related to the value of the security to be considered representations "in connection with" the sale of the security.

82.     Plaintiff would not have purchased the partnership interests in MJFA from Defendants were it not for the representations of liquidity in the private placement memorandum for MJFA; namely, that any purchased partnership interests would be redeemable as of the end of any quarter with 10 days prior written notice to MJFA. Accordingly, these representations

642431_1 8/14/01 1:43 pm

induced Plaintiff to purchase the partnership interests in MJFA, and they were directly enough related to the value of the security to be considered representations "in connection with" the sale of the security.

83.     Plaintiff would not have purchased the share interests in M.J. Select from Defendants were it not for the representations of liquidity in the offering documents for M.J. Select; namely, that any shares would be redeemable as of the end of any quarter with thirty (30) days prior written notice to M.J. Select. Accordingly, these representations induced Plaintiff to purchase shares in M.J. Select, and they were directly enough related to the value of the security to be considered representations "in connection with" the sale of the security.

84.     Plaintiff reasonably relied on the misrepresentations and omissions of Defendants in purchasing partnership interests in MJD and MJFA and shares in M.J. Select. Plaintiff's reliance was justifiable and reasonably foreseeable.

85.     Plaintiff has alleged the foregoing based upon the investigation of its counsel, which investigation has included, among other things, a review of correspondence between Plaintiff and representatives of Defendants; and the private placement memoranda and offering documents for MJD, MJFA, and M.J. Select.

86.     Defendants' federal securities violations have caused Plaintiff immediate and quantifiable injury including, but not limited to, (a) losses sustained from Defendants' failure to redeem Plaintiff's partnership interests and shares, and (b) losses sustained from Defendants' fraudulent conversion and transfer of proceeds resulting from the improper redemption and distribution of Plaintiff's partnership interests in MJD.

## COUNT II

### (As to the Allamian Defendants and Oceanic)
### (Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/12-13)

87.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein.

88.     Count II is brought pursuant to the Illinois Securities Law of 1953, against the

Allamian Defendants and Oceanic.

89.     Defendants against whom this Count is alleged circulated private placement

memoranda knowing or having reasonable grounds to know they contained the following false or

untrue material representations and omissions:

a)     Defendants misrepresented that, with respect to the MJD Partnership, "The
Units are redeemable by Shareholders at the Net Asset Value per Unit as of
the end of any calendar month with 30 days prior written notice to the
Fund. Any amount payable to the applicant in connection with the
redemption of Units shall be paid in United States Dollars and transferred
by wire at the applicant's request at his expense. Redemptions will be paid
by the 30th day of the month following the redemption date." Exhibit B at
p. 9.

b)     Defendants misrepresented that, with respect to the MJFA Partnership,
"The Units are redeemable by Shareholders at the Net Asset Value per Unit
as of the end of any Quarter with 10 business days prior written notice to
the Fund. Any amount payable to the applicant in connection with the
redemption of Units shall be paid in United States Dollars and transferred
by wire at the applicant's request at his expense." Exhibit C at p. 6.

c)     Defendants misrepresented that, with respect to M.J. Select, "The shares are
redeemable by shareholders at the net asset value per share as of the end of
any Calendar Quarter with thirty (30) days prior written notice to the Fund.
Each shareholder shall be paid the amount of its redemption as soon as
practicable following the effective date of the redemption." Exhibit F at p.
7.

d)     Defendants did not disclose that Plaintiff's partnership and share interests
would not in fact be readily redeemable, or that Defendant intended to
control, convert, and transfer Plaintiff's interests regardless of requests for
redemption.

24

90.     Each of these misrepresentations and omissions was material in the sense that any similarly situated reasonable investor would have considered them important in deciding whether to acquire a partnership interest.

91.     Defendants acted either with knowledge that the above alleged statements were false or they recklessly disregarded the falsity of these statements or the materiality of the omissions.

92.     Plaintiff reasonably relied on the misrepresentations and omissions of Defendants in deciding to purchase partnership interests in MJD and MJFA and shares in M.J.Select. Plaintiffs' reliance was justifiable and reasonably foreseeable.

93.     Defendants' securities violations have caused Plaintiff immediate and quantifiable injury including, but not limited to, (a) losses sustained from Defendants' failure to redeem Plaintiff's partnership interests and shares, and (b) losses sustained from Defendants' fraudulent conversion and transfer of proceeds resulting from the improper redemption and distribution of Plaintiff's partnership interests in MJD.

## COUNT III

### (As to Martin James, Martin Allamian, Andrew Allamian, and James Manning) (Breach of Contract)

94.     Plaintiffs repeat and reallege each of the allegations contained above as if fully set forth herein.

95.     Plaintiff and Defendant Martin James are parties to Limited Partnership Agreements for MJD and MJFA, each of which is dated June 1, 2000.

### A.     Breaches of the Limited Partnership Agreement for MJD

96.     The MJD Partnership Agreement executed by Plaintiff and Defendant Martin James, provides, inter alia, that "[a] Partner shall have the right to withdraw capital through the

redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement," and that "[a] partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar month ('the effective date') by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to Partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a 'Request for Redemption' attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the end of the calendar month." Exhibit D at pp. 37, 37 (§§ 7(e) and 10).

97.     Although Plaintiff timely and properly instructed Defendants to redeem its interests in MJD, Defendants have not redeemed Plaintiff's interests. Defendants breached their contractual obligations pursuant to the foregoing provisions by refusing to honor Plaintiff's instructions to redeem its partnership interest in MJD.

98.     Defendants have also breached their contractual obligations pursuant to the Partnership Agreement for MJD by redeeming a portion of the Plaintiff's partnership interest, in an amount of at least $3 million, and fraudulently transferring the proceeds from this redemption to limited partners in Asset Allocation, rather than distributing the proceeds to Plaintiff.

99.     Defendants' actions have also breached the implied covenant of good faith and fair dealing in the MJD Partnership Agreement, including the duty to act in a manner consistent with protecting the value and liquidity of Plaintiff's partnership interest in MJD.

**B.     Breaches of the Limited Partnership Agreement for MJFA**

100.     The Partnership Agreement for MJFA, executed by Plaintiff and Defendant Martin

James, provides, <u>inter alia</u>, that "[a] Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement," and that "[a] partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar quarter ('the effective date') by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to Partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a 'Request for Redemption' attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the beginning of the calendar quarter." Exhibit E at pp. 4, 5 (§§ 7(e) and 10).

101.    Although Plaintiff timely and properly instructed Defendants to redeem its interests in MJFA, Defendants have not redeemed Plaintiff's interests. Defendants breached their contractual obligations pursuant to the foregoing provisions by refusing to honor Plaintiff's instructions to redeem its partnership interest in MJFA.

102.    Defendants' actions have also breached the implied covenant of good faith and fair dealing in the Partnership Agreement for MJFA, including the duty to act in a manner consistent with protecting the value and liquidity of Plaintiff's limited partnership interests in MJFA.

### C.     Resulting Direct Damages

103.    As a natural and foreseeable consequence of their breaches of the MJD Partnership Agreement and the MJFA Partnership Agreement, Defendants have caused Plaintiff damages in an amount to be determined at trial, but not less than $ 16,000,000, exclusive of interest and costs.

27

## COUNT IV

**(As to Defendant Martin James, Martin Allamian, Andrew Allamian, and James Manning)**
**(Breach of Fiduciary Duty)**

104.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

105.    The Partnership Agreements for both MJD and MJFA provide, <u>inter</u> <u>alia</u>, that "[t]he General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of all funds and assets of the Partnership, and he shall not employ or permit others to employ such funds in any manner except for the exclusive benefit of the Partnership." <u>See</u> Exhibit D at p. 35 (§ 5); Exhibit E at p. 3 (§ 5).

106.    In addition to the fiduciary duties expressly undertaken by Defendants in the Partnership Agreements, each of the Defendants against whom this Count is alleged owed fiduciary duties to the Plaintiff by virtue of their partnership with Plaintiff and/or their control over entities in partnership with Plaintiff.

107.    Defendants' refusal to honor instructions properly given by Plaintiff to redeem its partnership interests in MJD and MJFA and its shares in M.J. Select breached the fiduciary duties owed by Defendants to Plaintiff.

108.    In addition, Defendants have breached the fiduciary duties they owe to Plaintiff by their unauthorized redemption of a portion of Plaintiff's partnership interests in MJD and the subsequent wrongful and unlawful transfer of the proceeds from this redemption to the limited partners in Asset Allocation.

28

## COUNT V

### (As to All Defendants)
### (Conversion)

109.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

110.    The unauthorized redemption by Defendant Martin James, in concert with Defendants Martin Allamian, Andrew Allamian, James Manning, and MJD, of a portion of Plaintiff's partnership interest in MJD, and the subsequent unauthorized and wrongful transfer of the proceeds from this redemption to the limited partners in Asset Allocation constitutes conversion.

111.    Defendant Asset Allocation and John Does 1-20, the limited partners of Asset Allocation, knowingly and wrongfully accepted and retained the funds realized from the partial redemption of Plaintiff's partnership interest in MJD without any legal entitlement to or interest in such funds.  Neither the call option transaction with ZCM MFC nor any other agreement entitles the limited partners to accept and retain the funds belonging to Plaintiff.  The wrongful acceptance and retention of Plaintiff's property by the limited partners of Asset Allocation constitutes conversion.

112.    Defendants Martin James, Martin Allamian, Andrew Allamian, James Manning, MJD, MJFA, M.J. Select, and Oceanic also wrongfully converted Plaintiff's partnership interests and shares by refusing to redeem those interests and shares and distribute the property to Plaintiff, instead improperly retaining control and possession of such property.

642431_1 8/14/01 1:43 pm

## COUNT VI

**(As to the Allamian Defendants, Asset Allocation, and John Does 1-20)**
**(Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/5)**

113.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

114.     Defendants' unauthorized redemption of a portion of Plaintiff's partnership interests in MJD and subsequent unauthorized transfer of the proceeds from this redemption to limited partners in Asset Allocation, another limited partnership created and managed by certain of the Defendants, was made with actual intent to hinder, delay, and defraud Plaintiff by making the proceeds from the redemption of Plaintiff's partnership interest unavailable to Plaintiff.  In addition, Defendants transferred the value of Plaintiff's partnership interest without receiving any value in exchange on behalf of Plaintiff, and without retaining the ability to compensate Plaintiff for the value of Plaintiff's interest.

115.     Defendants Asset Allocation and the Asset Allocation limited partners, John Does 1-20, knowingly participated in and/or benefitted from the transfer of Plaintiff's property without in any way notifying Plaintiff of the wrongful transfer or compensating Plaintiff for the value of Plaintiff's interest.

116.     Defendants' redemption and transfer of Plaintiff's partnership interest thus constitutes a fraudulent transfer under the Uniform Fraudulent Transfer Act as adopted in Illinois.

642431_1  8/14/01 1:43 pm

## COUNT VII

### (As to the Allamian Defendants and Oceanic)
### (Fraud)

117.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth

herein.

118.    Defendants against whom this Count is alleged made at least the following

affirmative misrepresentations and omissions:

a)      Defendants misrepresented that, with respect to the MJD Partnership, "The Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any calendar month with 30 days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense. Redemptions will be paid by the 30th day of the month following the redemption date." Exhibit B at p. 9.

b)      Defendants misrepresented that, with respect to the MJFA Partnership, "The Units are redeemable by Shareholders at the Net Asset Value per Unit as of the end of any Quarter with 10 business days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire at the applicant's request at his expense." Exhibit C at p. 6.

c)      Defendants misrepresented that, with respect to M.J. Select, "The shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption." Exhibit F at p. 7.

d)      Defendants did not disclose that Plaintiff's partnership and share interests would not in fact be readily redeemable, or that Defendant intended to control, convert, and transfer Plaintiff's interests regardless of requests for redemption.

119.    Defendant Martin Allamian also orally represented to Plaintiff, on multiple

occasions including discussions with Thomas Prunty and Jonathan Lewis, representatives of

Plaintiff, on or about March 28, 2001, April 19, 2001, June 1, 2001, and July 30, 2001, that

31

Plaintiff's investments in MJD, MJFA, and M.J. Select were liquid and readily redeemable upon notice.

120.     Each of these misrepresentations and omissions was material in the sense that Plaintiff considered them important and reasonably relied upon such statements and omissions in deciding to acquire partnership interests in MJD and MJFA and shares in M.J. Select, and in not acting at an even earlier date to request the redemption of its partnership and share interests.

121.     Defendants acted either with knowledge that the foregoing statements were false (and the omissions material) or they recklessly disregarded the falsity of these statements and the materiality of the omissions.

122.     The private placement memoranda and offering documents containing the foregoing misrepresentations were provided by Defendants to Plaintiff for the purpose of inducing reliance on the foregoing misrepresentations.

123.     Plaintiff reasonably relied on the misrepresentations and omissions of Defendants in deciding to purchase partnership interests in MJD and MJFA and shares in M.J. Select. Plaintiff's reliance was justifiable and reasonably foreseeable.

124.     As a consequence of Plaintiff's reliance on the foregoing misrepresentations, Plaintiff has been injured.  Plaintiff has been unable to redeem its partnership interests in MJD and MJFA and its shares in M.J. Select, which defendants have converted to their own interest. Further, the proceeds from a redemption of a portion of Plaintiff's partnership interest in MJD have been wrongfully transferred by Defendants to limited partners in Asset Allocation.

## COUNT VIII

### (As to Defendant Martin James)
### (Removal of Martin James as General Partner of MJD and MJFA)

125.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

126.     Defendant Martin James has breached its fundamental responsibilities and duties as General Partner to the limited partners of MJD and MJFA.

127.     Martin James has failed to redeem the partnership interests of Plaintiff in MJD and MJFA upon timely and proper requests, fraudulently converting such interests to its own use and control at the expense of the limited partner of MJD and MJFA.

128.     Martin James also has failed to provide a proper accounting of the assets in MJD, instead providing a false and improper accounting of partnership assets. Most recently, on August 2, 2001, Defendants Martin James and Martin Allamian provided a balance sheet indicating that $3 million had been withdrawn—but not distributed to Plaintiff—from the MJD partnership assets. Defendants Martin James and Martin Allamian subsequently provided, on the same day, a "revised" balance sheet reflecting that the $3 million were again partnership assets. On the very next day, Defendant Andrew Allamian admitted that the $3 million had in fact been withdrawn from partnership assets by Defendant Martin James and paid to the limited partners of another partnership controlled by Defendant Martin James.

129.     Defendant Martin James has fraudulently transferred at least $3 million of property belonging to Plaintiff, the sole limited partner of the MJD partnership, to entities that had no legal right or interest in MJD partnership assets, including at least Asset Allocation and its limited partners.

33

130.     Plaintiff has a legitimate concern and expectation that Defendant Martin James will continue improperly to convert, transfer, and misuse Plaintiff's partnership assets in MJD and MJFA, and that Defendant Martin James will misrepresent the facts regarding the status of such assets.

131.     The conduct of Defendant Martin James is wholly antithetical to its fiduciary and other duties as General Partner of MJD and MJFA, and has led directly to the injury and impairment of Plaintiff's partnership interests in MJD and MJFA.

132.     Under sections 15(c) of the MJD and MJFA Partnership Agreements, the limited partners owning more than 50% of the Units in the MJD and MJFA partnerships are entitled to remove or replace the General Partner of MJD and MJFA and/or dissolve the MJD and MJFA partnerships.  Plaintiff owns, directly or indirectly, 100% of the Units in MJD and MJFA. Plaintiff therefore demands that Martin James be immediately removed as General Partner of both MJD and MJFA, or, in the alternative, that the MJD and MJFA partnerships be dissolved with all assets returned to the limited partners, i.e., Plaintiff.  The formal requirement of thirty days notice for a meeting is not appropriate because Plaintiff is at risk that the General Partner will continue to convert and fraudulently transfer for its own benefit—and at the expense of Plaintiff—the assets owned by the limited partners of MJD and MJFA.  By separate letters dated August 14, 2001, Plaintiff has demanded that Defendant Martin James call a meeting for the purpose of voting on Martin James' removal as the General Partner and the dissolution of the MJD and MJFA partnerships.

133.     Under both Illinois and Nevada law, which govern, respectively, the MJD and MJFA partnerships, Plaintiff has a right independent of contract to demand the removal of the general partner upon self-dealing, conversion of partnership assets, and other wrongful conduct.

## COUNT IX

### (As to Asset Allocation and John Does 1-20)
### (Indemnification)

134.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

135.     The call option transaction between ZCM MFC and Defendant Asset Allocation expressly provides, in relevant part, that: "Buyer [Asset Allocation] agrees to indemnify and hold harmless Seller and any affiliate, agent, officer, director, or employee of Seller from and against any and all losses, claims, actions, damages or liabilities (including without limitation all reasonable legal or other costs, charges and expenses paid or incurred in disputing, investigating, defending, or settling same), joint or several (collectively, 'Losses'), which any of them may incur or which may be made against any of them insofar as such Losses arise from or are related to the Transaction, and Buyer agrees to reimburse such parties for all costs, charges and expenses (including counsel fees and disbursements) as incurred which any of such parties may pay or incur in connection with investigating, disputing, defending or settling any such Losses." Exhibit A at pp. 5-6.

136.     Plaintiff is an "affiliate" of ZCM MFC under the terms of the call option transaction, and therefore a beneficiary of the indemnity obligation.

137.     Plaintiff has incurred losses arising from or relating to the call option transaction in that: (1) Defendants, in concert with Defendant Asset Allocation, have taken advantage of the call option transaction and Plaintiff's investments in order to convert Plaintiff's assets to Defendants' benefit, despite Plaintiff's requests that its interests be redeemed and returned to Plaintiff; (2) Defendants have fraudulently transferred at least $3 million of Plaintiff's assets to the limited partners John Does 1-20 of Asset Allocation, which the limited partners improperly

35

accepted and retained, with knowledge that such assets were Plaintiff's property; (3) Defendants have forced Plaintiff to incur legal and other expenses in connecting with investigating the basis of Defendants' wrongdoing and initiating this legal action; (4) Defendants caused Plaintiff to suffer disproportionate losses from the Six Sigma bankruptcy due to Asset Allocation's improper selection of an inadequately diversified Reference Portfolio in which the concentration in Six Sigma exceeded 15%; and (5) Defendants continue to hold Plaintiff's assets at negative rates of return long after Plaintiff's requests for redemption, thus preventing Plaintiff from earning rates of return equivalent to its average return on capital investments and causing additional losses.

138.    Defendant Asset Allocation, and the limited partners of Asset Allocation at least to the extent of the value of their partnership interests in Asset Allocation, are obligated to indemnify Plaintiff for all of the losses set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a)    Declare that Defendants' conduct (i) violates 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5; (ii) violates the Illinois Securities Law of 1953; (iii) breaches their contractual obligations and implied duties of good faith and fair dealing; (iv) breaches their fiduciary duties to Plaintiff; (v) constitutes fraud and conversion, and (vi) violates the Uniform Fraudulent Transfer Act as adopted in Illinois;

b)    Preliminarily and permanently enjoin Defendants, their officers, directors, agents, servants, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and all others in active concert or participation with them or any of them from directly or indirectly transferring, selling, assigning, interfering with, or disposing of any property, funds, accounts or monies in which Plaintiff ZCM Asset Holding Company (Bermuda) Limited has an interest, pending adjudication of this proceeding and thereafter, including any funds obtained from the redemption of interests in M.J. Diversified, L.P., M.J. Financial Arbitrage, L.P., or M.J. Select Global;

642431_1  8/14/01 1:43 pm

c)  Order that Defendants account to Plaintiff for their profits and pay any damages sustained by Plaintiff arising from the foregoing wrongful and unlawful acts of Defendants and that, in accordance with such accounting, Plaintiff be awarded judgment for such profits or damages;

d)  Order that Defendants pay Plaintiff for any and all damages sustained by Plaintiff arising from the foregoing wrongful and unlawful acts of Defendants;

e)  Order that Defendant Martin James promptly redeem and return to Plaintiff its interests in M.J. Diversified, L.P., and M.J. Financial Arbitrage, L.P.;

f)  Order that Defendants Martin James and Oceanic promptly redeem and return to Plaintiff its shares in M.J. Select;

g)  Order that Defendant Martin James be required to return all fees retained in its capacity as General Partner of the M.J. Diversified and M.J. Financial Arbitrage Limited Partnerships, and its capacity as Investment Manager of M.J. Select Global;

h)  Order that Defendant Asset Allocation, and John Does 1-20, limited partners of Asset Allocation, be required to return to Plaintiff the proceeds from the redemption of Plaintiff's interest in MJD, which was wrongfully transferred to the Asset Allocation limited partners by Defendant Martin James;

i)  Order that Defendant Asset Allocation be required to indemnify Plaintiff for all losses arising from its investments in MJD, MJFA, and M.J. Select, including costs and attorneys' fees incurred in this action not reimbursed by the other Defendants; and

j)  Order that Plaintiff be awarded its costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action and such other and further relief as justice may require.

642431_1  8/14/01 1:43 pm

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 14, 2001         Respectfully submitted,

ZCM ASSET HOLDING COMPANY
(BERMUDA) LIMITED


By:_____
     Alan B. Vickery
     Philippe Z. Selendy
     Christopher M. Green
     Carl J. Nichols
     Jessica M. Friedman
     BOIES, SCHILLER & FLEXNER LLP
     570 Lexington Avenue
     New York, New York  10022
     (212) 446-2300

     William A. Von Hoene, Jr.
     Jessica M. Aspen
     JENNER & BLOCK LLC
     One IBM Plaza
     Chicago, Illinois  60611
     (312) 222-9350


     Counsel for Plaintiff

# EXHIBIT   A

EXECUTION COPY

ZCM Matched Funding Corp.
One Chase Manhattan Plaza, 44th Floor
New York, NY 10005

Asset Allocation Fund, L.P.
c/o Martin James Capital Management Inc.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174

**Re: Call Option Transaction**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 1991 ISDA Definitions (as supplemented by the 1998 Supplement and the 1998 Euro Definitions, the "Swap Definitions") and the 1996 ISDA Equity Derivative Definitions (the "Equity Definitions" and, together with the Swap Definitions, the "Definitions"), in each case published by the International Swaps and Derivatives Association, Inc. ("ISDA"), are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

1.  This Confirmation evidences a complete and binding agreement between you and us as to the terms of the Transaction to which this confirmation relates. In addition, upon the execution by Asset Allocation Fund, L.P. ("Asset Fund") and ZCM Matched Funding Corp. ("ZCM") of a Master Agreement (Multicurrency - Cross Border) in the form published by ISDA (the "Agreement"), with such modifications to such form as you and we shall in good faith agree, this Confirmation will supplement, form part of and be subject to the Agreement.

    Each party hereby agrees to make each payment specified in this Confirmation as being payable by it, not later than the due date in place of the account specified below (or as specified in writing to the other

party at the address specified below), in freely transferable funds and in the manner customary for payments in the applicable currency.

2.  The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms**

Trade Date:                May 31, 2000.

Effective Date:            The date upon which Seller determines, in its reasonable discretion, that the assets constituting the Reference Portfolio have been fully transferred from Buyer to Seller. Seller shall notify Buyer in writing upon the occurrence of the Effective Date.

Option Style:              European.

Option Type:               Call.

Seller:                    ZCM.

Buyer:                     Asset Fund.

Reference Portfolio:       The portfolio specified in Appendix A, as the same may be amended from time to time in writing by Buyer and Seller.

Reference Portfolio
Interests:                 A number of Eligible Interests having an initial aggregate value, as of April 30, 2000, of at least USD 26,506,296. Reference Portfolio Interests must be Eligible Interests.

Eligible Interests:        Hedge fund interests, cash or marketable securities which satisfy all the following conditions:
                           • effective redemption availability at least quarterly upon no more than 60 days' prior written notice;

- a rolling one-year annualised standard deviation (as defined in Appendix B) less than or equal to 30%; and
- an objective mark-to-market policy.

For the purpose of calculating the Strike Ratio, Seller may from time to time reasonably reject certain Eligible Interests from the calculation of the Notional Amount should the value or liquidity of any Eligible Interest become impaired in some material fashion.

Initial Reference
Portfolio Value:                    USD 26,506,296, determined as of the Effective Date.

Strike Price:                       On the Effective Date, an amount equal to USD 17,684,999.

                                    The Strike Price shall accrete on a daily basis at a daily rate of Overnight USD LIBOR plus the Spread, calculated on an actual/360 day count basis, subject to (i) the provisions set forth under the Seller Strike Adjustment and the Buyer Strike Adjustment and (ii) the Maximum Strike Price.

Minimum Strike
Price:                              USD 15,000,000.

Maximum Strike
Price:                              USD 35,000,000.

Spread:                             170 basis points per annum.

Seller
Strike Adjustment:                  At any time, Seller shall have the right, but not the obligation, to adjust each of the Strike Price and the Notional Amount by an equal amount, such that the Strike Ratio is adjusted to a

percentage less than the Maximum Strike Ratio. Such adjustments to the Notional Amount and, hence, the NAV of the Reference Portfolio, shall be effected through subscriptions and redemptions of Reference Portfolio Interests.

**Buyer Strike Adjustment:**

On a monthly basis with 2 days' prior written notice, provided the 1-year annualized standard deviation of the Reference Portfolio (see Appendix B) does not exceed 15% and there is no material change in the composition or liquidity of the Reference Portfolio (unless such changes have been approved by Seller in writing), Buyer shall have the right but not the obligation to increase the Premium or request that Seller increase the Notional Amount and the Strike Price to bring the Strike Ratio to a percentage less than or equal to 70%.

**Notional Amount:**

The aggregate net asset value ("NAV") of the Reference Portfolio Interests.

**Strike Ratio:**

An amount equal to the quotient (expressed as a percentage) of (i) the Strike Price and (ii) the Notional Amount at the most recent Reference Portfolio Valuation.

**Maximum Strike Ratio:**

70%.

**Transaction Fee:**

0.05% of the aggregate value of each Transaction, which fee shall be added to the Strike Price on the date of such Transaction.

**Transaction:**

Any transfer of Eligible Interests by Buyer, other than a transfer to Seller.

Reference Portfolio
Interest Concentration
Adjustment:

For purposes of calculating the Strike Ratio only, (i) individual Eligible Interests that in value comprise at any time more than 15% of the Notional Amount shall be discounted so that no single Eligible Interest shall comprise more than 15% of the Notional Amount and (ii) any three Eligible Interests that in aggregate comprise more than 40% of the Notional Amount shall be discounted so that no three Eligible Interests shall comprise more than 40% of the Notional Amount.

Reference Portfolio
Valuation:

The value of the Reference Portfolio Interests as determined by the Calculation Agent.

Premium:

USD 8,821,397, which Buyer shall pay to Seller on the Effective Date.

Reference Interest
Liquidity Covenant:

The total value of Eligible Interests with redemption rights on a monthly basis (with no more than 45 days' prior written notice) in the Reference Portfolio must equal at all times at least 100% of the Strike Price.

Exchange:

Not Applicable.

**Procedure for Exercise:**

Expiration Time:

12:00 p.m. (local time New York).

Expiration Date:

The Scheduled Termination Date or the Early Termination Date, as the case may be.

Scheduled Termination
Date:

If Physical Settlement is applicable, the fifth anniversary of the Trade Date; otherwise, the date or dates following the fifth anniversary of

the Trade Date upon which Seller receives aggregate liquidated proceeds of the Reference Portfolio Interests in excess of the Strike Price (the "Excess Liquidated Proceeds"), subject to adjustment in accordance with the modified following business day convention. The Excess Liquidated Proceeds, if any, will be paid by Seller to Buyer when received by Seller.

Early Termination: Subject to the Minimum Strike Price, Buyer shall have the right, upon at least 7 days' prior written notice, to terminate the transaction in whole but not in part on the last business day of any calendar quarter beginning on July 30, 2000. In the event of an early termination, Buyer will receive from Seller an amount equal to the liquidated value of the relevant Reference Portfolio Interests less the sum of (a) the prorated Strike Price and (b) the Early Termination Fee.

Early Termination Fee: If the transaction is terminated prior to May 26, 2001, the Early Termination Fee will be an amount equal to 1.0% of the Reference Portfolio Interests. If the transaction is terminated after May 26, 2001, no Early Termination Fee shall apply.

Early Termination Date: The date of an Early Termination.

Automatic Exercise: Inapplicable.

## Settlement Terms

Cash Settlement: Seller shall pay to Buyer the Exercise Value (if any) on the Cash Settlement Payment Date.

Physical Settlement: If the Notional Amount exceeds the Strike Price on the Scheduled Termination Date, then Buyer has the right, but not the obligation, to notify Seller that Physical Settlement is

applicable, and Seller will deliver the Reference Portfolio Interests to Buyer in exchange for the Strike Price, which may be paid, at Buyer's option, in Eligible Interests reasonably acceptable to Seller.

If the Notional Amount does not exceed the Strike Price on the Scheduled Termination Date, Seller has the right but not the obligation, to notify Buyer that Physical Settlement is applicable, and Seller may or may not liquidate all or part of the Reference Portfolio Interests as of the Scheduled Termination Date.

Exercise Value:

If Physical Settlement is applicable, on the Scheduled Termination Date Seller shall transfer entitlement of the Reference Portfolio Interests to Buyer in exchange for payment by Buyer of the Strike Price, which may be paid, at Buyer's option, in Eligible Interests reasonably acceptable to Seller.

If Cash Settlement is applicable, on the Scheduled Termination Date Seller shall pay to Buyer an amount equal to the excess, if any, of the liquidated value of the Reference Portfolio Interests less the Strike Price.

Final Reference Portfolio Liquidation:

On the Scheduled Termination Date Seller shall liquidate the Reference Portfolio Interests unless Physical Settlement is applicable.

Cash Settlement Payment Date:

The earlier of the fifth Business Day following the Expiration Date and the date on which Seller receives the liquidated proceeds of the Reference Portfolio Interests.

3.  Allocation Control.

Seller shall have absolute control over allocation decisions with respect to the Reference Portfolio. All proposed changes to the Reference Portfolio must be consented to by Seller in writing, such consent not to be unreasonably withheld. Seller shall communicate in writing its approval or rejection of such changes to Buyer within 2 business days of Seller's receipt of notice of such proposed change.

4.  Administration.

Seller shall provide a final monthly valuation of the Transaction on or before the 21st calendar day of each successive month, subject to Seller's receipt from the relevant administrators of final valuations of the Reference Portfolio Interests. Buyer shall ensure that the relevant administrators provide to Seller on or before the 21st calendar day of each month final valuations of the Reference Portfolio Interests.

5.  Indemnification.

Buyer agrees to indemnify and hold harmless Seller and any affiliate, agent or employee of Seller from and against any and all losses, claims, actions, damages or liabilities (including without limitation all reasonable legal or other costs, charges and expenses paid or incurred in disputing, investigating or defending same), joint or several (collectively, "Losses"), which any of them may incur or which may be made against any of them insofar as such Losses arise under law or regulation, at common law or otherwise in connection with this Transaction, and Buyer agrees to reimburse such parties for all costs, charges and expenses (including counsel fees and disbursements) as incurred which any of such parties may pay or incur in connection with investigating, disputing or defending any such Losses; provided, however, that such indemnification shall not apply to the extent that such Losses result from the gross negligence or wilful misconduct of Seller or the indemnified party. This indemnity will be in addition to any liability which Seller may otherwise have.

In the event that the indemnity provided above is unavailable to or insufficient to hold harmless an indemnified party from and against all such Losses for any reason whatsoever, including, without limitation, the unenforceability under applicable law of all or any part of the indemnity, Buyer agrees to contribute equally with such party to the aggregate amount of such Losses (including without limitation all reasonable legal or other costs, charges and expenses paid or incurred in disputing, investigating or

defending same) to which such party may be subject. If the allocation provided by the immediately preceding sentence is unavailable for any reason, Buyer shall contribute in such proportion as is appropriate to reflect the relative benefits received by Buyer and Seller from this Transaction. Each affiliate, agent or employee of Seller shall have the same rights to contribution under this paragraph as Seller.

In the event that any legal action is taken against Seller or any affiliate, agent or employee of Seller relating to this Transaction (other than a legal action brought by Buyer), Buyer will have the right, but not the obligation, to appoint counsel of Buyer's choice who will be permitted by Seller or such affiliate, agent or employee of Seller, as the case may be, to jointly defend such action on such party's behalf (subject to any applicable rules relating to the conduct of such legal action).

The obligations set forth in this Section 5 will survive the termination of this Transaction or of the Agreement.

6. <u>Calculation Agent</u>.

Seller, whose determinations and calculations will be binding absent manifest error.

7. <u>Account Details</u>:

Account for Payments to ZCM:

Citibank Delaware
ABA 021 000089
A/C 40735685

Account for Payments to Asset Fund:

Account details to be provided prior to transfers.

8. <u>Relationship Between Parties</u>:

Each party will be deemed to represent to the other party on the date on which it enters into a transaction that (in absence of a written agreement between the parties which expressly imposes affirmative obligations to the contrary for that transaction):

(A) <u>Non-Reliance.</u>  Each party is acting for its own account, and has made its own independent decisions to enter into that transaction and that such transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary.  Each party is not relying on any communication (written or oral) of the other party as investment advice or as recommendation to enter into that transaction; it being understood that information and explanation relating to the terms and conditions of a transaction shall not be considered investment advice or a recommendation to enter into that transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that transaction.

(B) <u>Assessment And Understanding</u>.  Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice) and accepts the terms, conditions and risks of that transaction.  Each party is also capable of assuming and assumes the risks of that transaction.

(C) <u>Status Of The Parties</u>.  Neither party is acting as a fiduciary or an advisor to the other in respect of that transaction.

9.  <u>Governing Law.</u>

The laws of the State of New York, regardless of conflicts of laws principles.

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing this Confirmation and returning it to us.

Yours faithfully,
for and on behalf of,
ZCM Matched Funding Corp.

By:
Name: Jonathan Lewis
Title: Authorised Signatory

Accepted and confirmed as
of the date first above written:
for and on behalf of,
Asset Allocation Fund, L.P.

By:
Name: Martin James Allaman
Title: Authorised Signatory

## APPENDIX A

## INITIAL ALLOCATIONS

| Fund Name | Initial Allocation ($) | Initial Allocation (shares) |
|---|---|---|
| | | |
| Asian Warrants | 2,000,000 | |
| Friedlander | 2,150,000 | |
| Kingate B | 1,800,000 | |
| Mistral Levant | 3,976,824 | |
| MJ Diversified | 3,976,824 | |
| MJ Financial Arbitrage | 3,976,824 | |
| MJ Select | 3,976,824 | |
| Piedmont | 1,249,000 | |
| Trinity | 1,600,000 | |
| Flow Trading Partners, L.P. | 1,800,000 | |
| | | |
| | | |
| | | |
| Total Allocation | 26,506,296 | |
| | | |

## APPENDIX B

The annualized standard deviation of the last 12 monthly returns on the value of the Reference Portfolio shall be defined as follows:

Let the last 12 monthly returns on the value of the Reference Portfolio, expressed as a percentage, be $r_1$ through $r_{12}$, and let the arithmetic average of these 12 returns be $r_{avg}$.

$$r_{avg} = \frac{1}{12} \sum_{i=1}^{12} r_i$$

Then the standard deviation of returns ("stdev") is calculated as follows:

$$stdev = \sqrt{\frac{1}{11} \sum_{i=1}^{12} (r_i - r_{avg})^2}$$

The annualized standard deviation of the last 12 monthly returns on the value of the Reference Portfolio is $stdev*\sqrt{12}$, the latter factor being the annualization factor.

This calculation is consistent with the formula discussed in Hull, <u>Options, Futures, and Other Derivatives</u>, Third Edition, pg. 233.

EXECUTION COPY

ZCM Matched Funding Corp.
One Chase Manhattan Plaza, 44th Floor
New York, NY 10005

Asset Allocation Fund, L.P.
c/o Martin James Capital Management Inc.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174

**Re: Call Option Transaction**

Dear Sirs,

The purpose of this letter agreement (this "Confirmation") is to confirm the
terms and conditions of the transaction entered into between us on the Trade
Date specified below (the "Transaction"). This Confirmation constitutes a
"Confirmation" as referred to in the ISDA Master Agreement specified
below.

The definitions and provisions contained in the 1991 ISDA Definitions (as
supplemented by the 1998 Supplement and the 1998 Euro Definitions, the
"Swap Definitions") and the 1996 ISDA Equity Derivative Definitions (the
"Equity Definitions" and, together with the Swap Definitions, the
"Definitions"), in each case published by the International Swaps and
Derivatives Association, Inc. ("ISDA"), are incorporated into this
Confirmation. In the event of any inconsistency between the Definitions and
this Confirmation, this Confirmation will govern.

1.  This Confirmation evidences a complete and binding agreement between
    you and us as to the terms of the Transaction to which this confirmation
    relates. In addition, upon the execution by Asset Allocation Fund, L.P.
    ("Asset Fund") and ZCM Matched Funding Corp. ("ZCM") of a Master
    Agreement (Multicurrency - Cross Border) in the form published by
    ISDA (the "Agreement"), with such modifications to such form as you
    and we shall in good faith agree, this Confirmation will supplement, form
    part of and be subject to the Agreement.

    Each party hereby agrees to make each payment specified in this
    Confirmation as being payable by it, not later than the due date in place
    of the account specified below (or as specified in writing to the other

party at the address specified below), in freely transferable funds and in the manner customary for payments in the applicable currency.

2. The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Trade Date: | May 31, 2000. |
| Effective Date: | The date upon which Seller determines, in its reasonable discretion, that the assets constituting the Reference Portfolio have been fully transferred from Buyer to Seller. Seller shall notify Buyer in writing upon the occurrence of the Effective Date. |
| Option Style: | European. |
| Option Type: | Call. |
| Seller: | ZCM. |
| Buyer: | Asset Fund. |
| Reference Portfolio: | The portfolio specified in Appendix A, as the same may be amended from time to time in writing by Buyer and Seller. |
| Reference Portfolio Interests: | A number of Eligible Interests having an initial aggregate value, as of April 30, 2000, of at least USD 26,506,296. Reference Portfolio Interests must be Eligible Interests. |
| Eligible Interests: | Hedge fund interests, cash or marketable securities which satisfy all the following conditions: |

- effective redemption availability at least quarterly upon no more than 60 days' prior written notice;

- a rolling one-year annualised standard deviation (as defined in Appendix B) less than or equal to 30%; and
- an objective mark-to-market policy.

For the purpose of calculating the Strike Ratio, Seller may from time to time reasonably reject certain Eligible Interests from the calculation of the Notional Amount should the value or liquidity of any Eligible Interest become impaired in some material fashion.

Initial Reference
Portfolio Value:

USD 26,506,296, determined as of the Effective Date.

Strike Price:

On the Effective Date, an amount equal to USD 17,684,999.

The Strike Price shall accrete on a daily basis at a daily rate of Overnight USD LIBOR plus the Spread, calculated on an actual/360 day count basis, subject to (i) the provisions set forth under the Seller Strike Adjustment and the Buyer Strike Adjustment and (ii) the Maximum Strike Price.

Minimum Strike
Price:

USD 15,000,000.

Maximum Strike
Price:

USD 35,000,000.

Spread:

170 basis points per annum.

Seller
Strike Adjustment:

At any time, Seller shall have the right, but not the obligation, to adjust each of the Strike Price and the Notional Amount by an equal amount, such that the Strike Ratio is adjusted to a

percentage less than the Maximum Strike Ratio. Such adjustments to the Notional Amount and, hence, the NAV of the Reference Portfolio, shall be effected through subscriptions and redemptions of Reference Portfolio Interests.

Buyer Strike
Adjustment:

On a monthly basis with 2 days' prior written notice, provided the 1-year annualized standard deviation of the Reference Portfolio (see Appendix B) does not exceed 15% and there is no material change in the composition or liquidity of the Reference Portfolio (unless such changes have been approved by Seller in writing), Buyer shall have the right but not the obligation to increase the Premium or request that Seller increase the Notional Amount and the Strike Price to bring the Strike Ratio to a percentage less than or equal to 70%.

Notional Amount:

The aggregate net asset value ("NAV") of the Reference Portfolio Interests.

Strike Ratio:

An amount equal to the quotient (expressed as a percentage) of (i) the Strike Price and (ii) the Notional Amount at the most recent Reference Portfolio Valuation.

Maximum Strike
Ratio:

70%.

Transaction Fee:

0.05% of the aggregate value of each Transaction, which fee shall be added to the Strike Price on the date of such Transaction.

Transaction:

Any transfer of Eligible Interests by Buyer, other than a transfer to Seller.

| | |
|---|---|
| Reference Portfolio Interest Concentration Adjustment: | For purposes of calculating the Strike Ratio only, (i) individual Eligible Interests that in value comprise at any time more than 15% of the Notional Amount shall be discounted so that no single Eligible Interest shall comprise more than 15% of the Notional Amount and (ii) any three Eligible Interests that in aggregate comprise more than 40% of the Notional Amount shall be discounted so that no three Eligible Interests shall comprise more than 40% of the Notional Amount. |
| Reference Portfolio Valuation: | The value of the Reference Portfolio Interests as determined by the Calculation Agent. |
| Premium: | USD 8,821,397, which Buyer shall pay to Seller on the Effective Date. |
| Reference Interest Liquidity Covenant: | The total value of Eligible Interests with redemption rights on a monthly basis (with no more than 45 days' prior written notice) in the Reference Portfolio must equal at all times at least 100% of the Strike Price. |
| Exchange: | Not Applicable. |

**Procedure for Exercise:**

| | |
|---|---|
| Expiration Time: | 12:00 p.m. (local time New York). |
| Expiration Date: | The Scheduled Termination Date or the Early Termination Date, as the case may be. |
| Scheduled Termination Date: | If Physical Settlement is applicable, the fifth anniversary of the Trade Date; otherwise, the date or dates following the fifth anniversary of |

the Trade Date upon which Seller receives aggregate liquidated proceeds of the Reference Portfolio Interests in excess of the Strike Price (the "Excess Liquidated Proceeds"), subject to adjustment in accordance with the modified following business day convention. The Excess Liquidated Proceeds, if any, will be paid by Seller to Buyer when received by Seller.

**Early Termination:** Subject to the Minimum Strike Price, Buyer shall have the right, upon at least 7 days' prior written notice, to terminate the transaction in whole but not in part on the last business day of any calendar quarter beginning on July 30, 2000. In the event of an early termination, Buyer will receive from Seller an amount equal to the liquidated value of the relevant Reference Portfolio Interests less the sum of (a) the prorated Strike Price and (b) the Early Termination Fee.

**Early Termination Fee:** If the transaction is terminated prior to May 26, 2001, the Early Termination Fee will be an amount equal to 1.0% of the Reference Portfolio Interests. If the transaction is terminated after May 26, 2001, no Early Termination Fee shall apply.

**Early Termination Date:** The date of an Early Termination.

**Automatic Exercise:** Inapplicable.

## Settlement Terms

**Cash Settlement:** Seller shall pay to Buyer the Exercise Value (if any) on the Cash Settlement Payment Date.

**Physical Settlement:** If the Notional Amount exceeds the Strike Price on the Scheduled Termination Date, then Buyer has the right, but not the obligation, to notify Seller that Physical Settlement is

applicable, and Seller will deliver the Reference Portfolio Interests to Buyer in exchange for the Strike Price, which may be paid, at Buyer's option, in Eligible Interests reasonably acceptable to Seller.

If the Notional Amount does not exceed the Strike Price on the Scheduled Termination Date, Seller has the right but not the obligation, to notify Buyer that Physical Settlement is applicable, and Seller may or may not liquidate all or part of the Reference Portfolio Interests as of the Scheduled Termination Date.

Exercise Value:

If Physical Settlement is applicable, on the Scheduled Termination Date Seller shall transfer entitlement of the Reference Portfolio Interests to Buyer in exchange for payment by Buyer of the Strike Price, which may be paid, at Buyer's option, in Eligible Interests reasonably acceptable to Seller.

If Cash Settlement is applicable, on the Scheduled Termination Date Seller shall pay to Buyer an amount equal to the excess, if any, of the liquidated value of the Reference Portfolio Interests less the Strike Price.

Final Reference Portfolio Liquidation:

On the Scheduled Termination Date Seller shall liquidate the Reference Portfolio Interests unless Physical Settlement is applicable.

Cash Settlement Payment Date:

The earlier of the fifth Business Day following the Expiration Date and the date on which Seller receives the liquidated proceeds of the Reference Portfolio Interests.

3. <u>Allocation Control.</u>

Seller shall have absolute control over allocation decisions with respect to the Reference Portfolio. All proposed changes to the Reference Portfolio must be consented to by Seller in writing, such consent not to be unreasonably withheld. Seller shall communicate in writing its approval or rejection of such changes to Buyer within 2 business days of Seller's receipt of notice of such proposed change.

4. <u>Administration.</u>

Seller shall provide a final monthly valuation of the Transaction on or before the 21st calendar day of each successive month, subject to Seller's receipt from the relevant administrators of final valuations of the Reference Portfolio Interests. Buyer shall ensure that the relevant administrators provide to Seller on or before the 21st calendar day of each month final valuations of the Reference Portfolio Interests.

5. <u>Indemnification.</u>

Buyer agrees to indemnify and hold harmless Seller and any affiliate, agent or employee of Seller from and against any and all losses, claims, actions, damages or liabilities (including without limitation all reasonable legal or other costs, charges and expenses paid or incurred in disputing, investigating or defending same), joint or several (collectively, "Losses"), which any of them may incur or which may be made against any of them insofar as such Losses arise under law or regulation, at common law or otherwise in connection with this Transaction, and Buyer agrees to reimburse such parties for all costs, charges and expenses (including counsel fees and disbursements) as incurred which any of such parties may pay or incur in connection with investigating, disputing or defending any such Losses; <u>provided</u>, <u>however</u>, that such indemnification shall not apply to the extent that such Losses result from the gross negligence or wilful misconduct of Seller or the indemnified party. This indemnity will be in addition to any liability which Seller may otherwise have.

In the event that the indemnity provided above is unavailable to or insufficient to hold harmless an indemnified party from and against all such Losses for any reason whatsoever, including, without limitation, the unenforceability under applicable law of all or any part of the indemnity, Buyer agrees to contribute equally with such party to the aggregate amount of such Losses (including without limitation all reasonable legal or other costs, charges and expenses paid or incurred in disputing, investigating or

defending same) to which such party may be subject. If the allocation provided by the immediately preceding sentence is unavailable for any reason, Buyer shall contribute in such proportion as is appropriate to reflect the relative benefits received by Buyer and Seller from this Transaction. Each affiliate, agent or employee of Seller shall have the same rights to contribution under this paragraph as Seller.

In the event that any legal action is taken against Seller or any affiliate, agent or employee of Seller relating to this Transaction (other than a legal action brought by Buyer), Buyer will have the right, but not the obligation, to appoint counsel of Buyer's choice who will be permitted by Seller or such affiliate, agent or employee of Seller, as the case may be, to jointly defend such action on such party's behalf (subject to any applicable rules relating to the conduct of such legal action).

The obligations set forth in this Section 5 will survive the termination of this Transaction or of the Agreement.

6. <u>Calculation Agent</u>.

Seller, whose determinations and calculations will be binding absent manifest error.

7. <u>Account Details</u>:

Account for Payments to
ZCM:

    Citibank Delaware
    ABA 021 000089
    A/C 40735685

Account for Payments to
Asset Fund:

    Account details to be provided prior to transfers.

8. <u>Relationship Between Parties</u>:

Each party will be deemed to represent to the other party on the date on which it enters into a transaction that (in absence of a written agreement between the parties which expressly imposes affirmative obligations to the contrary for that transaction):

(A) <u>Non-Reliance.</u>  Each party is acting for its own account, and has made its own independent decisions to enter into that transaction and that such transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary.  Each party is not relying on any communication (written or oral) of the other party as investment advice or as recommendation to enter into that transaction; it being understood that information and explanation relating to the terms and conditions of a transaction shall not be considered investment advice or a recommendation to enter into that transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that transaction.

(B) <u>Assessment And Understanding.</u>  Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice) and accepts the terms, conditions and risks of that transaction.  Each party is also capable of assuming and assumes the risks of that transaction.

(C) <u>Status Of The Parties.</u>  Neither party is acting as a fiduciary or an advisor to the other in respect of that transaction.

9.  <u>Governing Law.</u>

The laws of the State of New York, regardless of conflicts of laws principles.

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing this Confirmation and returning it to us.

Yours faithfully,
for and on behalf of,
ZCM Matched Funding Corp.

By:
Name: Jonathan Lewis
Title: Authorised Signatory

Accepted and confirmed as
of the date first above written:
for and on behalf of,
Asset Allocation Fund, L.P.

By:
Name: Martin James Allam, Ar
Title: Authorised Signatory

APPENDIX A

INITIAL ALLOCATIONS

| Fund Name | Initial Allocation ($) | Initial Allocation (shares) |
|---|---|---|
| | | |
| Asian Warrants | 2,000,000 | |
| Friedlander | 2,150,000 | |
| Kingate B | 1,800,000 | |
| Mistral Levant | 3,976,824 | |
| MJ Diversified | 3,976,824 | |
| MJ Financial Arbitrage | 3,976,824 | |
| MJ Select | 3,976,824 | |
| Piedmont | 1,249,000 | |
| Trinity | 1,600,000 | |
| Flow Trading Partners, L.P. | 1,800,000 | |
| | | |
| | | |
| | | |
| Total Allocation | 26,506,296 | |
| | | |

## APPENDIX B

The annualized standard deviation of the last 12 monthly returns on the value of the Reference Portfolio shall be defined as follows:

Let the last 12 monthly returns on the value of the Reference Portfolio, expressed as a percentage, be $r_1$ through $r_{12}$, and let the arithmetic average of these 12 returns be $r_{avg}$.

$$r_{avg} = \frac{1}{12} \sum_{i=1}^{12} r_i$$

Then the standard deviation of returns ("stdev") is calculated as follows:

$$stdev = \sqrt{\frac{1}{11} \sum_{i=1}^{12} (r_i - r_{avg})^2}$$

The annualized standard deviation of the last 12 monthly returns on the value of the Reference Portfolio is $stdev * \sqrt{12}$, the latter factor being the annualization factor.

This calculation is consistent with the formula discussed in Hull, <u>Options, Futures, and Other Derivatives</u>, Third Edition, pg. 233.

(Multicurrency – Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

**dated as of May 31, 2000**

### ZCM MATCHED FUNDING CORP and ASSET ALLOCATION FUND, L.P.

have entered and/or anticipate entering into one or more transaction (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanges between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

**1.      Interpretation**

(a)      **Definitions.** The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      **Inconsistency.** In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.   In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      **Single Agreement.** All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      **General Conditions.**

(i)   each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.    Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:--

    (i)     in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i) *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:--

    (1)     promptly notify the other party ("Y") of such requirement;

    (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

    (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

    (4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:--

        (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

        (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) *Liability*. If:--

    (1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)    X does not so deduct or withhold; and

    (3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:--

(a)    *Basic Representations.*

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;.

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    Accuracy of Specified Information. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

### 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:--

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:--

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

    ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:--

(i) *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii) *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:--

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:--

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:

    (i) *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax Under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

           ISDA® 1992

**6.      Early Termination**

(a)      *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      *Right to Terminate Following Termination Event.*

(i) *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If:

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i) *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i) *Events of Default.* If the Early Termination Date results from an Event of Default:--

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events.* If the Early Termination Date results from a Termination Event:--

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:--

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

**7.** **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:--

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.** **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9. Miscellaneous**

(a)      *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)      *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)      *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)      *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.      Offices: Multibranch Parties**

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)      Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)      If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.      Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)     *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:--

(i)     if in writing and delivered in person or by courier, on the date it is delivered;

(ii)     if sent by telex, on the date the recipient's answerback is received;

(iii)     if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted, or

(iv)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.     Governing Law and Jurisdiction**

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:--

(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:--

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:--

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate, and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful" will* be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:--

(a)     the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)     such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

16                                                                                                      ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

**IN WITNESS WHEREOF** the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**ZCM MATCHED FUNDING CORP**

By: _Jonathan Lewis_
Name: Jonathan Lewis
Title: Authorized Signatory
Date: May 31, 2000

**ASSET ALLOCATION FUND, L.P.**

By: _Martin James Allamin_
Name: Martin James Allamin
Title: Authorized Signatory
Date: May 31, 2000

18

ISDA ® 1992

Copyright © 1992 by International Swap Dealers Association, Inc.

**SCHEDULE**

**to the**

**ISDA Master Agreement**

**dated as of May 31, 2000**

**between ZCM Matched Funding Corp. ("Party A")**

**and**

**Asset Allocation Fund, L.P. ("Party B")**

Part 1
Termination Provisions

(a)     **"*Specified Entity*"** means:

in relation to Party A for the purpose of:

| | | |
|---|---|---|
| Section 5(a)(v) (Default Under Specified Transactions) | : | Inapplicable |
| Section 5(a)(vi) (Cross Default) | : | Inapplicable |
| Section 5(a)(vii) (Bankruptcy) | : | Inapplicable |
| Section 5(b)(iv) (Credit Event Upon Merger) | : | Inapplicable |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Inapplicable |
| Section 5(a)(vi): | Inapplicable |
| Section 5(a)(vii): | Inapplicable |
| Section 5(b)(iv): | Inapplicable |

(b)     **"*Specified Transaction*"** has the meaning specified in Section 14 of this Agreement.

(c)     The **"*Cross Default*"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

    (i)     **"*Specified Indebtedness*"** has the meaning specified in Section 14 of this Agreement.

    (ii)     **"*Threshold Amount*"** means U.S. $10,000,000 or the equivalent in any other currency.

    (iii)     An Event of Default pursuant to Section 5(a)(vi) shall not be deemed to have occurred if it is caused by an event that would constitute an Illegality if it occurred in connection with this Agreement.

(d)     The **"*Credit Event Upon Merger*"** provisions of Section 5(b)(iv) will apply to Party A and Party B.

(i)    Notwithstanding Section 5(b)(iv) of this Agreement, "Credit Event Upon Merger" means (1)(a) with respect to Party A or Party B, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) or (b) (A) any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X, any Credit Support Provider of X, or any applicable Specified Entity of Party X or (B) X, any Credit Support Provider of X, or any applicable Specified Entity of X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of preferred stock or other securities convertible into or exchangeable for, debt or preferred stock and (2)(a) the creditworthiness of X or the resulting, surviving or transferee entity is materially weaker than that of X, any Credit Support Provider of X or any applicable Specified Entity of X, as the case may be, immediately prior to such action or (b) with respect to the other party ("Y"), Y's policies in effect at such time would not permit Y to enter into every Transaction then outstanding with X or the resulting, surviving or transferee entity of X, such Credit Support Provider or such Specified Entity, as the case may be (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party).

(e)    The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)    *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement:

    (i)    Market Quotation will apply; and

    (ii)    the Second Method will apply.

(g)    *"Termination Currency"* means a freely available currency selected by the party which is not the Defaulting Party or the Affected Party, as the case may be, or where there is more than one Affected Party, a currency agreed upon by both parties; *provided*, that the Termination Currency shall be one of the currencies in which payments are required to be made in respect of Transactions or the currency of the jurisdiction in which the Defaulting Party or Affected Party is subject to suit with respect to this Agreement or to insolvency proceedings; and *provided, further,* that where there are two Affected Parties and the parties are unable to agree on a Termination Currency, the Termination Currency shall be United States Dollars.

(h)  *Additional Termination Event* will apply. The following shall constitute an Additional Termination Event:

Such Additional Termination Events as set out in any Confirmation.

Part 2
Tax Representations

(a)  **Payer Representations.**  For the purpose of Section 3(e) of this Agreement, Party A and Party B make the following representation to the other:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, each party may rely on:

(i)  The accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement;

(ii)  The satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)  The satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement.

*provided* that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)  **Payee Representations.**  (i) For the purpose of Section 3(f) of this Agreement, Party A makes the representations specified below:

It is a corporation duly organized and incorporated in the State of Delaware.

(ii)  For the purpose of Section 3(f) of this Agreement, Party B makes the representations specified below:

It is a limited partnership duly organised and formed under the laws of the State of Illinois.

Part 3
Documents to be delivered

(a)    For the purpose of Section 4(a)(i), the documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Form W9. (or such successor form) | Upon execution of the relevant document | No. |

(b)    For the purposes of Section 4(a)(ii), the other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of all documents evidencing necessary corporate and other authorizations and approvals with respect to the execution, delivery and performance by the party of this Agreement, each confirmation and any applicable Credit Support Document | Upon execution of the relevant document | Yes |
| Party A and Party B | A certificate of an authorized officer of the party certifying the names, true signatures and authority of the officers of the party signing this Agreement, each Confirmation and any applicable Credit Support Document | Upon execution of the relevant document. | Yes |
| Party B | A written opinion of legal counsel to the party reasonably satisfactory in form and substance to the other party. | Upon execution of this Agreement | No |
| Party A | A certified copy of the Credit Support Document specified with respect to such party in Part 4 of this Schedule | Upon execution of this Agreement | Yes |
| Party A and Party B | Such other documentation as the other party shall reasonably request | Upon request | Yes |

Part 4
Miscellaneous

(a) *Addresses for Notices.* For the purpose of Section 12 (a) of this Agreement:

Notices to Party A: ZCM Matched Funding Corp.
One Chase Manhattan Plaza, 44th Floor
New York, NY 10005
Tel: (212) 208-3600
Fax: (212) 208-3601
Attention: Counsel

Notices to Party B: Asset Allocation Fund, L.P.
c/o Martin James Capital Management Inc.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174
Tel: 630/587-4900
Fax: 630/587-4909
Attention: Martin J. Allamian

(b) *Process Agent.*

(c) *Offices.* The provisions of Section 10(a) will apply to this Agreement.

(d) *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e) *Calculation Agent.* The Calculation Agent shall be Party A unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f) *Credit Support Document.* "Credit Support Document" means (i) in relation to Party A, the Surety Bond made by the Zurich Insurance Company, dated as of August 6, 1997 and (ii) in relation to Party B, None.

(g) *Credit Support Provider.* Credit Support Provider means (i) in relation to Party A, the Zurich Insurance Company and (ii) in relation to Party B, None.

(h) *Governing Law.* This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to the choice of law principles thereof).

(i) *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(j) *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

## Part 5
## Other Provisions

(a)  **_Change of Account._**  Section 2(b) of this Agreement is hereby amended by inserting after the word "delivery" in the first line thereof the words "to another account in the same legal and tax jurisdiction as the original account".

(b)  **_Absence of Litigation._**  Section 3(c) is hereby amended by adding in the second line thereof after the word "governmental" the words "or regulatory".

(c)  **_Accuracy of Specified Information._**  Section 3(d) of this Agreement is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(d)  **_Representations._**  Section 3 of this Agreement is hereby further amended by adding the following Sections 3(g) (h) and (i) at the end thereof:

   (g)  **_Capacity._**  Each party specified below represents to the other party (which representations will be deemed to be represented by such party on each date on which a Transaction is entered into) that (i) it is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise) and (ii) the person(s) executing this Agreement on its behalf have been authorized to do so.

   (h)  **_No Reliance._**  Each party is acting for its own account and has made its own independent decisions to enter into that transaction and that such transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary.  Each party is not relying on any communication (written or oral) of the other party as investment advice or as recommendation to enter into that transaction; it being understood that information and explanation relating to the terms and conditions of a transaction shall not be considered investment advice or a recommendation to enter into that transaction.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that transaction.

   (i)  **_Swap Exemption and Swap Policy Statement._**  Each party represents to the other party on and as of the date hereof and on each date on which a Transaction is entered into between them that, in connection with the negotiation of, the entering into, and the confirming of the execution of this Agreement, any Credit Support Document to which it is a party, each Transaction, and any other documentation relating to this Agreement to which it is a party or that it is required by this Agreement to deliver that:

      (i)  This Agreement and each Transaction is intended to constitute a "swap agreement" within the meaning of Commodity Futures Trading Commission ("CFTC") Regulation Section 35.1(b)(1), Section 101(53)(B) of the U.S. Bankruptcy Code and the CFTC Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694 (July 21, 1989);

(ii)    It is an "eligible swap participant" within the meaning of CFTC Regulation Section 35.1(b)(2);

(iii)   Neither this Agreement nor any Transaction is one of a fungible class of agreements that are standardized as to their material economic terms, within the meaning of CFTC Regulation Section 35.2(b);

(iv)   The creditworthiness of the other party was or will be a material consideration in entering into or determining the terms of this Agreement and each Transaction, including pricing, cost or credit enhancement terms of the Agreement or Transaction, within the meaning of CFTC Regulation Section 35.2(c); and

(v)    It is entering into that Transaction for the purpose of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with a line of business.

(e)    *Additional Agreements.* Section 4 is hereby amended by adding the following section (f) at the end thereof:

(f)    *Notice of Certain Events.* Each party agrees, upon learning of the occurrence of any event or the commencement of any condition that constitutes (or that, with the giving of notice or passage of time or both, would constitute) an Event of Default or Termination Event with respect to that party, promptly to give the other party of such event or condition or to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event.

(f)    Section 6 of this Agreement is hereby amended by adding the following Section 6(f) at the end thereof:

(f)    *Set-Off.* In circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, any amount payable by the other party ("X") or any Affiliate of X under this Agreement, any Specified Transaction or otherwise to the Defaulting Party or Affected Party ("Y") will, at the option of X or any Affiliate of X (and without prior notice to Y), be reduced by X's or any Affiliate of X's set-off and recoupment against any amount(s) payable (whether at such time or in the future or upon the occurrence of a contingency) by Y to X or any Affiliate of X (irrespective of the currency, place of payment or booking office or branch office of any obligation to or from Y) under, pursuant to, or in connection with, this Agreement, another agreement, instrument, undertaking, transaction, any Specified Transaction or otherwise (and any such amount(s) payable to Y will be discharged promptly and in all respects to the extent it is so set-off). X or any Affiliate of X will give notice to Y of any set-off and recoupment effected under this Section 6(f). Each party acknowledges that (i) it will receive significant value from entering into this Agreement and each Transaction entered into hereunder and (ii) the other party would not enter into this Agreement or any Transaction unless such first party agreed to, among the other matters set forth in this Agreement, the provisions set forth in this Section 6(f).

For purposes of the foregoing, X or any Affiliate of X shall be entitled to convert any obligation denominated in one currency into another at such rates of exchange as it deems appropriate in good faith and in a commercially reasonable manner, and to convert any obligation to deliver non-cash property into an obligation to deliver cash in an amount determined by it as it deems appropriate in good faith and in a commercially reasonable manner.

If an obligation is unascertained, X or any Affiliate of X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(g) **Confirmations.** Notwithstanding anything to the contrary in the Agreement:

(i) The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone.

(ii) For each Transaction Party A and Party B agrees to enter into hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall examine and return the Confirmation to Party A or request correction of any error within five Local Business Days of receipt. Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation of such terms.

(iii) Notwithstanding anything contained in this Agreement to the contrary, if the parties enter into any Specified Transaction with each other, such Specified Transaction shall be subject to, governed by and construed in accordance with the terms of this Agreement unless the Confirmation relating thereto shall specifically state to the contrary. Each such Specified Transaction shall be a Transaction for purposes of this Agreement.

(h) **Consent to Recording.** Each party:

(i) consents to the recording of the telephone conversations of trading, marketing and operations personnel of the parties and their Affiliates in connection with this Agreement, any potential Transaction or any Transaction; and

(ii) agrees to obtain any necessary consent of, and give notice of such recording to, such personnel; and

(iii) agrees that such recording may be entered into evidence in any proceedings relating to this Agreement, any Credit Support Document or any Transaction.

(i) **_Waiver of Right to Trial by Jury._** Each of the parties hereby irrevocably waives any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Agreement or any Transaction.

(j) **_Escrow._** If either party in its reasonable judgment determines at any time that there has been a material adverse change that is likely to affect the other party's ability to perform its ensuing payment obligation in connection with a Transaction or Transactions involving payments due from each of the parties on the same day, the party that has formed that judgment may notify the other that the payments due on that day in connection with that Transaction or those Transactions are to be made in escrow, to a major commercial bank selected by that party in good faith and that has offices in the cities in which both payments are to be made. If such an election is made, each party shall make the payment due from it on that day by deposit into escrow to that escrow agent, for value on that day, with irrevocable instructions (i) to release the payment to the intended payee upon receipt by the escrow agent of the required counterpayment due from that payee on the same day in connection with that Transaction accompanied by irrevocable instructions to the same effect, or (ii) if the required deposit in escrow of the counter payment due is not so made on the same day for value on that day, to return the payment deposited in escrow to the party that made the escrow deposit. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and cause those arrangements to provide that the escrow agent will pay interest on each amount deposited in escrow with it in either of the relevant cities, for each day such amount remains in escrow past 5:00 p.m. local time in the city, at the same rate per annum, and calculated in the same way, as it would pay on overnight deposits placed with it in the relevant currency and city for value on such day. The escrow arrangements shall also provide that such interest on any amount in escrow shall be payable to the intended payee of that amount, provided that it has deposited the counterpayment due from it into escrow as contemplated herein, and that, if it has not done so, such interest shall be payable to the other party.

(l) **_Assignment._** Notwithstanding the provisions of Section 7, Party A may assign and delegate its rights and obligations under all Transactions to Zurich Insurance Company or any subsidiary of Zurich Insurance Company so long as the assignee (other than Zurich Insurance Company) benefits from a Surety Bond substantially identical to the Surety Bond that is the Credit Support Document in respect of Party A hereunder.

(m) **_Inconsistency._** In the event of any inconsistency between any of the following documents, the relevant document first listed shall govern: (i) a Confirmation, (ii) this Schedule, (iii) the definitions incorporated by reference in a Confirmation or in this Agreement, and (iv) the printed form of ISDA Master Agreement.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

ZCM MATCHED FUNDING CORP.

By: _____

Print Name: _L. Jonathan Levi_

Title: _Authorized Signatory_

Date: _May 31, 2000_

ASSET ALLOCATION FUND, L.P.

By: _Martinus Allanis_

Print Name: _Maelin James Allanis_

Title: _Authorized Signatory_

Date: _5/31/0·_

# EXHIBIT  B

Memorandum Number:_____

Furnished To:_____

# M.J. Diversified, L.P.

### (An Illinois Limited Partnership)

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES
TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE
PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PARTICIPANTS,
AN OFFERING MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO
BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION. THE
COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS
UPON THE MERITS OF PARTICIPATING IN A POOL OR UPON THE
ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM.
CONSEQUENTLY, THE COMMODITY FUTURES TRADING
COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING
OR ANY OFFERING MEMORANDUM FOR THIS POOL.

The Date of this Disclosure Document is February 29, 2000

Confidential Offering Memorandum Dated February 29, 2000

## M.J. Diversified, L.P.
### (An Illinois Limited Partnership)

#### Minimum Purchase $1,000,000

M.J. Diversified, L.P.. (the "Fund") is a limited liability, open ended investment company/commodity pool organized under the laws of the state of Illinois in October 1997. The Fund engages, directly or indirectly, in the speculative trading of (a) futures and options contracts and other commodity interests (including forward contracts on foreign currency and foreign options) and (b) securities, including stocks, bonds and interests in other commodity pools. The investment decisions of the Fund have been delegated to Martin James Capital Management, Inc., an Illinois corporation, who is the Fund's General Partner and Commodity Pool Operator. The Commodity Pool Operator is authorized to select one or more trading advisors to make commodity interest trading decisions, directly, through individually managed accounts, or indirectly, through commodity pools managed by these advisors, on behalf of the Fund. More specifically, the Commodity Pool Operator has primary responsibility for investing in securities, monitoring the performance of any individual commodity or security trading advisor, allocating the Fund's assets among such advisors and selecting additional or replacement advisors. (See "The Pool Operator", "Risk Factors-Conflicts of Interest" and ,with regard to the proposed allocation among advisors and/or specific pools, "The Advisors") The Fund has not selected a primary clearing broker. The Fund intends to use more than one Futures Commission Merchant (FCM).

THESE ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THESE SECURITIES ARE SUITABLE FOR INVESTMENT ONLY BY A PERSON WHO CAN AFFORD TO LOSE HIS ENTIRE INVESTMENT. (SEE INTRODUCTORY STATEMENT -"WHO SHOULD INVEST" AND "RISK FACTORS" ) THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OR AGENCY OF ANY STATE, NOR HAVE SUCH COMMISSIONS OR AGENCIES PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

| | OFFERING PRICE | SELLING COMMISSION | PROCEEDS TO FUND |
|---|---|---|---|
| Per Unit .................... | $1,000 | $0 | $1,000 |
| Total Maximum.............. | $100,000,000 | $0 | $100,000,000 |

Limited Partnership Interests ("Units") will be offered and sold initially by directors and officers of the Fund on a best-efforts, self-underwritten basis, and offered on a continuous basis.

In order to purchase Units, checks should be made payable to the Fund and forwarded with the Subscription Agreement /Limited Power of Attorney (Exhibit B) to the Fund in care of the Commodity Pool Operator.

1

CFTC RISK DISCLOSURE STATEMENT FOREIGN FUTURES AND FOREIGN OPTIONS.

THE RISK OF LOSS IN TRADING FOREIGN FUTURES AND FOREIGN OPTIONS CAN BE SUBSTANTIAL. THEREFORE, YOU SHOULD CAREFULLY CONSIDER WHETHER SUCH TRADING IS SUITABLE FOR YOU IN LIGHT OF YOUR FINANCIAL CONDITION. IN CONSIDERING WHETHER TO TRADE FOREIGN FUTURES OR FOREIGN OPTIONS, YOU SHOULD BE AWARE OF THE FOLLOWING:

(1) PARTICIPATION IN FOREIGN FUTURES AND FOREIGN OPTIONS TRANSACTIONS INVOLVES THE EXECUTION AND CLEARING OF TRADES ON OR SUBJECT TO THE RULES OF A FOREIGN BOARD OF TRADE.

(2) NEITHER THE COMMODITY FUTURES TRADING COMMISSION, THE NATIONAL FUTURES ASSOCIATION NOR ANY DOMESTIC EXCHANGE REGULATES ACTIVITIES OF ANY FOREIGN BOARDS OF TRADE, INCLUDING THE EXECUTION, DELIVERY AND CLEARING OF TRANSACTIONS, OR HAS THE POWER TO COMPEL ENFORCEMENT OF THE RULES OF A FOREIGN BOARD OF TRADE OR ANY APPLICABLE FOREIGN LAWS. THIS IS TRUE EVEN IF THE EXCHANGE IS FORMALLY LINKED TO A DOMESTIC MARKET SO THAT A POSITION TAKEN ON THE MARKET MAY BE LIQUIDATED BY A TRANSACTION ON ANOTHER MARKET. MOREOVER, SUCH LAWS OR REGULATIONS WILL VARY DEPENDING ON THE FOREIGN COUNTRY IN WHICH THE FOREIGN FUTURES OR FOREIGN OPTIONS TRANSACTION OCCURS.

(3) FOR THESE REASONS, CUSTOMERS WHO TRADE FOREIGN FUTURES OR FOREIGN OPTIONS CONTRACTS MAY NOT BE AFFORDED CERTAIN OF THE PROTECTIVE MEASURES PROVIDED BY THE COMMODITY EXCHANGE ACT, THE COMMISSION'S REGULATIONS AND THE RULES OF THE NATIONAL FUTURES ASSOCIATION AND ANY DOMESTIC EXCHANGE, INCLUDING THE RIGHT TO USE REPARATIONS PROCEEDINGS BEFORE THE COMMISSION AND ARBITRATION PROCEEDINGS PROVIDED BY THE NATIONAL FUTURES ASSOCIATION OR ANY DOMESTIC FUTURES EXCHANGE. IN PARTICULAR, FUNDS RECEIVED FROM CUSTOMERS FOR FOREIGN FUTURES OR FOREIGN OPTIONS TRANSACTIONS MAY NOT BE PROVIDED THE SAME PROTECTIONS AS FUNDS RECEIVED IN RESPECT OF

2

TRANSACTIONS ON UNITED STATES FUTURES EXCHANGES. THEREFORE, YOU SHOULD OBTAIN AS MUCH INFORMATION AS POSSIBLE FROM YOUR ACCOUNT EXECUTIVE CONCERNING THE FOREIGN RULES WHICH WILL APPLY TO YOUR PARTICULAR TRANSACTION.

(4) YOU SHOULD ALSO BE AWARE THAT THE PRICE OF ANY FOREIGN FUTURES OR FOREIGN OPTIONS CONTRACT AND, THEREFORE, THE POTENTIAL PROFIT AND LOSS THEREON, MAY BE AFFECTED BY ANY VARIANCE IN THE FOREIGN EXCHANGE RATE BETWEEN THE TIME YOUR ORDER IS PLACED AND THE TIME IT IS LIQUIDATED, OFFSET OR EXERCISED.

GENERAL REGULATORY NOTICES

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES ACT OF ANY STATE, AND HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES OR BLUE SKY ADMINISTRATOR OR ANY OTHER REGULATORY AUTHORITY. NO SUCH AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE DOCUMENT. NOR IS IT INTENDED THAT ANY SUCH AUTHORITY WILL DO SO. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS DISCLOSURE DOCUMENT CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE PROVIDED ON THE COVER PAGE OF THIS DISCLOSURE DOCUMENT AND ONLY IF THE DISCLOSURE DOCUMENT IS PROPERLY AUTHORIZED BY THE PARTNERSHIP.. THIS DISCLOSURE DOCUMENT HAS BEEN PREPARED BY THE PARTNERSHIP SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THE PROPOSED SALE OF LIMITED PARTNERSHIP INTERESTS OF THE PARTNERSHIP, AND ANY REPRODUCTION OF THE DISCLOSURE DOCUMENT, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS. WITHOUT THE PRIOR WRITTEN CONSENT OF THE PARTNERSHIP, IS PROHIBITED.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WHATSOEVER SHALL BE EMPLOYED IN THE OFFERING OF THE LIMITED PARTNERSHIP INTERESTS EXCEPT FOR THIS DISCLOSURE DOCUMENT. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT TO THE LIMITED PARTNERSHIP INTERESTS EXCEPT SUCH INFORMATION AS IS CONTAINED IN THIS DISCLOSURE DOCUMENT.

THESE SECURITIES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THESE SECURITIES ARE SUITABLE FOR INVESTMENT ONLY BY A PERSON WHO CAN AFFORD TO LOSE THE ENTIRE AMOUNT OF SUCH INVESTMENT. SEE "INVESTMENT REQUIREMENTS" AND "RISK FACTORS." THE PARTNERSHIP IS SUBJECT TO SUBSTANTIAL FEES AND EXPENSES. SEE "DESCRIPTION OF CHARGES TO THE PARTNERSHIP."

4

EACH INVESTOR IN THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY MUST ACQUIRE SUCH INTERESTS SOLELY FOR SUCH INVESTOR'S OWN ACCOUNT, FOR INVESTMENT AND NOT WITH THE INTENTION OF DISTRIBUTION, TRANSFER OR RESALE, EITHER IN WHOLE OR IN PART.

THIS DISCLOSURE DOCUMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE CONTENTS OF THIS DISCLOSURE DOCUMENT SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR IS URGED TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THE PARTNERSHIP.

STATE SECURITIES LAW LEGENDS

**For Residents of All States:**

THIS IS A PRIVATE OFFERING PURSUANT TO EXEMPTIONS
PROVIDED BY SECTION 4(2) OF THE SECURITIES AND EXCHANGE ACT
OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAW. IN
MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON
THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING
THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING
THE MERITS AND RISKS INVOLVED. NEITHER THE SECURITIES AND
EXCHANGE COMMISSION NOR ANY STATE SECURITIES AGENCY HAS
PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY
RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR
DISAPPROVED THIS OFFERING, OR PASSED UPON THE ADEQUACY
OR ACCURACY OF THIS DISCLOSURE DOCUMENT, ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON
TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED
OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF
1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS,
PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.
INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO
BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN
INDEFINITE PERIOD OF TIME.

**For Florida Residents Only:**

THESE SECURITIES WILL BE SOLD TO AND ACQUIRED BY THE
HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE
FLORIDA SECURITIES ACT. THESE SECURITIES HAVE NOT BEEN
REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN
ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF
VOIDING THE PURCHASE WITHIN 3 DAYS OF MAKING SUCH
PURCHASE. TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA
OFFEREE TO SEND A LETTER OR TELEGRAM TO THE GENERAL
PARTNER WITHIN SUCH 3 DAY PERIOD, STATING THAT THE OFFEREE
IS VOIDING AND RESCINDING THE PURCHASE. IF AN OFFEREE SENDS
A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN
RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND TO
EVIDENCE THE TIME OF MAILING.

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY INFORMATION | 9 |
| THE FUND | 11 |
| THE OFFERING | 14 |
| THE POOL OPERATOR | 15 |
| THE TRADING ADVISORS | 16 |
| THE COMMODITY BROKER | 16 |
| COMPENSATION AND EXPENSES | 17 |
| RISK FACTORS | 22 |
| TAX CONSIDERATIONS | 26 |
| GLOSSARY | 33 |
| PARTNERSHIP AGREEMENT | EX-A |
| SUBSCRIPTION AGREEMENT | EX-B |
| OFFEREE QUESTIONNAIRE | EX-C |
| REQUEST FOR REDEMPTION | EX-D |

8

# SUMMARY

This summary is intended as a highlight of more detailed information contained elsewhere in the body of this Memorandum. This Summary is qualified in its entirety by the information appearing elsewhere in this Memorandum and the Partnership Agreement. The Fund is offered pursuant Regulation D of the securities Act of 1933 and will cease operation December 31, 2025 or the first to occur of: an election to dissolve the Fund by the General Partner, the General Partner's dissolution, or any other event that constitutes a dissolution of a limited partnership under the Act.

| | |
|---|---|
| **The Fund** | M.J. Diversified, L.P. (the "Fund") is a limited partnership organized under the laws of the State of Illinois and will be engaged in the speculative trading of commodity futures contracts, stocks, securities and other investment vehicles. Investment in the Fund is being offered pursuant to Regulation D of the Securities Act of 1933. The principal office of The Fund is located at 1 W. Illinois St., #285, St. Charles, IL 60174. The telephone number is (630) 587-4900. The Fund was organized under the laws of the state of Illinois in October of 1997. |
| **Commodity Pool Operator** | The Commodity Pool Operator and General Partner is Martin James Capital Management, Inc., which has its principal office at 1 W. Illinois St., #285, St. Charles, IL 60174. The telephone number is (630) 587-4900. |
| **Investment Objective** | To engage in the speculative trading of futures and options on futures including but not limited to, interest rate, currency, energy, grains, livestock, metal and stock index futures and options. Also to invest with funds or pools that trade in U.S. (and non-U.S.) markets including but not limited to stocks, bonds, and other investment vehicles. |
| **Units Offered** | Limited Partnership Interests ("Units") are offered to the public at an initial price of $1,000 per Unit. Thereafter, Units will be available for purchase at the month end net asset value per Unit. The minimum required investment is $1,000,000 per shareholder. This minimum may vary at the discretion of the Commodity Pool Operator. The initial offering period is from February 29, 2000 through June 30, 2000. |
| **Trading Advisors** | The Fund will be traded by Advisors or invested in products selected by the General Partner, Martin James Capital Management, Inc. The General Partner intends to hire several different advisors to trade the Fund, but none of these Advisors have been selected at this time. |
| **Fund's Brokerage** | The Fund may pay a Clearing Broker on trades executed, brokerage commissions of $9 plus NFA fees and all applicable give-up charges and fees per round-turn for futures and futures option trades. |
| **Redemption of Units** | The Units are redeemable by Shareholders at the Net Asset value per Unit as of the end of any calendar month with 30 days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States dollars and transferred by wire upon the applicant's request at his expense. Redemption's will be paid by the 30th day of the month following the redemption date. |
| **Compensation** | The CPO will receive a management fee of 1% annually (1/12[th] of 1% monthly. |
| **Expenses** | The Fund will pay for on-going operating expenses which include accounting, legal expenses and the annual audit. |

| | |
|---|---|
| **Monthly Accounting** | Each Limited Partner will receive a monthly financial statement showing their month end Net Asset Value in the Fund. Additionally, each Limited Partner will receive a year end set of financial statements. |
| **Tax Treatment** | See the "Tax Considerations" section for a more complete discussion. |
| **Fiscal Year** | End December 31. |
| **Risks and Conflicts of Interest** | An investment in Units is speculative and involves a high degree of risk, reflecting the highly leveraged and frequently volatile markets in which the Fund will trade. In addition to trading risks, the Fund will be subject to substantial fees and expenses which must be offset by its revenues to prevent depletion of its trading assets. Also, because the CPO may share in the commissions, a potential conflict of interest exists. |
| **How to Subscribe** | Investors who want to purchase Units must execute a Partnership Agreement, Subscription Agreement and Offeree Questionnaire (Exhibits B and C) and deliver them with full payment. |
| **Functional Currency** | The fund will report its results and transact subscriptions and redemption's in United States Dollars. |

10

# THE FUND

M.J. Diversified, L.P., (the "Fund") is a limited partnership organized under the laws of the state of Illinois. The principal office of The Fund is located at 1 W Illinois St., St. Charles, IL 60174. The telephone number is (630) 587-4900. The Fund was formed under the laws of the state of Illinois in October of 1997.

## Introductory Statement

### Who Should Invest

**PURCHASE OF THE UNITS OFFERED HEREBY SHOULD BE MADE ONLY BY THOSE PERSONS WHO CAN AFFORD TO BEAR THE RISK OF A TOTAL LOSS OF THEIR INVESTMENT. THE FUND RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.**

Each subscriber will be required to make certain representations as to his net worth and income (See the Subscription Agreement and Offeree Questionnaire attached as Exhibits B and C). The Units are subject to restrictive redemption provisions. (See "Redemption's".) **The Fund believes that prospective investors should consider the Units as a long-term investment in order to permit the Traders' trading techniques to function over a significant time period.** There is no public market for these Units and none is likely to develop. In addition, offerees should not enter this program with the expectation of sheltering income. (See "Summary of Income Tax Consequences".)

### Certain Investment Advantages to be Considered

Limited Partners in the Fund will be able to obtain certain potential advantages which may otherwise be unavailable to them if they were to engage individually in commodity transactions. Among these are the following:

1.  **Limited Liability.** Subject to certain limitations, a limited partner cannot lose more than the amount of his investment and will not be personally subject to margin calls. (See "Description of Futures Trading - Margins.")

2.  **Administrative Convenience.** The Fund provides the partners with many services designed to reduce the administrative details involved in engaging in commodity interest trading. The Commodity Pool Operator, and the Clearing Broker perform services for the Fund, including entering orders for commodity transactions, segregating the Fund's assets in separate account(s), keeping books and records, distributing account statements to the shareholders, handling redemption's and transfers, facilitating distributions, and monitoring the Fund's activity.

3.  **Reduced Brokerage Commissions.** As described in "Fees, Compensation and Expenses," the Fund may pay a Clearing Broker $9 plus applicable fees for round-turn futures or options trades. To the extent an investor would be charged higher commissions were he to trade directly, he will benefit by the Fund's lower rate. No assurance can be given that the brokerage rates paid by the Fund are the lowest rates charged by the Clearing Broker or by other brokers.

4.  **Interest Income.** The Fund will seek to maximize interest income from all sources. All interest will be paid to the Fund. The Fund seeks to earn interest on 75% to 90% of its assets maintained

11

with the Clearing Broker or the funds or pools that it is invested in. In addition, Fund assets will be invested in U.S. Treasury Bills and other high quality interest-earning obligations, all as described in greater detail in "Application of Proceeds".

5.  **Performance Records of the Traders.** In choosing any investment for the Fund, the Commodity Pool Operator's choice will in part based on the investments' past performance records as well as several other proprietary qualitative and quantitative factors. These past performance records, however, may not necessarily be indicative of the future performance of the traders or the Fund.

6.  **Professional Trading Management.** The Commodity Pool Operator is responsible for selecting the traders solely at its discretion. Each trader will manage its investments in accordance with the investment objectives of the Fund and their individual trading strategies. In addition, the Pool Operator will, on behalf of the Fund, (i) monitor the trading activities of the traders in the managed accounts and allocate the Fund's assets among such traders. The Commodity Pool Operator may, in the future, select Commodity Trading Advisors or allocate the assets of the fund to other commodity funds.

7.  **No Redemption Fees.** There are no fees or deductions (other than wire transfer fees or other transaction costs) that will be charged to any investor on payments made for the redemption of his Units.

8.  **Diversification.** The Fund will use investments with different methods of trading, including trend following, counter trend trading, option trading and a variety of other strategies in various different markets. If further diversification is required additional traders may be hired and/or assets may be allocated to other funds. The Fund believes that such diversification is the best method for seeking substantial appreciation of the Fund's assets while at the same time spreading the Fund's risk exposure.

9.  **Diversification of Asset Class.** An investment in the Units may offer characteristics that would add to the diversification of typical portfolio allocations. For example, the factors affecting the investment performance of commodity interest trading for speculative investment purposes may often (but not necessarily) operate independently of those factors (such as interest rate movements, inflation and changing business cycles) which may affect the overall performance of a typical debt and/or equity portfolio.

12

10. **Purchases by Retirement Plans - ERISA Considerations.** The purchase of Units in the Fund might be a suitable investment for retirement plans, including corporate pension and profit sharing plans; self-employed plans; and Individual Retirement Accounts ("IRAs"). Those who have investment discretion on behalf of such plans are fiduciaries to these plans and should consult with their own legal and financial advisors regarding the considerations involved in such an investment including the following: (1) whether the purchase of Shares is permitted under the governing instruments of the plan; (2) whether the purchase of Shares is appropriate for the plan in view of its investment policy; (3) the applicability of certain state laws; (4) applicable restrictions and tax consequences under the Internal Revenue Code (see "Summary of Income Tax Consequences"); and (5) the requirements of ERISA.

Corporate retirement plans and, to a lesser degree, self-employed plans (including IRAs that are part of a program sponsored by an employer or employee organization) are governed by the provisions of ERISA. Such plans must be concerned that an investment in the Fund is not within the definition of "plan assets" under ERISA. In general, if the Fund's assets were treated as "plan assets," the Fund would be an inappropriate investment for retirement plans.

March 1987 Department of Labor regulations provide that the term "plan assets" does not include equity interests acquired by the retirement plan if less than 25% of the value of any class of equity interests in the entity is held by "benefit plan investors" -- employee benefit plans subject to ERISA, IRAs and other employee benefits plans not subject to ERISA (for example, governmental plans). For purposes of this regulation, "equity interests" include investments in Shares of the Fund. Any equity interests held by a person who has discretionary authority or control over assets of the entity is included in the 25%; however, investments by a person who provides investment advice for a fee with respect to the assets (or an affiliate of such a person) is not included in the 25%.

In view of the Department of Labor regulations, the Fund does not intend to accept subscriptions from benefit plan investors, if acceptance would violate the foregoing Department of Labor regulations. The Fund may require any retirement plan to withdraw in whole or in part from the Fund through redemption of its Shares if, in the Fund's sole good faith judgment, it is necessary to avoid the applicable provisions of such statute and regulations. Therefore, the Fund should be in compliance with the regulation and the underlying assets of the Fund should not be considered to be "plan assets".

The fiduciary provisions of ERISA are highly complex. Each employee benefit plan should consult with its own counsel as to the applicability of ERISA prior to investing in the Fund. Acceptance of subscriptions from employee benefit plans is not a representation that this investment meets the relevant legal requirements.

13

# THE OFFERING

PURCHASE OF THE UNITS OFFERED HEREBY SHOULD BE MADE ONLY BY THOSE PERSONS WHO CAN AFFORD TO BEAR THE RISK OF A TOTAL LOSS OF THEIR INVESTMENT. THE FUND RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

## MINIMUM SUBSCRIPTION

The minimum purchase is $1,000,000. At the discretion of the Pool Operator, lesser amounts may be accepted.

## INITIAL OFFERING PERIOD

The initial offering period is from February 29, 2000 to June 30, 2000. If at least $1,000,000 is not raised during this period, all subscriptions, plus pro-rata interest may be returned to subscribers, within 20 days.

## APPLICATION OF PROCEEDS

The proceeds of this offering will be used for speculative trading of commodity futures contracts and options on futures, and other investment vehicles selected by the General Partner. See "Glossary" and "Futures Markets" for a basic outline of how commodity futures and options are traded and "Risk Factors" for a description of the primary risks involved.

The proceeds of the offering that are not invested in to other Funds or investment vehicles that do not require the use of a Futures Commission Merchant (FCM), will be deposited into the Fund's trading account with a FCM ( the Fund may use more than one FCM). The FCM is regulated by the CFTC and the NFA. Any cash deposits held at the FCM will be held in segregation pursuant to the Commission's regulations and used for margin requirements. The Fund will fulfill its margin requirements with cash deposits only. It is expected that approximately 70% - 90% of the Fund's assets will be held at the FCM, and 5% - 10% will remain in the Fund's account at the First Eagle Bank. All interest will accrue to the Fund and each Shareholder will receive a pro-rata share. No part of the proceeds will be commingled in any account with any funds belonging to the Pool Operator. Prior to trading all funds will be deposited at the First Eagle National Bank, Hanover Park, IL.

14

# THE COMMODITY POOL OPERATOR

**Martin James Capital Management, Inc.'s** principals are Martin James Allamian and James J. Manning. Martin James Capital Management, Inc. is a Delaware corporation formed in 1991. It's principal office is located at 1 W. Illinois Street, Suite 285 St. Charles IL. 60174. The telephone number is (630) 587-4900.

Mr. Allamian obtained a B.S. Degree from Northern Illinois University in 1984. His studies concentrated in accounting and finance. After graduation he became an Associated Person of Investment Educators until 1986. His duties included performing market analysis and research. He was also responsible for teaching at educational seminars concerning futures and option trading. Investment Educators was registered as a CTA during Mr. Allamian's employment.

From 1986 to the present, Mr. Allamian has been trading his own futures and options accounts as a means of income. Within this time period he has had additional responsibilities. In 1987, he became a member of the Midamerica Commodity Exchange and traded his account as a floor trader. In 1988, he sold his Midamerica membership and became a member of the Chicago Board of Trade. From 1988 until 1991, he traded his own account as a floor trader. At the present time his is still a member of the Chicago Board of Trade. During the time he was a floor trader, from 1988 to 1989, he was also employed at Optima Futures Analysis, Inc., as a market analyst, primarily in the area of U.S. Treasury Bonds and Options. Optima Futures Analysis, Inc. is registered as a CTA.

In 1989 Mr. Allamian formed, and is President and sole principal of, *Martin James & Company, Inc.* ("MJC"). MJC is registered and currently operates as an Introducing Broker ("IB"). As president MJC, he is responsible for the complete management of the company. This includes, but is not limited to, supervising the firm's associated persons and developing institutional and retail client accounts in managed futures.

In 1991, to further service his managed futures clients, Mr. Allamian formed *Martin James Capital Management, Inc.*, a Commodity Pool Operator (CPO). Martin James Capital Management, Inc. is currently the General Partner for three Commodity pools, and functions as a Manager of Managers, responsible for research and analysis of trading advisors, investment advisors, and derivative investments. Mr. Allamian was also registered as the Principal and AP of Martin James Select Asset Management, Inc. from July 1991 - November 1995.

As of October 1997, James J. Manning must also be listed as a "Principal" of Martin James Capital Management, Inc. In accordance with the, United States Commodity Futures Trading Commission, rule 3.1. Because of Mr. Manning's role with Martin James Capital Management, Inc., he must also be listed as a principal with the firm.

James J. Manning has been an employee of Martin James Capital Management, Inc. and Martin James & Company since April 1992. He currently holds the title of Senior Vice President. Mr. Manning is in charge of all customer relations and marketing. Along with his primary responsibilities, he also assists in other areas as needed.

Mr. Manning was also registered as an AP of Martin James Select Asset Management, Inc. from March 1993 - November 1995.

The General Partner and its principals will trade commodity interests for their own accounts. Such trading records will not be available for inspection.

15

# THE TRADING ADVISORS

The Fund's purpose is to achieve capital appreciation through the speculative trading of futures and options contracts and their commodity interests (including forward contracts on foreign currency and foreign options) and (b) Securities, including stocks, bonds, and interests in other commodity pools and/or securities pools or instruments.

## Description of Advisor Selection

The General Partner monitors advisors and does extensive qualitative and quantitative analysis concerning trading performance. Qualitative analysis includes such things as reviewing the stability of the business organization, understanding the trading environment of the Advisors, and determining the ability of the Advisors to manage increasing amounts of equity. Quantitative analysis includes such things as statistical analysis of monthly rates of return, risk/reward ratios and specific Advisors correlations.

**Services to be Performed by General Partner.** The General Partner will, among other things, (i) monitor the performance of the traders, (ii) monitor compliance by the traders with any trading limitations established for the Fund, (iii) allocate Fund assets to advisors, (iv) determine whether to terminate or add advisors, (v) attempt to control profitability, volatility, and total exposure by creating a hedge account that will utilize various option and futures strategies, if deemed necessary. By speculative trading of (a) Futures and Options contracts and the commodity interests (including forward contracts on foreign currency and foreign options), and (b) Securities, including stocks, bonds, and interests in other commodity pools.

## A TRADING SUSPENSION

The Fund will suspend trading if the Net Asset Value per Unit declines 50% from the Net Asset Value per Unit as of the day the Fund began trading. Limited Partners will be promptly notified of the suspension. The Fund will not resume trading until the Limited Partners have had an opportunity to redeem their Units. Because of the volatility of futures prices and the possibility of market illiquidity, there can be no assurance the Net Asset Value per Unit will not decline by more than 50% before trading is suspended.

# THE COMMODITY BROKER

The fund will use a variety of different Futures Commission Merchants (FCM).

As a customer of a Clearing Broker, the Fund will enter into a standard customer agreement with them permitting them to, among other things, liquidate positions in the Fund's trading accounts with it, and to raise margin requirements for the accounts, at any time without prior notice.

Martin James and Company, Inc. will act as the Introducing Broker (IB) for the Fund. Futures and options' commissions will be paid to the IB.

16

## COMPENSATION AND EXPENSES OF THE FUND

**Pool Operator Fees.** Martin James Capital Management, will receive a portion of the commissions charged to the Fund

**Operating Expenses.** The General Partner will pay the Fund's operating and administrative expenses. These expenses include, but are not limited to accounting and legal estimated at $12,000 per year. The General Partner will pay for all organizational and offering expenses (approximately $20,000).

**Brokerage Commission.** The Fund will pay a brokerage commission of $9 per round-turn futures transaction plus all applicable fees to the Clearing Broker.

**Management and Incentive Fees.** As investments are selected by the General Partner for the Fund, these investments will typically have various Management and Incentive fees. The General Partner will negotiate the fees for each investment separately and in the best interest of the Fund. There have been no investments selected for the Fund, so there is no way to know the amount of Management or Incentive fees the Fund will be charged.

# RISK FACTORS/CONFLICTS OF INTEREST

The Fund is a new venture in a high risk business and investment in the Units should be made by persons and entities able to assume the risk of losing their entire investment and only after consulting with independent qualified sources of investment and tax advice. Among the risks involved are the following:

## Risks Related to Commodity Trading

1. **Price Fluctuation.** A principal risk in trading commodity interests as the Fund proposes to do is the volatility in the market prices, which fluctuate rapidly and over wide ranges. The profitability of the Fund will depend on predicting fluctuations in market prices. Prices of commodity futures contracts are affected by a wide variety of complex and hard to predict factors, such as supply and demand of a particular commodity, weather and climate conditions, governmental activities and regulations, political and economic events and prevailing psychological characteristics of the marketplace. (See "Description of Futures Trading" and "Trading Policies".)

2. **Substantial Leverage.** The lack of (or low) margin deposits normally required in commodity interest trading permits an extremely high degree of leverage. Thus a relatively small price movement in a commodity futures contract may result in immediate and substantial profit or loss to the investor. Like other leveraged investments, a commodity interest transaction may result in losses in excess of the amount invested. If the Fund invests a substantial amount of its net assets in such commodities (which must be within trading limits imposed by the Fund), a substantial change, up or down, in the value of a Share would result. Although the Fund may lose more than its initial margin on a trade, the Fund (and not the shareholders personally) will be subject to margin calls. (See "Description of Futures Trading – Margins" and "Trading Policies".)

3. **Illiquidity of Trading.** It is not always possible to execute a buy or sell order at the desired price, or to close out an open position, due to market conditions, limits on open positions and/or daily price fluctuation limits (see "Glossary") imposed by exchanges and approved by the Commodity Futures Trading Commission (the "CFTC"). Once the market price of a commodity futures contract reaches its daily price fluctuation limit, positions in the commodity can be neither taken nor liquidated unless traders are willing to effect trades at or within the limit. The holder of a commodity futures contract (including the Fund) may therefore be locked into an adverse price movement for several days or more and lose considerably more than the initial margin. Another instance of difficult or impossible execution occurs in markets which lack sufficient trading liquidity. Although the Fund intends to purchase and sell actively traded commodities, no assurance can be given that Fund orders will be executed at or near the desired price. (See "Trading Policies".)

4. **Position Limits**. The CFTC and domestic exchanges have established speculative position limits (referred to as "position limits") on the maximum net long or short futures position which any person, or group of persons acting in concert (other than a hedger), may hold or control in futures contracts or options on particular commodities. The principal purpose of speculative position limits is to prevent manipulation of a market -- i.e., an undue influence on price by a single trader or group of traders. The speculative position limits established by the CFTC apply to, among others, grains, corn, soybeans and cotton. In addition, the CFTC requires each exchange to submit speculative position limits for all commodities traded on such exchange for approval by the CFTC. Certain clearing houses also set limits on the total net positions that may be carried by its clearing members. Under applicable rules all commodity accounts controlled by the Advisors are combined for position limit purposes. With respect to futures trading in commodities subject to such limits, each Advisor may reduce the size of the futures positions which would otherwise be taken for the Fund in such commodities and not trade futures in certain of such commodities in order to avoid exceeding such limits. Such modification of trades of the Fund, if required, could adversely affect the operations and profitability of the Fund.

5. **Competition**. Commodity futures trading is by its very nature highly competitive. The Fund will be competing with others who may have greater experience, more extensive information about developments affecting the futures markets, more sophisticated means of analyzing and interpreting futures markets and greater financial resources. The Fund will be competing with, among others: commodity warehousemen and representatives of foreign governments, users of commodities, other commodity pools and others who utilize technical trading advice.

## Risks Related to the Parties

6. **Conflicts of Interest**. Certain inherent and potential conflicts of interest exist with respect to the operations of the Fund's business. (See "Conflicts of Interest".) These include (a) the conflict between the duty of the General Partner to monitor the Traders' trading recommendations and activities and the receipt by the General Partner of a portion of any commissions generated by such Traders (see "Fees, Compensation and Expenses") and (b) possible competition with the Fund by the Clearing Broker, the General Partner or the Fund's Traders and their customers when trading for their own accounts.

7. **Reliance on the Advisors and Their Trading Techniques**. The Fund, upon recommendation of the General Partner, will enter (or has entered) into contracts with those selected Advisors (or investments) which will direct trading on individually managed accounts or Funds. Under such contracts, such Advisors will manage a portion of the Fund's assets according to the allocations and the trading policies established by the Fund. (See also "Reliance on General Partner", "Trading Policies" and "The Advisors".) Alternatively, the Fund will acquire interests in commodity pools certain of the Advisors manage. Since all trading methods in general contain inherent limitations in erratic markets or in markets whose prices deviated from patterns recognizable as trends, no assurance can be given that the General Partner's selection of the Advisors or that the use of the respective Advisor's techniques will achieve profitable trades. The Advisors' decisions as to the purchase or sale of a commodity interest will be guided by the indicators of their respective trading methods. Occasionally, however, market conditions could be such that, in an Advisor's judgment, execution of the indicated trade or trades would be difficult or expose the Fund to undue risk.

Under such circumstances, the Advisor may choose to modify its trading methods.    Moreover, the Fund may experience increased competition for the same contracts, because of the widespread utilization by other traders of similar techniques.

There is no specific limit under the advisory contracts between the Fund and the Advisors as to the number of accounts which may be managed by the Advisors or any affiliates, so that such competition could be further increased if the Advisors agree to manage additional accounts in the future.   Although each advisory contract prohibits an Advisor from knowingly favoring any account it manages over any others, the performance of the Fund's investments could also be adversely affected by the manner in which particular orders are entered by an Advisor for all of its respective accounts.  In addition, all commodity accounts controlled by each Advisor and any affiliates are aggregated for the purposes of applying speculative position limits (see "Glossary" and "Risk Factors -- Illiquidity of Trading"), and such aggregation might limit the number of contracts which can be traded or held by the Fund.  Subject to the trading policies of the Fund (see "Trading Policies") as to individually managed accounts, the Fund may require changes in the trading strategies of the Advisors or alter specific trades of the Advisors if such change is in the best interests of the Fund.

Each Advisor of individually managed accounts has agreed to inform the Fund of any material change in its trading strategies, and shareholders will be informed by the Fund of any material changes reported to it.   Shareholders will not be notified of changes in specific commodity interests traded or the number of such interests traded.  Unless notified by the Advisors, the Fund may be unaware of any modifications made to the trading strategies of the Advisors. (See "The Advisors")  In addition, no assurance can be given that any particular Advisor's services will be available to the Fund after expiration of its current contract, or that the Advisor's contract may not be terminated under certain conditions.  (See "The Advisors") It is not known what effect, if any, a replacement of an Advisor would have on the performance of the Fund. Substitution of an Advisor with other trading advisor(s) would not terminate the Fund.

### Risk Related to Fund Operations

8. **Substantial Fees and Commissions**. The Fund will pay the Trading Advisors management and/or incentive fees described in "Fees, Compensation and Expenses". It should be noted that since all of these fees are calculated on a periodic basis, the Fund may have a net loss for the year even though substantial management and incentive fees may have been paid during interim periods. Such fees will be retained by these parties and will not be repaid to the Fund. Management fees will be paid monthly, whether or not the Fund is profitable; however, with respect to incentive fees, if a particular Advisor sustains a net loss for any month or quarter on the Fund's assets it manages, no further incentive fees will be paid to that Advisor until the Fund's assets managed by that Advisor again has the requisite Trading Profits, as defined, on a cumulative basis. The Fund will also pay substantial brokerage commissions. (See "Fees, Compensation and Expenses" and "Brokerage Arrangements".) Brokerage expenses are expected to be approximately 5% per year of the average annualized

Net Asset Value maintained, directly or indirectly, in any of the Fund's trading account(s), although such percentage could be significantly higher and may be lower depending on the trading activity

and the type of trades executed by the Advisors. The brokerage commission will be paid regardless of the Fund's trading performance. Offerees are advised that other trading vehicles similar to the Fund may provide for management and incentive fees and brokerage commissions different from and, in certain cases, lower than those which the Fund will pay. Therefore, the Fund must make substantial trading profits in order to avoid depletion of its assets and for the investors to realize appreciation in the value of their Shares. There is no way to predict accurately the amount of brokerage commissions that will be incurred since they will be entirely dependent on the volume of trading by the Fund.

9. **Investing in a Pool-of-Pools**. Since the Fund may invest in securities of other commodity pools ("portfolio funds"), instead of individually managed accounts, the General Partner will have less operational control over the portfolio funds than it would if there was a client relationship directly between the Fund and such Advisors. In addition, the Fund's ability to liquidate positions in securities may be adversely affected by the redemption limitations (and penalties, if any) of portfolio funds. The General Partner's review of the trading results of the Advisors for the portfolio funds will be limited to information available to holders of the portfolio funds. This information may be provided to the General Partner on a less timely basis than would otherwise be the case if the Fund had a direct investment in an account managed by the Advisor. Finally, the General Partner may cause the Fund to invest in the securities of one or more portfolio funds in which the General Partner has an interest or is affiliated by management or otherwise. Such an investment would make Fund investments less diversified and more dependent upon the management and financial condition of the General Partner.

10. **No Firm Underwriting**. Since there is no firm commitment for the purchase of Units, there can be no assurance that the Fund will sell the Units offered pursuant to this Memorandum.

11. **Limited Rights of Investors**. Purchasers of the Units will become limited partners in the Fund. They will be unable to exercise any management functions with respect to its operations.

12. **Failure of Commodity Brokers or Banks.** Under the Commodity Exchange Act, as amended (the "CEA"), commodity brokers are required to maintain customers' assets in segregated accounts. To the extent that the Clearing Broker does not do so, however, the Fund will be subject to a risk of loss in the event of the bankruptcy of such broker. In addition, irrespective of adequate segregation of accounts by the Clearing Broker, the Fund will be able to recover (even in respect to property specifically traceable to the Fund) only a pro rata share of the property available for distribution to all of the customers of the Clearing Broker, due to CFTC regulations classifying customers' property held as margin as not constituting property specifically identifiable as belonging to a particular customer. While rare, commodity broker bankruptcies have occurred in which customers were not able to recover from the broker's estate the full amount of their funds on deposit with the broker and owed to them. Similarly, those funds deposited in the Fund's account at a U.S. bank (if any) will be insured only up to $100,000 under existing federal regulations; amounts on deposit in excess of that amount would be subject to the risk of bank failure.

13. **Possible Effect of Redemption's on Unit Values.** Substantial redemption's of Units could require the Fund to liquidate positions more rapidly than otherwise desirable in order to raise the necessary cash to fund the redemption's and, at the same time, achieve a market position appropriately reflecting a smaller equity base. In the event of a high volume of redemption's, liquidation of positions could continue even after the redemption date and could make it more difficult to recover losses or generate trading profits. Illiquidity in the market could make it difficult to liquidate positions on favorable terms, and may result in losses to the Fund which decrease the Net Asset Value per Unit.

14. **Mandatory Redemption.** Because of Department of Labor regulations concerning definition of "plan assets" under ERISA, the Fund may elect not to accept subscriptions for Units if such subscriptions would result in "benefit plan investors" -- employee benefit plans subject to ERISA, IRAs and other employee benefit plans not subject to ERISA (for example, government plans) -- owning 25% of the total equity interests in the Fund.

15. **Limited Ability to Liquidate Investment in Shares.** Although a shareholder may transfer his Units, no market exists for the Shares and none is likely to develop. In addition, a transferee of a Unit can only become a substituted Limited Partner with the Fund's consent. (See "Limited partnership Agreement -- Assignability".). Under certain conditions, an investor may require the Fund to redeem any or all of his Units at the Net Asset Value per Unit as of the last business day of any calendar month on fifteen (15) days written notice and the approval of the Fund. However, the Fund has the authority under the Fund's Limited Partnership Agreement, to limit the transferability or redemption of Units under certain conditions. Partial redemption's of Unit may be for any number of Units provided that the redeeming redemption request resulting in a residual holding below this amount may be treated in the discretion of the Fund as constituting a redemption request for the full number of Units held by such Investor.

22

### Other Risks

16. **Absence of Certain Statutory Registration.** Neither the Fund is registered under the Investment Company Act of 1940, nor is the General Partner registered under the Investment Advisors Act of 1940. Accordingly, purchasers of the Shares will not be afforded the production provided by those Acts.

17. **Options Trading.** The Fund may engage in the trading of options (both puts and calls) on futures. The value of an option depends largely upon the likelihood of favorable price movements in the underlying futures contract in relationship to the exercise (or strike ) price during the life of the option. Therefore many of the risks applicable to trading the underlying futures contract are also applicable to options trading. In addition there are a number of other risks associated with the trading of options. For example, the purchaser of an option runs the risk of loss of his entire investment (the premium he pays). Similarly, the "uncovered writer" of an option is subject to an adverse price movement in the underlying futures position; any such movement may exceed the premium income from the option transaction. Spread positions using options are subject to the same risks involved in the purchase and writing of options. In addition, in the event the Fund were to write uncovered options as one part of a spread position and such option were exercised by the purchasing party, the Fund would be required to purchase and deliver the underlying futures contract in accordance with the terms of the option. Finally, an options trader runs the risk of market illiquidity preventing offsetting positions for any particular option. ( See" Illiquidity of Trading" above.)

18. **Trading on Foreign Exchanges.** Foreign exchanges are not regulated by the CFTC or any other U.S. governmental agency. Therefore, futures trading on any such exchange may be subject to more risks than trading futures or options on exchanges in the U.S.. Moreover, the Fund would be subject to whatever regulatory provisions are applicable to transactions effected outside the U.S. whether on foreign exchanges or otherwise. Trading on foreign exchanges involves the additional risk of expropriation, burdensome of confiscatory taxation, moratoriums, exchange and investment controls or political or diplomatic events which might adversely affect the Fund's trading activities. For example, foreign exchanges (in contrast to domestic exchanges) are "principals markets" in which performance is the responsibility only of the individual members with whom the trader has entered into a futures contract and not of an exchange or clearing corporation. In addition, since foreign currency contracts traded on foreign exchanges may be in foreign denominated currencies, unless the Fund hedges itself against fluctuations in exchange rates between the U.S. dollar and the foreign denominated currencies in which the Fund's contracts are traded, the Fund could incur losses as a result of adverse changes in exchange rates. Furthermore trading on certain foreign exchanges may be conducted in a manner that all participants are not afforded an equal opportunity to execute certain trades. Effective as of February 1, 1988, the CFTC adopted regulations to regulate the sale of foreign futures contracts within the U.S.. These regulations may restrict the Fund's access to foreign markets by limiting the activities of certain participants in these markets with whom the Fund would otherwise have traded. These CFTC regulations do not adopt, and the CFTC is prohibited from adopting, rules which govern in any respect any rule, contract term or action of any foreign commodity exchange.

23

19. **Foreign Currency Forward Contracts and Over the Counter Options.** In connection with any trading in foreign currency forward contracts or over the counter options (OTC options), the Fund may enter into agreements with both foreign and domestic banks, respectively, as agents and principals, and possible foreign and domestic broker-dealer firms, as agents, to make or take future delivery of a particular currency. Although the foreign currency market is not believed to be necessarily more volatile than the market in other commodities, there is less protection against defaults in the forward trading of currencies and OTC options than there is in trading such currencies on an exchange since such forward contracts and OTC options are not guaranteed by an exchange or clearing house; similarly, forward contracting with domestic and foreign banks and broker dealer firms is not regulated by the CFTC. If any counter-party in such transactions were to default, such default could deprive the Fund of any profit potential or force the Fund to cover its commitments for resale, if any, at the market price then current. Similarly, banks and broker-dealer firms are not required to continue to make markets in foreign currencies or OTC options and liquidity problems may arise because arrangements to trade foreign currency forward contracts or OTC options may be made with only a few banks and broker-dealer firms. Moreover, imposition of credit controls might limit any such forward trading. Prior to commencement of any such trading, the Fund may have to arrange lines of credit, and there is no assurance that these lines of credit can be obtained. Finally, the CFTC has indicated that it may assert jurisdiction over forward contracts on foreign currencies and OTC options in an attempt to prohibit certain entities from engaging in such transactions; in the event that such prohibition included the Fund, it might cease trading such contracts which might adversely affect the performance of those Advisors using the foreign exchange market for the Fund's trading.

**THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE OFFERING MEMORANDUM BEFORE DECIDING TO INVEST IN SHARES OF THE FUND.**

<u>Conflicts of Interest</u>

The following inherent or potential conflicts of interest should be considered by prospective investors before subscribing for Shares. All descriptions of conflicts addressed respectively as to the Clearing Broker and the Advisors also extend to the respective principal(s) of such entities.

**Other Commodity Pools.** The Commodity Pool Operator, the Clearing Broker or the Advisors (or their respective affiliates) may in the future solicit or manage other commodity pools which could compete with the Fund. Certain trading advisors for these commodity pools could be the same as those for the Fund. Additionally, the Pool Operator may also be engaged by other commodity pools to select trading advisors to direct trading for such other pools, certain of whose trading advisors are or may be the same as the Advisors. (See "The Pool Operator".)

**The Pool Operator, the Clearing Broker and the Advisors May Trade Commodity Interests for Their Own Accounts.** The Pool Operator, the Clearing Broker and the Advisors (or their affiliates) may trade commodity interests for their own accounts. Nonetheless, such persons may have a conflict of interest concerning the sequence in which orders for transactions will be transmitted to commodity brokers for execution. Additionally, a potential conflict may occur when an Advisor and its principals, as a result of a neutral allocation system, testing a new trading system, trading their own proprietary account(s) more aggressively or any other actions that would not constitute a violation of fiduciary duties, take position in their own proprietary account(s) which are opposite, or ahead of, the position(s) taken for a client. The Trading records of any such trading by the Pool Operator, Trading Advisor or any principal will not be available for inspection to participants.

**Distribution Would Decrease Compensation to the Pool Operator.** The articles of Association provide that the amount and frequency of distributions to the shareholders (other than redemption's) is solely within the discretion of the Fund. Since the Pool Operator's management fees are directly related to the size of the Fund, it would suffer an economic disadvantage if the Fund reduces its assets through such distributions to the shareholders. However, partial or complete redemption's are permitted on a monthly basis if properly requested pursuant to the Articles of Association.

**Martin James & Company, Inc. as the IB for the Fund.** Because Martin James & Company, Inc. will function as the Introducing Broker for the Fund, and receive a portion of each round turn commission, there is a potential conflict of interest. The CPO may tend to over-trade the assets of the Fund and there is no guarantee that the commission rate paid by the Fund was set through "arm's length" negotiations. **Currently all assets are allocated to other Funds or Pools.**

**Relationship of Pool Operator and Broker.** The Pool Operator is authorized to determine the broker to be used for each securities transaction for the Partnership. The Partnership will use various FCM's for all futures and options transactions. In selecting brokers or dealers to execute transactions, the Pool Operator need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. In selecting brokers, the Pool Operator may or may not negotiate "execution only" commission rates; thus the Partnership may be deemed to be paying for other services provided by the Broker to the Partnership or Pool Operator which are included in the commission rate. In negotiating commission rates, the Pool Operator will take into account the financial stability and reputation of brokerage firms and the brokerage, research and other services provided by such brokers, although the Partnership may not, in any particular instance, be the direct or indirect beneficiary of the services provided. The Pool Operator may also direct commissions to brokers who refer clients to the Partnership.

**Obligation of General Partner**
(a) The General Partner is not under any obligation to devote his full time to the business of the Partnership, but is only required to devote such time and attention to the affairs of the Partnership as it may deem appropriate in its sole and absolute discretion. In addition, the General Partner may manage a limited number of other accounts for which he may be compensated and may provide consulting and/or advisory services to others.
(b) The General Partner may manage other accounts and provide investment advice to other parties, and it may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Partnership's funds, in a particular security or strategy.

## TAX CONSIDERATIONS

**The analysis contained herein does not include all aspects of applicable U.S. federal and state tax law, and is not intended as a substitute for careful tax planning by shareholders. Therefore, each prospective shareholder should consult his own tax advisor to satisfy himself as to the tax consequences of this investment.**

Introduction

      This section summarizes some of the federal income tax consequences to participants owning limited partnership interests in the Partnership. This summary does not address the tax implications of owning and interest in the Partnership by corporations, partnerships, trusts and other non-individuals. This summary is also not a substitute for tax advice, particularly since certain of the tax consequences of owning an interest in the Partnership may not be the same for all taxpayers.

Partnership Status

      The General Partner believes that under current federal income tax law, it is more likely than not that the fund will be classified as a Partnership and not as an association taxable as a corporation. No ruling has been requested from the U.S. Internal Revenue Service ("IRS") nor has an opinion of counsel been sought with respect to such classification and the General Partner does not intend to request such a ruling or opinion.

      In the event that the Partnership were deemed to be an "association" taxable as corporation, profit or loss of the Partnership would not be passed through to the participants and the Partnership would be subject to tax on its income at the rate applicable to corporations. In addition, any distributions by the fund to participants could be taxable to them as well as dividends or capital gains.

Partnership Taxation

      For federal income tax purposes, a partnership is not a taxable entity but rather a conduit through which taxable income or deductions are passed to the partners. Thus, the partnership form of organization allows the partners rather than the partnership to receive any tax credits and deductions from the operations to be engaged in by the partnership. The partners will be subject to tax on income of the partnership, but no additional tax will result to the partnership. Each partner, in computing his own federal income tax liability for a taxable year, will be required to take into account his share of all items of partnership income, gain, loss, deduction or credit for the taxable year to the partnership regardless of whether such partner has received any distributions from the partnership.

      A participant's share of such items for federal income tax purposes generally will be determined by the Partnership Agreement on a pro-rata basis taking into account each participant's capital account and for participants who have redeemed units during the fiscal year, the number of days during the fiscal year that units were owned by such participants on a weighted average basis. A participant's distributive share of Partnership loss (including capital loss) will be deductible on his personal income tax return only to the extent of his adjusted basis in his Partnership interest. However, because of the limitations imposed upon the deductibility of capital losses by the IRS, a participant's pro rata share of the Partnership's net capital losses, if any, will not materially reduce his federal income tax on his ordinary income.

Treatment of Redemption's

If the cash received from the Partnership by a participant as a result of the redemption of any or all of his units by the Partnership during any calendar year exceeds his share of the Partnership's taxable income for that year, the excess will constitute a return of capital to the participant for federal income tax purposes. It will thereby reduce, but not below zero, the tax basis of his interest in the Partnership. If these redemption's exceed the participant's adjusted tax basis in his interest, the excess will be taxable to him as though it were a gain from a sale of the interest.

A loss will be recognized upon a withdrawal of capital only if, following the withdrawal of all of the participant's capital, the participant has any tax basis in his interest remaining. He will then recognize loss to the extent of the remaining basis.

Gains and Losses from Commodity Trades

The net unrealized gain or loss from open positions in Section 1256 contracts held as capital assets at the end of the Partnership's taxable year generally will be "marked-to-market", i.e. treated as if such gain or loss were realized on such date. Section 1256 contracts include futures contracts which are traded on a National Securities Exchange that is registered with the SEC, a Domestic Board or Trade designated as a contract market by the CFTC, or any other Board of Trade, Exchange or other market designated by the Secretary of the Treasury in which contracts are "marked-to-market" to determine the amount of margin which must be deposited or may be withdrawn.

The amount of unrealized gain or loss under Section 1256 contracts generally will be determined by reference to the prices quoted for the contracted on the Exchange on the last day of the Partnership's taxable year. Thus, for tax purposes, Section 1256 contracts will be treated as having been sold for its fair market value on the last day of the year, and gain or loss will be taken into account for that year. The General Partner anticipates that the Partnership will trade exclusively in Section 1256 contracts.

Any gain or loss recognized by the Partnership under Section 1256 contracts will be deemed to consist of 60% long term capital gain or loss and 40% short term capital gain or loss. Although long term and short term capital gains are currently taxed at the same effective tax rate, the tax code continues the 60-40 treatment for Section 1256 contracts because the distinction between long term and short term gains may be important for other reasons, such as the limitation on investment interest expense.

27

## Limited Deduction for Certain Expenses

Under current law, individual taxpayers who itemized deductions are permitted to deduct expenses of producing income, including investment advisory fees, when computing taxable income. Such expenses are to be aggregated with other expenses of producing income and the aggregate amount of such expenses are deductible only to the extent that such amount exceeds 2% of a taxpayer's adjusted gross income. It is unclear whether the Partnership's expenses will be subject to the 2% floor. The Partnership's principal expenses that might be subject to the 2% floor are expected to be the advisory fees paid to the Trading Advisor. The IRS might contend that the portion of the brokerage commissions and, to the extent applicable, the fees received by the General Partner would be re-characterized as fees paid to the General Partner in exchange for services. If such a contention were sustained, each partner's pro rata share of the amounts re-characterized would be deductible only to the extent that such partner's aggregate investment expenses exceed 2% of such partner's adjusted gross income. In addition, each partner's distributive share of income from the Partnership would be increased (solely for tax purposes) by such partner's pro rata share of the amounts re-characterized. The General Partner intends to report the management and advisory fees, if any, as not subject to the 2% limitation.

## Limitations of Deductibility of Passive Loss

The tax code generally provides that losses from a passive activity are disallowed to the extent that losses exceed income form all passive activities. A passive activity is a trade or business in which the taxpayer does not materially participate, unless otherwise provided in the regulations. Therefore, if the Partnership is considered to be engaged in a trade or business for federal income tax purposes, the ownership of units would constitute a "passive activity" with the result that net losses from Partnership operations (including net capital losses) would not be deductible in computing the taxable income of a partner except against certain income from the Partnership or other "passive activities" or until disposition of the partner's interest in the Partnership.

Temporary treasury regulations issued in February of 1988, provide that the trading in personal property such as securities and commodities will not be treated as a passive activity. Accordingly, a participant's distributive share of items of Partnership income, gain, deduction or loss will not be treated as passive income or loss, and Partnership gains allocable to participants will not be available to offset passive losses from sources outside the Partnership. Partnership capital gain allocable to participants will be treated as portfolio income and will be available to offset capital losses with respect to "portfolio" investments.

The excess of capital losses over capital gains is deductible by an individual against ordinary income on a dollar for dollar basis, subject to an annual limitation of $3,000. Excess capital losses may be carried forward.

## Purchase by Retirement Plans - ERISA Considerations

An ERISA account is a benefit plan or pension, profit-sharing, stock bonus or other employee plan qualified under Section 401 (a) of the Internal Revenue Code. The fiduciary provisions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), are highly complex. Accordingly, when considering an investment of the assets of an ERISA account in the Fund, a fiduciary with respect to such plan should consider among other things: (a) the definition of "plan assets" under ERISA and the final regulations issued by the Department of Labor ("DOL") regarding the definition of "plan assets"; (b) whether the investment satisfies the diversification requirements of paragraph 404(a)(1) of ERISA; (c) whether the investment satisfies the prudence requirements of paragraph 404(a)(1) of ERISA; whether income derived from the Fund could constitute "unrelated business income" subject to federal income taxation in the ERISA account; and (e) that there may be no market in which such fiduciary can sell or otherwise dispose of the Shares (other than through redemption's). Consequently, the Fund recommends that each investor and his financial and legal advisors consider the foregoing, among any other pertinent factors, before making any purchase of Shares. Because the Fund intends to satisfy pertinent DOL standards relating to what constitutes a "publicly offered security", it is expected that "benefit plan investors" as defined will be limited to less than 25% of the Net Asset Value of the Fund in order to avoid the impact of such regulations. Similarly, in view of such DOL regulations, the fund does not intend to accept subscriptions from benefit plan investors if the acceptance would violate the foregoing regulations. Moreover, the Fund also has the right to require ERISA accounts to redeem their Shares at any time to avoid application of the "plan asset" rules.

## Publicly Traded Partnership

The General Partner believes that income earned by the Partnership will not constitute "unrelated business taxable income" under Section 511 of the Code to plans and other tax exempt investors. The Partnership's income could be considered "unrelated business taxable income" if the Partnership is considered a "publicly traded partnership" ("PTP"). However, the Partnership does not expect to be a PTP, but there can be no assurance of this result. The Partnership would be a PTP if its interests are (a) traded on an established securities market or (b) readily tradable on a secondary market or the substantial equivalent thereof. While the units will not meet condition (a), the redeemability of the units might cause them to meet condition (b). However, the IRS has established certain safe harbors from PTP status, one of which basically provides that the redeemability of a Partnership's interest is disregarded for purposes of condition (b) above if the Partnership offers its interest in an offering exempt from registration under the Securities Act of 1933 and has no more that 500 investors or the minimum investment is $20,000 or more. The Partnership expects to meet at least this first condition. Even if the Partnership is a PTP, it will not be taxed as a corporation if 90% or more of its gross income for each taxable year is "qualifying income", which includes gains from securities, commodities, options, futures and commodity forward contracts, and generally includes interest income. The Partnership also expects to meet this condition.

## Tax Returns and Information

The Partnership will file an information tax return using the accrual method of accounting. Within 75 days after the close of the Partnership's taxable year, the Partnership will furnish each limited partner (and any assignee of an interest of any limited partner) copies of (a) the Partnership's schedule K-1 indicating the limited partner's distributive share of tax items and (b) such additional information as is reasonably necessary to permit the limited partners to prepare their own federal and state tax returns. The Partnership's tax return will be prepared by an independent certified public accountant selected by the General Partner.

<u>The Partnership's Taxable Year</u>

The Partnership will use the calendar year as its taxable year.

<u>Tax Audits</u>

Adjustments in tax liabilities with respect to Partnership items are made at the Partnership level. The General Partner will represent the Partnership during any audit and in any dispute with the IRS. Each limited partner will be informed by the General Partner of a commencement of an audit of the Partnership. In general, the General Partner may enter into a settlement agreement with the IRS on behalf of, and binding upon, the limited partners. However, prior to settlement a limited partner may file a statement with the IRS stating that the General Partner does not have the authority to settle on his behalf.

The period for assessing a deficiency against a partner in a partnership with respect to a partnership item is the later of three years after the partnership files its return or, if the name and address of the partner does not appear on the partnership return, one year after the IRS is furnished with the name and address of the partner. In addition, the General Partner may consent on behalf of the Partnership to the extension of the period for assessing a deficiency with respect to a Partnership item. As a result, a limited partner's federal income may be subject to examination and adjustment by the IRS for a Partnership item more than three years after it has been filed.

<u>State and Local Taxes</u>

In addition to the federal income tax consequences described above, the Partnership and the limited partners may be subject to various state and local taxes. A limited partner's distributive share of the realized profits of the Partnership may be required to be included in determining his reportable income for state or local tax purposes.

THE FOREGOING STATEMENTS REGARDING FEDERAL INCOME TAX CONSEQUENCES TO THE PARTNERS ARE BASED UPON THE EXISTING PROVISIONS OF THE INTERNAL REVENUE CODE AND THE EXISTING ADMINISTRATIVE AND JUDICIAL INTERPRETATIONS THEREUNDER. IT IS EMPHASIZED THAT NO ASSURANCE CAN BE GIVEN THAT LEGISLATIVE, ADMINISTRATIVE OR JUDICIAL CHANGES WILL NOT OCCUR WHICH MODIFY SUCH STATEMENTS. THIS SECTION IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, PROSPECTIVE PARTICIPANTS IN THE PARTNERSHIP ARE URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATION UNDER FEDERAL LAW AND THE PROVISIONS OF APPLICABLE STATE AND LOCAL LAW BEFORE SUBSCRIBING FOR UNITS.

## Audits

The code provides for the conduct of tax audits at the Fund level, rather than the individual shareholder level. Furthermore, an audit of the Fund may cause an audit of an individual shareholder on other issues; the Fund is not liable for the costs incurred by any shareholder in an audit.

# SUBSCRIPTION PROCEDURES

Investors wishing to purchase Units in M.J. DIVERSIFIED, L.P. must do the following:

* Complete the Partnership Agreement, Subscription Agreement and Offeree Questionnaire.

* Send the Partnership Agreement, Subscription Agreement and Offeree Questionnaire along with a check made payable to M.J. Diversified in the subscription amount to the Pool Operator as follows:

| | | |
|---|---|---|
| M.J. Diversified, L.P.<br>1 W. Illinois St., #285<br>St. Charles, IL 60174 | Wire to: | First Eagle National Bank<br>ABA # 071925017<br>M.J. Diversified, L.P.<br>Acct. #102961401 |

A fully executed Partnership Agreement, Subscription Agreement and Offeree Questionnaire must be received by the General Partner no later than 15 days before the end of any month during the continuous offering period. The General Partner may waive this requirement at it's discretion.

The Fund is entitled to reject in whole or in part the subscription, in which event the subscription monies received by the Fund from the subscriber will be returned in accordance with the Subscription Agreement.

## Investment Requirements

Accredited Investor and Qualified Eligible Participant Status

Initial all appropriate spaces below indicating the basis on which the undersigned qualifies as a "qualified eligible participant" and an "accredited investor." Only those which so qualify are eligible to invest in the Partnership. Please note that in the case of each category except (a) and (j) below the undersigned must (I) own securities (including participation in the Partnership and other pools) of issuers not affiliated with such person or entity and other investments (i.e., real estate held for investment purposes) with an aggregate market value of at least $2,000,000, (ii) have on deposit with a futures commission merchant at least $200,000 in exchange-specified initial margin and option premiums for commodity interest transactions, or (iii) own a portfolio comprised of a combination of (i) and (ii)(e.g. $1,000,000 in securities and $100,000 in margin and premiums((the "Portfolio Requirement").

(a) Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(b) An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) thereof that was not formed for the specific purpose of investing in the Partnership and that satisfies the Portfolio Requirement.

© A bank as defined in Section 3(a)(2) of the Securities Act of 1933, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act of 1933, acting for its own participant/accredited investor, that satisfies the Portfolio Requirement.

(d) An insurance company as defined in Section 2(13) of the Securities Act of 1933, acting for its own account or for the account of a qualified eligible participant/accredited investor, that satisfies the Portfolio Requirement.

31

(e) A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(f) An organization described in Section 501©(3) of the Internal Revenue Code, a corporation, "Massachusetts or similar business trust, or partnership," in each case other than a commodity pool and not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(g) A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(h) A commodity pool, trust, insurance company separate account or bank collective trust, not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000, whose participation in the Partnership is directed by a qualified eligible participant/accredited investor and which does not invest in aggregate more than 10 percent of the fair market value of its assets in the Partnership and other commodity pools exempt under CFTC Reg. 4.7.

(i) An entity which all of the unit owners and participants (i.e., all partners (including limited partners) of a partnership, shareholders of a corporation and the grantor of a grantor trust, but not the beneficiaries of a true trust) are qualified eligible participants and accredited investors.

**Exhibit A**
**M.J. DIVERSIFIED, L.P.**
**LIMITED PARTNERSHIP AGREEMENT**

THIS PARTNERSHIP AGREEMENT made and entered into this ␣ day of
␣␣␣␣␣␣␣␣␣␣␣, 200 ␣␣, by and between Martin James Capital Management, Inc. (the
"General Partner") and other parties who shall execute this agreement, whether in counterpart,
by separate instrument or otherwise, as Limited Partners (who are hereinafter referred to as
"Limited Partners") (the General Partner and the Limited Partners are sometimes collectively
referred to herein as "Partners").

**WITNESSETH**

WHEREAS, the parties hereto desire to form a partnership for the purpose of speculative trading
in commodity futures, options on futures and related financial instruments.

NOW, THEREFORE, the parties hereto agree as follows:

1.    **Formation and Name.**

The parties hereby form a partnership. The name of the partnership is M.J. Diversified, L.P. (the
"Partnership"). The General Partner shall execute and file with the Office of the Secretary of the
State of Illinois a Certificate of Limited Partnership and shall execute, file, record and publish as
appropriate such amendments, assumed name certificates and other documents as necessary or
advisable as determined by the General Partner. Each Limited Partner agrees to furnish the
General Partner with a limited power of attorney which may be filed with the Certificate of Limited
Partnership and any amendments thereto and such additional information as is required to
complete such documents and shall execute and cooperate in the filing, recording or publishing
of such documents at the request of the General Partner.

2.    **Principal Office.**

The principal office of the Partnership shall be 1 W. Illinois St., #285, St. Charles, IL. or such
other place as the General Partner may designate from time to time.

3.    **Business.**

The Partnership business and purpose is to trade, buy, sell or otherwise acquire, hold or dispose
of Securities, funds (or pools) and commodity futures contracts and options on futures contracts
and any rights pertaining thereto which are traded on U.S. exchanges and foreign commodity or
securities exchanges. The objective of the Partnership's business is appreciation of its assets
through speculative trading.

4.    **Term, Dissolution and Fiscal Year.**

      (a)    **Term.** The General Partner has filed a Certificate of Limited Partnership with the
Illinois Secretary of State. Trading will continue until any of the following events occur:

            (i)    December 31, 2025;

            (ii)    Withdrawal or insolvency of the General Partner unless a new General Partner
shall be substituted pursuant to Section 15(c) hereof;

33

(iii)   A decline in the net asset value per unit of Partnership interest to 50% or le of its value as of the first business day of trading, unless the General Partner elects to contin the partnership pursuant to Section 4(d) of this Agreement; and

(iv)   Any event which shall make unlawful the continued existence of t Partnership.

(b)   **Termination of initial offering.**  The Partnership will begin soliciting funds February 29, 2000.  June 30, 2000 will mark the end of the initial offering period.  Pursuant Regulation D of the Securities Act of 1933. This period can be extended or shortened at discretion of the General Partner.

(c)   **Dissolution.**  Upon the first to occur of the events in Section (a) above, Partnership shall terminate and be dissolved.  The General Partner and each Limited Part shall share in the assets of the Partnership, after the payment of creditors, pro rata in accordan with their respective capital accounts, less any amount owing by such Partner to the Partnershi

(d)   **Continuation of Partnership.**  Upon the decline in net asset value as outlined Section 4(a)(iii) above, the General Partner may, in its discretion poll the Partners to determi whether Partnership trading should continue.  All Partners will be provided the opportunity redeem their Partnership interest at this time.  If, in the judgment of the General Partner, enou Partners wish trading to resume, the General Partner will resume trading.  Otherwise, General Partner will terminate the Partnership.

(e)   **Fiscal Year.**  The fiscal year of the Partnership shall begin on January 1 of each ye and end on the following December 31; provided, however, that if such fiscal year is disapprov by the Internal Revenue Service the fiscal year shall be as otherwise approved by the Gene partner and the Internal Revenue Service.

5.   **Management of the Partnership.**

The General Partner, to the exclusion of all other partners, shall conduct and manage business of the Partnership including, without limitation, the investment of the funds of t partnership.  No Limited Partner shall be entitled to any salary, draw or other compensation fr the Partnership on account of any investment in the Partnership. The General Partner shall ha sole discretion in determining what distributions of profits and income, if any, shall be made to t Partners, shall execute various documents on behalf of the Partnership and the Partners a supervise the liquidation of the Partnership if an event causing termination of the Partnersh occurs.

The General Partner may in furtherance of the business of the Partnership cause the Partnersh to buy, sell, hold, otherwise acquire or dispose of commodity futures contracts or options futures traded on U.S. or foreign exchanges.

The General Partner will have sole discretion with regard to the appointment or employment of persons or entities providing services to the Partnership including, but not limited to, tradi advisors, brokers and accountants and may employ any such persons or entities on behalf of t Partnership without notice to the Partners.

34

The General Partner may engage in other business activities and shall not be required to refrain from any other activity or disgorge any profits from any such activity, whether as General Partner of additional partnerships for investment in commodity interests or otherwise. The General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of al funds and assets of the Partnership, and he shall not employ or permit others to employ such funds and assets in any manner except for the exclusive benefit of the Partnership. The Partnership shall keep and retain such books and records relating to the business of the Partnership as it deems necessary or advisable, or as required by the Commodity Exchange Act, as amended, and the rules and regulations of the Commodity Futures Trading Commission, at the principal office of the Partnership, or such other offices as the General Partner deems advisable. Such books and records shall be retained by the Partnership for not less than six years. The Limited Partners shall be given reasonable access to the books and records of the Partnership.

No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the partnership nor to determine any fact or circumstance bearing upon the existence of their authority.

The Partnership shall make no loans. Assets of the Partnership will not be commingled with assets of any other entity. Deposits of assets with a futures broker as margin shall not constitute commingling.

6.    **Capital Contributions and Units of Partnership Interest.**

   (a)    **Initial Capital Contributions.**    Interests in the Partnership shall be evidenced by Units of Partnership Interest ("Units" or individually a "Unit"). The General Partner on behalf of the Partnership will issue Units to persons desiring to become Limited Partners; provided that such persons are determined by the General Partner to be qualified and provided their subscriptions and Subscription Agreements are accepted by the General Partner.

After the Partnership begins trading operations, an investor will become a Limited Partner in the Partnership on the first day of the month following receipt by the Partnership of the investor's capital contribution and acceptance by the General Partner of such investor's executed Limited Partnership Agreement, Subscription Agreement, Purchaser Questionnaire, Power of Attorney and any other documents required by the General Partner (collectively, the "subscription documents") no less than ten days preceding the first day of the month.

   (b)    **Additional Capital Contributions.**    A Partner may, as of the first day of any month (the "effective date"), contribute additional funds to the Partnership, in amounts equal to or in excess of $1,000 provided such contribution is received at least 10 days prior to this effective date. As of the effective date, the General Partner will revise the contributing Partner's capital account to reflect such contribution, and the Units of all the Partners shall be adjusted to reflect the additional contributions to the total capital of the Partnership. The same adjustment will be made with respect to the initial capital contribution of new Partners so that Partnership profits and losses will be allocated proportionately to those Partners who were members of the Partnership during the applicable period. In determining the value of the capital accounts of the Partners, the value of each Unit, including Unites of General Partnership Interest, shall be determined as of the close of business on the last day of the month immediately preceding the effective date of the capital contribution. The General Partner may also contribute additional funds to the Partnership under the same terms and conditions.

7.    **Allocation of Profits and Losses.**

(a)    **Capital Accounts.** A capital account shall be established for each Partner. The initial balance of a Partner's capital account shall be his capital contribution at the time of his admission to the Partnership.

(b)    **Monthly Allocations.** As of the close of business on the last day of each month the following determinations and allocations shall be made:

(i)    The Net Asset Value of the Partnership (as defined in paragraph 8 hereof).

(ii)    Any increase or decrease in Net Asset Value as of the end of each month shall then be credited or charged to the capital account of each Partner in the ratio that the balance of each account bears to the balance of all accounts for that month.

(iii)    The amount of any distribution to a partner or any amount paid to a partner upon redemption of Units shall be charged to that Partner's capital account.

(c)    **Allocation of Profit and Loss for Federal Income Tax Purposes.** As of the end of each fiscal year, the Partnership's realized capital gain or loss and ordinary income or loss shall be allocated among the Partners in the proportion which their respective capital accounts bear to the total account of all Partners. Any Partner who redeems Units during any fiscal year will be allocated his or her proportionate share of the capital gain or loss and ordinary income or loss realized by the Partnership during the period that such Units were owned by such Partner.

(d)    **Expenses.** The Partnership shall bear all futures brokerage commissions and shall be obligated to pay all liabilities incurred by it including without limitation, all expenses incurred in connection with its trading activities.

The General Partner will pay all offering and organizational expenses and will not be reimbursed from partnership.

(e)    **Return of a Partner's Capital Contribution.** A Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement. In no event shall a Partner be entitled to demand or receive property other than cash.

(f)    **Distributions.** The General Partner shall have sole discretion in determining what distributions (other than redemption's of Units, which may be made at the discretion of any Partner as described in paragraph 10 below), if any, the Partnership will make to its Partners. Distributions will be pro rata in accordance with the respective capital accounts of the Partners.

36

8.   **Net Asset Value.**

The Net Asset Value of the Partnership shall be the difference between the value of the assets of the Partnership and the amount of liabilities of the Partnership. Unless otherwise specified below, all assets and liabilities are to be determined on the basis of generally accepted accounting principles, consistently applied. For purposes of this calculation Net asset Value shall include:

   (a)   Any unrealized profit or loss on open futures or options positions;

   (b)   Government Securities shall be valued at cost plus accrued interest monthly;

   (c)   Brokerage commissions, exchange and NFA fees on open positions shall be accrued in full (that is, on a round-turn basis) as a liability of the Partnership;

   (d)   Management fees shall be paid monthly and

   (e)   Incentive fees shall be accrued monthly but paid quarterly.

Net Asset Value per Unit is calculated by dividing the Net Asset Value of the Partnership by the number of Partnership Units outstanding for that month.

9.   **Reports to Partners.**

The General Partner will cause each Partner to receive (i) within 90 days after the close of each fiscal year, financial statements including (a) a balance sheet and statements of income and partner's equity and (b) a statement showing total fees, compensation, brokerage commissions and expenses paid by the Partnership, and (ii) by March 15 of each year, such tax information as is necessary for each Partner to complete his federal income Tax return. In addition, at the end of each month a statement of the Partnership's income and Partner's equity will be sent to all Partners.

10.   **Redemption of Units.**

A partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar month ("the effective date") by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a "Request for Redemption" attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the end of the calendar month.

11.   **Assignability.**

The Units may be assigned at the election of the Partner and upon notice to the General partner. However, the assignee shall become a substituted Partner in the Partnership only upon execution and delivery to the General partner of the subscription documents and the consent of the General Partner (which may be granted or withheld at its discretion). An assignee who does not become a substituted Partner shall be entitled to receive the share of the profits or the return of capital to which his assignor would otherwise be entitled, but shall not be entitled to vote, to an accounting of Partnership transactions, to receive tax information, or to inspect the books and records of the Partnership.

37

**12.  Admissions of Additional Partners.**

Newly admitted Partners shall contribute cash to the capital of the Partnership for each Unit of Partnership Interest to be acquired at the Net Asset Value per Unit as of the last business day of each month, as described in paragraph 8 hereof.

**13.  Limited Power of Attorney.**

Each partner irrevocably appoints Martin James Capital Management, Inc. as his attorney-in-fact to execute, acknowledge, swear to, deliver, file, record and publish, as appropriate: amendments to this Agreement hereto as described in Section 15; a certificate of limited partnership and amendments thereto; certificates of assumed name for the Partnership; and any other instruments appropriate to conduct the Partnership's business.

**14.  Withdrawal or Death of a Partner.**

The death, adjudication of incompetence or insanity, bankruptcy, retirement, resignation, dissolution, termination, insolvency or withdrawal of the General Partner shall dissolve and terminate the partnership unless the Partnership is continued pursuant to paragraph 17(c) hereof. The General Partner may withdraw from the Partnership at any time on 30 days written notice sent first class mail, postage prepaid, to each Partner. The death, legal disability, withdrawal, insolvency or dissolution of a Partner shall not terminate or dissolve the Partnership and such Partner, his estate, custodian or personal representative shall have no right to withdraw or value such Partner's interest in the Partnership except as provided in paragraph 10 above.

**15.  Amendments and Meetings.**

(a)  **Amendments with Consent of the General Partner.**  If, at any time during the term of the Partnership, the General Partner shall deem it necessary or desirable to amend this Agreement, such amendment shall be effective if embodied in an instrument signed by the General partner and by Partners owning more than fifty percent (50%) of the Units then owned by partners.  However, the General Partner may, in its sole discretion, make such amendments to this Agreement as may be necessary to enable the Partnership to be classified for federal income tax purposes as a Partnership and not as an association taxable as a corporation or to permit the qualification or registration of the Units for sale in any state or jurisdiction.  Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same has originally been embodied in and formed a part of this Agreement; provided, however, that no such supplemental or amendatory agreement shall, without consent of all Partners, change or alter this Section 15, extend the terms of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled.

(b)  **Meetings.**  Any Partner upon written request addressed to the General Partner shall be entitled to obtain from the General Partner, at the Partner's expense, a list of the names and addresses of record of all Partners and the number of Units held by each; provided that the Partner represents that the list will not be used for commercial purposes.  Upon receipt of a written request, signed by partners owning at least 25% of the Units then owned by Partners, that a meeting of the Partnership be called to vote upon any matter which the Partners may vote upon pursuant to this Agreement, the General Partner shall, by written notice to each Partner of record mailed within 15 days after such receipt, call a meeting of the Partnership.  Such meeting shall be held at least thirty but not more than sixty days after the mailing of such notice and shall specify the date, a reasonable place and time, and the purpose of such meeting.

(c) **Amendments and Actions Without Consent of the General Partner.** At any meeting called pursuant to Section 15(b), upon the affirmative vote (which may be in person or by proxy) of Partners owning more than 50% of the Units then owned by the Partners, the following actions may be taken: (I) this Partnership Agreement may be amended, provided, however, that no such supplemental or amendatory agreement shall, without the consent of all the Partners, change or alter this Section 15, extend the term of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled; (ii) the Partnership may be dissolved; (iii) a new General Partner or Partners may be elected if the General Partner elects to withdraw from the Partnership; (iv) any contracts with the General Partner or any of its affiliates may be terminated on sixty days notice without penalty; and (v) the sale of all assets of the Partnership may be approved, provided, however, that no such action may be taken if a court of competent jurisdiction has entered a final order to the effect that the action to be taken will adversely affect the status of the classification of the Partnership as a "partnership" under the Federal income tax laws. The term "final order" shall mean an order which is not subject to any further court proceedings for appeal, review or modification.

16. **No Personal Liability for Return of Capital.**

The General Partner shall not be liable for the return or repayment off all or any portion of the capital or profits of any Partner, it being expressly agreed that any such return of capital or profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the General Partner) of the Partnership.

17. **Indemnification.**

(a) **By the Partnership.** The Partnership shall indemnify, defend and hold harmless the General Partner, and its employees and affiliates from and against any loss, liability, damage, cost or expense (including legal fees and expenses) and any amounts paid in settlement thereof (provided that the Partnership shall have approved such settlement) resulting from or relating to its actions or capacity as General Partner, or otherwise concerning the business or activities undertaken on behalf of the Partnership, provided that the act or omission which was the subject of the demand, claim or lawsuit did not constitute gross negligence, willful or wanton misconduct, or breach any fiduciary obligations to the Partnership.

Any indemnification permitted by the first paragraph of this Section 16, unless ordered or expressly permitted by a court, shall be made by the Partnership only upon a determination by independent legal counsel in a written opinion that the conduct which is the subject of the claim, demand or lawsuit with respect to which indemnification is sought meets the standards set forth in said paragraph.

(b) **By the Partners.** In the event the Partnership is made a party of or to any claim, dispute or litigation, or otherwise incurs any loss or expense as a result of or in connection with any Partner's obligations or liabilities unrelated to the Partnership business, such Partner shall indemnify and reimburse the Partnership for all loss and expenses incurred, including reasonable attorney's fees.

18. **Governing Law.**

The validity and construction of this Agreement shall be determined and governed by the laws of the State of Illinois.

39

19. **Miscellaneous.**

(a) **Priority Among Partners.** No Partner shall be entitled to any priority or preference over any other Partner in regard to the affairs of the Partnership.

(b) **Notices.** All notices under this Agreement, other than reports by the General Partner to the Partners, shall be in writing and shall be effective upon personal delivery, or if sent registered or certified mail, postage prepaid, addressed to the last known address of the party to whom such notice is given, upon deposit of such notice in the United States mails. Reports by the General Partner to the Partners shall be in writing and shall be sent first class mail to the last known address of each Partner.

(c) **Binding Effect.** This Agreement shall inure to and be binding upon all of the parties, their successors, assigns as permitted herein, custodians, estates, heirs and personal representatives. For purposes of determining the rights of any Partner hereunder, the Partnership and the General Partner may rely upon the Partnership records as to who are Partners and all Partners agree that their rights shall be determined and that they shall be bound thereby, including all rights which they may have under Sections 10, 11 and 15 hereof.

(d) **Captions.** Captions in this Agreement no way define, limit, extend, or describe the scope of this Agreement nor the effect of any of its provisions.

(e) **Counterparts.** This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute an agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _____ day of _____, 200__.

General Partner:

Limited Partner(s):

Martin James Capital Management, Inc.

_____

By:_____

_____

     Martin James Allamian, President

40

**Exhibit B**
**M.J. DIVERSIFIED, L.P.**
**Subscription Agreement/Limited Power of Attorney**

**(To be executed by all purchasers)**

To:

Document Number _____

Martin James Capital Management, Inc.
1 W. Illinois St., #285
St. Charles, IL 60174

Date: _____, 200 _____

**1. Subscription.** I hereby subscribe for Units of Partnership Interest ("Units") in M.J. Diversified, L.P. (the "Fund"), at $1,000 per unit or at Net Asset Value per Unit on the last business day of this month if the Fund has started trading, provided that all necessary subscription documents and contribution is received by the General Partner at least five days prior to the month end, as described in the Confidential Private Placement Memorandum dated _____ (the "Memorandum"), and hereby tender a check in the amount of $ _____ ($1,000,000 minimum). Upon acceptance of this subscription, I agree to become a Partner in the Partnership and accept and adopt the provisions of the Partnership Agreement. If my subscription is rejected, the amount of my subscription will be promptly returned to me without interest thereon or deductions therefrom.

**2. Representations and Warranties.** I hereby represent and warrant to you as follows:

(a) Simultaneously with acceptance of this subscription by the Partnership, and by completing, executing and delivering the Power of Attorney which is Exhibit C to the Partnership's Private Placement memorandum, I will become a party to the Partnership Agreement and will appoint the General Partner as my attorney-in-fact to, among other things, execute on my behalf all further amendments to the Partnership Agreement, and I will be bound by all of the terms and conditions thereof.

(b) I (and my offeree representative, if any) have read, understand and am fully familiar with the Partnership Confidential Private Placement Memorandum and the exhibits thereto, applicable to this investment, and am satisfied that I have received adequate information concerning all matters which I consider material to a decision to purchase Units.

(c) I (and my offeree representative, if any) have had an opportunity to ask questions of and received answers from the General Partner concerning the terms and conditions of this investment, and all such questions have been answered to my full satisfaction.

(d) I (and my offeree representative, if any) have such knowledge and experience in financial and business matters that I am capable of evaluating the risks and merits of an investment in the Partnership.

1

(e) I have completed the Confidential Purchaser Questionnaire or the Purchaser Representative Questionnaire, as appropriate, and certify that all disclosures therein are accurate and true.

(f) I have substantial means of providing for my current needs and personal contingencies and have no need for liquidity in this investment.

(g) My overall commitment to investments which are not readily marketable or are not liquid is not disproportionate to my net worth and my purchase of the Units will not cause my overall commitment in this type of investment to become excessive.

(h) I have substantial experience in making investment decisions of this type or am relying upon my own qualified purchaser representative in making this investment decision.

(i) Where appropriate, I have consulted my lawyer, accountant, or other advisor with respect to my investment and all books, records and documents pertaining to the investment have been made available to me and such advisors by the Partnership.

(j) Except as set forth in the Partnership's Confidential Private Placement Memorandum and the Exhibits thereto (the "Offering Documents"), no representations or warranties have been made to me by the Partnership, the General Partner or any agent, employee or affiliate of either of them, in entering into this transaction, and I am not relying upon any information, other than that contained in such Offering Documents and the results of my own independent investigation.

(k) I understand that the Units have not been registered under the Securities Act of 1933, as amended, or the Illinois Securities Act, that the Units have not been approved or disapproved by the Securities and Exchange Commission or by any federal or state agency, and that no such agency has passed on the accuracy or adequacy of the Partnership's Confidential Private Placement Memorandum.

(l) I am acquiring my Units hereunder for my own account, for investment purposes only, and not with a view to the sale or other distribution thereof, in whole or in part.

(m) If the undersigned is a corporation or trust, the officer executing this Subscription Agreement represents and warrants that he or she is authorized to so sign; that the corporation or trust is authorized by the Articles (or Certificate) of Incorporation and By-Laws of the corporation or by the trust agreement, as the case may be, to make this investment and to enter into the Partnership Agreement and this Subscription Agreement.

In the case of a corporation, the corporation will, upon request of the General Partner or counsel to the Partnership, furnish to the Partnership a true and correct copy of the provisions of the Articles (or Certificate) of Incorporation or By-Laws, or both, authorizing the corporation to make such investment, and a copy (certified by the secretary or other authorized officer) of appropriate corporation resolutions authorizing the specific investment.

3. I understand the meaning and legal consequences of the representations and warranties contained in paragraph 2 hereof and I hereby agree to indemnify and hold harmless the Partnership and the General Partner and each Partner thereof from and against any and all loss, damage or liability due to or arising out of any breach of any representation or warranty of the undersigned, whether contained in the Partnership Agreement or this Subscription Agreement. Notwithstanding any representation or warranty of the undersigned, whether agreements made herein by me, I do not thereby or in any other manner waive any rights granted to me under federal or state laws.

2

4. I understand that this Subscription is not binding on the Partnership until the Partnership accepts it, which acceptance is at the sole discretion of the General Partner, by executing this Subscription Agreement where indicated.

5. All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Partnership, as the case may be, at the respective address set forth herein.

6. **Limited Power of Attorney.** Subscriber irrevocably constitutes and appoints the General Partner, Martin James Capital Management, Inc., as his true and lawful attorney-in-fact with full power of substitution and with authority in subscriber's name, place and stead, to execute, acknowledge, deliver, swear to, file and record:

(a) The Partnership's Agreement of Limited Partnership;

(b) Amendments to the Agreement of Limited Partnership;

(c) Certificates of Limited Partnership and all amendments thereto;

(d) All documents necessary to qualify or continue the Partnership in the states where it may do business;

(e) All instruments which effect a change or modification of the Agreement of Limited Partnership in accordance with the terms thereof;

(f) All conveyances, instruments, or documents necessary to carry on the business of the Partnership including, but not limited to, futures brokerage agreements with any futures brokerage firm or to effect the dissolution of the Partnership; and

(g) All other filings with governmental agencies that are necessary or desirable to carry out the business of the Partnership.

This power of attorney shall be deemed coupled with and interest, shall be irrevocable and shall survive a subscriber's death or disability.

3

7. **Items to be Delivered by Subscriber**

    (a)    A reviewed Partnership Agreement (Exhibit A to the Private Placement Memorandum);

    (b)    A completed and executed Subscription Agreement/Limited Power of Attorney (Exhibit B to the Private Placement Memorandum);

    (c)    A completed and executed Confidential Purchaser Questionnaire as appropriate, (Exhibits C to the Private Placement Memorandum); and

    (d)    A check (or wire) payable to M.J. Diversified, L.P. in the amount of the subscription.

    IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement the date set forth below.

_____
Date

 

                                _____
                                  Subscriber's Name (print)

                                  _____
                                  Signature(s) of Subscriber(s)

Please print information below as you wish it to appear in the records of the Partnership:

RESIDENCE ADDRESS

_____
Number and Street

                                  _____
                                  Name(s)

_____
City      State      Zip

                                  _____
                                  Social Security Number or
                                  Taxpayer Identification Number

Address for Notices if different from above:

_____
Number and Street

_____
City      State      Zip

4

## REPRESENTATIONS BY EMPLOYEE BENEFIT PLANS

The undersigned on behalf of the subscribing employee benefit plan, represents that all of the obligations and requirements of the Employee Retirement Income Securities Act of 1974, including prudence and diversification, with respect to the investment of trust assets in Asset Allocation Fund, L.P. (the Partnership) have been considered prior to subscribing for units of partnership interest in the Partnership (Units). The person with investment discretion on behalf of the plan has consulted his attorney or other tax adviser with regard to whether the purchase of Units might generate "unrelated business taxable income" under Section 512 of the Internal Revenue Code. By signing this representation letter, the trustee or custodian subscribing for Units assumes full responsibility for evaluating the appropriateness of the investment and represents that he has (i) authority to make this investment on behalf of the plan, (ii) authorization to sign this Representation Letter and (iii) performed his duties with respect to the plan solely in the interest of the participants of the plan with due care, skill and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise.


Date _____

_____
(Name of Plan)

By: _____
(Trustee)

5

# M.J. DIVERSIFIED, L.P.

## CERTIFICATE OF LIMITED PARTNERSHIP INTEREST

The subscription from _____, is hereby accepted by the Partnership this

_____ day of _____, 200 ____, for the number of Units of Partnership interest that can

be purchased with the sum of $ _____.


Martin James Capital Management, Inc.
General Partner,


By:_____
Martin James Allamian, President


**The Limited Partnership Interest in M.J. Diversified, L.P. has not been registered under the Securities Act of 1933 or state securities laws and cannot be resold unless registered under applicable federal or state securities law or unless an exemption from registration is available. Transfer and redemption of interests are subject to restrictions contained in the Partnership Agreement.**

**Exhibit C**
**M.J. DIVERSIFIED, L.P.**
**Offeree Questionnaire**

(To be completed by each Purchaser
who executes a Subscription Agreement)

1.  Purchaser understands that the Units offered by M.J. Diversified, L.P. (the "Fund") will not be registered under the Securities Act of 1933, as amended (the "Act"), or the laws of any state. Purchaser also understands that in order to insure that the offering and sale of the Units are exempt from registration under federal and state securities laws, the Fund is required to have reasonable grounds to believe, and must actually believe after making reasonable inquiry, that all purchasers of Units or their professional advisors, if used, are sophisticated investors able to evaluate the merits and risks of the Investment. Accordingly, the following Information is supplied to supplement information concerning the purchaser previously made available to the Fund.

2.  Purchaser has read the Fund's Memorandum and understands that there are restrictions on transfers and sales of Units and that Purchaser's ability to liquidate the investment in Units may be limited.

3.  Is Purchaser an "Qualified Eligible Participant", as defined below?  Yes ___  No ___   (If purchaser is an "Qualified Eligible Participant", check the applicable categories below.

Accredited Investor and Qualified Eligible Participant Status

Initial all appropriate spaces below indicating the basis on which the undersigned qualifies as a "qualified eligible participant" and an "accredited investor." Only those which so qualify are eligible to invest in the Partnership. Please note that in the case of each category except (a) and (j) below the undersigned must (I) own securities (including participation in the Partnership and other pools) of issuers not affiliated with such person or entity and other investments (i.e., real estate held for investment purposes) with an aggregate market value of at least $2,000,000, (ii) have on deposit with a futures commission merchant at least $200,000 in exchange-specified initial margin and option  premiums for commodity interest transactions, or (iii) own a portfolio comprised of a combination of (i) and (ii)(e.g. $1,000,000 in securities and $100,000 in margin and premiums((the "Portfolio Requirement").

(a) _____  Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(b) _____  An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) thereof that was not formed for the specific purpose of investing in the Partnership and that satisfies the Portfolio Requirement.

(c) _____  A bank as defined in Section 3(a)(2) of the Securities Act of 1933, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act of 1933, acting for its own participant/accredited investor, that satisfies the Portfolio Requirement.

(d) _____  An insurance company as defined in Section 2(13) of the Securities Act of 1933, acting for its own account or for the account of a qualified eligible participant/accredited investor, that satisfies the Portfolio Requirement.

(e) _____  A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

1

(f) _____ An organization described in Section 501(c(3) of the Internal Revenue Code, a corporation, "Massachusetts or similar business trust, or partnership," in each case other than a commodity pool and not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(g) _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(h) _____ A commodity pool, trust, insurance company separate account or bank collective trust, not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000, whose participation in the Partnership is directed by a qualified eligible participant/accredited investor and which does not invest in aggregate more than 10 percent of the fair market value of its assets in the Partnership and other commodity pools exempt under CFTC Reg. 4.7.

(i) _____ An entity which all of the unit owners and participants (i.e., all partners (including limited partners) of a partnership, shareholders of a corporation and the grantor of a grantor trust, but not the beneficiaries of a true trust) are qualified eligible participants and accredited investors.

8. I represent and warrant that the information contained in this questionnaire is true and correct.

**FOR INDIVIDUALS:**

Dated: _____, 200 ____

_____
Purchaser's Signature

_____
Name - Print or Type

**FOR ENTITIES:**

_____
Name of Entity - Print or Type

_____
Authorized Officer's Signature

_____
Name of Officer - Print or Type

_____
Title of Officer - Print or Type

**PLEASE RETURN THIS OFFEREE QUESTIONNAIRE TO THE FUND WITH YOUR LIMITED PARTNERSHIP AGREEMENT (EXHIBIT A), ALONG WITH THE FOLLOWING IMPORTANT WIRE IDENTIFICATION INFORMATION:**

2

**Name of Purchaser's Bank:** _____

**Address of Purchaser's Bank:** _____

_____

**ABA# of Purchaser's Bank:** _____

**Date of Wire Transfer:** _____

**Amount of Wire Transfer:** _____

**Exhibit D**

**M.J. DIVERSIFIED, L.P.**
**REQUEST FOR REDEMPTION**

To: Martin James Capital Management, Inc.                    Date:_____

RE: M.J. Diversified, L.P.

I hereby give notice of my intent to redeem _____ Limited Partnership Interests (the "Units") in M.J. Diversified, L.P. (the "Fund").  In giving this notice, I certify my full understanding as follows that: (1) this notice is irrevocable; (2) this notice must be received by the Commodity Pool Operator during business hours at least 30 business days prior to the last business day of the calendar month in which redemption shall be effected (the "Redemption Date"); (3) upon failure to satisfy condition (2) above, the Fund will not redeem such Units until the last business day of the calendar month in which such conditions shall be fulfilled; (4) that the Net Asset Value per Unit at which such Units shall be redeemed shall be the Net Asset Value per Unit determined as of the Redemption Date as provided in the fund's Limited Partnership Agreement and the Offering Memorandum, less any wire transfer or other transaction cost; (5) where I do hereby give notice to redeem all my Units, then the Fund may exercise its right to redeem the balance of my Units if the aggregate Net Asset Value of my/our outstanding Units shall be less than U.S. $1,000,000 as determined as of the redemption date; and (6) the redemption proceeds will be paid by the fund within thirty (30) business days after the Redemption Date; except that; under such special circumstances Memorandum (including, but not limited to, the inability of the Pool Operator to reasonably determine the Net Asset Value of the Fund as of any Redemption Date), the Fund may suspend redemption's of Units, provided that the Fund Shall as soon as practicable thereafter cause such units to be redeemed or such redemption payment to be made.

Redemption Proceeds should be remitted as follows:

A.  If by check:          Payee:          _____

                          Address:        _____

                                          _____

                                          _____

B.  If by wire:           Bank:           _____

                          Bank Address:   _____

                          ABA#:           _____

                          Account Name:   _____

                          Account Number: _____

1

**INVESTOR'S SIGNATURE(S) MUST BE IDENTICAL TO NAME IN WHICH THE UNITS ARE REGISTERED.**

Partnership, Plan, Trust or Corporate Investor

_____  _____

_____  

_____  By: _____
               Partner, Trustee or Authorized Officer

**Shareholder's Signature(s)**

2

# Exhibit C

Memorandum Number:_____

Furnished To:_____

# M.J. Financial Arbitrage, L.P.

**(A Nevada Limited Partnership)**

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

The Date of this Disclosure Document is October 1, 1999

Confidential Offering Memorandum Dated October 1, 1999

# M.J. Financial Arbitrage, L.P.
### (A Nevada Limited Partnership)

**Minimum Purchase $500,000**

M.J. Financial Arbitrage L.P. (the "Fund") is a Limited Partnership organized under the laws of the state of Nevada in July 1999. The Fund engages, directly or indirectly, in the speculative lending of capital to various mortgage lenders. Once the loans are completed they are sold to a variety of "loan purchasers" pursuant to pre-selling agreements which exist between the lender and loan purchasers. The General Partner is responsible for directly or indirectly selecting the mortgage lenders as well as the loan purchasers to be used. At no time will a loan be completed unless it has already been pre-sold to one of the loan purchasers. The investment decisions of the Fund have been delegated to Martin James Capital Management, Inc., who is the Fund's General Partner.

THESE ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THESE SECURITIES ARE SUITABLE FOR INVESTMENT ONLY BY A PERSON WHO CAN AFFORD TO LOSE HIS ENTIRE INVESTMENT. (SEE INTRODUCTORY STATEMENT "WHO SHOULD INVEST" AND "RISK FACTORS".) THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OR AGENCY OF ANY STATE, NOR HAVE SUCH COMMISSIONS OR AGENCIES PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | OFFERING PRICE | SELLING COMMISSION | PROCEED TO FUND |
|---|---|---|---|
| Per Unit ..................... | $1,000 | $0 | $1,000 |
| Total Maximum ..... | $25,000,000 | $0 | $25,000,000 |

Limited Partnership Interests ("Units") will be continuously offered and sold initially by directors and officers of the Fund on a best-efforts, self-underwritten basis.

In order to purchase Units, checks should be made payable to the Fund and forwarded with the Subscription Agreement / Limited Power of Attorney (Exhibit B) to the Fund in care of the General Partner.

1

**RISK DISCLOSURE STATEMENT**

PROSPECTIVE PURCHASERS OF UNITS ARE NOT TO RELY ON THE CONTENTS OF THIS DISCLOSURE DOCUMENT AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE PURCHASER SHOULD CONSULT HIS OWN PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING HIS INVESTMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE DOCUMENT HAS BEEN PRESENTED AND IS ACCEPTED WITH THE EXPRESS AGREEMENT AND UNDERSTANDING THAT IT IS CONFIDENTIAL AND THAT IT WILL NOT BE REPRODUCED IN WHOLE OR IN PART, NOR WILL IT BE DISTRIBUTED OR DISCLOSED TO ANY OTHER PERSON, FIRM OR CORPORATION WITHOUT PRIOR WRITTEN PERMISSION. ANY PERSON ACTING CONTRARY TO THE FOREGOING RESTRICTIONS MAY PLACE HIMSELF AND THE FUND IN VIOLATION OF FEDERAL OR STATE SECURITIES LAWS.

EXCEPT AS OTHERWISE INDICATED, THIS DISCLOSURE DOCUMENT SPEAKS AS OF THE DATE OF ITS ISSUANCE AND NEITHER THE DELIVERY HEREOF NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF ISSUANCE.

<u>Notice For Residents In All States</u>

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF CERTAIN STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFER ABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

<u>NOTICES FOR RESIDENTS OF THE FOLLOWING STATES</u>

<u>ALASKA</u>: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500 - 3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170. THE INVESTOR MUST RELY ON HIS OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

<u>CALIFORNIA</u>: IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF UNITS, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFORE, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER RULES. EACH INVESTOR OR TRANSFEREE WHO IS A RESIDENT OF CALIFORNIA MUST BE PROVIDED WITH A COPY OF SECTION 260.141.11 OF THE RULES OF THE COMMISSIONER OF CORPORATIONS.

<u>CONNECTICUT</u>: THE INTERESTS ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION AND HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE ACT AND, THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

<u>FLORIDA</u>: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT IN RELIANCE UPON EXEMPTION PROVISIONS CONTAINED THEREIN. §517.061(11)(a)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT (THE "FLORIDA ACT") PROVIDES THAT ANY PURCHASER OF SECURITIES IN FLORIDA WHICH ARE EXEMPTED FROM REGISTRATION UNDER §517.061(11) OF THE FLORIDA ACT MAY WITHDRAW HIS SUBSCRIPTION AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE BUSINESS DAYS AFTER HE TENDERS CONSIDERATION FOR SUCH SECURITIES. THEREFORE, ANY FLORIDA RESIDENT WHO PURCHASES SECURITIES IS ENTITLED TO EXERCISE THE FOREGOING STATUTORY RESCISSION RIGHT WITHIN THREE BUSINESS DAYS AFTER TENDERING CONSIDERATION FOR THE SECURITIES BY TELEPHONE, TELEGRAM, OR LETTER NOTICE TO THE GENERAL PARTNER AT THE ADDRESS OR TELEPHONE NUMBER SET FORTH ON THE COVER PAGE HEREOF. ANY TELEGRAM OR LETTER SHOULD BE SENT OR POSTMARKED PRIOR TO THE END OF THE THIRD BUSINESS DAY. A LETTER SHOULD BE MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE IT RECEIPT AND TO EVIDENCE THE TIME OF MAILING. ANY ORAL REQUESTS SHOULD BE CONFIRMED IN WRITING.

3

**GEORGIA:** THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE "GEORGIA SECURITIES ACT OF 1973," AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

**MAINE:** THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OF THE STATE OF MAINE UNDER SECTION 10502(2)(R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXISTS.

**MISSISSIPPI:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY INFORMATION | 6 |
| THE FUND | 8 |
| THE OFFERING | 9 |
| THE GENERAL PARTNER | 11 |
| COMPENSATION AND EXPENSES | 12 |
| RISK FACTORS / CONFLICTS OF INTEREST | 12 |
| TAX CONSIDERATIONS | 14 |
| | |
| PARTNERSHIP AGREEMENT | EX- A |
| SUBSCRIPTION AGREEMENT | EX- B |
| OFFEREE QUESTIONNAIRE | EX - C |
| REQUEST FOR REDEMPTION | EX - D |

# SUMMARY

This summary is intended as a highlight of more detailed information contained elsewhere in the body of this Memorandum. This Summary is qualified in its entirety by the information appearing elsewhere in this Memorandum and the Partnership Agreement. The Fund is offered pursuant Regulation D of the Securities Act of 1933 and will cease operation December 31, 2025 or the first to occur of: an election to dissolve the Fund by the General Partner, the General Partner's dissolution, or any other event that constitutes a dissolution of a limited partnership under the Act.

**The Fund**

M.J. Financial Arbitrage, L.P. (the "Fund") is a limited partnership organized under the laws of the State of Nevada and will be engaged in the speculative lending of capital to various mortgage lenders. Investment in the Fund is being offered pursuant to Regulation D of the Securities Act of 1933. The principal office of The Fund is located at 6 N 808 Dunham Road, Elgin, IL 60120. The telephone number is (630) 497-9104. The Fund was organized under the laws of the state of Nevada in July of 1999.

**General Partner**

The General Partner is Martin James Capital Management, Inc., which has its principal office at 6 N 808 Dunham Road Elgin IL 60120. The telephone number is (630) 497-9104.

**Investment Objective**

To engage in the speculative lending of capital to various mortgage lenders. Once the loans are completed they are sold to a variety of "loan purchasers" pursuant to pre-selling agreements which exist between the lenders and loan purchasers. The General Partner is responsible for directly or indirectly selecting the mortgage lenders as well as the loan purchasers to be used. At no time will a loan be completed unless it has already been pre-sold to one of the loan purchasers.

**Units Offered**

Limited Partnership Interests ("Units") are offered to the public at an initial price of $1,000 per Unit. Thereafter, Units will be available for purchase at the month end net asset value per Unit. The minimum required investment is $500,000 per shareholder. This minimum may vary at the discretion of the General Partner.

**Redemption of Shares**

The Units are redeemable by Shareholders at the Net Asset value per Unit as of the end of any Quarter with 10 business days prior written notice to the Fund. Any amount payable to the applicant in connection with the redemption of Units shall be paid in United States Dollars and transferred by wire upon the applicant's request at his expense.

**Compensation**

The Fund's General Partner will receive a monthly management fee equal to 1/12 of 2% (2% annually) of the net assets under management and will also receive 10% of the net profits each quarter.

6

**Expenses**          The Fund will pay for on-going operating expenses which include accounting, legal and auditing, estimated at .25% of assets under management.

**Monthly Report**    Each Limited Partner will receive a monthly financial statement showing their month end Net Asset Value in the Fund. Additionally, each Limited Partner will receive a year end set of financial statements audited by a Certified Public Accountant.

**Tax Treatment**     See the "Tax Considerations" section for a more complete discussion.

**Fiscal Year**       End December 31.

**Risks**             An investment in Units is speculative and involves a high degree of risk.

**How to Subscribe**  Investors who want to purchase Units must execute a Partnership Agreement, Subscription Agreement and Offeree Questionnaire (Exhibits B and C) and deliver them with full payment.

**Functional Currency** The fund will report its results and transact subscriptions and redemptions in United States Dollars.

7

# THE FUND

M.J. Financial Arbitrage, L.P., (the "Fund") is a limited partnership organized under the laws of the state of Illinois. The principal office of The Fund is located at 6 N 808 Dunham Road, Elgin IL 60120. The telephone number is (630) 497-9104. The Fund was formed under the laws of the state of Nevada in July of 1999.

## Financial Information

M.J, Financial Arbitrage, L.P., (the Fund), was formed in 1999. Prospective investors that wish to see unaudited performance sheets for the Fund may obtain these upon request to the Fund.

## Introductory Statement

### Who Should Invest

PURCHASE OF THE UNITS OFFERED HEREBY SHOULD BE MADE ONLY BY THOSE PERSONS WHO CAN AFFORD TO BEAR THE RISK OF A TOTAL LOSS OF THEIR INVESTMENT. THE FUND RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

Each subscriber will be required to make certain representations as to his net worth and income (See the Subscription Agreement and Offeree Questionnaire attached as Exhibits B and C). The Units are subject to restrictive redemption provisions. (See "Redemptions".) **The Fund believes that prospective investors should consider the Units as a long-term investment.** There is no public market for these Units and none is likely to develop. In addition, offerees should not enter this program with the expectation of sheltering income. (See "Summary of Income Tax Consequences".)

### Certain Investment Advantages to be Considered

Limited Partners in the Fund will be able to obtain certain potential advantages which may otherwise be unavailable to them if they were to engage individually in these types of lending transactions. Among these are the following:

1. **Limited Liability.** Subject to certain limitations, a limited partner cannot lose more than the amount of his investment.

2. **Administrative Convenience.** The Fund provides the partners with many services designed to reduce the administrative details involved in these types of transactions.

3. **Professional Management.** The General Partner is responsible for selecting the mortgage lenders and loan purchasers solely at its discretion.

4. **No Redemption Fees.** There are no fees or deductions (other than wire transfer fees or other transaction costs) that will be charged to any investor on payments made for the redemption of his Units.

5. **Diversification Of Asset Class.** An investment in the shares may offer characteristics that would add to the diversification of typical portfolio allocations.

6. **Purchases by Retirement Plans - ERISA Considerations.** The purchase of Units in the Fund might be a suitable investment for retirement plans, including corporate pension and profit sharing plans; self-employed plans; and Individual Retirement Accounts ("IRAs"). Those who have investment discretion on behalf of such plans are fiduciaries to these plans and should consult with their own legal and financial advisors regarding the considerations involved in such an investment including the following: (1) whether the purchase of Shares is permitted under the governing instruments of the plan; (2) whether the purchase of Shares is appropriate for the plan in view of its investment policy; (3) the applicability of certain state laws; (4) applicable restrictions and tax consequences under the Internal Revenue Code (see "Summary of Income Tax Consequences"); and (5) the requirements of ERISA.

The fiduciary provisions of ERISA are highly complex. Each employee benefit plan should consult with its own counsel as to the applicability of ERISA prior to investing in the Fund. Acceptance of subscriptions from employee benefit plans is not a representation that this investment meets the relevant legal requirements.

## THE OFFERING

PURCHASE OF THE UNITS OFFERED HEREBY SHOULD BE MADE ONLY BY THOSE PERSONS WHO CAN AFFORD TO BEAR THE RISK OF A TOTAL LOSS OF THEIR INVESTMENT. THE FUND RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

## MINIMUM SUBSCRIPTION

The minimum purchase is $500,000. At the discretion of the General Partner, lesser amounts may be accepted.

9

## APPLICATION OF PROCEEDS

The proceeds of this offering will be used for speculative lending of capital to various mortgage lenders. Once the loans are completed they are sold to a variety of "loan purchasers" pursuant to pre-selling agreements which exist between the lenders and loan purchasers. The General Partner is responsible for directly or indirectly selecting the mortgage lenders as well as the loan purchasers to be used. At no time will a loan be completed unless it has already been pre-sold to one of the loan purchasers.

## LEVERAGE

At various times the Fund may borrow money from various lending institutions to utilize towards the strategy. It is anticipated that initially $60.00 will be borrowed for every $100.00 that is invested. The Fund intends to borrow between $60.00 to $100.00 for every $100.00 invested.

## THE INVESTMENT PROCESS

Step 1)  Mortgage lender identifies candidate for a $100,000.00 loan.

Step 2)  Mortgage lender supplies candidate information and secures underwriting specifics from loan purchaser.

Step 3)  Pre-purchase documents are executed.

Step 4)  M.J. Financial Arbitrage L.P. either directly or indirectly gets confirmation of their security interest in the loan, until their capital is returned.

Step 5)  The loan closes and is sold per the agreement in 7-12 days.

Step 6)  Mortgage lender receives a check from the loan purchaser.

Step 7)  Mortgage lender sends a check for 25% of the premium that was received to M.J. Financial Arbitrage, L.P.

Step 8)  Mortgage lenders sends a check for 1/12 of 5% of the total capital made available by M.J. Financial Arbitrage, L.P. to M.J. Financial Arbitrage L.P.

## THE GENERAL PARTNER

**Martin James Capital Management, Inc.'s** principals are Martin James Allamian and James J. Manning. Martin James Capital Management, Inc. is a Delaware corporation formed in 1991. It's principal office is located at 6 N 808 Dunham Road, Elgin, IL 60120. The telephone number is (630) 497-9104.

Mr. Allamian obtained a B.S. Degree from Northern Illinois University in 1984. His studies concentrated in accounting and finance. After graduation he became an Associated Person of Investment Educators until 1986. His duties included performing market analysis and research. He was also responsible for teaching at educational seminars concerning futures and option trading. Investment Educators was registered as a CTA during Mr. Allamian's employment.

From 1986 to the present, Mr. Allamian has been trading his own futures and options accounts as a means of income. Within this time period he has had additional responsibilities. In 1987, he became a member of the Midamerica Commodity Exchange and traded his account as a floor trader. In 1988, he sold his Midamerica membership and became a member of the Chicago Board of Trade. From 1988 until 1991, he traded his own account as a floor trader. During the time he was a floor trader, from 1988 to 1989, he was also employed at Optima Futures Analysis, Inc., as a market analyst, primarily in the area of U.S. Treasury Bonds and Options. Optima Futures Analysis, Inc. is registered as a CTA.

In 1989 Mr. Allamian formed, and is President and sole principal of, *Martin James & Company, Inc.* ("MJC"). MJC is registered and currently operates as an Introducing Broker ("IB"). As President of MJC, he is responsible for the complete management of the company. This includes, but is not limited to, supervising the firm's associated persons and developing institutional and retail client accounts in managed futures.

In 1991, to further service his managed futures clients, Mr. Allamian formed *Martin James Capital Management, Inc.* Martin James Capital Management, Inc. is currently the General Partner for four funds, and functions as a Manager of Managers, responsible for research and analysis of trading advisors, investment advisors, and derivative investments.

James J. Manning has been an employee of Martin James Capital Management, Inc. and Martin James & Company since April 1992. He currently holds the title of Senior Vice President. Mr. Manning is in charge of all customer relations and marketing. Along with his primary responsibilities, he also assists in other areas as needed.

## TRADING SUSPENSION

The Fund will suspend trading if the Net Asset Value per Unit declines 5% from the Net Asset Value per Unit as of the day the Fund began trading. Limited Partners will be promptly notified of the suspension. The Fund will not resume trading until the Limited Partners have had an opportunity to redeem their Units.

## COMPENSATION AND EXPENSES OF THE FUND

**General Partner Fees.** The General Partner will receive a monthly management fee equal to 1/12 of 2% (2% annually) of the Net Assets Under Management of the Fund. (the Fund's total assets, including all cash and cash equivalents, and accrued interest). The General Partner will also receive 10% of Net Profits.

**Operating Expenses.** The Fund will pay its operating and administrative expenses. These expenses include, but are not limited to accounting, legal and auditing, estimated at .25% (1/4 of 1%) of total assets.

## RISK FACTORS/CONFLICTS OF INTEREST

The Fund is a new venture in a high risk business and investment in the Units should be made by persons and entities able to assume the risk of losing their entire investment and only after consulting with independent qualified sources of investment and tax advice. Among the risks involved are the following:

**Possible Interest Rate Increases.** Interest rates in general are subject to a number of factors over which the General Partner has no control. Substantial increases in interest rates for residential real estate loans may adversely affect the Partnerships ability to underwrite and sell a substantial volume of spot loans or achieve the projected profit.

**Tax status of the partnership.** The Partnership does not intend to request a ruling from the Internal Revenue Service (the 'IRS") to the effect that the Partnership will be classified as a Partnership for Federal income tax purposes and will not be classified as an association taxable as a corporation. If the Partnership were treated as an association taxable as a corporation for Federal income tax purposes in any taxable year, income and losses of the Partnership would be reflected only on its tax return rather than being passed through to the Members, and all or a portion of the distributions made to the Member could be taxable as dividend income.

**Restrictions on Transfer and No Market for Partnership Interest.** The operating Agreement places express restrictions on the transfer of the Partnership interest. Interests will not be registered under the 1933 Act or qualified under the securities acts of various states, but will be sold in reliance upon exemptions from registration. Interests may not be re-offered for sale or resold without the consent of the General Partner. The transferability of interests is specifically restricted by the Operating Agreement, including a provision requiring the approval of the Manager before any transfer can be made. Further, no transfer may be made in violation of applicable securities laws or it would effect a termination of the Company for Federal income tax purposes. See "Limited Operating Agreement." There is no market for the interests and no market is likely to develop. Consequently, Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason.

12

**Absence of Operating History.** The Partnership has no operating history.

**Conflicts.** The interests of the Members may be inconsistent in some respects with the interests of the Partnership notwithstanding that the Manager has a fiduciary obligation to the Partnership and the Members.

**No Independent Counsel.** No independent counsel has been retained to represent the interests of the Members. The Operating Agreement has not been reviewed by any attorney on behalf of the Members. The investor is, therefore, urged to consult with his own counsel as to the terms and provisions of the Operating Agreement and all other documents relating thereto.

**Reliance Upon General Partner.** The Partnership will have one General Partner which will have sole discretion and authority to manage the affairs of the Partnership. The success of the operation of the Partnership depends in large part upon the services and knowledge of the Manager. If its services become unavailable for any reason, it may be difficult or impossible for the Partnership to find a suitable replacement.

**THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE OFFERING MEMORANDUM BEFORE DECIDING TO INVEST IN SHARES OF THE FUND.**

# TAX CONSIDERATIONS

**The analysis contained herein does not include all aspects of applicable U.S. federal and state tax law, and is not intended as a substitute for careful tax planning by shareholders. Therefore, each prospective shareholder should consult his own tax advisor to satisfy himself as to the tax consequences of this investment.**

Introduction

    This section summarizes some of the federal income tax consequences to participants owning limited partnership interests in the Partnership. This summary does not address the tax implications of owning an interest in the Partnership by corporations, partnerships, trusts and other non-individuals. This summary is also not a substitute for tax advice, particularly since certain of the tax consequences of owning an interest in the Partnership may not be the same for all taxpayers.

Partnership Status

    The General Partner believes that under current federal income tax law, it is more likely than not that the fund will be classified as a Partnership and not as an association taxable as a corporation. No ruling has been requested from the U.S. Internal Revenue Service ("IRS") nor has an opinion of counsel been sought with respect to such classification and the General Partner does not intend to request such a ruling or opinion.

    In the event that the Partnership were deemed to be an "association" taxable as corporation, profit or loss of the Partnership would not be passed through to the participants and the Partnership would be subject to tax on its income at the rate applicable to corporations. In addition, any distributions by the fund to participants could be taxable to them as dividends or capital gains.

Partnership Taxation

    For federal income tax purposes, a partnership is not a taxable entity but rather a conduit through which taxable income or deductions are passed to the partners. Thus, the partnership form of organization allows the partners rather than the partnership to receive any tax credits and deductions from the operations to be engaged in by the partnership. The partners will be subject to tax on income of the partnership, but no additional tax will result to the partnership. Each partner, in computing his own federal income tax liability for a taxable year, will be required to take into account his share of all items of partnership income, gain, loss, deduction or credit for the taxable year to the partnership regardless of whether such partner has received any distributions from the partnership.

    A participant's share of such items for federal income tax purposes generally will be determined by the Partnership Agreement on a pro-rata basis taking into account each participant's capital account and for participants who have redeemed units during the fiscal year, the number of days during the fiscal year that units were owned by such participants on a weighted average basis. A participant's distributive share of Partnership loss (including capital loss) will be deductible on his personal income tax return only to the extent of his adjusted basis in his Partnership interest. However, because of the limitations imposed upon the deductibility of capital losses by the IRS, a participant's pro rata share of the Partnership's net capital losses, if any, will not materially reduce his federal income tax on his ordinary income.

### Treatment of Redemptions

If the cash received from the Partnership by a participant as a result of the redemption of any or all of his units by the Partnership during any calendar year exceeds his share of the Partnership's taxable income for that year, the excess will constitute a return of capital to the participant for federal income tax purposes. It will thereby reduce, but not below zero, the tax basis of his interest in the Partnership. If these redemptions exceed the participant's adjusted tax basis in his interest, the excess will be taxable to him as though it were a gain from a sale of the interest.

A loss will be recognized upon a withdrawal of capital only if, following the withdrawal of all of the participant's capital, the participant has any tax basis in his interest remaining. He will then recognize loss to the extent of the remaining basis.

### Limitations of Deductibility of Passive Loss

The tax code generally provides that losses from a passive activity are disallowed to the extent that losses exceed income from all passive activities. A passive activity is a trade or business in which the taxpayer does not materially participate, unless otherwise provided in the regulations. Therefore, if the Partnership is considered to be engaged in a trade or business for federal income tax purposes, the ownership of units would constitute a "passive activity" with the result that net losses from Partnership operations (including net capital losses) would not be deductible in computing the taxable income of a partner except against certain income from the Partnership or other "passive activities" or until disposition of the partner's interest in the Partnership.

### Purchase by Retirement Plans - ERISA Considerations

An ERISA account is a benefit plan or pension, profit-sharing, stock bonus or other employee plan qualified under Section 401 (a) of the Internal Revenue Code. The fiduciary provisions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), are highly complex. Accordingly, when considering an investment of the assets of an ERISA account in the Fund, a fiduciary with respect to such plan should consider among other things: (a) the definition of "plan assets" under ERISA and the final regulations issued by the Department of Labor ("DOL") regarding the definition of "plan assets"; (b) whether the investment satisfies the diversification requirements of paragraph 404(a)(1) of ERISA; (c) whether the investment satisfies the prudence requirements of paragraph 404(a)(1) of ERISA; whether income derived from the Fund could constitute "unrelated business income" subject to federal income taxation in the ERISA account; and (e) that there may be no market in which such fiduciary can sell or otherwise dispose of the Shares (other than through redemptions). Consequently, the Fund recommends that each investor and his financial and legal advisors consider the foregoing, among any other pertinent factors, before making any purchase of Shares. Because the Fund intends to satisfy pertinent DOL standards relating to what constitutes a "publicly offered security", it is expected that "benefit plan investors" as defined will be limited to less than 25% of the Net Asset Value of the Fund in order to avoid the impact of such regulations. Similarly, in view of such DOL regulations, the fund does not intend to accept subscriptions from benefit plan investors if the acceptance would violate the foregoing regulations. Moreover, the Fund also has the right to require ERISA accounts to redeem their Shares at any time to avoid application of the "plan asset" rules.

Publicly Traded Partnership

The General Partner believes that income earned by the Partnership will not constitute "unrelated business taxable income" under Section 511 of the Code to plans and other tax exempt investors. The Partnership's income could be considered "unrelated business taxable income" if the Partnership is considered a "publicly traded partnership" ("PTP"). However, the Partnership does not expect to be a PTP, but there can be no assurance of this result. The Partnership would be a PTP if its interests are (a) traded on an established securities market or (b) readily tradable on a secondary market or the substantial equivalent thereof. While the units will not meet condition (a), the redeemability of the units might cause them to meet condition (b). However, the IRS has established certain safe harbors from PTP status, one of which basically provides that the redeemability of a Partnership's interest is disregarded for purposes of condition (b) above if the Partnership offers its interest in an offering exempt from registration under the Securities Act of 1933 and has no more than 500 investors or the minimum investment is $20,000 or more. The Partnership expects to meet at least this first condition. Even if the Partnership is a PTP, it will not be taxed as a corporation if 90% or more of its gross income for each taxable year is "qualifying income", which includes gains from securities, commodities, options, futures and commodity forward contracts, and generally includes interest income. The Partnership also expects to meet this condition.

Tax Returns and Information

The Partnership will file an information tax return using the accrual method of accounting. Within 75 days after the close of the Partnership's taxable year, the Partnership will furnish each limited partner (and any assignee of an interest of any limited partner) copies of (a) the Partnership's schedule K-1 indicating the limited partner's distributive share of tax items and (b) such additional information as is reasonably necessary to permit the limited partners to prepare their own federal and state tax returns. The Partnership's tax return will be prepared by an independent certified public accountant selected by the General Partner.

The Partnership's Taxable Year

The Partnership will use the calendar year as its taxable year.

Tax Audits

Adjustments in tax liabilities with respect to Partnership items are made at the Partnership level. The General Partner will represent the Partnership during any audit and in any dispute with the IRS. Each limited partner will be informed by the General Partner of a commencement of an audit of the Partnership. In general, the General Partner may enter into a settlement agreement with the IRS on behalf of, and binding upon, the limited partners. However, prior to settlement a limited partner may file a statement with the IRS stating that the General Partner does not have the authority to settle on his behalf.

The period for assessing a deficiency against a partner in a partnership with respect to a partnership item is the later of three years after the partnership files its return or, if the name and address of the partner does not appear on the partnership return, one year after the IRS is furnished with the name and address of the partner. In addition, the General Partner may consent on behalf of the Partnership to the extension of the period for assessing a deficiency with respect to a Partnership item. As a result, a limited partner's federal income may be subject to examination and adjustment by the IRS for a Partnership item more than three years after it has been filed.

<u>State and Local Taxes</u>

In addition to the federal income tax consequences described above, the Partnership and the limited partners may be subject to various state and local taxes. A limited partner's distributive share of the realized profits of the Partnership may be required to be included in determining his reportable income for state or local tax purposes.

THE FOREGOING STATEMENTS REGARDING FEDERAL INCOME TAX CONSE-QUENCES TO THE PARTNERS ARE BASED UPON THE EXISTING PROVISIONS OF THE INTERNAL REVENUE CODE AND THE EXISTING ADMINISTRATIVE AND JUDICIAL INTERPRETATIONS THEREUNDER. IT IS EMPHASIZED THAT NO ASSURANCE CAN BE GIVEN THAT LEGISLATIVE, ADMINISTRATIVE OR JUDICIAL CHANGES WILL NOT OCCUR WHICH MODIFY SUCH STATEMENTS. THIS SECTION IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, PROSPECTIVE PARTICIPANTS IN THE PARTNERSHIP ARE URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATION UNDER FEDERAL LAW AND THE PROVISIONS OF APPLICABLE STATE AND LOCAL LAW BEFORE SUBSCRIBING FOR UNITS.

## Audits

The code provides for the conduct of tax audits at the Fund level, rather than the individual shareholder level. Furthermore, an audit of the Fund may cause an audit of an individual shareholder on other issues; the Fund is not liable for the costs incurred by any shareholder in an audit.

# SUBSCRIPTION PROCEDURES

Investors wishing to purchase Units in M.J. Financial Arbitrage ,L.P. must do the following:

* Complete the Partnership Agreement, Subscription Agreement and Offeree Questionnaire.

* Send the Partnership Agreement, Subscription Agreement and Offeree Questionnaire along with a check (or wire funds to instructions below) in the subscription amount to the General Partner as follows:

M.J. Financial Arbitrage L.P.                First Eagle National Bank - Hanover Park, IL.
6 N 808 Dunham Road      or wire to:    ABA #071925017
Elgin, IL 60120                       M.J. Financial Arbitrage L.P.
                                    Account #102851101

A fully executed Partnership Agreement, Subscription Agreement and Offeree Questionnaire must be received by the General Partner no later than 15 days before the end of any month during the continuous offering period. The General Partner may waive this requirement at it's discretion.

The Fund is entitled to reject in whole or in part the subscription, in which event the subscription monies received by the Fund from the subscriber will be returned in accordance with the Subscription Agreement.

## Investment Requirements

Subscriptions for the purchase of the Shares offered hereby are subject to the following conditions:

(1)    The minimum purchase of $500,000. The General Partner in its discretion may accept smaller subscriptions. Except for tax or other regulatory considerations described herein, there is no limit on the maximum number of Units that may be purchased by any one investor.

(2)    Each purchaser must certify in the Subscription Agreement attached hereto as Exhibit B that he has read this Memorandum and understands the risks of participating in this investment, including the risk of losing his entire investment, and that he is purchasing shares in the Fund for his own account (or for a trust account) for investment and not with a view for resale or distribution.

(3)    To be considered an accredited investor, a purchaser must represent in the Offeree Questionnaire that he has (a) a net worth exclusive of home, furnishings and automobile of at least $1,000,000 or (b) a net worth (similarly calculated) of at least $250,000 and an annual gross income of at least $200,000. The Fund can accept a limited number of individuals who are not accredited investors.

(4)    In the case of a pension or profit sharing plan or trust, the trustee must represent that he or she is authorized to execute such subscription on behalf of the plan and that such investment is not prohibited by law or the plan's governing documents.

(5)    The General Partner may reject any subscription. All subscriptions are irrevocable.

18

### Exhibit A

# M.J. FINANCIAL ARBITRAGE L.P.
## LIMITED PARTNERSHIP AGREEMENT

THIS PARTNERSHIP AGREEMENT made and entered into this _____ day of _____, by and between Martin James Capital Management, Inc. (the "General Partner") and other parties who shall execute this agreement, whether in counterpart, by separate instrument or otherwise, as Limited Partners (who are hereinafter referred to as "Limited Partners") (the General Partner and the Limited Partners are sometimes collectively referred to herein as "Partners").

**WITNESSETH**

WHEREAS, the parties hereto desire to form a partnership for the purpose of funding certain individual spot loans of various mortgage lenders.

NOW, THEREFORE, the parties hereto agree as follows:

1.     **Formation and Name.**

The parties hereby form a partnership. The name of the partnership is M.J. Financial Arbitrage, L.P. (the "Partnership"). The General Partner shall execute and file with the Office of the Secretary of the State of Nevada a Certificate of Limited Partnership and shall execute, file, record and publish as appropriate such amendments, assumed name certificates and other documents as necessary or advisable as determined by the General Partner. Each Limited Partner agrees to furnish the General Partner with a limited power of attorney which may be filed with the Certificate of Limited Partnership and any amendments thereto and such additional information as is required to complete such documents and shall execute and cooperate in the filing, recording or publishing of such documents at the request of the General Partner.

2.     **Principal Office.**

The principal office of the Partnership shall be 6 N 808 Dunham Road, Elgin, IL 60120 or such other place as the General Partner may designate from time to time.

3.     **Business.**

The Partnership business and purpose is to provide funding to various mortgage lenders in exchange for an agreed upon annual rate of return and a percentage of the premiums earned when the loan is sold. The objective of the Partnership's business is appreciation of its assets.

4.     **Term, Dissolution and Fiscal Year.**

      (a)   **Term.** The General Partner has filed a Certificate of Limited Partnership with the Nevada Secretary of State. Trading will continue until any of the following events occur:

            (i)     December 31, 2025;

            (ii)    Withdrawal or insolvency of the General Partner unless a new General Partner shall be substituted pursuant to Section 15(c) hereof;

(iii)    A decline in the net asset value per unit of Partnership interest to 5% or less of its value as of the first business day of the month, unless the General Partner elects to continue the partnership pursuant to Section 4(d) of this Agreement; and

(iv)    Any event which shall make unlawful the continued existence of the Partnership.

(b)    **Termination of initial offering.** The Partnership began soliciting funds in July 1999. November 1, 1999 marks the end of the initial offering period.  Pursuant to Regulation D of the Securities Act of 1933.

(c)    **Dissolution.**    Upon the first to occur of the events in Section (a) above, the Partnership shall terminate and be dissolved.  The General Partner and each Limited Partner shall share in the assets of the Partnership, after the payment of creditors, pro rata in accordance with their respective capital accounts, less any amount owing by such Partner to the Partnership.

(d)    **Continuation of Partnership.**    Upon the decline in net asset value as outlined in Section 4(a)(iii) above, the General Partner may, in its discretion poll the Partners to determine whether Partnership trading should continue.  All Partners will be provided the opportunity to redeem their Partnership interest at this time.  If, in the judgment of the General Partner, enough Partners wish investing to resume, the General Partner will resume investing.  Otherwise, the General Partner will terminate the Partnership.

(e)    **Fiscal Year.**    The fiscal year of the Partnership shall begin on January 1 of each year and end on the following December 31, provided, however, that if such fiscal year is disapproved by the Internal Revenue Service the fiscal year shall be as otherwise approved by the General Partner and the Internal Revenue Service.

5.    **Management of the Partnership.**

The General Partner, to the exclusion of all other partners, shall conduct and manage the business of the Partnership including, without limitation, the investment of the funds of the partnership.  No Limited Partner shall be entitled to any salary, draw or other compensation from the Partnership on account of any investment in the Partnership.  The General Partner shall have sole discretion in determining what distributions of profits and income, if any, shall be made to the Partners, shall execute various documents on behalf of the Partnership and the Partners and supervise the liquidation of the Partnership if an event causing termination of the Partnership occurs.

The General Partner will have sole discretion with regard to the appointment or employment of all persons or entities providing services to the Partnership including, but not limited to, mortgage lenders, brokers and accountants and may employ any such persons or entities on behalf of the Partnership without notice to the Partners.

2

The General Partner may engage in other business activities and shall not be required to refrain from any other activity or disgorge any profits from any such activity, whether as General Partner of additional partnerships or otherwise. The General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of all funds and assets of the Partnership, and he shall not employ or permit others to employ such funds and assets in any manner except for the exclusive benefit of the Partnership. The Partnership shall keep and retain such books and records relating to the business of the Partnership as it deems necessary or advisable, at the principal office of the Partnership, or such other offices as the General Partner deems advisable. Such books and records shall be retained by the Partnership for not less than six years. The Limited Partners shall be given reasonable access to the books and records of the Partnership.

No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the partnership nor to determine any fact or circumstance bearing upon the existence of their authority.

The Partnership shall make no loans. Assets of the Partnership will not be commingled with assets of any other entity.

6.    **Capital Contributions and Units of Partnership Interest.**

(a)    **Initial Capital Contributions.** Interests in the Partnership shall be evidenced by Units of Partnership Interest ("Units" or individually a "Unit"). The General Partner on behalf of the Partnership will issue Units to persons desiring to become Limited Partners; provided that such persons are determined by the General Partner to be qualified and provided their subscriptions and Subscription Agreements are accepted by the General Partner.

After the Partnership begins operations, an investor will become a Limited Partner in the Partnership on the first day of the month following receipt by the Partnership of the investor's capital contribution and acceptance by the General Partner of such investor's executed Limited Partnership Agreement, Subscription Agreement, Purchaser Questionnaire, Power of Attorney and any other documents required by the General Partner (collectively, the "subscription documents") no less than ten days preceding the first day of the month.

(b)    **Additional Capital Contributions.** A Partner may, as of the first day of any month (the "effective date"), contribute additional funds to the Partnership, in amounts equal to or in excess of $500,000 provided such contribution is received at least 10 days prior to this effective date. As of the effective date, the General Partner will revise the contributing Partner's capital account to reflect such contribution, and the Units of all the Partners shall be adjusted to reflect the additional contributions to the total capital of the Partnership. The same adjustment will be made with respect to the initial capital contribution of new Partners so that Partnership profits and losses will be allocated proportionately to those Partners who were members of the Partnership during the applicable period. In determining the value of the capital accounts of the Partners, the value of each Unit, including Units of General Partnership Interest, shall be determined as of the close of business on the last day of the month immediately preceding the effective date of the capital contribution. The General Partner may also contribute additional funds to the Partnership under the same terms and conditions.

3

7.    **Allocation of Profits and Losses.**

    (a)    **Capital Accounts.**  A capital account shall be established for each Partner.  The initial balance of a Partner's capital account shall be his capital contribution at the time of his admission to the Partnership.

    (b)    **Monthly Allocations.**  As of the close of business on the last day of each month the following determinations and allocations shall be made:

        (i)    The Net Asset Value of the Partnership (as defined in paragraph 8 hereof).

        (ii)    Any increase or decrease in Net Asset Value as of the end of each month shall then be credited or charged to the capital account of each Partner in the ratio that the balance of each account bears to the balance of all accounts for that month.

        (iii)    The amount of any distribution to a partner or any amount paid to a partner upon redemption of Units shall be charged to that Partner's capital account.

    (c)    **Allocation of Profit and Loss for Federal Income Tax Purposes.**  As of the end of each fiscal year, the Partnership's realized capital gain or loss and ordinary income or loss shall be allocated among the Partners in the proportion which their respective capital accounts bear to the total account of all Partners.  Any Partner who redeems Units during any fiscal year will be allocated his or her proportionate share of the capital gain or loss and ordinary income or loss realized by the Partnership during the period that such Units were owned by such Partner.

    (d)    **Expenses.**  The Partnership shall bear all expenses, up to .25% (1/4 of 1%) of the net Asset Value and shall be obligated to pay all liabilities incurred by it including without limitation, all expenses incurred in connection with its lending activities, and the management fee payable to the General Partner.

    The General Partner will pay all offering and organizational expenses and will not be reimbursed from the partnership.

    (e)    **Return of a Partner's Capital Contribution.**  A Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement.  In no event shall a Partner be entitled to demand or receive property other than cash.

    (f)    **Distributions.**  The General Partner shall have sole discretion in determining what distributions (other than redemptions of Units, which may be made at the discretion of any Partner as described in paragraph 10 below), if any, the Partnership will make to its Partners. Distributions will be pro rata in accordance with the respective capital accounts of the Partners.

4

8.    **Net Asset Value.**

The Net Asset Value of the Partnership shall be the difference between the value of the assets of the Partnership and the amount of liabilities of the Partnership. Unless otherwise specified below, all assets and liabilities are to be determined on the basis of generally accepted accounting principles, consistently applied. For purposes of this calculation Net asset Value shall include:

(a)    Any realized and unrealized profit or loss from lending activities;

(b)    Government Securities shall be valued at cost plus accrued interest monthly;

(c)    Partnership expenses;

(d)    Management fees shall be paid monthly and;

(e)    Incentive fees shall be accrued monthly but paid quarterly.

Net Asset Value per Unit is calculated by dividing the Net Asset Value of the Partnership by the number of Partnership Units outstanding for that month.

9.    **Reports to Partners.**

The General Partner will cause each Partner to receive (i) within 90 days after the close of each fiscal year, financial statements including (a) a balance sheet and statements of income and partner's equity and (b) a statement showing total fees, compensation, and expenses paid by the Partnership, and (ii) by March 15 of each year, such tax information as is necessary for each Partner to complete his federal income Tax return. In addition, at the end  of each month a statement of the Partnership will be sent to all Partners.

10.    **Redemption of Units.**

A partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar quarter ("the effective date") by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a "Request for Redemption" attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the beginning of the calendar quarter.

11.    **Assignability.**

The Units may be assigned at the election of the Partner and upon notice to the General Partner. However, the assignee shall become a substituted Partner in the Partnership only upon execution and delivery to the General Partner of the subscription documents and the consent of the General Partner (which may be granted or withheld at its discretion). An assignee who does not become a substituted Partner shall be entitled to receive the share of the profits or the return of capital to which his assignor would otherwise be entitled, but shall not be entitled to vote, to an accounting of Partnership transactions, to receive tax information, or to inspect the books and records of the Partnership.

5

12. **Admissions of Additional Partners.**

Newly admitted Partners shall contribute cash to the capital of the Partnership for each Unit of Partnership Interest to be acquired at the Net Asset Value per Unit as of the last business day of each month, as described in paragraph 8 hereof.

13. **Limited Power of Attorney.**

Each partners irrevocably appoints Martin James Capital Management, Inc. as his attorney-in-fact to execute, acknowledge, swear to, deliver, file, record and publish, as appropriate: amendments to this Agreement hereto as described in Section 15; a certificate of limited partnership and amendments thereto; certificates of assumed name for the Partnership; and any other instruments appropriate to conduct the Partnership's business.

14. **Withdrawal or Death of a Partner.**

The death, adjudication of incompetence or insanity, bankruptcy, retirement, resignation, dissolution, termination, insolvency or withdrawal of the General Partner shall dissolve and terminate the partnership unless the Partnership is continued pursuant to paragraph 17(c) hereof. The General Partner may withdraw from the Partnership at any time on 30 days written notice sent first class mail, postage prepaid, to each Partner. The death, legal disability, withdrawal, insolvency or dissolution of a Partner shall not terminate or dissolve the Partnership and such Partner, his estate, custodian or personal representative shall have no right to withdraw or value such Partner's interest in the Partnership except as provided in paragraph 10 above.

15. **Amendments and Meetings.**

(a)    **Amendments with Consent of the General Partner.** If, at any time during the term of the Partnership, the General Partner shall deem it necessary or desirable to amend this Agreement, such amendment shall be effective if embodied in an instrument signed by the General Partner and by Partners owning more than fifty percent (50%) of the Units then owned by partners. However, the General Partner may, in its sole discretion, make such amendments to this Agreement as may be necessary to enable the Partnership to be classified for federal income tax purposes as a Partnership and not as an association taxable as a corporation or to permit the qualification or registration of the Units for sale in any state or jurisdiction. Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same has originally been embodied in and formed a part of this Agreement; provided, however, that no such supplemental or amendatory agreement shall, without consent of all Partners, change or alter this Section 15, extend the terms of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled.

(b)    **Meetings.** The General Partner shall, by written notice to each Partner of record, call a meeting of the Partnership. Such meeting shall be held at least thirty but not more than sixty days after the mailing of such notice and shall specify the date, a reasonable place and time, and the purpose of such meeting.

(c)    **Amendments and Actions Without Consent of the General Partner.**    At any meeting called pursuant to Section 15(b), upon the affirmative vote (which may be in person or by proxy) of Partners owning more than 50% of the Units then owned by the Partners, and the consent of the General Partner the following actions may be taken: (i) this Partnership Agreement may be amended, provided, however, that no such supplemental or amendatory agreement shall, without the consent of all the Partners, change or alter this Section 15, extend the term of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled; (ii) the Partnership may be dissolved; (iii) the General Partner may be removed and replaced; (iv) a new General Partner or Partners may be elected if the General Partner elects to withdraw from the Partnership; (v) any contracts with the General Partner or any of its affiliates may be terminated on sixty days notice without penalty; and (vi) the sale of all assets of the Partnership may be approved, provided, however, that no such action may be taken if a court of competent jurisdiction has entered a final order to the effect that the action to be taken will adversely affect the status of the classification of the Partnership as a "partnership" under the Federal income tax laws.  The term "final order" shall mean an order which is not subject to any further court proceedings for appeal, review or modification.

16.    **No Personal Liability for Return of Capital.**

The General Partner shall not be liable for the return or repayment of all or any portion of the capital or profits of any Partner, it being expressly agreed that any such return of capital or profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the General Partner) of the Partnership.

17.    **Indemnification.**

(a)    **By the Partnership.**  The Partnership shall indemnify, defend and hold harmless the General Partner, and its employees and affiliates from and against any loss, liability, damage, cost or expense (including legal fees and expenses) and any amounts paid in settlement thereof (provided that the Partnership shall have approved such settlement) resulting from or relating to its actions or capacity as General Partner, or otherwise concerning the business or activities undertaken on behalf of the Partnership, provided that the act or omission which was the subject of the demand, claim or lawsuit did not constitute gross negligence, willful or wanton misconduct, or breach any fiduciary obligations to the Partnership.

Any indemnification permitted by the first paragraph of this Section 16, unless ordered or expressly permitted by a court, shall be made by the Partnership only upon a determination by independent legal counsel in a written opinion that the conduct which is the subject of the claim, demand or lawsuit with respect to which indemnification is sought meets the standards set forth in said paragraph.

(b)    **By the Partners.**  In the event the Partnership is made a party of or to any claim, dispute or litigation, or otherwise incurs any loss or expense as a result of or in connection with any Partner's obligations or liabilities unrelated to the Partnership business, such Partner shall indemnify and reimburse the Partnership for all loss and expenses incurred, including reasonable attorney's fees.

18.    **Governing Law.**

The validity and construction of this Agreement shall be determined and governed by the laws of the State of Nevada.

7

19.   **Miscellaneous.**

    (a)   **Priority Among Partners.**   No Partner shall be entitled to any priority or preference over any other Partner in regard to the affairs of the Partnership.

    (b)   **Notices.**   All notices under this Agreement, other than reports by the General Partner to the Partners, shall be in writing and shall be effective upon personal delivery, or if sent registered or certified mail, postage prepaid, addressed to the last known address of the party to whom such notice is given, upon deposit of such notice in the United States mails.  Reports by the General Partner to the Partners shall be in writing and shall be sent first class mail to the last known address of each Partner.

    (c)   **Binding Effect.**   This Agreement shall inure to and be binding upon all of the parties, their successors, assigns as permitted herein, custodians, estates, heirs and personal representatives.  For purposes of determining the rights of any Partner hereunder, the Partnership and the General Partner may rely upon the Partnership records as to who are Partners and all Partners agree that their rights shall be determined and that they shall be bound thereby, including all rights which they may have under Sections 10, 11 and 15 hereof.

    (d)   **Captions.**   Captions in this Agreement no way define, limit, extend, or describe the scope of this Agreement nor the effect of any of its provisions.

    (e)   **Counterparts.**   This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute an agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _____ day of _____, _____


General Partner:                                  Limited Partner(s):

Martin James Capital Management, Inc.             _____

By:_____              _____
      Martin James Allamian, President


8

**Exhibit B**
# M.J. FINANCIAL ARBITRAGE L.P.
### Subscription Agreement/Limited Power of Attorney

(To be executed by all purchasers)

To:                                    Document Number _____

Martin James Capital Management, Inc.        Date: _____, _____
6 N 808 Dunham Road
Elgin, IL 60120

**1. Subscription.** I hereby subscribe for Units of Partnership Interest ("Units") in M.J. Financial Arbitrage, L.P. (the "Fund"), at $1,000 per unit or at Net Asset Value per Unit on the last business day of this month if the Fund has started trading, provided that all necessary subscription documents and contribution is received by the General Partner at least fifteen days prior to the month end, as described in the Confidential Private Placement Memorandum dated October 1, 1999 (the "Memorandum"), and hereby tender a check in the amount of $ _____ ($500,000 minimum). Upon acceptance of this subscription, I agree to become a Partner in the Partnership and accept and adopt the provisions of the Partnership Agreement. If my subscription is rejected, the amount of my subscription will be promptly returned to me without interest thereon or deductions therefrom.

2. **Representations and Warranties.** I hereby represent and warrant to you as follows:

(a) Simultaneously with acceptance of this subscription by the Partnership, and by completing, executing and delivering the Power of Attorney which is Exhibit C to the Partnership's Private Placement Memorandum, I will become a party to the Partnership Agreement and will appoint the General Partner as my attorney-in-fact to, among other things, execute on my behalf all further amendments to the Partnership Agreement, and I will be bound by all of the terms and conditions thereof.

(b) I (and my offeree representative, if any) have read, understand and am fully familiar with the Partnership Confidential Private Placement Memorandum and the exhibits thereto, applicable to this investment, and am satisfied that I have received adequate information concerning all matters which I consider material to a decision to purchase Units.

(c) I (and my offeree representative, if any) have had an opportunity to ask questions of and received answers from the General Partner concerning the terms and conditions of this investment, and all such questions have been answered to my full satisfaction.

(d) I (and my offeree representative, if any) have such knowledge and experience in financial and business matters that I am capable of evaluating the risks and merits of an investment in the Partnership.

(e) I have completed the Confidential Purchaser Questionnaire or the Purchaser Representative Questionnaire, as appropriate, and certify that all disclosures therein are accurate and true.

1

(f) I have substantial means of providing for my current needs and personal contingencies and have no need for liquidity in this investment.

(g) My overall commitment to investments which are not readily marketable or are not liquid is not disproportionate to my net worth and my purchase of the Units will not cause my overall commitment in this type of investment to become excessive.

(h) I have substantial experience in making investment decisions of this type or am relying upon my own qualified purchaser representative in making this investment decision.

(i) Where appropriate, I have consulted my lawyer, accountant, or other advisor with respect to my investment and all books, records and documents pertaining to the investment have been made available to me and such advisors by the Partnership.

(j) Except as set forth in the Partnership's Confidential Private Placement Memorandum and the Exhibits thereto (the "Offering Documents"), no representations or warranties have been made to me by the Partnership, the General Partner or any agent, employee or affiliate of either of them, in entering into this transaction, and I am not relying upon any information, other than that contained in such Offering Documents and the results of my own independent investigation.

(k) I understand that the Units have not been registered under the Securities Act of 1933, as amended, or the Illinois Securities Act, that the Units have not been approved or disapproved by the Securities and Exchange Commission or by any federal or state agency, and that no such agency has passed on the accuracy or adequacy of the Partnership's Confidential Private Placement Memorandum.

(l) I am acquiring my Units hereunder for my own account, for investment purposes only, and not with a view to the sale or other distribution thereof, in whole or in part.

(m) If the undersigned is a corporation or trust, the officer executing this Subscription Agreement represents and warrants that he or she is authorized to so sign; that the corporation or trust is authorized by the Articles (or Certificate) of Incorporation and By-Laws of the corporation or by the trust agreement, as the case may be, to make this investment and to enter into the Partnership Agreement and this Subscription Agreement.

In the case of a corporation, the corporation will, upon request of the General Partner or counsel to the Partnership, furnish to the Partnership a true and correct copy of the provisions of the Articles (or Certificate) of Incorporation or By-Laws, or both, authorizing the corporation to make such investment, and a copy (certified by the secretary or other authorized officer) of appropriate corporation resolutions authorizing the specific investment.

3. I understand the meaning and legal consequences of the representations and warranties contained in paragraph 2 hereof and I hereby agree to indemnify and hold harmless the Partnership and the General Partner and each Partner thereof from and against any and all loss, damage or liability due to or arising out of any breach of any representation or warranty of the undersigned, whether contained in the Partnership Agreement or this Subscription Agreement. Notwithstanding any representation or warranty of the undersigned, whether agreements made herein by me, I do not thereby or in any other manner waive any rights granted to me under federal or state laws.

4. I understand that this Subscription is not binding on the Partnership until the Partnership accepts it, which acceptance is at the sole discretion of the General Partner, by executing this Subscription Agreement where indicated.

2

5. All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Partnership, as the case may be, at the respective address set forth herein.

6. **Limited Power of Attorney.** Subscriber irrevocably constitutes and appoints the General Partner, Martin James Capital Management, Inc., as his true and lawful attorney-in-fact with full power of substitution and with authority in subscriber's name, place and stead, to execute, acknowledge, deliver, swear to, file and record:

(a)    The Partnership's Agreement of Limited Partnership;

(b)    Amendments to the Agreement of Limited Partnership;

(c)    Certificates of Limited Partnership and all amendments thereto;

(d)    All documents necessary to qualify or continue the Partnership in the states where it may do business;

(e)    All instruments which effect a change or modification of the Agreement of Limited Partnership in accordance with the terms thereof;

(f)    All conveyances, instruments, or documents necessary to carry on the business of the Partnership;

(g)    All other filings with governmental agencies that are necessary or desirable to carry out the business of the Partnership.

This power of attorney shall be deemed coupled with and interest, shall be irrevocable and shall survive a subscriber's death or disability.

3

7. **Items to be Delivered by Subscriber**

    (a)    A reviewed Partnership Agreement (Exhibit A to the Private Placement Memorandum);

    (b)    A completed and executed Subscription Agreement/Limited Power of Attorney (Exhibit B to the Private Placement Memorandum);

    (c)    A completed and executed Confidential Purchaser Questionnaire as appropriate, (Exhibits C to the Private Placement Memorandum); and

    (d)    A check payable to M.J. Financial Arbitrage, L.P. in the amount of the subscription.

    IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement the date set forth below.

_____

Date

                                _____

                                  Subscriber's Name (print)

                                  _____

                                  Signature(s) of Subscriber(s)

Please print information below as you wish it to appear in the records of the Partnership:

RESIDENCE ADDRESS

_____        _____

Number and Street                                Name(s)

_____        _____

City       State       Zip                     Social Security Number or
                                          Taxpayer Identification Number

Address for Notices if different from above:

_____

Number and Street

_____

City       State       Zip

## REPRESENTATIONS BY EMPLOYEE BENEFIT PLANS

The undersigned on behalf of the subscribing employee benefit plan, represents that all of the obligations and requirements of the Employee Retirement Income Securities Act of 1974, including prudence and diversification, with respect to the investment of trust assets in M.J. Financial Arbitrage, L.P. (the Partnership) have been considered prior to subscribing for units of partnership interest in the Partnership (Units). The person with investment discretion on behalf of the plan has consulted his attorney or other tax adviser with regard to whether the purchase of Units might generate "unrelated business taxable income" under Section 512 of the Internal Revenue Code. By signing this representation letter, the trustee or custodian subscribing for Units assumes full responsibility for evaluating the appropriateness of the investment and represents that he has (i) authority to make this investment on behalf of the plan, (ii) authorization to sign this Representation Letter and (iii) performed his duties with respect to the plan solely in the interest of the participants of the plan with due care, skill and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise.


_____
Date

 

                       _____
                       (Name of Plan)

By: _____
              (Trustee)

5

# M.J. FINANCIAL ARBITRAGE, L.P.

## CERTIFICATE OF LIMITED PARTNERSHIP INTEREST

The subscription from _____, is hereby accepted by the Partnership this

_____ day of _____, ____, for the number of Units of Partnership interest that can

be purchased with the sum of $ _____.

Martin James Capital Management, Inc.
General Partner

By:_____
Martin James Allamian, President

**The Limited Partnership Interest in M.J. Financial Arbitrage, L.P. has not been registered under the Securities Act of 1933 or state securities laws and cannot be resold unless registered under applicable federal or state securities law or unless an exemption from registration is available. Transfer and redemption of interests are subject to restrictions contained in the Partnership Agreement.**

6

**Exhibit C**

# M.J. FINANCIAL ARBITRAGE, L.P.
### Offeree Questionnaire

(To be completed by each Purchaser
who executes a Subscription Agreement)

1.  Purchaser understands that the Units offered by M.J. Financial Arbitrage, L.P. (the "Fund") will not be registered under the Securities Act of 1933, as amended (the "Act"), or the laws of any state. Purchaser also understands that in order to insure that the offering and sale of the Units are exempt from registration under federal and state securities laws, the Fund is required to have reasonable grounds to believe, and must actually believe after making reasonable inquiry, that all purchasers of Units or their professional advisors, if used, are sophisticated investors able to evaluate the merits and risks of the investment. Accordingly, the following information is supplied to supplement information concerning the purchaser previously made available to the Fund.

2.  Purchaser has read the Fund's Memorandum and understands that there are restrictions on transfers and sales of Units and that Purchaser's ability to liquidate the investment in Units may be limited.

3.  Is Purchaser an "accredited investor", as defined below? Yes _____ No _____ (If purchaser is an "accredited investor", check the applicable categories below.

_____ (a) Any bank as defined in section 3(a)(2) of the Act, or any savings or loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual of fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of the Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investments Act of 1956; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees if such plan has total assets in excess of $5 million; any employee benefit plan within the meaning of ERISA. If the Investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are "accredited investors"; or

_____ (b) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940; or

_____ (c) Any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring share/interests, with total assets in excess of $5,000,000; or

1

_____ (d)  Any natural person whose individual net worth, or joint net worth that person's spouse, at the time of his purchase exceeds $1,000,000; or

_____ (e)  Any natural person who had an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

_____ (f)  Any trust with total assets in excess of $5,000,000 not formed for the specific purpose of purchasing a shares/interest, whose purchase is directed by a "sophisticated" person; or

_____ (g)  Any entity in which all of the equity owners are "accredited investors."

**Please answer YES or NO for questions 4 through 6.**

4.  Can Purchaser afford to hold Purchaser's Investment in the Fund for an indefinite period of time?_____

5.  Can Purchaser afford a complete loss of its prospective investment in the fund?_____

6.  If subscriber <u>is an INDIVIDUAL</u> and is <u>NOT</u> an "accredited investor", please answer the following questions:

(a)  Income of Purchaser (from all sources) for the two immediately preceding calendar years and anticipated income for the current calendar year (check appropriate range):

| | | | |
|---|---|---|---|
| Under $100,000 | _____ | _____ | _____ |
| $100,000 to $200,000 | _____ | _____ | _____ |
| Over $200,000 | _____ | _____ | _____ |

(b)  Net Worth as of the date of the Subscription Agreement (check appropriate range):

| | |
|---|---|
| _____ | Under $100,000 |
| _____ | $100,000 - $200,000 |
| _____ | $200,001 - $500,000 |
| _____ | $500,001 - $1,000,000 |
| _____ | Over $1,000,000 |

What percentage of Purchaser's net worth is attributable to homes, furnishings, and automobiles?  _____%

(c)  Does Purchaser make Purchaser's own investment decisions?  _____.  If not, who makes Purchaser's investment decisions?  Please give the name, address, occupation, and area of specialization of such person.  (THE PURCHASER MUST FORWARD TO THE FUND A LETTER TO THIS EFFECT FROM PURCHASER REPRESENTATIVE TO PURCHASER WHICH MUST BE DATED AND EXECUTED BY PURCHASER.)

(d)   Does Purchaser have prior experience in investing in private placements or restricted securities? _____. If Purchaser's answer is yes, specify the investments:

(e)   Please provide any information not specifically given in the Purchaser's answers to the above questions which would be helpful in evaluating whether Purchaser has such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of this investment, and in evaluating whether Purchaser is able to bear the economic risk of this investment:

7.   If Purchaser is <u>NOT AN INDIVIDUAL</u> and <u>NOT</u> an "accredited investor", please answer the following questions:

(a)   Check below the types of investments Purchaser (not the officers, directors, shareholders, partners, beneficiaries or other persons owning or controlling same) has made during the past 5 years for its own account.

[ ]   U.S. government and federal agency securities

[ ]   State and local government securities

[ ]   Corporate stocks

[ ]   Corporate bonds, debentures and notes

[ ]   Shares in mutual funds, investment trusts and closed-end investment companies (including money market funds)

[ ]   Interests in real estate investment trusts

[ ]   Options on common stock

[ ]   Interests in limited partnerships

[ ]   Commodity futures contracts and options thereon

[ ]   Investment in real estate (land, buildings, cooperative apartments, condominium units)

[ ]   Annuities

[ ]   Other investments (describe below)

(b)   Were any of the foregoing investments acquired in private placements whereby resales were restricted pursuant to federal and/or state securities laws? _____.   If yes, describe these investments, including the amounts invested, on an attachment sheet.

3

(c)    Set forth below details regarding each individual executing this Agreement on behalf of Purchaser (if more than one individual, please photocopy the applicable pages of this Agreement and complete this question separately for each such person).

(i)   Name:          _____

_____

(ii)  Title or Position:  _____

_____

(iii) Years employed by, or affiliated with, Purchaser:

_____

(iv) Business address:

_____

_____

(v)  Business telephone number:

_____

(vi) Education:

_____

_____

(vii) Give his or her occupation(s) and other business associations during the past 5 years. Listing the most recent position first, provide the names and addresses of his or her employers, if any, the kinds of business of such employers, his or her positions with such employers, and the years he or she was employed thereby.

_____

_____

4

(viii) Directorships held during the past 5 years (indicating years held):

_____

_____

(ix) Other business affiliations during the past 5 years (indicating years held):

_____

_____

(x) Check below the types of investments made by such individual during the past 5 years for his or her own account, or for the account of his or her spouse, any relative of such individual or his or her spouse who has the same principal residence as such individual, or any trust, estate, corporation or organization in which such individual, his or her spouse or such relatives have a majority of the beneficial or equity interests.

[ ]  U.S. government and federal agency securities

[ ]  State and local government securities

[ ]  Corporate stocks

[ ]  Corporate bonds, debentures and notes

[ ]  Shares in mutual funds, investment trusts and closed-end investment companies (including money market funds)

[ ]  Interests in real estate investment trusts

[ ]  Options on common stock

[ ]  Interests in limited partnerships

[ ]  Commodity futures contracts and options thereon

[ ]  Investment in real estate (land, buildings, cooperative apartments, condominium units)

[ ]  Annuities

[ ]  Other investments (describe below)

5

(xi) Were any of the foregoing investments acquired in private placements whereby resales were restricted pursuant to federal and/or state securities laws? _____.   If yes, describe these investments, including the amounts invested.


(xii) Does such individual have any occupational experience with regard to investments, i.e., as a securities broker or dealer, investment adviser, futures commission merchant, introduction broker, commodity trading advisor, commodity pool operator, real estate broker, attorney, accountant or banker? __. If yes, give details.

(d)     In evaluating the merits and risks of Purchaser's proposed purchase of shares/interests, does Purchaser intend to rely upon the knowledge, judgment, experience, and advice of one or more financially sophisticated persons, other than the individual(s) named above (e.g., an investment adviser, broker, attorney, or accountant)? .    (IF YES, PURCHASER MUST FORWARD TO THE FUND A LETTER FROM PURCHASER REPRESENTATIVE TO PURCHASER TO THIS EFFECT DATED AND EXECUTED BY PURCHASER.)

(e)     Have any of the purchaser representatives named in (d) given Purchaser investment advice in the past? _____. If yes, give details.

(f)     Indicate one of the following with respect to Purchaser's evaluation of the merits and risks of its prospective purchase of Units:

_____ (i) Purchaser intends to rely solely upon the knowledge, judgment, and experience of the individual(s) named in (d) above in reaching such investment decision.

_____ (ii) Purchaser intends to rely solely upon the knowledge, judgment, experience and advice of its purchaser representative(s) in reaching such an investment decision.

_____ (iii) Purchaser intends to rely upon a combination of the knowledge, judgment, and experience of the individual(s) named in (d) above, as well as the knowledge, judgment, experience and advice of its purchaser representative(s) in reaching such an investment decision.

(g)     Provide any additional information not specifically given in the answers to prior questions which would be helpful to the investment advisor in evaluating whether Purchaser is able to bear the economic risk of an investment in the Shares.

6

8.  I represent and warrant that the information contained in this questionnaire is true and correct.

**FOR INDIVIDUALS:**

Dated _____, _____

_____
Purchaser's Signature

_____
Name - Print or Type

**FOR ENTITIES:**

_____
Name of Entity - Print or Type

_____
Authorized Officer's Signature

_____
Name of Officer - Print or Type

_____
Title of Officer - Print or Type

**PLEASE RETURN THIS OFFEREE QUESTIONNAIRE TO THE FUND WITH YOUR LIMITED PARTNERSHIP AGREEMENT (EXHIBIT A), ALONG WITH THE FOLLOWING IMPORTANT WIRE IDENTIFICATION INFORMATION:**

# Wiring Information

**Name of Purchaser's Bank:** _____

**Address of Purchaser's Bank:** _____

_____

**ABA# of Purchaser's Bank:** _____

**Date of Wire Transfer:** _____

**Amount of Wire Transfer:** _____

7

**Exhibit D**

# M.J. FINANCIAL ARBITRAGE, L.P.

### REQUEST FOR REDEMPTION

To: Martin James Capital Management, Inc.                    Date:_____

RE: M.J. Financial Arbitrage Fund, L.P.

I hereby give notice of my intent to redeem _____ Limited Partnership Interests (the "Units") in M.J. Financial Arbitrage, L.P. (the "Fund"). In giving this notice, I certify my full understanding as follows that: (1) this notice is irrevocable; (2) this notice must be received by the General Partner during business hours at least 10 business days prior to the first business day of the calendar Quarter in which redemption shall be effected (the "Redemption Date"); (3) upon failure to satisfy condition (2) above, the Fund will not redeem such Units until the last business day of the calendar Quarter in which such conditions shall be fulfilled; (4) that the Net Asset Value per Unit at which such Units shall be redeemed shall be the Net Asset Value per Unit determined as of the Redemption Date as provided in the fund's Limited Partnership Agreement and the Offering Memorandum, less any wire transfer or other transaction cost; (5) where I do hereby give notice to redeem all my Units, then the Fund may exercise its right to redeem the balance of my Units if the aggregate Net Asset Value of my/our outstanding Units shall be less than U.S. $500,000 as determined as of the redemption date; and (6) the redemption proceeds will be paid by the fund within thirty (30) business days after the Redemption Date; except that; under such special circumstances (including, but not limited to, the inability of the General Partner to reasonably determine the Net Asset Value of the Fund as of any Redemption Date), the Fund may suspend redemptions of Units, provided that the Fund shall as soon as practicable thereafter cause such units to be redeemed or such redemption payment to be made.

Redemption Proceeds should be remitted as follows:

A.  If by check:          Payee:          _____

                          Address:        _____

                                          _____

                                          _____


B.  If by wire:           Bank:           _____

                          Bank Address:   _____

                          ABA#:           _____

                          Account Name:   _____

                          Account Number: _____

INVESTOR'S SIGNATURE(S) MUST BE IDENTICAL TO NAME IN WHICH THE UNITS ARE REGISTERED.

Partnership, Plan, Trust or Corporate Investor

By: _____

Partner, Trustee or Authorized Officer

Shareholder's Signature(s)

2

# **Exhibit D**

**Exhibit A**
**M.J. DIVERSIFIED, L.P.**
**LIMITED PARTNERSHIP AGREEMENT**

THIS PARTNERSHIP AGREEMENT made and entered into this ‚ day of
_____, 200 __, by and between Martin James Capital Management, Inc. (the
"General Partner") and other parties who shall execute this agreement, whether in counterpart,
by separate instrument or otherwise, as Limited Partners (who are hereinafter referred to as
"Limited Partners") (the General Partner and the Limited Partners are sometimes collectively
referred to herein as "Partners").

**WITNESSETH**

WHEREAS, the parties hereto desire to form a partnership for the purpose of speculative trading
in commodity futures, options on futures and related financial instruments.

NOW, THEREFORE, the parties hereto agree as follows:

1.      **Formation and Name.**

The parties hereby form a partnership. The name of the partnership is M.J. Diversified, L.P. (the
"Partnership"). The General Partner shall execute and file with the Office of the Secretary of the
State of Illinois a Certificate of Limited Partnership and shall execute, file, record and publish as
appropriate such amendments, assumed name certificates and other documents as necessary or
advisable as determined by the General Partner. Each Limited Partner agrees to furnish the
General Partner with a limited power of attorney which may be filed with the Certificate of Limited
Partnership and any amendments thereto and such additional information as is required to
complete such documents and shall execute and cooperate in the filing, recording or publishing
of such documents at the request of the General Partner.

2.      **Principal Office.**

The principal office of the Partnership shall be 1 W. Illinois St., #285, St. Charles, IL. or such
other place as the General Partner may designate from time to time.

3.      **Business.**

The Partnership business and purpose is to trade, buy, sell or otherwise acquire, hold or dispose
of Securities, funds (or pools) and commodity futures contracts and options on futures contracts
and any rights pertaining thereto which are traded on U.S. exchanges and foreign commodity or
securities exchanges. The objective of the Partnership's business is appreciation of its assets
through speculative trading.

4.      **Term, Dissolution and Fiscal Year.**

        (a)     **Term.**  The General Partner has filed a Certificate of Limited Partnership with the
Illinois Secretary of State. Trading will continue until any of the following events occur:

                (i)     December 31, 2025;

                (ii)    Withdrawal or insolvency of the General Partner unless a new General Partner
shall be substituted pursuant to Section 15(c) hereof;

(iii) A decline in the net asset value per unit of Partnership interest to 50% or less of its value as of the first business day of trading, unless the General Partner elects to continue the partnership pursuant to Section 4(d) of this Agreement; and

(iv) Any event which shall make unlawful the continued existence of the Partnership.

(b) **Termination of initial offering.** The Partnership will begin soliciting funds on February 29, 2000. June 30, 2000 will mark the end of the initial offering period. Pursuant to Regulation D of the Securities Act of 1933. This period can be extended or shortened at the discretion of the General Partner.

(c) **Dissolution.** Upon the first to occur of the events in Section (a) above, the Partnership shall terminate and be dissolved. The General Partner and each Limited Partner shall share in the assets of the Partnership, after the payment of creditors, pro rata in accordance with their respective capital accounts, less any amount owing by such Partner to the Partnership.

(d) **Continuation of Partnership.** Upon the decline in net asset value as outlined in Section 4(a)(iii) above, the General Partner may, in its discretion poll the Partners to determine whether Partnership trading should continue. All Partners will be provided the opportunity to redeem their Partnership interest at this time. If, in the judgment of the General Partner, enough Partners wish trading to resume, the General Partner will resume trading. Otherwise, the General Partner will terminate the Partnership.

(e) **Fiscal Year.** The fiscal year of the Partnership shall begin on January 1 of each year and end on the following December 31; provided, however, that if such fiscal year is disapproved by the Internal Revenue Service the fiscal year shall be as otherwise approved by the General partner and the Internal Revenue Service.

5. **Management of the Partnership.**

The General Partner, to the exclusion of all other partners, shall conduct and manage the business of the Partnership including, without limitation, the investment of the funds of the partnership. No Limited Partner shall be entitled to any salary, draw or other compensation from the Partnership on account of any investment in the Partnership. The General Partner shall have sole discretion in determining what distributions of profits and income, if any, shall be made to the Partners, shall execute various documents on behalf of the Partnership and the Partners and supervise the liquidation of the Partnership if an event causing termination of the Partnership occurs.

The General Partner may in furtherance of the business of the Partnership cause the Partnership to buy, sell, hold, otherwise acquire or dispose of commodity futures contracts or options on futures traded on U.S. or foreign exchanges.

The General Partner will have sole discretion with regard to the appointment or employment of all persons or entities providing services to the Partnership including, but not limited to, trading advisors, brokers and accountants and may employ any such persons or entities on behalf of the Partnership without notice to the Partners.

34

The General Partner may engage in other business activities and shall not be required to refrain from any other activity or disgorge any profits from any such activity, whether as General Partner of additional partnerships for investment in commodity interests or otherwise. The General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of al funds and assets of the Partnership, and he shall not employ or permit others to employ such funds and assets in any manner except for the exclusive benefit of the Partnership. The Partnership shall keep and retain such books and records relating to the business of the Partnership as it deems necessary or advisable, or as required by the Commodity Exchange Act, as amended, and the rules and regulations of the Commodity Futures Trading Commission, at the principal office of the Partnership, or such other offices as the General Partner deems advisable. Such books and records shall be retained by the Partnership for not less than six years. The Limited Partners shall be given reasonable access to the books and records of the Partnership.

No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the partnership nor to determine any fact or circumstance bearing upon the existence of their authority.

The Partnership shall make no loans. Assets of the Partnership will not be commingled with assets of any other entity. Deposits of assets with a futures broker as margin shall not constitute commingling.

6.      **Capital Contributions and Units of Partnership Interest.**

(a)     **Initial Capital Contributions.** Interests in the Partnership shall be evidenced by Units of Partnership Interest ("Units" or individually a "Unit"). The General Partner on behalf of the Partnership will issue Units to persons desiring to become Limited Partners; provided that such persons are determined by the General Partner to be qualified and provided their subscriptions and Subscription Agreements are accepted by the General Partner.

After the Partnership begins trading operations, an investor will become a Limited Partner in the Partnership on the first day of the month following receipt by the Partnership of the investor's capital contribution and acceptance by the General Partner of such investor's executed Limited Partnership Agreement, Subscription Agreement, Purchaser Questionnaire, Power of Attorney and any other documents required by the General Partner (collectively, the "subscription documents") no less than ten days preceding the first day of the month.

(b)     **Additional Capital Contributions.** A Partner may, as of the first day of any month (the "effective date"), contribute additional funds to the Partnership, in amounts equal to or in excess of $1,000 provided such contribution is received at least 10 days prior to this effective date. As of the effective date, the General Partner will revise the contributing Partner's capital account to reflect such contribution, and the Units of all the Partners shall be adjusted to reflect the additional contributions to the total capital of the Partnership. The same adjustment will be made with respect to the initial capital contribution of new Partners so that Partnership profits and losses will be allocated proportionately to those Partners who were members of the Partnership during the applicable period. In determining the value of the capital accounts of the Partners, the value of each Unit, including Unites of General Partnership Interest, shall be determined as of the close of business on the last day of the month immediately preceding the effective date of the capital contribution. The General Partner may also contribute additional funds to the Partnership under the same terms and conditions.

35

7.    **Allocation of Profits and Losses.**

(a)    **Capital Accounts.**  A capital account shall be established for each Partner.  The initial balance of a Partner's capital account shall be his capital contribution at the time of his admission to the Partnership.

(b)    **Monthly Allocations.**  As of the close of business on the last day of each month the following determinations and allocations shall be made:

(i)    The Net Asset Value of the Partnership (as defined in paragraph 8 hereof).

(ii)    Any increase or decrease in Net Asset Value as of the end of each month shall then be credited or charged to the capital account of each Partner in the ratio that the balance of each account bears to the balance of all accounts for that month.

(iii)    The amount of any distribution to a partner or any amount paid to a partner upon redemption of Units shall be charged to that Partner's capital account.

(c)    **Allocation of Profit and Loss for Federal Income Tax Purposes.**  As of the end of each fiscal year, the Partnership's realized capital gain or loss and ordinary income or loss shall be allocated among the Partners in the proportion which their respective capital accounts bear to the total account of all Partners.  Any Partner who redeems Units during any fiscal year will be allocated his or her proportionate share of the capital gain or loss and ordinary income or loss realized by the Partnership during the period that such Units were owned by such Partner.

(d)    **Expenses.**  The Partnership shall bear all futures brokerage commissions and shall be obligated to pay all liabilities incurred by it including without limitation, all expenses incurred in connection with its trading activities.

The General Partner will pay all offering and organizational expenses and will not be reimbursed from partnership.

(e)    **Return of a Partner's Capital Contribution.**  A Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement.  In no event shall a Partner be entitled to demand or receive property other than cash.

(f)    **Distributions.**  The General Partner shall have sole discretion in determining what distributions (other than redemption's of Units, which may be made at the discretion of any Partner as described in paragraph 10 below), if any, the Partnership will make to its Partners. Distributions will be pro rata in accordance with the respective capital accounts of the Partners.

8.    **Net Asset Value.**

The Net Asset Value of the Partnership shall be the difference between the value of the assets of the Partnership and the amount of liabilities of the Partnership. Unless otherwise specified below, all assets and liabilities are to be determined on the basis of generally accepted accounting principles, consistently applied. For purposes of this calculation Net asset Value shall include:

(a)    Any unrealized profit or loss on open futures or options positions;

(b)    Government Securities shall be valued at cost plus accrued interest monthly;

(c)    Brokerage commissions, exchange and NFA fees on open positions shall be accrued in full (that is, on a round-turn basis) as a liability of the Partnership;

(d)    Management fees shall be paid monthly and

(e)    Incentive fees shall be accrued monthly but paid quarterly.

Net Asset Value per Unit is calculated by dividing the Net Asset Value of the Partnership by the number of Partnership Units outstanding for that month.

9.    **Reports to Partners.**

The General Partner will cause each Partner to receive (I) within 90 days after the close of each fiscal year, financial statements including (a) a balance sheet and statements of income and partner's equity and (b) a statement showing total fees, compensation, brokerage commissions and expenses paid by the Partnership, and (ii) by March 15 of each year, such tax information as is necessary for each Partner to complete his federal income Tax return. In addition, at the end of each month a statement of the Partnership's income and Partner's equity will be sent to all Partners.

10.    **Redemption of Units.**

A partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar month ("the effective date") by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a "Request for Redemption" attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the end of the calendar month.

11.    **Assignability.**

The Units may be assigned at the election of the Partner and upon notice to the General partner. However, the assignee shall become a substituted Partner in the Partnership only upon execution and delivery to the General partner of the subscription documents and the consent of the General Partner (which may be granted or withheld at its discretion). An assignee who does not become a substituted Partner shall be entitled to receive the share of the profits or the return of capital to which his assignor would otherwise be entitled, but shall not be entitled to vote, to an accounting of Partnership transactions, to receive tax information, or to inspect the books and records of the Partnership.

37

12.   **Admissions of Additional Partners.**

Newly admitted Partners shall contribute cash to the capital of the Partnership for each Unit of Partnership Interest to be acquired at the Net Asset Value per Unit as of the last business day of each month, as described in paragraph 8 hereof.

13.   **Limited Power of Attorney.**

Each partner irrevocably appoints Martin James Capital Management, Inc. as his attorney-in-fact to execute, acknowledge, swear to, deliver, file, record and publish, as appropriate: amendments to this Agreement hereto as described in Section 15; a certificate of limited partnership and amendments thereto; certificates of assumed name for the Partnership; and any other instruments appropriate to conduct the Partnership's business.

14.   **Withdrawal or Death of a Partner.**

The death, adjudication of incompetence or insanity, bankruptcy, retirement, resignation, dissolution, termination, insolvency or withdrawal of the General Partner shall dissolve and terminate the partnership unless the Partnership is continued pursuant to paragraph 17(c) hereof. The General Partner may withdraw from the Partnership at any time on 30 days written notice sent first class mail, postage prepaid, to each Partner. The death, legal disability, withdrawal, insolvency or dissolution of a Partner shall not terminate or dissolve the Partnership and such Partner, his estate, custodian or personal representative shall have no right to withdraw or value such Partner's interest in the Partnership except as provided in paragraph 10 above.

15.   **Amendments and Meetings.**

     (a)   **Amendments with Consent of the General Partner.** If, at any time during the term of the Partnership, the General Partner shall deem it necessary or desirable to amend this Agreement, such amendment shall be effective if embodied in an instrument signed by the General partner and by Partners owning more than fifty percent (50%) of the Units then owned by partners. However, the General Partner may, in its sole discretion, make such amendments to this Agreement as may be necessary to enable the Partnership to be classified for federal income tax purposes as a Partnership and not as an association taxable as a corporation or to permit the qualification or registration of the Units for sale in any state or jurisdiction. Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same has originally been embodied in and formed a part of this Agreement; provided, however, that no such supplemental or amendatory agreement shall, without consent of all Partners, change or alter this Section 15, extend the terms of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled.

     (b)   **Meetings.** Any Partner upon written request addressed to the General Partner shall be entitled to obtain from the General Partner, at the Partner's expense, a list of the names and addresses of record of all Partners and the number of Units held by each; provided that the Partner represents that the list will not be used for commercial purposes. Upon receipt of a written request, signed by partners owning at least 25% of the Units then owned by Partners, that a meeting of the Partnership be called to vote upon any matter which the Partners may vote upon pursuant to this Agreement, the General Partner shall, by written notice to each Partner of record mailed within 15 days after such receipt, call a meeting of the Partnership. Such meeting shall be held at least thirty but not more than sixty days after the mailing of such notice and shall specify the date, a reasonable place and time, and the purpose of such meeting.

(c)    **Amendments and Actions Without Consent of the General Partner.**  At any meeting called pursuant to Section 15(b), upon the affirmative vote (which may be in person or by proxy) of Partners owning more than 50% of the Units then owned by the Partners, the following actions may be taken: (I) this Partnership Agreement may be amended, provided, however, that no such supplemental or amendatory agreement shall, without the consent of all the Partners, change or alter this Section 15, extend the term of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled; (ii) the Partnership may be dissolved; (iii) a new General Partner or Partners may be elected if the General Partner elects to withdraw from the Partnership; (iv) any contracts with the General Partner or any of its affiliates may be terminated on sixty days notice without penalty; and (v) the sale of all assets of the Partnership may be approved, provided, however, that no such action may be taken if a court of competent jurisdiction has entered a final order to the effect that the action to be taken will adversely affect the status of the classification of the Partnership as a "partnership" under the Federal income tax laws.  The term "final order" shall mean an order which is not subject to any further court proceedings for appeal, review or modification.

16.    **No Personal Liability for Return of Capital.**

The General Partner shall not be liable for the return or repayment off all or any portion of the capital or profits of any Partner, it being expressly agreed that any such return of capital or profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the General Partner) of the Partnership.

17.    **Indemnification.**

(a)    **By the Partnership.**  The Partnership shall indemnify, defend and hold harmless the General Partner, and its employees and affiliates from and against any loss, liability, damage, cost or expense (including legal fees and expenses) and any amounts paid in settlement thereof (provided that the Partnership shall have approved such settlement) resulting from or relating to its actions or capacity as General Partner, or otherwise concerning the business or activities undertaken on behalf of the Partnership, provided that the act or omission which was the subject of the demand, claim or lawsuit did not constitute gross negligence, willful or wanton misconduct, or breach any fiduciary obligations to the Partnership.

Any indemnification permitted by the first paragraph of this Section 16, unless ordered or expressly permitted by a court, shall be made by the Partnership only upon a determination by independent legal counsel in a written opinion that the conduct which is the subject of the claim, demand or lawsuit with respect to which indemnification is sought meets the standards set forth in said paragraph.

(b)    **By the Partners.**  In the event the Partnership is made a party of or to any claim, dispute or litigation, or otherwise incurs any loss or expense as a result of or in connection with any Partner's obligations or liabilities unrelated to the Partnership business, such Partner shall indemnify and reimburse the Partnership for all loss and expenses incurred, including reasonable attorney's fees.

18.    **Governing Law.**

The validity and construction of this Agreement shall be determined and governed by the laws of the State of Illinois.

19. **Miscellaneous.**

(a) **Priority Among Partners.** No Partner shall be entitled to any priority or preference over any other Partner in regard to the affairs of the Partnership.

(b) **Notices.** All notices under this Agreement, other than reports by the General Partner to the Partners, shall be in writing and shall be effective upon personal delivery, or if sent registered or certified mail, postage prepaid, addressed to the last known address of the party to whom such notice is given, upon deposit of such notice in the United States mails. Reports by the General Partner to the Partners shall be in writing and shall be sent first class mail to the last known address of each Partner.

(c) **Binding Effect.** This Agreement shall inure to and be binding upon all of the parties, their successors, assigns as permitted herein, custodians, estates, heirs and personal representatives. For purposes of determining the rights of any Partner hereunder, the Partnership and the General Partner may rely upon the Partnership records as to who are Partners and all Partners agree that their rights shall be determined and that they shall be bound thereby, including all rights which they may have under Sections 10, 11 and 15 hereof.

(d) **Captions.** Captions in this Agreement no way define, limit, extend, or describe the scope of this Agreement nor the effect of any of its provisions.

(e) **Counterparts.** This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute an agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _1_ day of ___June___, 200_2_.

General Partner:

Martin James Capital Management, Inc.

By: _____
    Martin James Allamian, President

Limited Partner(s):

_Kirby Smith_

_Kirby Smith - Authorized_
_Signatory_

_ZCM Asset Holding Compan_
_(Bermuda) Limited_
_P.O. Box HM2268_
_Hamilton, HMJX_
_Bermuda_

40

# SUBSCRIPTION PROCEDURES

Investors wishing to purchase Units in M.J. DIVERSIFIED, L.P. must do the following:

* Complete the Partnership Agreement, Subscription Agreement and Offeree Questionnaire.

* Send the Partnership Agreement, Subscription Agreement and Offeree Questionnaire along with a check made payable to M.J. Diversified in the subscription amount to the Pool Operator as follows:

| M.J. Diversified, L.P. | | First Eagle National Bank |
|---|---|---|
| 1 W. Illinois St., #285 | Wire to: | ABA # 071925017 |
| St. Charles, IL 60174 | | M.J. Diversified, L.P. |
| | | Acct. #102961401 |

A fully executed Partnership Agreement, Subscription Agreement and Offeree Questionnaire must be received by the General Partner no later than 15 days before the end of any month during the continuous offering period.  The General Partner may waive this requirement at it's discretion.

The Fund is entitled to reject in whole or in part the subscription, in which event the subscription monies received by the Fund from the subscriber will be returned in accordance with the Subscription Agreement.

## Investment Requirements

Accredited Investor and Qualified Eligible Participant Status

Initial all appropriate spaces below indicating the basis on which the undersigned qualifies as a "qualified eligible participant" and an "accredited investor."   Only those which so qualify are eligible to invest in the Partnership. Please note that in the case of each category except (a) and (j) below the undersigned must (I) own securities (including participation in the Partnership and other pools) of issuers not affiliated with such person or entity and other investments (i.e., real estate held for investment purposes) with an aggregate market value of at least $2,000,000, (ii) have on deposit with a futures commission merchant at least $200,000 in exchange-specified initial margin and option  premiums for commodity interest transactions, or (iii) own a portfolio comprised of a combination of (i) and (ii)(e.g. $1,000,000 in securities and $100,000 in margin and premiums((the "Portfolio Requirement").

(a) Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(b) An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) thereof that was not formed for the specific purpose of investing in the Partnership and that satisfies the Portfolio Requirement.

©  A bank as defined in Section 3(a)(2) of the Securities Act of 1933, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act of 1933, acting for its own participant/accredited investor, that satisfies the Portfolio Requirement.

(d) An insurance company as defined in Section 2(13) of the Securities Act of 1933, acting for its own account or for the account of a qualified eligible participant/accredited investor, that satisfies the Portfolio Requirement.

1

(e) A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(f) An organization described in Section 501©(3) of the Internal Revenue Code, a corporation, "Massachusetts or similar business trust, or partnership," in each case other than a commodity pool and not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(g) A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(h) A commodity pool, trust, insurance company separate account or bank collective trust, not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000, whose participation in the Partnership is directed by a qualified eligible participant/accredited investor and which does not invest in aggregate more than 10 percent of the fair market value of its assets in the Partnership and other commodity pools exempt under CFTC Reg. 4.7.

(i) An entity which all of the unit owners and participants (i.e., all partners (including limited partners) of a partnership, shareholders of a corporation and the grantor of a grantor trust, but not the beneficiaries of a true trust) are qualified eligible participants and accredited investors.

**Exhibit B**
**M.J. DIVERSIFIED, L.P.**
**Subscription Agreement/Limited Power of Attorney**

**(To be executed by all purchasers)**

To:                                    Document Number _____

Martin James Capital Management, Inc.        Date: _June 1_, 200 _0_____
1 W. Illinois St., #285
St. Charles, IL 60174

1. **Subscription.**   I hereby subscribe for Units of Partnership Interest ("Units") in M.J. Diversified, L.P. (the "Fund"), at $1,000 per unit or at Net Asset Value per Unit on the last business day of this month if the Fund has started trading, provided that all necessary subscription documents and contribution is received by the General Partner at least five days prior to the month end, as described in the Confidential Private Placement Memorandum dated _1,476,824_ (the "Memorandum"), and hereby tender a check in the amount of $ ($1,000,000 minimum). Upon acceptance of this subscription, I agree to become a Partner in the Partnership and accept and adopt the provisions of the Partnership Agreement. If my subscription is rejected, the amount of my subscription will be promptly returned to me without interest thereon or deductions therefrom.

2. **Representations and Warranties.** I hereby represent and warrant to you as follows:

(a) Simultaneously with acceptance of this subscription by the Partnership, and by completing, executing and delivering the Power of Attorney which is Exhibit C to the Partnership's Private Placement memorandum, I will become a party to the Partnership Agreement and will appoint the General Partner as my attorney-in-fact to, among other things, execute on my behalf all further amendments to the Partnership Agreement, and I will be bound by all of the terms and conditions thereof.

(b) I (and my offeree representative, if any) have read, understand and am fully familiar with the Partnership Confidential Private Placement Memorandum and the exhibits thereto, applicable to this investment, and am satisfied that I have received adequate information concerning all matters which I consider material to a decision to purchase Units.

(c) I (and my offeree representative, if any) have had an opportunity to ask questions of and received answers from the General Partner concerning the terms and conditions of this investment, and all such questions have been answered to my full satisfaction.

(d) I (and my offeree representative, if any) have such knowledge and experience in financial and business matters that I am capable of evaluating the risks and merits of an investment in the Partnership.

1

(e) I have completed the Confidential Purchaser Questionnaire or the Purchaser Representative Questionnaire, as appropriate, and certify that all disclosures therein are accurate and true.

(f) I have substantial means of providing for my current needs and personal contingencies and have no need for liquidity in this investment.

(g) My overall commitment to investments which are not readily marketable or are not liquid is not disproportionate to my net worth and my purchase of the Units will not cause my overall commitment in this type of investment to become excessive.

(h) I have substantial experience in making investment decisions of this type or am relying upon my own qualified purchaser representative in making this investment decision.

(i) Where appropriate, I have consulted my lawyer, accountant, or other advisor with respect to my investment and all books, records and documents pertaining to the investment have been made available to me and such advisors by the Partnership.

(j) Except as set forth in the Partnership's Confidential Private Placement Memorandum and the Exhibits thereto (the "Offering Documents"), no representations or warranties have been made to me by the Partnership, the General Partner or any agent, employee or affiliate of either of them, in entering into this transaction, and I am not relying upon any information, other than that contained in such Offering Documents and the results of my own independent investigation.

(k) I understand that the Units have not been registered under the Securities Act of 1933, as amended, or the Illinois Securities Act, that the Units have not been approved or disapproved by the Securities and Exchange Commission or by any federal or state agency, and that no such agency has passed on the accuracy or adequacy of the Partnership's Confidential Private Placement Memorandum.

(l) I am acquiring my Units hereunder for my own account, for investment purposes only, and not with a view to the sale or other distribution thereof, in whole or in part.

(m) If the undersigned is a corporation or trust, the officer executing this Subscription Agreement represents and warrants that he or she is authorized to so sign; that the corporation or trust is authorized by the Articles (or Certificate) of Incorporation and By-Laws of the corporation or by the trust agreement, as the case may be, to make this investment and to enter into the Partnership Agreement and this Subscription Agreement.

In the case of a corporation, the corporation will, upon request of the General Partner or counsel to the Partnership, furnish to the Partnership a true and correct copy of the provisions of the Articles (or Certificate) of Incorporation or By-Laws, or both, authorizing the corporation to make such investment, and a copy (certified by the secretary or other authorized officer) of appropriate corporation resolutions authorizing the specific investment.

3. I understand the meaning and legal consequences of the representations and warranties contained in paragraph 2 hereof and I hereby agree to indemnify and hold harmless the Partnership and the General Partner and each Partner thereof from and against any and all loss, damage or liability due to or arising out of any breach of any representation or warranty of the undersigned, whether contained in the Partnership Agreement or this Subscription Agreement. Notwithstanding any representation or warranty of the undersigned, whether agreements made herein by me, I do not thereby or in any other manner waive any rights granted to me under federal or state laws.

2

4. I understand that this Subscription is not binding on the Partnership until the Partnership accepts it, which acceptance is at the sole discretion of the General Partner, by executing this Subscription Agreement where indicated.

5. All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Partnership, as the case may be, at the respective address set forth herein.

6. **Limited Power of Attorney.** Subscriber irrevocably constitutes and appoints the General Partner, Martin James Capital Management, Inc., as his true and lawful attorney-in-fact with full power of substitution and with authority in subscriber's name, place and stead, to execute, acknowledge, deliver, swear to, file and record:

   (a)    The Partnership's Agreement of Limited Partnership;

   (b)    Amendments to the Agreement of Limited Partnership;

   (c)    Certificates of Limited Partnership and all amendments thereto;

   (d)    All documents necessary to qualify or continue the Partnership in the states where it may do business;

   (e)    All instruments which effect a change or modification of the Agreement of Limited Partnership in accordance with the terms thereof;

   (f)    All conveyances, instruments, or documents necessary to carry on the business of the Partnership including, but not limited to, futures brokerage agreements with any futures brokerage firm or to effect the dissolution of the Partnership; and

   (g)    All other filings with governmental agencies that are necessary or desirable to carry out the business of the Partnership.

This power of attorney shall be deemed coupled with and interest, shall be irrevocable and shall survive a subscriber's death or disability.

3

7. **Items to be Delivered by Subscriber**

  (a)  A reviewed Partnership Agreement (Exhibit A to the Private Placement Memorandum);

  (b)  A completed and executed Subscription Agreement/Limited Power of Attorney (Exhibit B to the Private Placement Memorandum);

  (c)  A completed and executed Confidential Purchaser Questionnaire as appropriate, (Exhibits C to the Private Placement Memorandum); and

  (d)  A check (or wire) payable to M.J. Diversified, L.P. in the amount of the subscription.

  IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement the date set forth below.

ZCM Asset Holding Company (Bermuda) Limited
P.O. Box HM2268
Hamilton HMJX
Bermuda

_6/1/2000_

Date

Subscriber's Name (print)

_Kirby Smith_

Signature(s) of Subscriber(s)

Please print information below as you wish it to appear in the records of the Partnership:

RESIDENCE ADDRESS

Please mail correspondence to:
c/o Zurich Capital Markets Company
Europa House, Harcourt Centre
Harcourt St.
Dublin 2, Ireland
Attn: Ann Marie Callanan

Name(s)

City      State      Zip

Social Security Number or
Taxpayer Identification Number

Address for Notices if different from above:

Number and Street

Please mail correspondence to:
c/o Zurich Capital Markets Company
Europa House, Harcourt Centre
Harcourt St.
Dublin 2, Ireland
Attn: Ann Marie Callanan

City      State      Zip

4

## REPRESENTATIONS BY EMPLOYEE BENEFIT PLANS

The undersigned on behalf of the subscribing employee benefit plan, represents that all of the obligations and requirements of the Employee Retirement Income Securities Act of 1974, including prudence and diversification, with respect to the investment of trust assets in Asset Allocation Fund, L.P. (the Partnership) have been considered prior to subscribing for units of partnership interest in the Partnership (Units). The person with investment discretion on behalf of the plan has consulted his attorney or other tax adviser with regard to whether the purchase of Units might generate "unrelated business taxable income" under Section 512 of the Internal Revenue Code. By signing this representation letter, the trustee or custodian subscribing for Units assumes full responsibility for evaluating the appropriateness of the investment and represents that he has (i) authority to make this investment on behalf of the plan, (ii) authorization to sign this Representation Letter and (iii) performed his duties with respect to the plan solely in the interest of the participants of the plan with due care, skill and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise.

_____
Date

_____
(Name of Plan)

By: _____
(Trustee)

5

# M.J. DIVERSIFIED, L.P.

## CERTIFICATE OF LIMITED PARTNERSHIP INTEREST

The subscription from _____, is hereby accepted by the Partnership this

_____ day of _____, 200 ____, for the number of Units of Partnership interest that can

be purchased with the sum of $ _____.

Martin James Capital Management, Inc.
General Partner,

By:_____
Martin James Allamian, President

**The Limited Partnership Interest in M.J. Diversified, L.P. has not been registered under the Securities Act of 1933 or state securities laws and cannot be resold unless registered under applicable federal or state securities law or unless an exemption from registration is available. Transfer and redemption of interests are subject to restrictions contained in the Partnership Agreement.**

## Exhibit C
## M.J. DIVERSIFIED, L.P.
### Offeree Questionnaire

(To be completed by each Purchaser
who executes a Subscription Agreement)

1. Purchaser understands that the Units offered by M.J. Diversified, L.P. (the "Fund") will not be registered under the Securities Act of 1933, as amended (the "Act"), or the laws of any state. Purchaser also understands that in order to insure that the offering and sale of the Units are exempt from registration under federal and state securities laws, the Fund is required to have reasonable grounds to believe, and must actually believe after making reasonable inquiry, that all purchasers of Units or their professional advisors, if used, are sophisticated investors able to evaluate the merits and risks of the investment. Accordingly, the following information is supplied to supplement information concerning the purchaser previously made available to the Fund.

2. Purchaser has read the Fund's Memorandum and understands that there are restrictions on transfers and sales of Units and that Purchaser's ability to liquidate the investment in Units may be limited.

3. Is Purchaser an "Qualified Eligible Participant", as defined below? Yes ✓ No ____ (If purchaser is an "Qualified Eligible Participant", check the applicable categories below.

Accredited Investor and Qualified Eligible Participant Status

Initial all appropriate spaces below indicating the basis on which the undersigned qualifies as a "qualified eligible participant" and an "accredited investor." Only those which so qualify are eligible to invest in the Partnership. Please note that in the case of each category except (a) and (j) below the undersigned must (i) own securities (including participation in the Partnership and other pools) of issuers not affiliated with such person or entity and other investments (i.e., real estate held for investment purposes) with an aggregate market value of at least $2,000,000, (ii) have on deposit with a futures commission merchant at least $200,000 in exchange-specified initial margin and option premiums for commodity interest transactions, or (iii) own a portfolio comprised of a combination of (i) and (ii)(e.g. $1,000,000 in securities and $100,000 in margin and premiums((the "Portfolio Requirement").

(a) _____ Any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(b) _____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) thereof that was not formed for the specific purpose of investing in the Partnership and that satisfies the Portfolio Requirement.

(c) _____ A bank as defined in Section 3(a)(2) of the Securities Act of 1933, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act of 1933, acting for its own participant/accredited investor, that satisfies the Portfolio Requirement.

(d) _____ An insurance company as defined in Section 2(13) of the Securities Act of 1933, acting for its own account or for the account of a qualified eligible participant/accredited investor, that satisfies the Portfolio Requirement.

(e) _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

1

(f) __✓/G__ An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, "Massachusetts or similar business trust, or partnership," in each case other than a commodity pool and not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000 and satisfies the Portfolio Requirement.

(g) _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(h) _____ A commodity pool, trust, insurance company separate account or bank collective trust, not formed for the specific purpose of investing in the Partnership, which has total assets in excess of $5,000,000, whose participation in the Partnership is directed by a qualified eligible participant/accredited investor and which does not invest in aggregate more than 10 percent of the fair market value of its assets in the Partnership and other commodity pools exempt under CFTC Reg. 4.7.

(i) _____ An entity which all of the unit owners and participants (i.e., all partners (including limited partners) of a partnership, shareholders of a corporation and the grantor of a grantor trust, but not the beneficiaries of a true trust) are qualified eligible participants and accredited investors.

8. I represent and warrant that the information contained in this questionnaire is true and correct.

**FOR INDIVIDUALS:**

Dated: __6 / 1__, 200 _0_

_____
Purchaser's Signature

_____
Name - Print or Type

**FOR ENTITIES:**

ZCM Asset Holding Company (Bermuda) Limited .
P.O. Box HM2268
Hamilton HMJX
Bermuda

_____
Name of Entity - Print or Type

_Kirby Smith_
Authorized Officer's Signature

_Kirby Smith_
Name of Officer - Print or Type

_Authorized Signatory_
Title of Officer - Print or Type

**PLEASE RETURN THIS OFFEREE QUESTIONNAIRE TO THE FUND WITH YOUR LIMITED PARTNERSHIP AGREEMENT (EXHIBIT A), ALONG WITH THE FOLLOWING IMPORTANT WIRE IDENTIFICATION INFORMATION:**

2

Name of Purchaser's Bank: Citibank N.A.

Address of Purchaser's Bank: 399 Park Avenue New York

ABA# of Purchaser's Bank: 021-000-089

Date of Wire Transfer: 6/1/2000

Amount of Wire Transfer: $ 1,476,824

3

# Exhibit E

**Exhibit A**

# M.J. FINANCIAL ARBITRAGE L.P.
### LIMITED PARTNERSHIP AGREEMENT

THIS PARTNERSHIP AGREEMENT made and entered into this *1* day of *June 2000* by and between Martin James Capital Management, Inc. (the "General Partner") and other parties who shall execute this agreement, whether in counterpart, by separate instrument or otherwise, as Limited Partners (who are hereinafter referred to as "Limited Partners") (the General Partner and the Limited Partners are sometimes collectively referred to herein as "Partners").

**WITNESSETH**

WHEREAS, the parties hereto desire to form a partnership for the purpose of funding certain individual spot loans of various mortgage lenders.

NOW, THEREFORE, the parties hereto agree as follows:

**1.     Formation and Name.**

The parties hereby form a partnership. The name of the partnership is M.J. Financial Arbitrage, L.P. (the "Partnership"). The General Partner shall execute and file with the Office of the Secretary of the State of Nevada a Certificate of Limited Partnership and shall execute, file, record and publish such amendments, assumed name certificates and other documents as necessary or advisable as determined by the General Partner. Each Limited Partner agrees to furnish the General Partner with a limited power of attorney which may be filed with the Certificate of Limited Partnership and any amendments thereto and such additional information as is required to complete such documents and shall execute and cooperate in the filing, recording or publishing of such documents at the request of the General Partner.

**2.     Principal Office.**

The principal office of the Partnership shall be 6 N 808 Dunham Road, Elgin, IL 60120 or such other place as the General Partner may designate from time to time.

**3.     Business.**

The Partnership business and purpose is to provide funding to various mortgage lenders in exchange for an agreed upon annual rate of return and a percentage of the premiums earned when the loan is sold. The objective of the Partnership's business is appreciation of its assets.

**4.     Term, Dissolution and Fiscal Year.**

       (a)     **Term.** The General Partner has filed a Certificate of Limited Partnership with the Nevada Secretary of State. Trading will continue until any of the following events occur:

              (i)     December 31, 2025;

              (ii)     Withdrawal or insolvency of the General Partner unless a new General Partner shall be substituted pursuant to Section 15(c) hereof;

1

(iii)    A decline in the net asset value per unit of Partnership interest to 5% or less of its value as of the first business day of the month, unless the General Partner elects to continue the partnership pursuant to Section 4(d) of this Agreement; and

(iv)    Any event which shall make unlawful the continued existence of the Partnership.

(b)    **Termination of initial offering.** The Partnership began soliciting funds in July 1999. November 1, 1999 marks the end of the initial offering period.  Pursuant to Regulation D of the Securities Act of 1933.

(c)    **Dissolution.**    Upon the first to occur of the events in Section (a) above, the Partnership shall terminate and be dissolved.  The General Partner and each Limited Partner shall share in the assets of the Partnership, after the payment of creditors, pro rata in accordance with their respective capital accounts, less any amount owing by such Partner to the Partnership.

(d)    **Continuation of Partnership.**    Upon the decline in net asset value as outlined in Section 4(a)(iii) above, the General Partner may, in its discretion poll the Partners to determine whether Partnership trading should continue.  All Partners will be provided the opportunity to redeem their Partnership interest at this time.  If, in the judgment of the General Partner, enough Partners wish investing to resume, the General Partner will resume investing.  Otherwise, the General Partner will terminate the Partnership.

(e)    **Fiscal Year.**  The fiscal year of the Partnership shall begin on January 1 of each year and end on the following December 31, provided, however, that if such fiscal year is disapproved by the Internal Revenue Service the fiscal year shall be as otherwise approved by the General Partner and the Internal Revenue Service.

5.    **Management of the Partnership.**

The General Partner, to the exclusion of all other partners, shall conduct and manage the business of the Partnership including, without limitation, the investment of the funds of the partnership.  No Limited Partner shall be entitled to any salary, draw or other compensation from the Partnership on account of any investment in the Partnership.  The General Partner shall have sole discretion in determining what distributions of profits and income, if any, shall be made to the Partners, shall execute various documents on behalf of the Partnership and the Partners and supervise the liquidation of the Partnership if an event causing termination of the Partnership occurs.

The General Partner will have sole discretion with regard to the appointment or employment of all persons or entities providing services to the Partnership including, but not limited to, mortgage lenders, brokers and accountants and may employ any such persons or entities on behalf of the Partnership without notice to the Partners.

2

The General Partner may engage in other business activities and shall not be required to refrain from any other activity or disgorge any profits from any such activity, whether as General Partner of additional partnerships or otherwise. The General Partner shall have a fiduciary responsibility to the Partnership with respect to the safekeeping and use of all funds and assets of the Partnership, and he shall not employ or permit others to employ such funds and assets in any manner except for the exclusive benefit of the Partnership. The Partnership shall keep and retain such books and records relating to the business of the Partnership as it deems necessary or advisable, at the principal office of the Partnership, or such other offices as the General Partner deems advisable. Such books and records shall be retained by the Partnership for not less than six years. The Limited Partners shall be given reasonable access to the books and records of the Partnership.

No person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the partnership nor to determine any fact or circumstance bearing upon the existence of their authority.

The Partnership shall make no loans. Assets of the Partnership will not be commingled with assets of any other entity.

6.    **Capital Contributions and Units of Partnership Interest.**

       (a)    **Initial Capital Contributions.** Interests in the Partnership shall be evidenced by Units of Partnership Interest ("Units" or individually a "Unit"). The General Partner on behalf of the Partnership will issue Units to persons desiring to become Limited Partners; provided that such persons are determined by the General Partner to be qualified and provided their subscriptions and Subscription Agreements are accepted by the General Partner.

After the Partnership begins operations, an investor will become a Limited Partner in the Partnership on the first day of the month following receipt by the Partnership of the investor's capital contribution and acceptance by the General Partner of such investor's executed Limited Partnership Agreement, Subscription Agreement, Purchaser Questionnaire, Power of Attorney and any other documents required by the General Partner (collectively, the "subscription documents") no less than ten days preceding the first day of the month.

       (b)    **Additional Capital Contributions.** A Partner may, as of the first day of any month (the "effective date"), contribute additional funds to the Partnership, in amounts equal to or in excess of $500,000 provided such contribution is received at least 10 days prior to this effective date. As of the effective date, the General Partner will revise the contributing Partner's capital account to reflect such contribution, and the Units of all the Partners shall be adjusted to reflect the additional contributions to the total capital of the Partnership. The same adjustment will be made with respect to the initial capital contribution of new Partners so that Partnership profits and losses will be allocated proportionately to those Partners who were members of the Partnership during the applicable period. In determining the value of the capital accounts of the Partners, the value of each Unit, including Units of General Partnership Interest, shall be determined as of the close of business on the last day of the month immediately preceding the effective date of the capital contribution. The General Partner may also contribute additional funds to the Partnership under the same terms and conditions.

7. **Allocation of Profits and Losses.**

(a) **Capital Accounts.** A capital account shall be established for each Partner. The initial balance of a Partner's capital account shall be his capital contribution at the time of his admission to the Partnership.

(b) **Monthly Allocations.** As of the close of business on the last day of each month the following determinations and allocations shall be made:

(i) The Net Asset Value of the Partnership (as defined in paragraph 8 hereof).

(ii) Any increase or decrease in Net Asset Value as of the end of each month shall then be credited or charged to the capital account of each Partner in the ratio that the balance of each account bears to the balance of all accounts for that month.

(iii) The amount of any distribution to a partner or any amount paid to a partner upon redemption of Units shall be charged to that Partner's capital account.

(c) **Allocation of Profit and Loss for Federal Income Tax Purposes.** As of the end of each fiscal year, the Partnership's realized capital gain or loss and ordinary income or loss shall be allocated among the Partners in the proportion which their respective capital accounts bear to the total account of all Partners. Any Partner who redeems Units during any fiscal year will be allocated his or her proportionate share of the capital gain or loss and ordinary income or loss realized by the Partnership during the period that such Units were owned by such Partner.

(d) **Expenses.** The Partnership shall bear all expenses, up to .25% (1/4 of 1%) of the net Asset Value and shall be obligated to pay all liabilities incurred by it including without limitation, all expenses incurred in connection with its lending activities, and the management fee payable to the General Partner.

The General Partner will pay all offering and organizational expenses and will not be reimbursed from the partnership.

(e) **Return of a Partner's Capital Contribution.** A Partner shall have the right to withdraw capital through the redemption of Units and shall be entitled to distributions in accordance with the terms of this Agreement. In no event shall a Partner be entitled to demand or receive property other than cash.

(f) **Distributions.** The General Partner shall have sole discretion in determining what distributions (other than redemptions of Units, which may be made at the discretion of any Partner as described in paragraph 10 below), if any, the Partnership will make to its Partners. Distributions will be pro rata in accordance with the respective capital accounts of the Partners.

8.    **Net Asset Value.**

The Net Asset Value of the Partnership shall be the difference between the value of the assets of the Partnership and the amount of liabilities of the Partnership. Unless otherwise specified below, all assets and liabilities are to be determined on the basis of generally accepted accounting principles, consistently applied. For purposes of this calculation Net asset Value shall include:

     (a)    Any realized and unrealized profit or loss from lending activities;

     (b)    Government Securities shall be valued at cost plus accrued interest monthly;

     (c)    Partnership expenses;

     (d)    Management fees shall be paid monthly and;

     (e)    Incentive fees shall be accrued monthly but paid quarterly.

Net Asset Value per Unit is calculated by dividing the Net Asset Value of the Partnership by the number of Partnership Units outstanding for that month.

9.    **Reports to Partners.**

The General Partner will cause each Partner to receive (i) within 90 days after the close of each fiscal year, financial statements including (a) a balance sheet and statements of income and partner's equity and (b) a statement showing total fees, compensation, and expenses paid by the Partnership, and (ii) by March 15 of each year, such tax information as is necessary for each Partner to complete his federal income Tax return. In addition, at the end of each month a statement of the Partnership will be sent to all Partners.

10.    **Redemption of Units.**

A partner may withdraw from the Partnership all or any part of his capital contributions and undistributed profits, if any, effective as of the end of each calendar quarter ("the effective date") by requiring the Partnership to redeem any or all of his Units at its Net Asset Value per Unit (as determined by the General Partner), calculated as of the effective date; provided that, (i) there remains property of the Partnership (except any liability to partners on account of their capital contributions) and (ii) the General Partner shall have received notice of the Partner's intent to redeem (by forwarding a "Request for Redemption" attached as Exhibit D to the Confidential Private Placement Memorandum) at least ten days prior to the beginning of the calendar quarter.

11.    **Assignability.**

The Units may be assigned at the election of the Partner and upon notice to the General Partner. However, the assignee shall become a substituted Partner in the Partnership only upon execution and delivery to the General Partner of the subscription documents and the consent of the General Partner (which may be granted or withheld at its discretion). An assignee who does not become a substituted Partner shall be entitled to receive the share of the profits or the return of capital to which his assignor would otherwise be entitled, but shall not be entitled to vote, to an accounting of Partnership transactions, to receive tax information, or to inspect the books and records of the Partnership.

**12.    Admissions of Additional Partners.**

Newly admitted Partners shall contribute cash to the capital of the Partnership for each Unit of Partnership Interest to be acquired at the Net Asset Value per Unit as of the last business day of each month, as described in paragraph 8 hereof.

**13.    Limited Power of Attorney.**

Each partners irrevocably appoints Martin James Capital Management, Inc. as his attorney-in-fact to execute, acknowledge, swear to, deliver, file, record and publish, as appropriate: amendments to this Agreement hereto as described in Section 15; a certificate of limited partnership and amendments thereto; certificates of assumed name for the Partnership; and any other instruments appropriate to conduct the Partnership's business.

**14.    Withdrawal or Death of a Partner.**

The death, adjudication of incompetence or insanity, bankruptcy, retirement, resignation, dissolution, termination, insolvency or withdrawal of the General Partner shall dissolve and terminate the partnership unless the Partnership is continued pursuant to paragraph 17(c) hereof. The General Partner may withdraw from the Partnership at any time on 30 days written notice sent first class mail, postage prepaid, to each Partner. The death, legal disability, withdrawal, insolvency or dissolution of a Partner shall not terminate or dissolve the Partnership and such Partner, his estate, custodian or personal representative shall have no right to withdraw or value such Partner's interest in the Partnership except as provided in paragraph 10 above.

**15.    Amendments and Meetings.**

(a)    **Amendments with Consent of the General Partner.**  If, at any time during the term of the Partnership, the General Partner shall deem it necessary or desirable to amend this Agreement, such amendment shall be effective if embodied in an instrument signed by the General Partner and by Partners owning more than fifty percent (50%) of the Units then owned by partners. However, the General Partner may, in its sole discretion, make such amendments to this Agreement as may be necessary to enable the Partnership to be classified for federal income tax purposes as a Partnership and not as an association taxable as a corporation or to permit the qualification or registration of the Units for sale in any state or jurisdiction. Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same has originally been embodied in and formed a part of this Agreement; provided, however, that no such supplemental or amendatory agreement shall, without consent of all Partners, change or alter this Section 15, extend the terms of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled.

(b)    **Meetings.**  The General Partner shall, by written notice to each Partner of record, call a meeting of the Partnership.  Such meeting shall be held at least thirty but not more than sixty days after the mailing of such notice and shall specify the date, a reasonable place and time, and the purpose of such meeting.

(c)    **Amendments and Actions Without Consent of the General Partner.**    At any meeting called pursuant to Section 15(b), upon the affirmative vote (which may be in person or by proxy) of Partners owning more than 50% of the Units then owned by the Partners, and the consent of the General Partner the following actions may be taken: (i) this Partnership Agreement may be amended, provided, however, that no such supplemental or amendatory agreement shall, without the consent of all the Partners, change or alter this Section 15, extend the term of the Partnership, reduce the capital account of any Partner or modify the percentage of profits, losses or distributions to which any Partner is entitled; (ii) the Partnership may be dissolved; (iii) the General Partner may be removed and replaced; (iv) a new General Partner or Partners may be elected if the General Partner elects to withdraw from the Partnership; (v) any contracts with the General Partner or any of its affiliates may be terminated on sixty days notice without penalty; and (vi) the sale of all assets of the Partnership may be approved, provided, however, that no such action may be taken if a court of competent jurisdiction has entered a final order to the effect that the action to be taken will adversely affect the status of the classification of the Partnership as a "partnership" under the Federal income tax laws. The term "final order" shall mean an order which is not subject to any further court proceedings for appeal, review or modification.

16.    **No Personal Liability for Return of Capital.**

The General Partner shall not be liable for the return or repayment of all or any portion of the capital or profits of any Partner, it being expressly agreed that any such return of capital or profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the General Partner) of the Partnership.

17.    **Indemnification.**

(a)    **By the Partnership.**    The Partnership shall indemnify, defend and hold harmless the General Partner, and its employees and affiliates from and against any loss, liability, damage, cost or expense (including legal fees and expenses) and any amounts paid in settlement thereof (provided that the Partnership shall have approved such settlement) resulting from or relating to its actions or capacity as General Partner, or otherwise concerning the business or activities undertaken on behalf of the Partnership, provided that the act or omission which was the subject of the demand, claim or lawsuit did not constitute gross negligence, willful or wanton misconduct, or breach any fiduciary obligations to the Partnership.

Any indemnification permitted by the first paragraph of this Section 16, unless ordered or expressly permitted by a court, shall be made by the Partnership only upon a determination by independent legal counsel in a written opinion that the conduct which is the subject of the claim, demand or lawsuit with respect to which indemnification is sought meets the standards set forth in said paragraph.

(b)    **By the Partners.**    In the event the Partnership is made a party of or to any claim, dispute or litigation, or otherwise incurs any loss or expense as a result of or in connection with any Partner's obligations or liabilities unrelated to the Partnership business, such Partner shall indemnify and reimburse the Partnership for all loss and expenses incurred, including reasonable attorney's fees.

18.    **Governing Law.**

The validity and construction of this Agreement shall be determined and governed by the laws of the State of Nevada.

7

19.  **Miscellaneous.**

(a)  **Priority Among Partners.**  No Partner shall be entitled to any priority or preference over any other Partner in regard to the affairs of the Partnership.

(b)  **Notices.**  All notices under this Agreement, other than reports by the General Partner to the Partners, shall be in writing and shall be effective upon personal delivery, or if sent registered or certified mail, postage prepaid, addressed to the last known address of the party to whom such notice is given, upon deposit of such notice in the United States mails.  Reports by the General Partner to the Partners shall be in writing and shall be sent first class mail to the last known address of each Partner.

(c)  **Binding Effect.**  This Agreement shall inure to and be binding upon all of the parties, their successors, assigns as permitted herein, custodians, estates, heirs and personal representatives.  For purposes of determining the rights of any Partner hereunder, the Partnership and the General Partner may rely upon the Partnership records as to who are Partners and all Partners agree that their rights shall be determined and that they shall be bound thereby, including all rights which they may have under Sections 10, 11 and 15 hereof.

(d)  **Captions.**  Captions in this Agreement no way define, limit, extend, or describe the scope of this Agreement nor the effect of any of its provisions.

(e)  **Counterparts.**  This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute an agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _1_ day of _June_, _2000_

General Partner:

Martin James Capital Management, Inc.

By:_____
    Martin James Allamian, President

Limited Partner(s):

_Kirby Smith_

_Authorized Signatory_

2CM Asset Holding Company (Bermuda) Limited
P.O. Box HM2268
Hamilton HMJX
Bermuda

8

Exhibit B

# M.J. FINANCIAL ARBITRAGE L.P.

### Subscription Agreement/Limited Power of Attorney

**(To be executed by all purchasers)**

**To:**

Martin James Capital Management, Inc.
6 N 808 Dunham Road
Elgin, IL 60120

Document Number _____

Date: *June 1, 2000*

**1. Subscription.** I hereby subscribe for Units of Partnership Interest ("Units") in M.J. Financial Arbitrage, L.P. (the "Fund"), at $1,000 per unit or at Net Asset Value per Unit on the last business day of this month if the Fund has started trading, provided that all necessary subscription documents and contribution is received by the General Partner at least fifteen days prior to the month end, as described in the Confidential Private Placement Memorandum dated October 1, 1999 (the "Memorandum"), and hereby tender a check in the amount of $ _____ ($500,000 minimum). Upon acceptance of this subscription, I agree to become a Partner in the Partnership and accept and adopt the provisions of the Partnership Agreement. If my subscription is rejected, the amount of my subscription will be promptly returned to me without interest thereon or deductions therefrom.

**2. Representations and Warranties.** I hereby represent and warrant to you as follows:

(a) Simultaneously with acceptance of this subscription by the Partnership, and by completing, executing and delivering the Power of Attorney which is Exhibit C to the Partnership's Private Placement Memorandum, I will become a party to the Partnership Agreement and will appoint the General Partner as my attorney-in-fact to, among other things, execute on my behalf all further amendments to the Partnership Agreement, and I will be bound by all of the terms and conditions thereof.

(b) I (and my offeree representative, if any) have read, understand and am fully familiar with the Partnership Confidential Private Placement Memorandum and the exhibits thereto, applicable to this investment, and am satisfied that I have received adequate information concerning all matters which I consider material to a decision to purchase Units.

(c) I (and my offeree representative, if any) have had an opportunity to ask questions of and received answers from the General Partner concerning the terms and conditions of this investment, and all such questions have been answered to my full satisfaction.

(d) I (and my offeree representative, if any) have such knowledge and experience in financial and business matters that I am capable of evaluating the risks and merits of an investment in the Partnership.

(e) I have completed the Confidential Purchaser Questionnaire or the Purchaser Representative Questionnaire, as appropriate, and certify that all disclosures therein are accurate and true.

1

(f) I have substantial means of providing for my current needs and personal contingencies and have no need for liquidity in this investment.

(g) My overall commitment to investments which are not readily marketable or are not liquid is not disproportionate to my net worth and my purchase of the Units will not cause my overall commitment in this type of investment to become excessive.

(h) I have substantial experience in making investment decisions of this type or am relying upon my own qualified purchaser representative in making this investment decision.

(i) Where appropriate, I have consulted my lawyer, accountant, or other advisor with respect to my investment and all books, records and documents pertaining to the investment have been made available to me and such advisors by the Partnership.

(j) Except as set forth in the Partnership's Confidential Private Placement Memorandum and the Exhibits thereto (the "Offering Documents"), no representations or warranties have been made to me by the Partnership, the General Partner or any agent, employee or affiliate of either of them, in entering into this transaction, and I am not relying upon any information, other than that contained in such Offering Documents and the results of my own independent investigation.

(k) I understand that the Units have not been registered under the Securities Act of 1933, as amended, or the Illinois Securities Act, that the Units have not been approved or disapproved by the Securities and Exchange Commission or by any federal or state agency, and that no such agency has passed on the accuracy or adequacy of the Partnership's Confidential Private Placement Memorandum.

(l) I am acquiring my Units hereunder for my own account, for investment purposes only, and not with a view to the sale or other distribution thereof, in whole or in part.

(m) If the undersigned is a corporation or trust, the officer executing this Subscription Agreement represents and warrants that he or she is authorized to so sign; that the corporation or trust is authorized by the Articles (or Certificate) of Incorporation and By-Laws of the corporation or by the trust agreement, as the case may be, to make this investment and to enter into the Partnership Agreement and this Subscription Agreement.

In the case of a corporation, the corporation will, upon request of the General Partner or counsel to the Partnership, furnish to the Partnership a true and correct copy of the provisions of the Articles (or Certificate) of Incorporation or By-Laws, or both, authorizing the corporation to make such investment, and a copy (certified by the secretary or other authorized officer) of appropriate corporation resolutions authorizing the specific investment.

3. I understand the meaning and legal consequences of the representations and warranties contained in paragraph 2 hereof and I hereby agree to indemnify and hold harmless the Partnership and the General Partner and each Partner thereof from and against any and all loss, damage or liability due to or arising out of any breach of any representation or warranty of the undersigned, whether contained in the Partnership Agreement or this Subscription Agreement. Notwithstanding any representation or warranty of the undersigned, whether agreements made herein by me, I do not thereby or in any other manner waive any rights granted to me under federal or state laws.

4. I understand that this Subscription is not binding on the Partnership until the Partnership accepts it, which acceptance is at the sole discretion of the General Partner, by executing this Subscription Agreement where indicated.

5.   All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Partnership, as the case may be, at the respective address set forth herein.

6.   **Limited Power of Attorney.**   Subscriber irrevocably constitutes and appoints the General Partner, Martin James Capital Management, Inc., as his true and lawful attorney-in-fact with full power of substitution and with authority in subscriber's name, place and stead, to execute, acknowledge, deliver, swear to, file and record:

    (a)    The Partnership's Agreement of Limited Partnership;

    (b)    Amendments to the Agreement of Limited Partnership;

    (c)    Certificates of Limited Partnership and all amendments thereto;

    (d)    All documents necessary to qualify or continue the Partnership in the states where it may do business;

    (e)    All instruments which effect a change or modification of the Agreement of Limited Partnership in accordance with the terms thereof;

    (f)    All conveyances, instruments, or documents necessary to carry on the business of the Partnership;

    (g)    All other filings with governmental agencies that are necessary or desirable to carry out the business of the Partnership.

This power of attorney shall be deemed coupled with and interest, shall be irrevocable and shall survive a subscriber's death or disability.

**7. Items to be Delivered by Subscriber**

(a)    A reviewed Partnership Agreement (Exhibit A to the Private Placement Memorandum);

(b)    A completed and executed Subscription Agreement/Limited Power of Attorney (Exhibit B to the Private Placement Memorandum);

(c)    A completed and executed Confidential Purchaser Questionnaire as appropriate, (Exhibits C to the Private Placement Memorandum); and

(d)    A check payable to M.J. Financial Arbitrage, L.P. in the amount of the subscription.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement the date set forth below.

ZCM Asset Holding Company (Bermuda) Limited
P.O. Box HM2268
Hamilton HMJX
Bermuda

6/1/2000
_____
Date

_____
Subscriber's Name (print)

_____
Signature(s) of Subscriber(s)

Please print information below as you wish it to appear in the records of the Partnership:

RESIDENCE ADDRESS

Please mail correspondence to:
c/o Zurich Capital Markets Company
Europa House, Harcourt Centre
Harcourt St.
Dublin 2, Ireland

_____
Number and Street

_____
Name(s)    Attn: Ann Marie Callanan

_____
City    State    Zip

_____
Social Security Number or
Taxpayer Identification Number

Address for Notices if different from above:

_____
Number and Street

Please mail correspondence to:
c/o Zurich Capital Markets Company
Europa House, Harcourt Centre
Harcourt St.
Dublin 2, Ireland
Attn: Ann Marie Callanan

_____
City    State    Zip

4

## REPRESENTATIONS BY EMPLOYEE BENEFIT PLANS

The undersigned on behalf of the subscribing employee benefit plan, represents that all of the obligations and requirements of the Employee Retirement Income Securities Act of 1974, including prudence and diversification, with respect to the investment of trust assets in M.J. Financial Arbitrage, L.P. (the Partnership) have been considered prior to subscribing for units of partnership interest in the Partnership (Units). The person with investment discretion on behalf of the plan has consulted his attorney or other tax adviser with regard to whether the purchase of Units might generate "unrelated business taxable income" under Section 512 of the Internal Revenue Code. By signing this representation letter, the trustee or custodian subscribing for Units assumes full responsibility for evaluating the appropriateness of the investment and represents that he has (i) authority to make this investment on behalf of the plan, (ii) authorization to sign this Representation Letter and (iii) performed his duties with respect to the plan solely in the interest of the participants of the plan with due care, skill and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise.

_____
Date

_____
(Name of Plan)

By: _____
(Trustee)

# M.J. FINANCIAL ARBITRAGE, L.P.

## CERTIFICATE OF LIMITED PARTNERSHIP INTEREST

The subscription from _____, is hereby accepted by the Partnership this

_____ day of _____, ____, for the number of Units of Partnership interest that can

be purchased with the sum of $ _____.

Martin James Capital Management, Inc.
General Partner

By:_____
Martin James Allamian, President

**The Limited Partnership Interest in M.J. Financial Arbitrage, L.P. has not been registered under the Securities Act of 1933 or state securities laws and cannot be resold unless registered under applicable federal or state securities law or unless an exemption from registration is available. Transfer and redemption of interests are subject to restrictions contained in the Partnership Agreement.**

**Exhibit C**

# M.J. FINANCIAL ARBITRAGE, L.P.
**Offeree Questionnaire**

(To be completed by each Purchaser
who executes a Subscription Agreement)

1.   Purchaser understands that the Units offered by M.J. Financial Arbitrage, L.P. (the "Fund") will not be registered under the Securities Act of 1933, as amended (the "Act"), or the laws of any state. Purchaser also understands that in order to insure that the offering and sale of the Units are exempt from registration under federal and state securities laws, the Fund is required to have reasonable grounds to believe, and must actually believe after making reasonable inquiry, that all purchasers of Units or their professional advisors, if used, are sophisticated investors able to evaluate the merits and risks of the investment. Accordingly, the following information is supplied to supplement information concerning the purchaser previously made available to the Fund.

2.   Purchaser has read the Fund's Memorandum and understands that there are restrictions on transfers and sales of Units and that Purchaser's ability to liquidate the investment in Units may be limited.

3.   Is Purchaser an "accredited investor", as defined below? Yes __✓__ No ____ (If purchaser is an "accredited investor", check the applicable categories below.

_____ (a) Any bank as defined in section 3(a)(2) of the Act, or any savings or loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual of fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of the Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investments Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees if such plan has total assets in excess of $5 million; any employee benefit plan within the meaning of ERISA. If the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are "accredited investors"; or

_____ (b) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940; or

__✓__ (c) Any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring share/interests, with total assets in excess of $5,000,000; or

7

_____ (d)  Any natural person whose individual net worth, or joint net worth that person's spouse, at the time of his purchase exceeds $1,000,000; or

_____ (e)  Any natural person who had an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

_____ (f)  Any trust with total assets in excess of $5,000,000 not formed for the specific purpose of purchasing a shares/interest, whose purchase is directed by a "sophisticated" person; or

_____ (g)  Any entity in which all of the equity owners are "accredited investors."

**Please answer YES or NO for questions 4 through 6.**

4. Can Purchaser afford to hold Purchaser's investment in the Fund for an indefinite period of time?  YES

5. Can Purchaser afford a complete loss of its prospective investment in the fund?  YES

6. If subscriber is an INDIVIDUAL and is NOT an "accredited investor", please answer the following questions:

(a)  Income of Purchaser (from all sources) for the two immediately preceding calendar years and anticipated income for the current calendar year (check appropriate range):

| | | | |
|---|---|---|---|
| Under $100,000 | _____ | _____ | _____ |
| $100,000 to $200,000 | _____ | _____ | _____ |
| Over $200,000 | _____ | _____ | _____ |

(b)  Net Worth as of the date of the Subscription Agreement (check appropriate range):

| | |
|---|---|
| _____ | Under $100,000 |
| _____ | $100,000 - $200,000 |
| _____ | $200,001 - $500,000 |
| _____ | $500,001 - $1,000,000 |
| _____ | Over $1,000,000 |

What percentage of Purchaser's net worth is attributable to homes, furnishings, and automobiles?  _____ %

(c)  Does Purchaser make Purchaser's own investment decisions?  _____.  If not, who makes Purchaser's investment decisions?  Please give the name, address, occupation, and area of specialization of such person.  (THE PURCHASER MUST FORWARD TO THE FUND A LETTER TO THIS EFFECT FROM PURCHASER REPRESENTATIVE TO PURCHASER WHICH MUST BE DATED AND EXECUTED BY PURCHASER.)

8

(d)    Does Purchaser have prior experience in investing in private placements or restricted securities? _ . ___. If Purchaser's answer is yes, specify the investments:

(e)    Please provide any information not specifically given in the Purchaser's answers to the above questions which would be helpful in evaluating whether Purchaser has such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of this investment, and in evaluating whether Purchaser is able to bear the economic risk of this investment:

7.    If Purchaser is <u>NOT AN INDIVIDUAL</u> and <u>NOT</u> an "accredited investor", please answer the following questions:

(a)    Check below the types of investments Purchaser (not the officers, directors, shareholders, partners, beneficiaries or other persons owning or controlling same) has made during the past 5 years for its own account.

    [ ]    U.S. government and federal agency securities

    [ ]    State and local government securities

    [ ]    Corporate stocks

    [ ]    Corporate bonds, debentures and notes

    [ ]    Shares in mutual funds, investment trusts and closed-end investment companies (including money market funds)

    [ ]    Interests in real estate investment trusts

    [ ]    Options on common stock

    [ ]    Interests in limited partnerships

    [ ]    Commodity futures contracts and options thereon

    [ ]    Investment in real estate (land, buildings, cooperative apartments, condominium units)

    [ ]    Annuities

    [ ]    Other investments (describe below)

(b)    Were any of the foregoing investments acquired in private placements whereby resales were restricted pursuant to federal and/or state securities laws? _____. If yes, describe these investments, including the amounts invested, on an attachment sheet.

9

(c)    Set forth below details regarding each individual executing this Agreement on behalf of Purchaser (if more than one individual, please photocopy the applicable pages of this Agreement and complete this question separately for each such person).

(i)  Name: _____

_____

(ii) Title or Position: _____

_____

(iii) Years employed by, or affiliated with, Purchaser:

_____

(iv) Business address:

_____

_____

(v)  Business telephone number:

_____

(vi) Education:

_____

_____

(vii) Give his or her occupation(s) and other business associations during the past 5 years.  Listing the most recent position first, provide the names and addresses of his or her employers, if any, the kinds of business of such employers, his or her positions with such employers, and the years he or she was employed thereby.

_____

_____

10

(viii) Directorships held during the past 5 years (indicating years held):

_____

_____

(ix) Other business affiliations during the past 5 years (indicating years held):

_____

_____

(x) Check below the types of investments made by such individual during the past 5 years for his or her own account, or for the account of his or her spouse, any relative of such individual or his or her spouse who has the same principal residence as such individual, or any trust, estate, corporation or organization in which such individual, his or her spouse or such relatives have a majority of the beneficial or equity interests.

[ ] U.S. government and federal agency securities

[ ] State and local government securities

[ ] Corporate stocks

[ ] Corporate bonds, debentures and notes

[ ] Shares in mutual funds, investment trusts and closed-end investment companies (including money market funds)

[ ] Interests in real estate investment trusts

[ ] Options on common stock

[ ] Interests in limited partnerships

[ ] Commodity futures contracts and options thereon

[ ] Investment in real estate (land, buildings, cooperative apartments, condominium units)

[ ] Annuities

[ ] Other investments (describe below)

11

(xi) Were any of the foregoing investments acquired in private placements whereby resales were restricted pursuant to federal and/or state securities laws? _____. If yes, describe these investments, including the amounts invested.

(xii) Does such individual have any occupational experience with regard to investments, i.e., as a securities broker or dealer, investment adviser, futures commission merchant, introduction broker, commodity trading advisor, commodity pool operator, real estate broker, attorney, accountant or banker? __. If yes, give details.

(d)    In evaluating the merits and risks of Purchaser's proposed purchase of shares/interests, does Purchaser intend to rely upon the knowledge, judgment, experience, and advice of one or more financially sophisticated persons, other than the individual(s) named above (e.g., an investment adviser, broker, attorney, or accountant? _____.    (IF YES, PURCHASER MUST FORWARD TO THE FUND A LETTER FROM PURCHASER REPRESENTATIVE TO PURCHASER TO THIS EFFECT DATED AND EXECUTED BY PURCHASER.)

(e)    Have any of the purchaser representatives named in (d) given Purchaser investment advice in the past? _____. If yes, give details.

(f)    Indicate one of the following with respect to Purchaser's evaluation of the merits and risks of its prospective purchase of Units:

_____ (i) Purchaser intends to rely solely upon the knowledge, judgment, and experience of the individual(s) named in (d) above in reaching such investment decision.

_____ (ii) Purchaser intends to rely solely upon the knowledge, judgment, experience and advice of its purchaser representative(s) in reaching such an investment decision.

_____ (iii) Purchaser intends to rely upon a combination of the knowledge, judgment, and experience of the individual(s) named in (d) above, as well as the knowledge, judgment, experience and advice of its purchaser representative(s) in reaching such an investment decision.

(g)    Provide any additional information not specifically given in the answers to prior questions which would be helpful to the investment advisor in evaluating whether Purchaser is able to bear the economic risk of an investment in the Shares.

12

8. I represent and warrant that the information contained in this questionnaire is true and correct.

Dated _June 1 , 2000_

**FOR INDIVIDUALS:**

_____
Purchaser's Signature

_____
Name - Print or Type

**FOR ENTITIES:**                ZCM Asset Holding Company (Bermuda) Limited
                                 P.O. Box HM268
                                 Hamilton HMUX
                                 Bermuda

_____
Name of Entity - Print or Type

_____
Authorized Officer's Signature

_Kirby Smith_
Name of Officer - Print or Type

_Authorized Signatory_
Title of Officer - Print or Type

**PLEASE RETURN THIS OFFEREE QUESTIONNAIRE TO THE FUND WITH YOUR LIMITED PARTNERSHIP AGREEMENT (EXHIBIT A), ALONG WITH THE FOLLOWING IMPORTANT WIRE IDENTIFICATION INFORMATION:**

# Wiring Information

Name of Purchaser's Bank:       _Citibank NA_

Address of Purchaser's Bank:    _399 Park Avenue_
                                _New York_

ABA# of Purchaser's Bank:       _021-000-089_

Date of Wire Transfer:          _6-1-2000_

Amount of Wire Transfer:        _$2,577,706_

13

# EXHIBIT F

# M.J. Select Global, Ltd.

An investment company incorporated as
an International Business Company in accordance with
the laws of the Commonwealth of the Bahamas.

**April 1, 2000**

**[PAGE INTENTIONALLY LEFT BLANK]**

# M.J. SELECT GLOBAL, LTD.

**INVESTMENT MANAGER**
Martin James Capital Management, Inc.

**TRADING ADVISORS**
Global Arbitrage Development, Ltd.

**REGISTRAR and TRANSFER AGENT**
Oceanic Bank and Trust Company Limited
(Formerly New World Trustees Limited)

**BANKERS**
Barclays Bank PLC.

## TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY INFORMATION | 6 |
| THE FUND | 9 |
| ADMINISTRATION | 9 |
| THE OFFERING | 9 |
| THE INVESTMENT MANAGER | 11 |
| THE TRADING ADVISORS | 12 |
| TRADING ADVISORS PERFORMANCE | 14 |
| FUND PERFORMANCE | 17 |
| COMPENSATION AND EXPENSES | 19 |
| RISK FACTORS | 19 |
| ADVANTAGES OF THE FUND | 20 |
| TAX CONSIDERATIONS | 21 |
| SUBSCRIPTION PROCEDURES | 34 |
| SUBSCRIPTION AGREEMENT | 36 |
| OFFEREE QUESTIONNAIRE | 42 |
| REQUEST FOR REDEMPTION | 45 |

## NOTICES FOR RESIDENTS OF THE FOLLOWING STATES

**ALASKA:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500 - 3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF ADMINISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR APPROVES THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170. THE INVESTOR MUST RELY ON HIS OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

**CALIFORNIA:** IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF UNITS, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFORE, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER RULES. EACH INVESTOR OR TRANSFEREE WHO IS A RESIDENT OF CALIFORNIA MUST BE PROVIDED WITH A COPY OF SECTION 260.141.11 OF THE RULES OF THE COMMISSIONER OF CORPORATIONS.

**CONNECTICUT:** THE INTERESTS ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION AND HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT. THEY CANNOT, THEREFORE, BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE ACT AND, THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

**FLORIDA:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT IN RELIANCE UPON EXEMPTION PROVISIONS CONTAINED THEREIN. §517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT (THE "FLORIDA ACT") PROVIDES THAT ANY PURCHASER OF THE SECURITIES IN FLORIDA WHICH ARE EXEMPTED FROM REGISTRATION UNDER §517.061(11) OF THE FLORIDA ACT MAY WITHDRAW HIS SUBSCRIPTION AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE (3) BUSINESS DAYS AFTER HE TENDERS CONSIDERATIONS FOR SUCH SECURITIES. THEREFORE, ANY FLORIDA RESIDENT WHO PURCHASES SECURITIES IS ENTITLED TO EXERCISE THE FOREGOING STATUTORY RESCISSION RIGHT WITHIN THREE (3) BUSINESS DAYS AFTER TENDERING CONSIDERATION FOR THE SECURITIES BY TELEPHONE, TELEGRAM, OR LETTER NOTICE TO THE GENERAL PARTNER AT THE ADDRESS OR TELEPHONE NUMBER SET FORTH ON PAGE 7 HEREOF. ANY TELEGRAM OR LETTER SHOULD BE SENT OR POSTMARKED PRIOR TO THE END OF THE THIRD BUSINESS DAY. A LETTER SHOULD BE MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE ITS RECEIPT AND TO EVIDENCE THE TIME OF MAILING. ANY ORAL REQUESTS SHOULD BE CONFIRMED IN WRITING.

4

**GEORGIA:** THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE "GEORGIA SECURITIES ACT OF 1973," AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

**MAINE:** THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OF THE STATE OF MAINE UNDER SECTION 10502(2)(r) OF THE TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXIST.

**MISSISSIPPI:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OF EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**NEW YORK:** THIS PRIVATE OFFERING MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

## SUMMARY

**The Fund**

M.J. Select Global, Ltd. (the "Fund") is a limited liability, open-ended investment company organized under the laws of the Commonwealth of the Bahamas. The Fund is offering, through this offering memorandum, common shares (the "shares") at their current net asset value to participate in the trading of International and U.S. securities, security options, bonds, mutual funds, and related investments following a "market neutral" trading approach that utilizes arbitrage trading strategies.

**Investment Objective**

The Fund will seek to achieve long-term capital appreciation utilizing investment advisors that will trade securities, security options, bonds, mutual funds, and related investments applying a "market neutral" trading approach utilizing arbitrage trading strategies.

**Shares Offered**

Shares are offered to the public at an initial price of $1,000.00 U.S.D. per share. Thereafter, shares will be available for purchase at the month end net asset value per share. The minimum required investment is $500,000.00 U.S.D. This minimum may vary at the discretion of the Investment Manager.

**Offering Period**

The Fund will offer whole and fractional shares to accredited investors (as defined by the Securities Act of 1933) at the respective month-end net asset value per share. Shares will only be offered when the Investment Manager determines that sufficient capacity exists.

**Trading Advisor**

The initial Trading Advisor will be Global Arbitrage Development, Ltd., a corporation organized under the laws of the British Virgin Islands.

**Investment Manager**

Martin James Capital Management, Inc. will act as the Fund's Investment Manager. As Investment Manager, the company will select and allocate the Fund's trading assets among the Advisors. The Investment Manager will continuously monitor and analyze the performance and trading characteristics of current and prospective Advisors.

6

| | |
|---|---|
| **Registrar** | The Registrar, Transfer Agent, and Administrator of the Fund is Oceanic Bank and Trust Limited (**Formerly New World Trustees Limited**). Their address is: TK House ,Bayside Executive Park, West Bay Street & Blake Road, P.O. Box AP-59213, Nassau, The Bahamas. The telephone number is 242-502-8822. |
| **Administration** | The day-to-day business affairs of the Fund (exclusive of the trading operations) will be conducted by Oceanic Bank and Trust Limited. |
| **Redemption** | The shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption. However, the administrator shall have the right, exercisable from time to time, to postpone the payment and effective date of any redemption for up to three (3) months if the Administrator determines in good faith that the liquidation of the shareholder's assets or investments in the fund would adversely affect the value of the shares in the fund. Any amount payable to the applicant in connection with the redemption of shares shall be paid by wire upon the applicant's request at his expense. |
| **Compensation** | The Fund's Trading Advisor will receive a monthly management fee equal to 1/12 of 2% (2% annually) of the net assets under management and a quarterly incentive fee equal to 20% of total trading gains. The Investment Manager will receive a monthly management fee of 1/12 of 1% (1% annually) of the net asset value of the fund. |
| **Expenses** | The fund will pay for on-going operating expenses which include accounting, legal, auditing, and Administrator fees for administration services. |
| **Shareholder Reports** | Shareholders will receive a monthly financial statement showing their month end net asset value in the Fund. Additionally, each shareholder will receive a year-end set of financial statements audited by a CPA. |

| | |
|---|---|
| **Tax Treatment** | Under current Bahamian law there are no income, capital gains, withholding, estate, duty, or inheritance taxes payable by the Fund or its shareholders with respect to their shares. U.S. investors should see the "Tax Considerations" section for a more complete discussion. |
| **Fiscal Year** | December 31. |
| **Risks** | Despite the Fund's policy of diversification, an investment in shares is speculative and involves a high degree of risk, reflecting the highly leveraged and frequently volatile markets in which the Fund will trade. In addition to trading risks, the Fund will be subject to substantial fees and expenses that must be offset by its revenues to prevent depletion of its trading assets. |
| **How To Subscribe** | Investors who want to purchase shares must execute a Subscription Agreement and deliver it along with full payment. Enclosed is a Subscription Agreement and complete instructions. |
| **Functional Currency** | The Fund will report its results and transact subscriptions and redemptions in United States dollars. |

## THE FUND

M.J. Select Global, Ltd. is a limited liability, open ended investment company incorporated under the laws of the Commonwealth of the Bahamas, designed to give investors access to the significant profit potential which the directors consider to be available from trading International and U.S. securities, security options, bonds, mutual funds, and other related investments following a "market neutral" trading approach utilizing arbitrage trading strategies. With the benefit of advice from specially selected professional trading advisors and investment advisors, the directors consider that investors will be able to participate in some of the most advanced and potentially profitable markets in the world. The Fund aims to generate profits by utilizing the services of investment managers that trade on various exchanges throughout the world.

## THE ADMINISTRATOR, REGISTRAR, AND TRANSFER AGENT

The Registrar, Transfer Agent, and Administrator of the Fund is Oceanic Bank and Trust Limited. Its address and the principal business address of the Fund is: 1st Floor, Euro Canadian Centre, P.O. Box N-8327, Nassau, Bahamas. Oceanic Bank and Trust Limited will maintain the principal corporate records of the Fund, publish the monthly shareholder statements, and effect transfers and redemption's of the Fund's shares. Oceanic Bank and Trust Limited will also be responsible for all other day-to-day administrative requirements of the Fund.

## THE OFFERING & OFFERING PERIOD

PURCHASE OF THE SHARES OFFERED HEREBY SHOULD BE MADE ONLY BY THOSE PERSONS WHO CAN AFFORD TO BEAR THE RISK OF A TOTAL LOSS OF THEIR INVESTMENT. THE FUND RESERVES THE RIGHTS TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

The Fund will offer whole and fractional shares to accredited investors (as defined by the Securities Act of 1933) at the respective month-end net asset value per share. Shares will only be offered when the Investment Manager determines that sufficient capacity exists.

9

## MINIMUM SUBSCRIPTION

The minimum purchase is $500,000.00. At the discretion of the Investment Manager, lesser amounts may be accepted.

## APPLICATION OF PROCEEDS

Initial proceeds will be deposited into the Fund's bank account where they will earn interest. All interest will accrue to the Fund and each shareholder will receive a pro-rata share. The proceeds will be available to purchase shares in other funds and/or supply margin for the Funds trading accounts.

## CAPITAL STRUCTURE OF THE FUND

The Fund was incorporated in the Bahamas under the International Business Companies Act of the Commonwealth of the Bahamas (the "IBC") as a limited liability, open-ended private investment company. The shares offered hereby are common shares with no voting rights which, subject to the Articles of Association, are entitled to (a) dividends, when and if declared, and to participate pro rata in the profits and losses of the Fund; (b) share in the assets of the Fund pro rata with the holders of all shares in the event of a winding up or dissolution of the Fund, whether voluntary or involuntary, or upon a distribution of capital; and (c) request redemption of their shares.

Meetings of shareholders generally will be held annually (in person or by proxy) at the discretion of the Fund's Board of Directors.

## THE INVESTMENT MANAGER

The Fund has hired Martin James Capital Management, Inc. (MJCM) to function as the Investment Manager. MJCM is located at: 1 W. Illinois St., St. Charles, Illinois 60174. The telephone number is 630-587-4900.

The President and sole principal of the Investment Manager is Martin James Allamian. Mr. Allamian obtained a B.S. Degree from Northern Illinois University in 1984. His studies concentrated in accounting and finance. After graduation he became an Associated Person of Investment Educators until 1986. His duties included performing market analysis and research. He was also responsible for teaching at educational seminars concerning futures and option trading. Investment Educators is registered as a CTA.

From 1986 to present, Mr. Allamian has been trading his own futures and options accounts as a means of income. Within this time period he has had additional responsibilities. In 1987, he became a member of the Midamerica Commodity Exchange and traded his account as a floor trader. In 1988, he sold his Midamerica membership and became a member of the Chicago Board of Trade. From 1988 until 1991, he traded his own account as a floor trader. At the present time, he is still a member of the Chicago Board of Trade. During the time he was a floor trader, from 1988 to 1989, he was also employed at Optima Futures Analysis, Inc., as a market analyst, primarily in the area of U.S. Treasury Bonds and Options. Optima Futures Analysis, Inc. is registered as a CTA.

In 1989, Mr. Allamian formed and is President and sole principal of Martin James & Company, Inc. ("MJC"). MJC is registered and currently operates as an Introducing Broker ("IB"). As president of MJC, he is responsible for the complete management of the company. This includes, but is not limited to, supervising the firm's associated persons and developing institutional and retail client accounts in managed futures.

In 1991, to further service his managed futures clients, Mr. Allamian formed Martin James Capital Management, Inc., a Commodity Pool Operator (CPO) and Commodity Trading Advisor (CTA). Martin James Capital Management, Inc. is currently the General Partner for four commodity pools. Martin James Capital Management, Inc. also functions as a Manager of Managers, responsible for research and analysis of trading advisors, investment advisors, and derivative investments.

11

As the Investment Manager of the Fund, MJCM will select the Trading & Investment Advisors (the "Advisors") and allocate the Fund's trading assets among the Advisors. The Investment Manager will continuously monitor and analyze the performance and trading characteristics of the current and prospective Advisors. The Advisor selection will be an ongoing process. The Investment Manager may propose the reallocation of capital among, the change of, or the addition of Advisors whenever it is deemed that the market conditions or the performance of certain Advisors warrants such action.

The Investment Manager has selected Global Arbitrage Development, Ltd. as the initial Trading Advisor.

## THE TRADING ADVISOR

Global Arbitrage Development, Ltd. is an open-ended investment company incorporated in the British Virgin Islands.

The Advisor will trade International and U.S. securities, security options, bonds, mutual funds, and other related investments following a "market neutral" trading approach utilizing arbitrage trading strategies. The Advisor may hire traders directly or participate in their programs through a fund. Following is a description of the trading strategies and how they will be used.

1) Fixed Income Securities Arbitrage

The Advisor will trade both U.S. and International fixed-income securities and Euro-dollar deposits. The Advisor will trade "spreads" between two or more fixed income securities of different maturities in order to take advantage of a perceived distortion in the yield curve. The Advisor generally seeks to establish positions that will profit from a favorable change in the price relationships between the corresponding long and short positions, rather than from an outright move in any one position.

2) Synthetic Stock Market Hedge Yielding Program

This program is aimed at participating in the profits to be expected from an increase or decrease in volatility in any stock market (U.S. or International) while hedging against a decrease to the principal investment. The program is structured to yield a return close to or exceeding the risk free rate of the underlying stock market economy if there is no significant change in volatility. For example, if the program is applied to the U.S. stock market, and volatility does not change, the advisor expects to earn a rate of return at least equivalent to the U.S. Treasury Bill rate of return. If the Japanese stock market is utilized, and volatility does not change, then the Advisor expects to earn at least the equivalent of the Japanese Euro-Yen rate of return.

For example, the actual trading could require the Advisor to purchase a basket of warrants that are very "inexpensive or free," (volatility is low and is expected to increase) relative to the underlying stock prices. Inexpensive or free warrants exist when their trading price is approximately equal to their intrinsic value. In other words, no premium or discount exists. The Advisor will then supplement this purchase with a short sale of the underlying stocks and the subsequent sale of the underlying put options. The Advisor will make his buy or sell decisions depending on what instruments are undervalued or overvalued.

With an increase in volatility, and no change in the price of the stock, the Advisor would expect to profit from increasing warrant prices and time decay from the short put options. If the stock price increases, the short stock losses would be covered by appreciating warrants and the collection of put option premium (plus time decay) on the short put options. A falling stock price will yield profit from the short sale of stock and the collection of put option premium. Eventually these gains would be offset by the rising premium of the short put option.

3) Volatility Arbitrage

The Advisor may engage in equity derivatives arbitrage such as a "volatility arbitrage" between international equity warrants and their short term options listed on foreign markets. The objective is to capture the excess premiums that exist in the call options at times of high volatility expectations. The Advisor will attempt to collect the "overpriced" option premium while at the same time being hedged against market direction risk.

The Advisor will attempt to hedge its investments in securities denominated in currencies other than U.S. dollars through the use of forward contracts and options to buy and sell foreign currencies. The decision of when to buy or sell securities of a given company will generally be made based solely upon factors affecting the company or its securities and not based upon predictions as to the future currency exchange rates.

See the following pages for the performance record of the Advisor.

# GLOBAL ARBITRAGE DEVELOPMENT, LTD. PERFORMANCE RECORD

| Month | Beginning Equity (1) | Additions (2) | Withdraws (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | $1,000 Index (7) |
|---|---|---|---|---|---|---|---|
| **1990** | | | | | | | |
| Jan | 0 | 600,000 | 0 | 6,060 | 606,060 | 1.01 | 1,010 |
| Feb | 606,060 | 0 | 0 | 7,576 | 613,636 | 1.25 | 1,023 |
| Mar | 613,636 | 0 | 0 | 7,735 | 621,371 | 1.26 | 1,036 |
| Apr | 621,371 | 0 | 0 | 9,325 | 630,696 | 1.50 | 1,051 |
| May | 630,696 | 0 | 0 | 6,542 | 637,238 | 1.04 | 1,062 |
| Jun | 637,238 | 0 | 0 | 16,269 | 653,507 | 2.55 | 1,089 |
| Jul | 653,507 | 500,000 | 0 | 18,002 | 1,171,509 | 1.56 | 1,106 |
| Aug | 1,171,509 | 0 | 0 | 12,252 | 1,183,761 | 1.05 | 1,118 |
| Sep | 1,183,761 | 0 | 0 | 22,220 | 1,205,981 | 1.88 | 1,139 |
| Oct | 1,205,981 | 0 | 0 | 25,656 | 1,231,637 | 2.13 | 1,163 |
| Nov | 1,231,637 | 0 | 0 | 32,548 | 1,264,185 | 2.64 | 1,194 |
| Dec | 1,264,185 | 0 | 0 | 18,121 | 1,282,306 | 1.43 | 1,211 |

**1990 Annual Rate of Return 21.08 %**

| Month | Beginning Equity (1) | Additions (2) | Withdraws (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | $1,000 Index (7) |
|---|---|---|---|---|---|---|---|
| **1991** | | | | | | | |
| Jan | 1,282,306 | 500,000 | 0 | 32,571 | 1,814,877 | 1.83 | 1,233 |
| Feb | 1,814,877 | 0 | 0 | 30,235 | 1,845,112 | 1.67 | 1,253 |
| Mar | 1,845,112 | 0 | 0 | 4,950 | 1,850,062 | 0.27 | 1,257 |
| Apr | 1,850,062 | 400,000 | 0 | 27,854 | 2,277,916 | 1.24 | 1,272 |
| May | 2,277,916 | 0 | 0 | 38,654 | 2,316,570 | 1.70 | 1,294 |
| Jun | 2,316,570 | 0 | 0 | 44,952 | 2,361,522 | 1.94 | 1,319 |
| Jul | 2,361,522 | 0 | 0 | (3,250) | 2,358,272 | (0.14) | 1,317 |
| Aug | 2,358,272 | 0 | 0 | 24,950 | 2,383,222 | 1.06 | 1,331 |
| Sep | 2,383,222 | 0 | 0 | 70,226 | 2,453,448 | 2.95 | 1,370 |
| Oct | 2,453,448 | 0 | 0 | 54,623 | 2,508,071 | 2.23 | 1,401 |
| Nov | 2,508,071 | 0 | 0 | 35,984 | 2,544,055 | 1.43 | 1,421 |
| Dec | 2,544,055 | 0 | 0 | 31,250 | 2,575,305 | 1.23 | 1,438 |

**1991 Annual Rate of Return 18.81 %**

| Month | Beginning Equity (1) | Additions (2) | Withdraws (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | $1,000 Index (7) |
|---|---|---|---|---|---|---|---|
| **1992** | | | | | | | |
| Jan | 2,575,305 | 1,000,000 | 0 | 75,269 | 3,650,574 | 2.11 | 1,469 |
| Feb | 3,650,574 | 1,500,000 | 0 | 95,321 | 5,245,895 | 1.85 | 1,496 |
| Mar | 5,245,895 | 1,000,000 | 0 | 53,565 | 6,299,460 | 0.86 | 1,509 |
| Apr | 6,299,460 | 2,750,000 | 0 | 158,652 | 9,208,112 | 1.75 | 1,535 |
| May | 9,208,112 | 585,362 | 0 | 214,000 | 10,007,474 | 2.19 | 1,569 |
| Jun | 10,007,474 | 1,000,000 | 0 | (13,152) | 10,994,322 | (0.12) | 1,567 |
| Jul | 10,994,322 | 725,652 | 0 | 175,264 | 11,895,238 | 1.50 | 1,590 |
| Aug | 11,895,238 | 1,458,000 | 0 | 193,654 | 13,546,892 | 1.45 | 1,613 |
| Sep | 13,546,892 | 500,000 | 850,000 | 225,601 | 13,452,493 | 1.94 | 1,645 |
| Oct | 13,452,493 | 289,523 | 0 | 231,481 | 13,973,497 | 1.68 | 1,672 |
| Nov | 13,973,497 | 523,612 | 0 | 265,412 | 14,762,521 | 1.83 | 1,703 |
| Dec | 14,762,521 | 0 | 1,230,536 | 272,503 | 13,804,488 | 2.01 | 1,737 |

**1992 Annual Rate of Return 20.77 %**

14

# GLOBAL ARBITRAGE DEVELOPMENT, LTD. PERFORMANCE RECORD

| | Beginning Equity (1) | Additions (2) | Withdraws (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | $1,000 Index (7) |
|---|---|---|---|---|---|---|---|
| **1993** | | | | | | | |
| Jan | 13,804,488 | 500,000 | 0 | 138,800 | 14,443,288 | 0.97 | 1,754 |
| Feb | 14,443,288 | 1,000,000 | 150,000 | 212,365 | 15,505,653 | 1.39 | 1,778 |
| Mar | 15,505,653 | 896,524 | 480,000 | 251,424 | 16,173,601 | 1.58 | 1,807 |
| Apr | 16,173,601 | 425,743 | 225,864 | (75,862) | 16,297,618 | (0.46) | 1,798 |
| May | 16,297,618 | 550,000 | 325,687 | 269,121 | 16,791,052 | 1.63 | 1,827 |
| Jun | 16,791,052 | 1,000,000 | 220,000 | 651,700 | 18,222,752 | 3.71 | 1,895 |
| Jul | 18,222,752 | 750,000 | 375,050 | 365,487 | 18,963,189 | 1.97 | 1,933 |
| Aug | 18,963,189 | 512,365 | 0 | 25,954 | 19,501,508 | 0.13 | 1,935 |
| Sep | 19,501,508 | 1,895,452 | 0 | 278,450 | 21,675,410 | 1.30 | 1,960 |
| Oct | 21,675,410 | 0 | 225,001 | 492,525 | 21,942,934 | 2.30 | 2,005 |
| Nov | 21,942,934 | 0 | 0 | 425,689 | 22,368,623 | 1.94 | 2,044 |
| Dec | 22,368,623 | 0 | 0 | 345,000 | 22,713,623 | 1.54 | 2,076 |

*1993 Annual Rate of Return  19.48 %*

| | Beginning Equity (1) | Additions (2) | Withdraws (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | $1,000 Index (7) |
|---|---|---|---|---|---|---|---|
| **1994** | | | | | | | |
| Jan | 22,713,623 | 0 | 0 | 868,524 | 23,582,147 | 3.82 | 2,155 |
| Feb | 23,582,147 | 0 | 786,000 | 131,254 | 22,927,401 | 0.58 | 2,168 |
| Mar | 22,927,401 | 0 | 0 | 394,226 | 23,321,627 | 1.72 | 2,205 |
| Apr | 23,321,627 | 0 | 0 | 265,421 | 23,587,048 | 1.14 | 2,230 |
| May | 23,587,048 | 0 | 800,000 | 175,893 | 22,962,941 | 0.77 | 2,247 |
| Jun | 22,962,941 | 0 | 1,000,256 | 263,111 | 22,225,796 | 1.20 | 2,274 |
| Jul | 22,225,796 | 2,000,000 | 0 | 593,521 | 24,819,317 | 2.45 | 2,330 |
| Aug | 24,819,317 | 0 | 0 | 206,239 | 25,025,556 | 0.83 | 2,349 |
| Sep | 25,025,556 | 0 | 0 | 448,018 | 25,473,574 | 1.79 | 2,391 |
| Oct | 25,473,574 | 0 | 0 | 555,436 | 26,029,010 | 2.18 | 2,443 |
| Nov | 26,029,010 | 0 | 0 | 471,229 | 26,500,239 | 1.81 | 2,487 |
| Dec | 26,500,239 | 0 | 0 | 54,239 | 26,554,478 | 0.20 | 2,493 |

*1994 Annual Rate of Return  20.08 %*

## FOOTNOTES TO TABLE A

1) "Beginning Equity" represents the sum of the actual equity (including cash and cash equivalents) in the accounts.

2) "Additions" represents all additional capital deposited during that month.

3) "Withdraws" represents all withdraws of capital during that month.

4) "Net Performance" is the sum of the gain (loss) realized from closure of trade positions during the period minus commissions and fees charged on those transactions plus the total increase (decrease) in unrealized profits or losses on open positions at the end of the period when compared to open positions at the end of the prior period, less any advisory management or incentive fees as defined.

5) "Ending Equity" represents the sum of beginning equity plus additions minus withdraws plus net performance.

6) "Monthly Rate of Return" is calculated by dividing net performance by beginning equity as adjusted by the time-weighted value of additions and/or withdraws.

7) "1000 per Unit NAV" represents the value of a hypothetical $1,000 unit of investment over time.

16

## M.J. SELECT GLOBAL, LTD. PERFORMANCE RECORD

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-95 | 0 | 525,000 | 0 | 10,655 | 535,655 | 2.03 | 1020.30 |
| Feb-95 | 535,655 | 0 | 0 | 10,700 | 546,355 | 2.00 | 1040.68 |
| Mar-95 | 546,355 | 930,000 | 0 | 9,512 | 1,485,867 | 0.64 | 1047.38 |
| Apr-95 | 1,485,867 | 0 | 0 | 16,022 | 1,501,889 | 1.08 | 1058.67 |
| May-95 | 1,501,889 | 140,000 | 75,000 | 13,290 | 1,580,179 | 0.85 | 1067.65 |
| Jun-95 | 1,580,179 | 0 | 0 | 29,223 | 1,609,402 | 1.85 | 1087.40 |
| Jul-95 | 1,609,402 | 750,000 | 0 | 17,012 | 2,376,414 | 0.72 | 1095.24 |
| Aug-95 | 2,376,414 | 100,000 | 0 | 13,015 | 2,489,429 | 0.53 | 1101.00 |
| Sep-95 | 2,489,429 | 75,000 | 0 | 35,217 | 2,599,646 | 1.37 | 1116.12 |
| Oct-95 | 2,599,646 | 500,000 | 513,204 | 23,524 | 2,609,966 | 0.91 | 1126.27 |
| Nov-95 | 2,609,966 | 700,000 | 314,034 | 20,109 | 3,016,041 | 0.67 | 1133.83 |
| Dec-95 | 3,016,041 | 100,000 | 1,070,974 | 33,822 | 2,078,889 | 1.65 | 1152.58 |

**1995 Annual Rate Of Return = 15.30%**

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-96 | 2,078,889 | 45,000 | 0 | 36,021 | 2,159,910 | 1.70 | 1172.13 |
| Feb-96 | 2,159,910 | 275,000 | 28,158 | 41,805 | 2,448,557 | 1.74 | 1192.49 |
| Mar-96 | 2,448,557 | 265,000 | 0 | 5,702 | 2,719,259 | 0.21 | 1194.99 |
| Apr-96 | 2,719,259 | 60,000 | 0 | 10,563 | 2,789,822 | 0.38 | 1199.53 |
| May-96 | 2,789,822 | 0 | 40,673 | 27,779 | 2,776,928 | 1.01 | 1211.65 |
| Jun-95 | 2,776,928 | 0 | 27,857 | 45,363 | 2,794,434 | 1.65 | 1231.65 |
| Jul-96 | 2,794,434 | 0 | 308,990 | 67,583 | 2,553,027 | 2.72 | 1265.14 |
| Aug-96 | 2,553,027 | 0 | 263,535 | 17,168 | 2,306,660 | 0.75 | 1274.62 |
| Sep-96 | 2,306,660 | 125,000 | 0 | 42,358 | 2,474,018 | 1.74 | 1296.83 |
| Oct-96 | 2,474,018 | 0 | 0 | 52,097 | 2,526,115 | 2.11 | 1324.14 |
| Nov-96 | 2,526,115 | 148,000 | 0 | 40,686 | 2,714,801 | 1.52 | 1344.28 |
| Dec-96 | 2,714,801 | 175,000 | 0 | 58,443 | 2,948,244 | 2.02 | 1371.47 |

**1996 Annual Rate Of Return = 19.00%**

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-97 | 2,948,245 | 1,252,935 | 0 | 50,747 | 4,251,927 | 1.21 | 1388.04 |
| Feb-97 | 4,251,927 | 302,000 | 0 | 91,938 | 4,645,865 | 2.02 | 1416.06 |
| Mar-97 | 4,645,865 | 254,000 | 0 | 59,447 | 4,959,312 | 1.21 | 1433.24 |
| Apr-97 | 4,959,312 | 0 | 0 | 111,052 | 5,070,364 | 2.24 | 1465.33 |
| May-97 | 5,070,364 | 25,000 | 0 | 66,118 | 5,161,482 | 1.30 | 1484.35 |
| Jun-97 | 5,161,482 | 170,092 | 0 | 108,756 | 5,440,330 | 2.04 | 1514.62 |
| Jul-97 | 5,440,330 | 1,263,212 | 38,212 | 69,674 | 6,735,004 | 1.05 | 1530.46 |
| Aug-97 | 6,735,004 | 310,000 | 0 | 118,046 | 7,163,050 | 1.68 | 1556.10 |
| Sep-97 | 7,163,050 | 450,000 | 325,000 | 80,492 | 7,368,542 | 1.10 | 1573.29 |
| Oct-97 | 7,368,542 | 400,000 | 200,000 | 207,139 | 7,775,681 | 2.74 | 1616.35 |
| Nov-97 | 7,775,681 | 7,505,816 | 155,816 | 142,547 | 15,268,228 | 0.94 | 1631.58 |
| Dec-97 | 15,268,228 | 1,200,000 | 40,790 | 175,748 | 16,603,186 | 1.07 | 1649.03 |

**1997 Annual Rate of Return = 20.20%**

17

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-98 | 16,603,186 | 157,000 | 0 | 297,811 | 17,057,998 | 1.78 | 1678.34 |
| Feb-98 | 17,057,998 | 555,000 | 0 | 215,936 | 17,828,934 | 1.23 | 1698.91 |
| Mar-98 | 17,828,934 | 1,265,000 | 200,000 | 401,440 | 19,295,374 | 2.12 | 1735.01 |
| Apr-98 | 19,295,374 | 757,500 | 0 | 201,883 | 20,254,757 | 1.01 | 1752.48 |
| May-98 | 20,254,757 | 3,565,000 | 0 | 413,413 | 24,233,169 | 1.74 | 1782.89 |
| Jun-98 | 24,233,169 | 570,000 | 0 | 481,385 | 25,284,555 | 1.94 | 1817.49 |
| Jul-98 | 25,284,555 | 1,300,000 | 365,000 | 461,221 | 26,680,776 | 1.76 | 1849.47 |
| Aug-98 | 26,680,776 | 4,000,000 | 0 | 499,151 | 31,179,927 | 1.63 | 1879.56 |
| Sep-98 | 31,179,927 | 5,720,000 | 0 | 417,901 | 37,317,828 | 1.13 | 1900.84 |
| Oct-98 | 37,317,828 | 1,889,090 | 4,167 | 406,179 | 39,608,930 | 1.04 | 1920.54 |
| Nov-98 | 39,608,930 | 3,811,000 | 0 | 912,872 | 44,332,802 | 2.10 | 1960.91 |
| Dec-98 | 44,332,802 | 1,100,000 | 2,309,778 | 455,238 | 43,578,262 | 1.06 | 1981.61 |

**1998 Annual Rate of Return = 20.17%**

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-99 | 43,578,262 | 809,546 | 1,706,446 | 705,433 | 43,386,795 | 1.65 | 2014.37 |
| Feb-99 | 43,386,795 | 2,670,500 | 0 | 519,716 | 46,577,011 | 1.13 | 2037.10 |
| Mar-99 | 46,577,011 | 2,085,000 | 15,000 | 525,475 | 49,172,486 | 1.08 | 2059.10 |
| Apr-99 | 49,172,486 | 2,578,794 | 4,161,275 | 658,498 | 48,248,502 | 1.38 | 2087.59 |
| May-99 | 48,248,502 | 909,190 | 1,055,000 | 1,034,459 | 49,137,151 | 2.15 | 2132.49 |
| Jun-99 | 49,137,151 | 2,150,000 | 1,075,000 | 497,192 | 50,709,343 | .99 | 2153.61 |
| Jul-99 | 50,709,343 | 2,356,787 | 1,818,707 | 892,867 | 52,140,291 | 1.74 | 2191.13 |
| Aug-99 | 52,140,291 | 1,336,004 | 442,514 | 836,086 | 53,899,871 | 1.58 | 2225.65 |
| Sep-99 | 53,899,871 | 3,259,750 | 438,614 | 1,012,978 | 57,733,985 | 1.79 | 2265.40 |
| Oct-99 | 57,733,985 | 4,444,488 | 60,589 | 821882 | 62,939,765 | 1.32 | 2295.37 |
| Nov-99 | 62,939,765 | 2,600,000 | 667,239 | 717,056 | 65,589,582 | 1.11 | 2320.74 |
| Dec-99 | 65,623,674 | 3,181,269 | 586,560 | 534,680 | 68,718,971 | .78 | 2338.94 |

**1999 Annual Rate of Return = 18.00%**

| Month/Yr | Beginning Equity (1) | Additions (2) | Withdrawals (3) | Net Performance (4) | Ending Equity (5) | Monthly Rate of Return (6) | 1000.00 Per Unit NAV (7) |
|---|---|---|---|---|---|---|---|
| Jan-00 | 68,718,971 | 3,560,000 | 125,463 | 1,476,297 | 73,629,805 | 2.05 | 2386.80 |
| Feb-00 | 73,629,805 | 2,974,500 | 341,493 | 1,013,576 | 77,276,389 | 1.33 | 2418.52 |
| Mar-00 | 77,276,389 | 5,370,000 | 20,812,436 | 1,670,760 | 63,504,713 | 2.70 | 2483.87 |

**2000 Year to Date Return = 6.20%**

The preceding notes are an integral part of this performance data.
**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS.**

## FOOTNOTES TO TABLE B

1) "Beginning Equity" represents the sum of the actual equity (including cash and cash equivalents) in the accounts.

2) "Additions" represents all additional capital deposited during that month.

3) "Withdraws" represents all withdraws of capital during that month.

4) "Net Performance" is the sum of the gain (loss) realized from closure of trade positions during the period minus commissions and fees charged on those transactions plus the total increase (decrease) in unrealized profits or losses on open positions at the end of the period when compared to open positions at the end of the prior period, less any advisory management or incentive fees as defined.

5) "Ending Equity" represents the sum of beginning equity plus additions minus withdraws plus net performance.

6) "Monthly Rate of Return" is calculated by dividing net performance by beginning equity as adjusted by the time-weighted value of additions and/or withdraws.

7) "1000 per Unit NAV" represents the value of a hypothetical $1,000 unit of investment over time.

## COMPENSATION AND EXPENSES OF THE FUND

**Trading Advisor Fees.** The Trading Advisor, Global Arbitrage Development, Ltd. will receive a monthly management fee equal to 1/12 of 2% (2% annually) of the net assets under management. Net assets under management is equal to total assets minus total liabilities, including unrealized gains and losses. The Trading Advisor will also receive a quarterly incentive fee equal to 20% of the total trading gains. Total trading gains is equal to the total profit or loss on all closed out positions, plus the profit or loss on all open positions.

**Investment Manager Fees.** The Investment Manager will receive a monthly management fee equal to 1-12 of 1% (1% annually) of the net asset value of the Fund. The Investment Manager's management fee will be calculated after the Trading Advisor fees have been deducted.

**Operating Expenses.** The Fund will pay its operating and administrative expenses. These expenses include, but are not limited to accounting, legal, auditing, and Administrator fees for administration services.

## RISK FACTORS

Investment in the Fund is speculative, involves a high degree of risk and is suitable only for persons who are able to assume the risk of losing the entire investment. Prospective investors should consider the risks set forth below, among others, before investing.

## THE SECURITIES MARKETS

**Volatility of Securities Markets.** Security prices have been subject to periods of volatility in the past and such periods may recur. Price movements of securities are caused by many unpredictable factors.

**Possible Lack of Liquidity.** At certain times the lack of liquidity in the markets may make it impossible to execute trades; this may cause substantial losses to the Fund.

**Leverage.** A securities position can be established with the payment of a deposit ("margin") that is typically about 50% of the total value of the securities purchased. Thus, a small movement in the price of the securities can result in a substantial gain or loss relative to the margin deposit.

**Security Options.** The Fund may trade security options which are right's acquired for a price (commonly called a "premium"), to buy or sell a security at a predetermined price within a specified time. Such trading involves risks similar to those involved in trading securities, in that options are speculative and highly leveraged. The seller of an option is subject to the potentially limited risk of loss resulting from the difference between the premium received for the option and the price of the security underlying the option which the writer must purchase or deliver upon exercise of the option.

## ADVANTAGES OF THE FUND

**Limited Liability.** Unlike an individual account, a shareholder cannot lose more than the amount of his Fund investment, plus his share of any undistributed Fund profits.

**Investment Diversification.** The Fund's performance will tend to differ from that of traditional investments such as stocks, bonds, and real estate. This can give the investor a major element of diversification in his overall portfolio.

**Profit Potential in Declining Markets.** Because the Fund will trade primarily "market neutral" strategies, the Fund has the ability to profit in either rising or falling markets.

**Professional Management.** An investor who is not prepared to spend substantial time implementing various trading strategies can participate in these complex markets through the Fund, which provides professional trading management in these areas.

**Access to Advisors.** The Fund can utilize Advisors and investment programs that an individual investor may not have access to because the Advisor or program may have extremely high minimum account size requirements.

**Multi-Advisor Approach.** Modern Portfolio Theory holds that diversification can reduce a portfolio's risk of loss and reduce the volatility without an equivalent reduction in it's expected rate of return. The Fund will follow this principle by utilizing Advisors that trade across a diverse group of markets.

**Monthly Liquidity.** Shareholders can add (if capacity is available as determined by the Investment Manager) and subtract from their investment in the Fund on a monthly basis.

**Administrative Convenience.** The Shareholders will receive a monthly summary which will report the net result of all of the Fund's trades and transactions. Shareholders will also receive a statement after the year-end summarizing the tax consequences of their investment, and they will also receive a copy of the audited annual report of the Fund. The net asset value per share will be available on a daily basis.

## TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax consequences relating to an investment in the Fund respectively for U.S. and non-U.S. taxpayers. It is based upon the Internal Revenue Code of 1986 as amended (the "Code"), including the changes under the Omnibus Budget Reconciliation Act of 1993, the Revenue Reconciliation Act of 1990, the Revenue Reconciliation Act of 1989, the Technical and Miscellaneous Revenue Act of 1987 and the Tax Reform Act of 1986 and upon judicial decisions and administrative regulations, rulings and practice, all of which are subject to change at any time, including retroactive changes. The analysis contained herein does not include all aspects of applicable U.S. federal and state tax law, and is not intended as a substitute for careful tax planning by shareholders. Therefore, each prospective shareholder should consult his own tax advisor to satisfy himself as to the tax consequences of this investment. **Moreover, the decision as to which one of the three options are available to U.S. taxpayers/investors may be deferred until the due date for filing your U.S. income tax returns (including extensions for the year in which such investment is made).**

# UNITED STATES TAXPAYERS
## Taxation of Passive Foreign Investment Companies

## A. The Fund as a PFIC

The Fund will be treated for U.S. tax purposes as a "Passive Foreign Investment Company" ("PFIC") under the Code. A PFIC is a foreign investment corporation with certain income and asset characteristics specified by the Code and Treasury Regulations issued by the Internal Revenue Service ("IRS"). Specifically, a PFIC is any foreign corporation which either: (I) earns 75% or more of it's gross income from passive sources; or (II) 50% or more of the corporation's average percentage of assets during the taxable year produce or are held for the production of passive income. Since the Fund will (I) receive 75% or more of it's gross income from passive income i.e., dividends, interest, rents, royalties, or gains from investments and foreign currency transactions and (II) 50% or more of fund assets produce (or are held to produce) passive income, the Fund will be treated as a PFIC.

As a PFIC, the Fund, as currently structured, will not be subject to U.S. income taxes. However, a U.S. citizen or resident who is a shareholder of a PFIC except if the PFIC is a "Qualified Electing Fund" (a "QEF"), is generally subject to U.S. income taxes plus interest based on the value of the tax deferral (as explained below), when the U.S. shareholder either disposes of the shares or receives an "excess distribution." Since the Fund is a corporation, shareholders will not be able to utilize losses or deductions incurred by the Fund to offset other sources of income as they would be allowed if the fund were a partnership. The information required for a shareholder to make the QEF election is discussed in the next several pages. In the unlikely event that the Fund is deemed a Controlled Foreign Corporation ("CFC"), U.S. shareholders who own 10% or more of the Fund's shares will be required to pay taxes on their pro rata share of the Fund income each year regardless of the amount of cash actually distributed to such shareholders. In the unlikely event that the Fund is deemed a CFC, since greater than 25% of the Fund's assets will be "passive assets," a U.S. shareholder would also have to include in income the lesser of the shareholder's pro-rata share of the CFC's "excess passive assets" (not previously taxed), or the CFC's earnings accumulated in tax years beginning after September 30, 1993. (See "Controlled Foreign Corporation" discussion below.) In the highly unlikely event that the fund is deemed a Foreign Personal Holding Company (a "FPHC"), the deferral of taxes is unavailable to all U.S. shareholders and accordingly, U.S. shareholders would be required to pay income taxes currently on their pro rata portion of the Fund's income regardless of whether they received an actual cash distribution from the Fund. (See "Foreign Personal Holding Company" discussed below.) Thus, if the Fund is deemed a CFC or a FPHC, a shareholder could have a tax liability in excess of cash distributed to such shareholders. The Fund will attempt to take all necessary action to prevent the Fund from being deemed a CFC or FPHC; however, no assurance can be given that the Fund will be successful.

## B. Taxation of shareholders Without QEF Election -- Option 1: (All fund earnings are taxed as ordinary income.)

The U.S. income tax imposed on a shareholder of a disposition of shares is computed by multiplying the shareholder's pro rata portion of income of the PFIC for each year or portion thereof the shareholder held the shares by the highest marginal rates (currently 36%, before the 10% surtax, for individuals and 35% for corporations) in effect during each of those years ("deferred tax") plus interest on the amount of the deferred tax. The interest is computed at the statutory rates imposed on underpayment of federal income taxes pursuant to Section 6621 of the Code. Currently this interest rate is approximately 7% per annum compounded daily, and the rate is adjusted quarterly. The shareholder's pro rata share of earnings from the Fund is treated as ordinary income, regardless of the source or type of income.

As an alternative to the taxes imposed upon disposition, a U.S. shareholder is subject to U.S. income taxes on the receipt of "excess" distributions. For these purposes, an "excess" distribution is defined in the Code as distributions on PFIC stock which, in the aggregate, exceed 125% of the average amount of distributions received by the shareholder from the Fund during the three preceding tax years (or shorter time period in which the shareholder held the stock). The computation of income earned for purposes on an "excess" distribution is made on a daily basis with various adjustments required. In the case of an "excess" distribution, the deferred tax payable is equal to the portion of the excess distribution allocated to the first taxable year the shareholder held the shares multiplied by the highest marginal tax rate for such year until the full amount of the shareholder's pro rata portion of the income has been subjected to such tax. If the "excess" distribution is larger than the shareholder's pro rata portion of income for the first year, then the excess distribution is allocated to the next taxable year. The shareholder must increase his tax liability for the taxable year in which he receives the "excess" distribution by the amount of the deferred tax plus interest on the deferred tax as explained above. This tax is in addition to any U.S. income taxes attributed to (I) the realized gain on the redemption of the shares of the Fund or (II) the distribution by the Fund to the shareholder.

Based on the foregoing, U.S. shareholders should consider the following in evaluating the tax consequences of an investment in the Fund: (I) whether or not they are currently in the highest marginal tax rate; (II) since all income and gain is taxed at ordinary tax rates rather than capital gains tax rate, such gains will be taxed at 36% plus the 10% surtax (rather than 28%); (III) capital losses from other sources will only be available to reduce the gains attributed to the Fund to the extent of $3,000; and (IV) the interest paid on the deferred tax is not deductible on the shareholder's individual tax return. Accordingly, shareholders should consult with their own tax advisor in order to determine the tax consequences of an investment in the Fund and whether or not the investor should make a QEF election as explained below.

## C. QEF Election

(1)     Taxation of shareholders Without Election To Defer the Payment of Taxes-Option 2: (Except that losses are not deductible, taxation on Fund earnings is similar to customary limited partnership tax treatment).

Whether an individual, partnership or corporation, a Fund shareholder that is a U.S. citizen or resident may elect on an individual basis to have the Fund treated as a QEF as to itself provided, however, that the Fund continues to meet certain requirements discussed below. If a shareholder makes the QEF election, he will be taxed currently on his share of the Fund's income. The shareholder will be required to include in his taxable income for each taxable year his pro rata share of the Fund's income for that taxable year, regardless of whether the shareholder has received any distribution from the Fund. Accordingly, shareholder tax liability with an investment in the Fund may exceed cash actually distributed to the shareholder. The shareholder's pro rata share of income is calculated on a daily basis with certain adjustments, with the Fund's capital gains (net of associated trading fees) being characterized as capital gains and items of income such as interest and dividends being characterized as ordinary income to the shareholder.

(2)     Taxation of Shareholders With Election to Defer the Payment of Taxes-Option 3: (Taxes on Fund earnings are deferred while preserving the character of Fund Income.)

Additionally, a shareholder making the QEF election may elect to extend the time for the payment of taxes on his share of "undistributed PFIC earnings tax liability", instead of paying the tax currently; however, the shareholder will be required to pay interest on the unpaid taxes at the statutory rate. "Undistributed PFIC earnings tax liability" is defined as the excess of the income taxes imposed on the shareholder of a PFIC on income from all sources over the income taxes which would be imposed if the undistributed earnings of the PFIC were excused from the computation of income taxes for the year. To the extent a shareholder receives a distribution or redeems a portion of his shares, such extension of the time to pay taxes is unavailable to such income. In the unlikely event that the Fund is deemed a CFC or a FPHC, the extension of time to pay the taxes is unavailable. (See discussions below regarding "Controlled Foreign Corporation" and "Foreign Personal Holding Company," respectively.)

25

If a shareholder chooses to defer the tax, he must include in his taxable income, his pro rata share of earnings of the Fund; the tax due on these earnings will be deferred until the election is terminated. Under current Treasury Regulations, the election will be terminated upon the occurrence of a number of events, including but not limited to, the following events: (I) a distribution of earnings to the shareholder which includes earnings subject to the extension; (II) a transfer of the stock in the QEF (including, but not limited to, a sale or redemption); (III) a loan, guarantee or pledge of the shares as security for a loan will be treated as a deemed distribution of Fund earnings to the extent of the principal amount of the loan; (IV) a revocation or termination of the QEF election or cessation of PFIC status; (V) a loan by the QEF directly or indirectly to a shareholder; or (VI) a determination by the District Director of the IRS that the collection of tax is in jeopardy. While the Fund will attempt to maintain its status as a QEF, no assurance is given that a change in circumstances or the requirements imposed to be treated as a QEF will not cause a termination of such status. The Treasury Regulations do not define what type of transactions would be treated as a deemed distribution in the case of loans, guarantees or pledges of the shares; accordingly, shareholders are urged to consult their own tax advisor if they are contemplating a transaction which may be effected by this provision. The District Director of the IRS may, as a condition for granting the extension of time to pay taxes, require that a shareholder post a bond not in excess of twice the taxes due. A shareholder can revoke the election at anytime; however, such revocation will trigger the payment of taxes and interest.

The shareholder is required annually to compute the amount of tax as if undistributed income is included in the taxable income and disclose "undistributed PFIC earnings tax liability" on the election form (discussed below). The "undistributed PFIC earnings tax liability", plus interest computed at the statutory underpayment rate found in Section 6621 of the Code (currently approximately 7% compounded daily, adjusted quarterly) is payable in the year of the termination of the election.

## D. Procedure for Making the QEF Election

A shareholder makes a QEF election by attaching a "Shareholder Section 1295 Election Statement," a "PFIC Annual Information Statement" and Form 8621 to a timely filed income tax return in which the shareholder reports its inclusion of PFIC income for the year to which the election applies. A copy of the election statement must also be filed with the Internal Revenue Service at the time the election statement is filed with the return. The Fund will provide all information necessary to complete the election statement, annual information statement and Form 8621.

26

If an investor becomes a shareholder in the Fund in 1994, the election will need to be filed with the shareholder's 1994 tax return. The election is effective for the shareholder's taxable year for which it is made and all subsequent taxable years of the shareholder. If the shareholder fails to make the election in the first year, the shareholder could be subject to duplicative U.S. taxation under the QEF and PFIC rules.

In making a determination of whether a shareholder should make the QEF election or the election to extend the time to pay the taxes for being a shareholder of a QEF, the following factors should be considered (although such listing should not be deemed exhaustive of all pertinent factors which may affect an individual's tax situation): (I) the income reported by a QEF maintains its character as ordinary or capital gain while all income from a PFIC is ordinary; (II) the recent changes in the U.S. tax rate structure including, but not limited to, the differential between ordinary and capital gains rates; (III) the interest paid on the value of the tax deferral under either an election to defer the payment of taxes or where no QEF election is made is not deductible; (IV) will the Fund earn sufficient income to pay the tax and the interest on the tax deferral; (IIV) the planned holding period for the shares, including any potential for causing a termination of the election to defer the tax payment (such as a loan or a partial redemption of the shares); and (V) if the QEF election is made without electing the deferral in the tax payment, a shareholder would be subject to tax without the receipt of funds from the Fund to pay the tax. Since tax-deferred shareholders such as pension and profit sharing plans will generally not be subject to income taxes based on an investment in the Fund, such shareholders should consider making a QEF election without electing to defer the payment of taxes in order to avoid legislative or other changes in the tax laws affecting taxation of an investment in the Fund. All shareholders are strongly urged to discuss these and other possible individual factors with their tax advisor to evaluate an investment in the Fund or which election they should make with regard to an investment in the Fund.

### E.. Comparative Analysis of the Foregoing Election Options

The following provides an illustration of the tax treatment of an investment in the Fund under each of the options discussed above, assuming the following facts. Such data is provided as an example only and should not be viewed as predictive in character, whether as to gains or losses or amounts:

A Redeeming Individual Shareholder's Pro Rata Portion of Fund Income

|      | Capital Gains | Ordinary Income |
|------|---------------|-----------------|
| 1993 | $1,000        | $500            |
| 1994 | $1,200        | $750            |
| 1995 | $1,500        | $900            |

This example assumes (I) shares are held from June 1, 1993 and are redeemed December 31, 1995; (II) there has not been any prior taxes imposed under Options 1 and 3 on this income; (III) the tax rate in effect for all years is 28% on capital gains and 36% on ordinary income with the taxpayer in the maximum tax rate for all years; and (IV) the interest rate on under payments is 7% for all years.

Option 1: No QEF Election: (All Fund earnings are taxes as ordinary income.)

| | | |
|---|---|---|
| Tax attributable to 1993 - ($1,000 + $500) x 36%: | $540 | |
| Interest attributable to 1993 tax liability from 4/15/94-4/15/96: | 76 | |
| Tax attributable to 1994 - ($1,200 + $750) x 36%: | | 702 |
| Interest attributable to 1994 tax liability from 4/15/95-4/15/96: | 49 | |
| Tax attributable to 1995 - ($1,500 + $900) x 36%: | | 864 |
| | ------- | |
| Total taxes and interest due on Fund Income | $2,231 | |

28

Option 2: QEF Election Without Deferral of Payment of Taxes: (Except that losses are not deductible, taxation on Fund earnings is similar to customary limited partnership tax treatment.)

| | |
|---|---|
| Tax attributable to 1993 - ($1,000 x 28%) + ($500 x 36%): | $460 |
| Tax attributable to 1994 - ($1,200 x 28%) + ($750 x 36%): | 606 |
| Tax attributable to 1995 - ($1,500 x 28%) + ($900 x 36%): | 744 |
| | ------- |
| Total taxes due on Fund Income | $1,810 |

Option 3: QEF Election With Election to Defer Payment of Taxes: (Taxes on Fund earnings are deferred while preserving the character of Fund Income)

| | |
|---|---|
| Tax attributable to 1993 - ($1,000 x 28%) + ($500 x 36%): | $460 |
| Interest attributable to 1993 tax liability from 4/15/94-4/15/96: | 64 |
| Tax attributable to 1994 - ($1,200 x 28%) + ($750 X 36%): | 606 |
| Interest attributable to 1994 tax liability from 4/15/95-4/15/96: | 42 |
| Tax attributable to 1995 - ($1,5000 x 28%) + ($900 x 36%): | 744 |
| | ------- |
| Total taxes and interest due on Fund Income | $1,916 |

**THE ABOVE DESCRIPTIONS ARE SUMMARIES ONLY AND ARE GENERAL IN NATURE. SHAREHOLDERS ARE URGED TO CONSULT THEIR INDIVIDUAL TAX ADVISORS AS TO THEIR PARTICULAR CIRCUMSTANCES BEFORE ELECTING ANY OF THE FOREGOING OPTIONS, SUCH DECISION MAY BE DEFERRED UNTIL THE DUE DATE FOR FILING YOUR U.S. INCOME TAX RETURNS INCLUDING EXTENSIONS FOR THE YEAR IN WHICH, SUCH INVESTMENT IS MADE.**

## F. Additional Factors

The IRS may prescribe any disclosures it requires to effectuate PFIC provisions. Additionally, the IRS has broad discretion to require additional disclosures at any time and without prior notice.

The Fund will notify each of the shareholders of its earnings or losses in accordance with U.S. income tax accounting principles as well as generally accepted accounting principles. Accordingly, deductions and expenses which are allowed under general income tax principles such as syndication expense (see "Organization and Syndication Expenses") will not be allowed in computing income and expense for the Fund.

The IRS may, in connection with a tax audit, assert that certain income adjustments are required. If sustained, a shareholder's pro rata share of the Fund's ordinary earnings may differ from the shareholder's pro rata share of the Fund's economic earnings (with a corresponding adjustment to the basis of the shares of the Fund). If a shareholder has reported his pro rata share of the Fund's ordinary earnings and later receives a distribution from the Fund of those earnings, generally the shareholder will not be required to report the distribution as a taxable dividend.

If the Fund at some future date was no longer deemed a PFIC, a shareholder would still be subject to the tax on the sale of the stock of the Fund as if it remained a PFIC. If such an event were to occur, a taxpayer could make an election to make a deemed sale of the Fund's stock as of the last day of the last year the Fund was a PFIC and recognized all deferred taxes. If this event were to occur, the Fund would notify its shareholders of its options under the deemed sales election.

## Controlled Foreign Corporation

A Controlled Foreign Corporation ("CFC") is a foreign corporation in which more than 50% of the value or voting power of the stock of such corporation is owned by "U.S. shareholders." For purposes of these rules, a U.S. shareholder is defined as a U.S. person who owns directly or indirectly as least 10% of the voting stock of the foreign corporation. The U.S. shareholders of a CFC must report currently their pro rata share of "subpart F income", regardless of whether it is distributed to them. Subpart F income includes among other items, interest, dividends, and gains from commodity transactions. Further, the 1993 Tax Act requires a U.S. shareholder of a CFC to include an amount in income currently if the CFC's passive assets exceed 25% of its total assets. The income inclusion is the lesser of the shareholder's pro-rata share of the CFC's "excess passive assets" (not previously taxed), or the CFC's earnings accumulated in tax years beginning after September 30, 1993. In the case of a foreign corporation which is both a PFIC and a CFC, the CFC rules will prevail.

Accordingly, if the Fund was treated as a CFC, the U.S. shareholders who owned 10% or more of the shares of the Fund would not be able to defer income or the payment of taxes. (Any

such conclusion would have no impact on shareholders owning less than 10% of the Fund's outstanding shares.)

Based on the following representations of the Fund: (I) U.S. Shareholders (as defined under CFC rules) do not currently own, directly or indirectly, more than 50% of the value or voting power of the Fund; (II) the Fund will not accept subscriptions from U.S. persons if such acceptance will cause the Fund to be deemed a CFC; and (III) the Fund will force the redemption of shares from U.S. shareholders if redemption's from other shareholders cause the Fund to potentially become a CFC, shareholders in the Fund should be unaffected by the CFC provisions. However, no assurance can be given that transfers of shares without the Fund's knowledge or other unforeseen events could cause the Fund to be deemed a CFC.

**Foreign Personal Holding Company**

A Foreign Personal Holding Company ("FPHC") is any foreign corporation if at least 60% of its gross income (50% after its first year as such a company) is foreign personal company income (i.e. general passive income, such as dividends, interest royalties and rent, gains from the sale or exchange of stock, securities, gains from commodity and foreign currency transactions and amounts received under personal service contracts) and more than 50% in value of its outstanding stocks is owned directly or indirectly by or for not more than five citizens or residents of the U.S., including domestic corporations, partnerships, and trust. Under section 551 of the Code, the undistributed foreign personal holding company income of a FPHC is included in the gross income of the citizens or residents of the U.S. who are shareholders in the FPHC. The FPHC rules would prevent all U.S. shareholders in the fund from deferring income or taxes associated with an investment in the Fund, since the FPHC rules override both the PFIC and CFC rules.

The FPHC provisions cannot be evaded by using family Members or controlled entities to make more than five shareholders because the attribution rules would very likely apply in such a case to reduce the number of shareholders to the minimum five persons. The term "undistributed foreign personal holding company income" means the taxable income of a FPHC, as adjusted, minus the dividends paid deduction. Thus, the FPHC could distribute all its taxable income to the shareholders and the FPHC income would be eliminated. While this avoids FPHC status, it also defeats the purpose of establishing a foreign corporation because there is no tax deferral.

Based on the following representations of the Fund: (I) five or fewer U.S. persons for purposes of the FPHC rules do not currently own directly or indirectly more than 50% of the value or voting power of the Fund; (II) the Fund will not accept subscription from U.S. persons if such acceptance will cause the Fund to be Deemed a FPHC; and (III) the Fund will force the redemption of shares from U.S. persons if redemption's from other shareholders cause the Fund to potentially become a FPHC, shareholders in the Fund should be unaffected by the FPHC provisions. However, no assurance can be given that transfers of shares without the Fund's knowledge or other unforeseen events could cause the fund to be deemed a FPHC.

**ACCORDINGLY, THE SHAREHOLDERS ARE URGED TO CONSULT THEIR INDIVIDUAL TAX ADVISORS AS TO THEIR PARTICULAR CIRCUMSTANCES BEFORE INVESTING IN THE FUND.**

32

## Organization and Offering (Syndication) Expenses

Neither the Fund nor any shareholder will be entitled to any deduction for syndication expenses (i.e., amounts paid or incurred in connection with issuing and marketing the shares). The IRS might also contend that certain fees, commissions, and other expenses paid and deducted by the fund constitute syndication expenses, in which case the Fund could be required to capitalize such amounts.

## Investment by Tax Exempt Plans

Tax-exempt retirement plans (including corporate pension and profit sharing plans, simplified employee plans, self-employed plans, and IRA's) should consider the special tax rules relating to such retirement plans before investing in the Fund. A tax-exempt shareholder would be taxed on its distribution share of any income from the Fund to the extent that either the tax-exempt shareholder's investment in the fund, or the Fund's investment in the asset from which the income is derived, is debt financed. Such an investment will be debt financed if the investment is made with the use of borrowed funds, or if it is reasonably foreseeable that as a result of such investments, future borrowings would be necessary to meet anticipated cash requirements. Prospective plan investors should consult with their own legal and financial advisors regarding this and other considerations involved in an investment in the Fund by a particular plan.

## State and Local Taxes

The Fund and the shareholders may be subject to various state and local taxes as well as federal tax. A shareholder's distributive share of taxable income from the fund may be required to be included in determining his reportable income for state tax purposes. However, each prospective investor is urged to consult with his own tax advisor for advice on these matters.

## Non-United States Taxpayers

Provided the Fund does not (as expected) engage in a U.S. trade or business and does not establish a place of business in the U.S., the Fund should incur no tax in the U.S. The Fund believes that it is not engaged in a U.S. trade or business and accordingly, the Fund should not be subject to U.S. taxes; however, no assurance can be given that this conclusion would be sustained by a court if contested by the IRS.

If the IRS were successful in such a challenge, U.S. taxes could be imposed at the corporate level upon the Fund's "effectively connected taxable income" at full graduated U.S. rates. This would require the Fund to file a U.S. tax return. Also, even though the Fund is not considered to be engaged in a U.S. trade or business, certain types of U.S. source income generated (i.e. interest, dividends, etc.) could be subject to U.S. withholding taxes. However, based on the nature of the Fund, investment in foreign source variable annuity products, the Fund believes that, under current U.S. taxation rules, it will not be subject to U.S. income tax withholding. These rules are very complex and there is no assurance the IRS may not attempt to assert a contrary position. Accordingly, while shareholders may not be subject to U.S. taxes or withholding, each prospective investor is urged to seek their own tax advice concerning the consequences of investing in the Fund.

Generally, "non-resident alien" taxpayers will not be subject to U.S. income taxes solely based on their investment in the Fund and there may be tax treaty exemptions available in other cases. Accordingly, such persons must consult their own tax advisors concerning potential effects of their investing in the Fund. For example, notwithstanding the general rule, a non-U.S. shareholder could be subject to U.S. income tax as if he were a U.S. person if he is present within the U.S. or its possessions or territories for a aggregate of 183 days or more during the tax year or if he is present over a three (3) year period an average of 122 days per year, calculated based on three (3) year weighted rolling average. However, prospective investors are urged to consult with their own tax advisors with reference to the effects of this investment on their own tax situation.

The foregoing analysis is not intended as substitute for careful tax planning, particularly because certain income tax consequences of an investment in the Fund may not be the same for all taxpayers, and because critical characterizations of the Fund's activities may vary from year to year and for different purposes. In addition, the foregoing does not discuss state and local taxes, estate tax, gift tax or other estate planning aspects of this investment.

34

Accordingly, prospective investors are urged to consult with their own tax advisors with specific reference to effects of this investment on their own tax situation.

## Purchase by Retirement Plans - ERISA Considerations

An ERISA account is a benefit plan or pension, profit-sharing, stock bonus, or other employee plan qualified under Section 401 (a) of the Internal Revenue Code. The fiduciary provisions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), are highly complex. Accordingly, when considering an investment of the assets of an ERISA account in the Fund, a fiduciary with respect to such plan should consider among other things: (A) the definition of "plan assets" under ERISA and the final regulations issued by the Department of Labor ("DOL") regarding the definition of "plan assets"; (B) whether the investment satisfies the diversification requirements of paragraph 404(a)(1) of ERISA; (C) whether the investment satisfies the prudence requirements of paragraph 404(A)(1) of ERISA; whether income derived from the Fund could constitute "unrelated business income" subject to federal income taxation in the ERISA account; and (E) that there may be no market in which such fiduciary can sell or otherwise dispose of the shares (other than through redemption's). Consequently, the Fund recommends that each investor and his financial and legal advisors consider the foregoing, among any other pertinent factors, before making any purchase of shares. Because the Fund intends to satisfy pertinent DOL standards relating to what constitutes a "publicly offered security", it is expected that "benefit plan investors" as defined will be limited to less than 25% of the net asset value of the Fund in order to avoid the impact of such regulations. Similarly, in view of such DOL regulations, the fund does not intend to accept subscriptions from benefit plan investors if the acceptance would violate the foregoing regulations. Moreover, the Fund also has the right to require ERISA accounts to redeem their shares at any time to avoid application of the "plan asset" rules.

## Audits

The code provides for the conduct of tax audits at the fund level, rather than the individual shareholder level. Furthermore, an audit of the Fund may cause an audit of an individual shareholder on other issues; the Fund is not liable for the costs incurred by any shareholder in an audit.

## SUBSCRIPTION PROCEDURESSUBSCRIPTION PROCEDURES

Investors wishing to purchase Shares in M.J. Select Global, Ltd. must do the following:

1.    Complete the Subscription Agreement.

2.    Send the Subscription Agreement to the Administrator as follows:

Oceanic Bank and Trust Limited
TK House, Bayside Executive Park,
West Bay Street & Blake Road,
P.O. Box AP - 59213,
Nassau, The Bahamas

A fully executed Subscription Agreement must be received by the Administrator no later than 15 days before the end of any month during the continuous offering period.

3.    Telegraphic transfer subscription amount in U.S. Dollars within five days of the date of the subscription agreement.

4.    The Fund is entitled to reject in whole or in part the subscription, in which event the subscription monies received by the Fund from the subscriber will be returned in accordance with the Subscription Agreement.

**Investment Requirements**

Subscriptions for the purchase of the Shares offered hereby are subject to the following conditions:

(1) The minimum purchase of $500,000.00. The Investment Manager in its discretion may accept smaller subscriptions. Except for tax or other regulatory considerations described herein, there is no limit on the maximum number of Shares that may be purchased by any one investor.

(2) Each purchaser must certify in the Subscription Agreement attached hereto as Exhibit A that he has read this Memorandum and understands the risks of participating in this investment, including the risk of losing his entire investment, and that he is purchasing shares in the Fund for his own account (or for a trust account) for investment and not with a view for resale or distribution.

(3) Each purchaser must represent in the Subscription Agreement that he has (A) a net worth exclusive of home, furnishings, and automobile of at least $1,000,000 or (B) a net worth (similarly calculated) of at least $250,000 and an annual gross income of at least $200,000.

(4) In the case of a pension or profit sharing plan or trust, the trustee must represent that he or she is authorized to execute such subscription on behalf of the plan and that such investment is not prohibited by law or the plan's governing documents.

(5) The Investment Manager may reject any subscription. All subscriptions are irrevocable.

## M. J. SELECT GLOBAL, LTD.
### Subscription Agreement

(To be executed by all purchasers)
Exhibit A

To: The Directors
Oceanic Bank And Trust Limited
TK House, Bayside Executive Park,
West Bay Street & Blake Road,
P.O. Box AP- 59213
Nassau, The Bahamas

Document Number _____

Date: _____, 200_____

Gentlemen:

The undersigned (the "Purchaser") irrevocably subscribes for M.J. Select Global, Ltd., (the "Fund") in a subscription amount of: $_____ (minimum initial subscriptions of U.S. $500,000 subject to the discretion of the Investment Manager to accept less).

**Representations and Warranties**

Purchaser hereby represents and warrants the following to the Fund:

(A) Purchaser has at least a net worth and/or income as specified in the Offeree Questionnaire (Exhibit B) and has the power and authority to enter into this Agreement; Purchaser understands there is a risk that Purchaser may lose all of his investment, but Purchaser can afford such a loss.

(B) Purchaser is acquiring these shares for his own account for investment purposes and not with a view to the distribution or resale thereof; Purchaser understands that the shares, as securities, have not been registered under the Securities Act of 1933, as amended, or any state securities law and that no federal or state agency has passed upon the shares or made any finding or determination as to the fairness of an investment in the shares; and Purchaser further understands that these shares cannot be resold in the absence of such registration or an exemption therefrom.

(C) Purchaser is not dependent upon a current cash return with respect to his or its investment in the shares. Purchaser understands that distributions are not required, and that redemption's probably will be the sole method for shareholders (including Purchaser) to withdraw profits and capital from the Fund.

39

(D) Purchaser understands that the Fund is not a "tax shelter," and any information to be furnished to Purchaser concerning the federal income tax consequences arising from an investment in the Fund is necessarily general in nature, and the specific tax consequences to Purchaser relative to an investment in the Fund will depend on Purchaser's individual circumstances.

(E) Purchaser understands that the transferability of the shares is restricted and that an investment in the Fund involves limited liquidity.

(F) Purchaser acknowledges receipt of, and represents that Purchaser has carefully reviewed the Offering Memorandum (particularly the information contained in "Risk Factors") with Purchaser's attorney or accountant or has had the opportunity to do so.

(G) If Purchaser is a pension or profit-sharing plan, the undersigned is an independent trustee representing Purchaser who has reviewed the plan's portfolio and finds (considering such factors as diversification, liquidity and current return, and projected return of the portfolio) this purchase to be a prudent investment thereby. Moreover, the undersigned independent trustee is authorized to execute such subscription on behalf of the plan or trust and such investment is not prohibited by law or the plan's or trust's governing documents.

This Agreement and the representations and warranties contained herein shall be binding upon the heirs, executors, administrators, and other successors of the Purchaser. If there is more than one signatory hereto, the obligations, representations, warranties, and agreements of Purchaser are made jointly and severally.

By executing this Agreement, Purchaser certifies, under penalty of perjury, that:

(1) The social security number of employer identification number, as applicable, provided below is correct; and

(2) The Internal Revenue Service ("IRS") has never notified Purchaser that Purchaser is subject to 20% backup withholding, nor has the IRS notified Purchaser that Purchaser is no longer subject to such backup withholding. (Note: If this part (2) is not true in your case, please strike out this part before signing).

(3) Purchaser acknowledges and agrees that this information may be disclosed to the IRS by the Fund and that any false statement contained herein is punishable by fine, imprisonment or both. Purchaser will notify the Fund within sixty (60) days after the date upon which any of the information contained herein becomes false or otherwise changes in a material manner, or Purchaser becomes a foreign person. Purchaser agrees to update this information whenever requested by the Fund. Under penalties of perjury, Purchaser has examined the information contained herein and, to the best of Purchaser's knowledge and belief, it is true, correct and complete.

A failure to: (A) complete this Agreement; (B) notify the Fund of a change in status as required in this Agreement; or (C) re-execute this Agreement when requested by the Fund (as required by the Code) will result in the Fund withholding income taxes pursuant to #1446 of the Code.

By executing this Agreement below, Purchaser acknowledges that the shares do not entitle the Purchaser to vote on matters concerning the Fund including, but not limited to, matters concerning trading management of the Fund.

**PLEASE COMPLETE THE FOLLOWING:**

**Purchaser (CHECK ONE) [IS _____ "OR" IS NOT _____] a person, corporation, trust, or partnership that is a U.S. person or U.S. domestic corporation, trust, or partnership as defined by the Internal Revenue Code of 1966, as amended (the "Code").**

**IF THE PURCHASER IS A U.S. PERSON, DOMESTIC CORPORATION, TRUST, OR PARTNERSHIP AS DEFINED BY THE INTERNAL REVENUE CODE OF 1966, AS AMENDED (THE "CODE"), YOU MUST COMPLETE THE SECTION BELOW.**

Purchaser is the following kind of entity (please check one):

_____ Individual                                      _____ Pension Plan*
_____ Joint Acct. - JTWROS*                  _____ Trust*
_____ UGMA (Gift to Minor)                  _____ Non-Profit Organization*
_____ Corporation*                                  _____ Partnership*
_____ Employee of NASD member firm  _____ Other  (Specify)
                                                              _____

41

*NOTE: Joint Subscriptions are only accepted as joint tenants with right of survivorship (JTWROS). Each tenant must sign in the space provided. If the Purchaser is a trust, partnership, corporation, or other business association, the signing trustee, partner or other represents and warrants the he/she/it has full power and authority to execute this Subscription Agreement on its behalf. If the Purchaser is a corporation, please attach a copy of a certified corporate resolution authorizing the signature.

Date: _____, 200___   Subscription Amount $_____

_____
Name of First Purchaser (Print or Type)

_____        _____
Date of Birth of First Purchaser        Social Security or Tax ID #
                                        of First Purchaser if applicable

_____        _____
Street Address of First Purchaser        Business Phone

_____        _____
City, State, Country and Zip Code        Home Phone

_____
**Signature of First Purchaser (Individual, Trustee, Custodian, Officer, or Partner)**
=========================================================================
**JOINT INVESTORS MUST COMPLETE:**

_____
Name of Joint Purchaser (Print or Type)

_____        _____
Date of Birth of Joint Purchaser        Social Security or Tax ID #
                                        of Joint Purchaser if applicable

_____        _____
Street Address of Joint Purchaser        Business Phone

_____        _____
City, State, Country and Zip Code        Home Phone

_____
**Signature of Joint Purchaser (Individual, Trustee, Custodian, Officer, or Partner)**

42

## SUBSCRIPTION INSTRUCTIONS

**A WIRE TRANSFER MUST BE SENT SIMULTANEOUSLY WITH THE SUBSCRIPTION AGREEMENT AND OFFEREE QUESTIONNAIRE.**

**Please send original executed subscription documents "and" fax a copy to:**

**Oceanic Bank and Trust Limited
RE: M.J. Select Global Ltd.
TK House, Bayside Executive Park,
West Bay Street & Blake Road ,
P.O. Box AP- 59213,
Nassau, The Bahamas
Telephone: 242-502-8822
Fax: 242-502-8840**

**Please wire funds to:**

**IBK name: Barclays Bank PLC
New York Agency, N.Y.
ABA # 026-0025-74
Bene Bank (BBK) Barclays Bank PLC
Main Office, Bay Street
Nassau, Bahamas (acct. #280 72 4230)
Further credit to:
M.J. Select Global, Ltd.
Account # 3231881**

43

**[PAGE INTENTIONALLY LEFT BLANK]**

---

**M.J. SELECT GLOBAL, LTD.**
**Offeree Questionnaire**

---

Exhibit B
(To be completed by each Purchaser who executes a Subscription Agreement)

1.  Purchaser understands that the Shares offered by M.J. Select Global, Ltd. (the "Fund") will not be registered under the Securities Act of 1933, as amended (the "Act), or the laws of any state. Purchaser also understands that in order to insure that the offering and sale of the shares are exempt from registration under federal and state securities laws, the Fund is required to have reasonable grounds to believe, and must actually believe after making reasonable inquiry, that all purchasers of shares or their professional advisors, if used, are sophisticated investors able to evaluate the merits and risks of the investment. Accordingly, the following information is supplied to supplement information concerning the purchaser previously made available to the Fund.

2.  Purchaser has read the Fund's Memorandum and understands that there are restrictions on transfers and sales of shares and that Purchaser's ability to liquidate the investment in shares may be limited.

3.  Is Purchaser a Non-U.S. person?
**Check One. Yes_____ No_____** (If "YES" proceed to question #5)

4.  If purchaser is a U.S. person, **CHECK** the applicable categories below.

_____ (A) Any bank as defined in section 3(A)(2) of the Act, or any savings or loan association or other institution as defined in section 3(A)(5)(A) of the Act whether acting in its individual of fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(A)(48) of the Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(C) or (D) of the Small Business Investments Act of 1956; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees if such plan has total assets in excess of $5 million; any employee benefit plan within the meaning of ERISA. If the Investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are "accredited investors"; or

_____ (B) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940; or

_____ (C) Any organization described in section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring share/interests, with total assets in excess of $5,000,000; or

_____ (D) Any natural person whose individual net worth, or joint net worth that person's spouse, at the time of his purchase exceeds $1,000,000; or

_____ (E) Any natural person who had an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

_____ (F) Any trust with total assets in excess of $5,000,000 not formed for the specific purpose of purchasing a shares/interest, whose purchase is directed by a "sophisticated" person; or

_____ (G) Any entity in which all of he equity owners are "accredited investors."

**Please answer YES or NO for questions 5 through 7.**

5. Can Purchaser afford to hold Purchaser's Investment in the Fund for an indefinite period of time? _____

6. Can Purchaser afford a complete loss of its prospective investment in the fund? _____

7. I represent and warrant that the information contained in this questionnaire is true and correct. _____

FOR INDIVIDUALS:

Date: _____, 200_____

_____

Purchaser's Signature

_____

Name - Print or Type

FOR ENTITIES:

_____

Name of Entity - Print or Type

_____

Authorized Officer's Signature

_____

Name of Officer - Print or Type

_____

Title of Officer - Print or Type

**PLEASE RETURN THIS OFFEREE QUESTIONNAIRE TO THE FUND WITH YOUR SUBSCRIPTION AGREEMENT (EXHIBIT A), ALONG WITH THE FOLLOWING IMPORTANT WIRE IDENTIFICATION INFORMATION:**

**Name of Purchaser's Bank:** _____

**Address of Purchaser's Bank:** _____

_____

**ABA# of Purchaser's Bank:** _____

**Date of Wire Transfer:** _____

**Amount of Wire Transfer:** _____

# M.J. GLOBAL SELECT GLOBAL, Ltd.
## Request for Redemption

To:  The Directors                                Date: _____
Oceanic Bank and Trust Limited
RE: M.J. Select Global Ltd.
Tk House, Bayside Executive Park,
West Bay Street & Blake Road,
P.O. Box AP- 59213,
Nassau, The Bahamas

I hereby give notice of my intent to redeem _____ common shares (the "Shares") in M. J. Select Global, Ltd. (the "Fund").  In giving this notice, I certify my full understanding as follows that: (1) this notice is irrevocable; (2) this notice must be received by the Administrator during business hours at least 30 business days prior to the last business day of the calendar Quarter in which redemption shall be effected (the "Redemption Date"); (3) upon failure to satisfy condition (2) above, the Fund will not redeem such shares until the last business day of the calendar quarter in which such conditions shall be fulfilled; **Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption; provided however, that the administrator shall have the right, exercisable from time to time, to postpone the payment and effective date of any redemption for up to three (3) months if the Administrator determines in good faith that the liquidation of the shareholder's assets or investments required to the fund would adversely affect the value of the shares in the fund.** (4) that the net asset value per share at which such shares shall be redeemed shall be the net asset value per share determined as of the redemption date as provided in the fund's Articles of Association and the Offering Memorandum, less any wire transfer or other transaction cost; (5) where I do hereby give notice to redeem all my shares, then the Fund may exercise its right to redeem the balance of my shares if the aggregate net asset value of my/our outstanding shares shall be less than $500,000 U.S.D. as determined as of the redemption date; and (6) the redemption proceeds will be paid by the Fund within thirty (30) business days after the redemption date; except that; under such special circumstances Memorandum (including, but not limited to, the inability of the Administrator to reasonably determine the net asset value of the Fund as of any redemption date), the Fund may suspend redemption's of shares, provided that the Fund shall as soon as practicable thereafter cause such shares to be redeemed or such redemption payment to be made.

48

Redemption Proceeds should be remitted as follows:

A.  If by check:       Payee:         _____

                       Address:       _____

                                      _____

                                      _____


B.  If by wire:        Bank:          _____

                       Bank Address:  _____

                       ABA#:          _____

                       Account Name:  _____

                       Account Number: _____


**INVESTOR'S SIGNATURE (S) MUST BE IDENTICAL TO NAME IN WHICH THE SHARES ARE REGISTERED.**


_____          Partnership, Plan, Trust, or
                                    Corporate Investor
_____


_____          _____

_____          By:_____
Shareholder's Signature(s)          Partner, Trustee, or Auth. Officer

49

**[THIS PAGE INTENTIONALLY LEFT BLANK]**

# Exhibit G



ZURICH

March 29, 2001

Asset Allocation Fund, L.P.
C/o Martin James Capital Management Inc.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174
Attention: Martin J. Allamain

Re:   Call Option Transaction dated May 31, 2000 between Asset
      Allocation Fund, L.P. and ZCM Matched Funding Corp.

Dear Mr. Allamain:

This letter is in reference to the Call Option Agreement (the "Agreement") dated May 31, 2000 between Asset Allocation Fund, L.P. and ZCM Matched Funding Corp. ("ZCM"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreement.

As of today's date, the value of one of the Reference Portfolio Interests, Six Sigma, LLC , has become materially impaired, and, in accordance with the terms of the Agreement, ZCM has excluded such Reference Portfolio Interest from the Notional Amount for purposes of calculating the Strike Ratio. As a result, the Strike Ratio currently is 80.4%, significantly in excess of the Maximum Strike Ratio. Pursuant to the terms of Section 2 of the Agreement, "Seller Strike Adjustment":

At any time, the Seller shall have the right, but not the obligation, to adjust each of the Strike Price and the Notional Amount by an equal amount, such that the Strike Ratio is adjusted to a percentage less than the Maximum Strike Ratio. Such adjustments to the Notional Amount and hence, the NAV of the Reference Portfolio, shall be effected through subscriptions and redemptions of Reference Portfolio Interests.

Accordingly, ZCM will submit for redemption certain of the Reference Portfolio Interests on or before March 30, 2001, so that the Strike Ratio is adjusted to a percentage less than or equal to the Maximum Strike Ratio.

Zurich Capital Markets Inc.

One Chase Manhattan Plaza
New York, NY 10005
United States

Tel: (212) 208-3600
Fax: (212) 208-3601

Page 2



ZURICH

You may notify us no later than the close of business in New York on Thursday, March 29, 2001, as to which Reference Portfolio Interests you would like us to submit for redemption. However, please be aware that, although we may attempt to accommodate your request, pursuant to the terms of the Agreement, ZCM may ultimately make such a decision in its sole discretion.

Sincerely,

Patricia L. Hogan
Vice President & Counsel

Zurich Capital Markets Inc.

Patricia L. Hogan
Vice President & Counsel

One Chase Manhattan Plaza
New York, NY 10005
United States

Tel: (212) 208-3655
Fax: (212) 208-3601

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual and/or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address by mail. Thank you.

# Exhibit H



**ZURICH**

April 4, 2001

M.J.Diversified, L.P.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174
Tel: 630-587-4900
Fax: 630-587-4909

Re: M.J. Diversified, L.P.

Dear Sir or Madam:

I hereby authorize you to redeem $4,500,000 of M.J. Diversified, LP currently
registered in the name of ZCM Asset Holding Company LLC for net asset value
at the next available NAV, which we believe to be April 30, 2001.

The redemptions proceeds should be wired to the following:

ZCM Mated Funding Corp.-HF
Bank Name:           Citibank, NA
ABA#:                021-000-089
A/C name:            ZCM Matched Funding Corp.
A/C#:                30443267

If you have any further questions regarding this matter, please contact Christine
Quinlan of Zurich Capital Markets Inc. at (212) 208-3600.

Thank you for your assistance.

Thomas Prunty
Authorized Signatory

ZCM Asset Holding Company LLC

One Chase Manhattan Plaza
44th Floor
New York, NY 10005
Tel: (212) 208-3600
Fax: (212) 208-3601

# Exhibit I



**ZURICH**

April 4, 2001

M.J. Financial Arbitrage L.P.
6 N 808 Dunham Road
Elgin, IL 60120
Tel: 630-587-4900
Fax: 630-587-4909

Re: M.J. Financial Arbitrage L.P.

Dear Sir or Madam:

I hereby authorize you to redeem $5,300,000 of M.J. Financial Arbitrage LP currently registered in the name of ZCM Asset Holding Company LLC for net asset value at the next available NAV, which we believe to be April 30, 2001.

The redemptions proceeds should be wired to the following:

ZCM Mated Funding Corp.-HF
Bank Name:       Citibank, NA
ABA#:            021-000-089
A/C name:        ZCM Matched Funding Corp.
A/C#:            30443267

If you have any further questions regarding this matter, please contact Christine Quinlan of Zurich Capital Markets Inc. at (212) 208-3600.

Thank you for your assistance.

Thomas Prunty
Authorized Signatory

ZCM Asset Holding Company LLC

One Chase Manhattan Plaza
44th Floor
New York, NY 10005
Tel: (212) 208-3600
Fax: (212) 208-3601

# Exhibit J



**ZURICH**

April 13, 2001

M.J.Diversified, L.P.
1 W. Illinois Street, Suite 285
St. Charles, IL 60174
Tel: 630-587-4900
Fax: 630-587-4909

<u>Re: M.J. Diversified, L.P.</u>

Dear Sir or Madam:

I hereby authorize you to redeem our entire position of M.J. Diversified, LP currently registered in the name of ZCM Asset Holding Company LLC for net asset value at the next available NAV, which we believe to be April 30, 2001. This request supercedes our previous request dated April 4, 2001, to redeem $4,500,000.

The redemptions proceeds should be wired to the following:

**ZCM Asset Holding Company LLC**

One Chase Manhattan Plaza
44ᵗʰ Floor
New York, NY 10005
Tel: (212) 208-3600
Fax: (212) 208-3601

ZCM Mated Funding Corp.-HF
Bank Name:       Citibank, NA
ABA#:            021-000-089
A/C name:        ZCM Matched Funding Corp.
A/C#:            30443267

If you have any further questions regarding this matter, please contact Christine Quinlan of Zurich Capital Markets Inc. at (212) 208-3600.

Thank you for your assistance.

Thomas Prunty
Authorized Signatory

# Exhibit K



**ZURICH**

April 13, 2001

M.J. Financial Arbitrage L.P.
6 N 808 Dunham Road
Elgin, IL 60120
Tel: 630-587-4900
Fax: 630-587-4909

Re:  M.J. Financial Arbitrage L.P.

Dear Sir or Madam:

I hereby authorize you to redeem our entire position of M.J. Financial Arbitrage
LP currently registered in the name of ZCM Asset Holding Company LLC for
net asset value at the next available NAV, which we believe to be April 30, 2001.
This request supercedes our previous request dated April 4, 2001, to redeem
$5,300,000.

The redemptions proceeds should be wired to the following:

ZCM Asset Holding Company LLC

One Chase Manhattan Plaza
44" Floor
New York, NY 10005
Tel: (212) 208-3600
Fax: (212) 208-3601

ZCM Mated Funding Corp.-HF
Bank Name:          Citibank, NA
ABA#:               021-000-089
A/C name:           ZCM Marched Funding Corp.
A/C#:               30443267

If you have any further questions regarding this matter, please contact Christine
Quinlan of Zurich Capital Markets Inc. at (212) 208-3600.

Thank you for your assistance.

Thomas Prunty
Authorized Signatory

# **Exhibit L**



**ZURICH**

April 13, 2001

M.J. Select Global, Ltd.
Oceanic Bank and Trust Limited
TK House, Bayside Executive Park
West Bay Street & Blake Road
P.O. Box AP – 59213
Nassau, Bahamas
Attn: Sharon Claire
Tel: 242-502-8822
Fax: 242-502-8840

<u>Re: M.J. Select Global, Ltd.</u>

Dear Sir or Madam:

I hereby authorize you to redeem 2613.145894 our entire position of M.J.
Financial Arbitrage LP currently registered in the name of ZCM Asset Holding
Company LLC for net asset value at the next available NAV, which we believe
to be April 30, 2001.

The redemptions proceeds should be wired to the following:

ZCM Mated Funding Corp.-HF
Bank Name:              Citibank, NA
ABA#:                   021-000-089
A/C name:               ZCM Matched Funding Corp.
A/C#:                   30443267

If you have any further questions regarding this matter, please contact Christine
Quinlan of Zurich Capital Markets Inc. at (212) 208-3600.

Thank you for your assistance.

Thomas Prunty
Authorized Signatory

ZCM Asset Holding Company
(Bermuda) Ltd.

90 Pitts Bay Road
P.O. Box HM 2286
Hamilton HM JX Bermuda

Tel: 441-294-2170
Fax: 441-294-2171

# Exhibit M



# ANDREW M. ALLAMIAN
*Attorney At Law*

1 West Illinois Street
Suite 285
St. Charles, IL 60174

Phone  (630) 587-4905
Fax    (630) 587-4909
E-Mail  aallamian@aol.com

Sent Via Facsimile (212) 208-3601

August 3, 2001

Thomas Prunty
Zurich Capital Markets, Inc.
One Chase Manhattan Plaza
New York, NY 10005

**RE: Redemption of MJ Financial Arbitrage, L.P.
and MJ Diversified, L.P.**

Dear Mr. Prunty,

I am writing to you today to clarify the position of Martin James Capital Management, Inc. as to the requested redemptions as well as the arrangement with Asset Allocation Fund, L.P. Contrary to the position that you stated yesterday, I feel that the transactions are very much related and so inextricably bound, that they must be addressed together.

We feel that it would be in the best interest of Martin James and Zurich, to reach an agreement that would wind up the relationship immediately. We believe that this can be accomplished if Zurich is willing to share in part of the loss sustained by the limited partners of Asset Allocation Fund, L.P. Neither Martin James Capital Management, Inc., nor any of its principals are trying to benefit at the expense of Zurich.

The redeemed proceeds from the Soc Gen portfolio have been returned to the limited partners of Asset Allocation. Given the situation, Martin James Capital Management, Inc. suggests the following arrangement to settle the various claims between the parties. The investment of M.J. Diversified, L.P in Zephyr will be immediately transferred to ZCM. Martin James Capital Management, Inc. will not make any claim against the ZCM account in MJ Select Global, Ltd. Additionally, Martin James Capital Management, Inc. will send Zurich $500,000.00.

In return, Zurich will agree that the option agreement is terminated and relinquish any and all claims against Martin James Capital Management, Inc. and any of the funds involved. Zurich will acknowledge that its investments into Six Sigma, Freidlander and Worldmark were for the benefit

Thomas Prunty
August 3, 2001
Page 2

of Asset Allocation and assign the rights of these claims to Martin James Capital Management, Inc., who will pursue said claims and return half of any recovery on these accounts to Zurich.

As you indicated yesterday, we understand that you feel you have certain enforceable claims. Likewise, I feel that we have some very viable defenses for our actions. Specifically, the accounts in MJ Financial Arbitrage, L.P. and M.J. Diversified, L.P. were opened for the benefit of Asset Allocation Fund, L.P. Additionally, I believe that there are serious problems with the Option Agreement and Zurich's interpretation of the termination provisions and to the risk of loss over and above the option premium.

If Zurich insists on pursuing its position as you indicated yesterday, we really have no option but to defend your litigation claims. I trust that you will sincerely consider this offer. I do not feel that litigation will benefit either party. I look forward to hearing from you on these issues.

Sincerely,

Andrew M. Allamian

cc: Alan Vicory (212) 446-2350

# Exhibit N

# ANDREW M. ALLAMIAN
*Attorney At Law*

1 West Illinois Street
Suite 285
St. Charles, IL 60174

Phone   (630) 587-4905
Fax      (630) 587-4909
E-Mail  aallamian@aol.com

August 9, 2001

Dear Shareholder:

Over the past several days, we have received numerous phone calls and e-mails containing your questions and concerns. We have done our best to address the specific issues that have been raised. However, many of your questions, concerns and suggestions are simply beyond our authority and knowledge. The majority of the questions relate to five topics: redemption/liquidation, timing on the liquidation of underlying fund, identity of June redemptions, calculation of NAV and legal action against GAD.

## Redemption/Liquidation

The operations concerning redemptions of M.J. Select Global, Ltd. are controlled solely by Oceanic Bank and Trust. In our last correspondence you were told that Oceanic had made the decision to honor confirmed June redemptions first, then proceed with the liquidation. This is based on my telephone conference with Ms. Terah Rehming who informed my that she had a written letter from Oceanic's attorney. I have requested a copy of the letter. I still have not received a copy of that letter from Oceanic.

Many of you have presented me with reasoning as to how the situation should unwind. Arguably, since Oceanic had no knowledge of a liquidity problem when they confirmed the June redemptions, such redemptions should be paid first. The flip side of this argument is that Oceanic is now aware of a liquidity problem and honoring June redemptions would leave the remaining shareholders with the most illiquid part of the portfolio.

I have communicated these concerns directly to Terah both in phone conversations and by e-mail. Some of you have called and e-mailed her directly. If you have feelings, opinions or legal authority regarding this issue, please direct these inquiries to Oceanic directly, as the decision is solely their own.

## Liquidity of Dominion and VC Fund

Our office has been attempting to get information from these two entities. We have been met with considerable resistance which I believe stems primarily from the fact that M.J. Select Global, Ltd. is not the named investor in the funds. Unfortunately, until the transfer is effectuated and the account is re-titled, obtaining information will be difficult.

It is my understanding that Mr. Ken Clows, an attorney at Oceanic, has made the administrators of these funds aware of our interest. I do not believe that he was able to receive any estimates regarding July performance or the anticipated redemption schedule.

Continued . . .

**Identity of June Redemptions**

Several investors have voiced concern that the investors redeeming may have had inside knowledge that there were liquidity problems. Although we will not reveal the identity of investors, I can definitively state that neither Martin James Capital Management, Inc., its principals nor affiliates are the beneficial owners of the redeeming accounts. Further, neither Martin James Capital Management, Inc., its principals nor affiliates have been the beneficial owner in any account that has redeemed from M.J. Select Global, Ltd. during 2001. I have already stated this information to Oceanic.

**Calculation of NAV**

In our last correspondence, we stated that it appears the restatement may have been from a culmination of losses from earlier in the year. We stated this because it seemed unlikely that a trading strategy that had previously generated positive monthly returns in the area of .5%-1.5% would suddenly lose 15%. Many people have suggested that M.J. Select Global, Ltd. should go back and restate numbers from January.

Oceanic is solely responsible for the calculation and verification of the NAV for the fund. They have not indicated to me their intentions as to re-stating returns. I believe that in order to accomplish such a task, they would have to have access to the records of GAD and from those records they could recalculate.

**Legal Action Against GAD**

I have been asked several times if I had taken legal action against GAD. As I have explained to the people posing this question, Martin James Capital Management, Inc. was hired as the investment manager of M.J. Select Global, Ltd. As such we were responsible for proposing investments and for raising capital. I do not believe that we have the power to file suit on behalf of the fund. Should the administrator determine that legal action is in the best interest of M.J. Select Global, Ltd., we will work with them in their effort.

I will continue to press Oceanic for resolution of these issues. As I receive information I will pass it on to all shareholders. If you have questions or concerns regarding these issues, please contact Ms. Terah Rehming at Oceanic at: (242) 502-8869. If you do have questions for me, please e-mail me directly at: aallamian@aol.com

Sincerely,

Andrew M. Allamian

# Exhibit O

AUG-09-01 THU 05:11 PM   OCEANIC BANK & TRUST        FAX NO. 2425028840                   P. 01/02 


# OCEANIC
### BANK AND TRUST LIMITED

TK HOUSE
BAYSIDE EXECUTIVE PARK
WEST BAY STREET & BLAKE ROAD
P.O. BOX A.P. 59213
NASSAU, THE BAHAMAS

eMAIL:info@oceanic.bs
TEL: (242) 502-8822
FAX: (242) 502-8840

8th August, 2001

VIA FACSIMILE #  441 294 2171

ZCM Asset Holding Company (Bermuda) Ltd.
P.P. Box HM 2268
Hamilton HMJX
Bermuda

Dear Shareholders of M.J. Select Ltd.,

We write to you in our capacity as Administrators of M. J. Select Fund Ltd. Events unveiling over the past two weeks are of grave concern to us as Administrators of M. J Select. As Administrator of the fund we are responsible for the maintenance of the corporate records of the fund, publishing the monthly shareholders statements, and effecting transfers and redemption's of the fund's shares. The fund retained the services of Commodity Compliance Services to calculate the net asset value of the Fund, and as such they responsible for the correctness of the net asset value calculation.

As detailed in the offering document Global Arbitrage Development Limited (GAD) is the Trading Advisors to the fund. Martin James Capital Management, Inc is the Investment Manager.

During the month of May, we received fully executed redemption requests for the June 30, valuation date totaling approximately $24,000,000. As Administrator, we are responsible for notifying the investment manager of the pending redemptions. It is the responsibility of the Investment Manager to effect liquidity from the underlying investments to make payments for pending redemption's. Subsequent to notifying the Investment Manager of the pending redemption's, we received notice from the Board of Directors on behalf of Global Arbitrage Development Limited, stating that a decision was made to redeem M.J Select's entire investment in GAD. Accordingly, all market positions will be liquidated as soon as practical and proceeds will be forwarded to us. Any positions that cannot be liquidated will be requested to be transferred to the name of M.J Select Global Fund. We have consulted with legal counsel, and they have advised that it would be in the best interest of the fund for us to accept transfer of the underlying investments. When the transfers become effective, MJ Select is then entitled to deal directly with the underlying funds.

We have ascertained that GAD invested the funds predominately with Dominion Capital Fund and VC Advantage (Bermuda) Fund. We have not received sufficient funds to meet the June 30th redemptions. Our investigation raise concerns about the value of the underlying investments. Already we have received a "revised" N.A.V calculation at 30th June, but we are not satisfied that the revised calculation is accurate. Because of the confusion surrounding the value of the underlying fund, all redemptions are being placed on hold at present.

Oceanic has written to both Martin James Capital, the investment managers and Global Arbitrage Development demanding detailed explanation and supporting documents for the original June 30th valuation and the subsequent revised statements.

Over the course of the past two weeks, we have received calls from concerned investors, we share your concerns and are doing our best to provide all involved with complete and accurate information.

Yours sincerely,

Terah L. Rahming
Manager, Fund Services

Cc:    Zurich Capital Markets
       Attn: Thomas Prunty
       Fax# 212 208 8601

Cc:    Zurich Capital Markets
       Attn: Ann Marie Callanan
       Fax# 353 1 417 9201

# Exhibit P

# Martin James Capital Management, Inc.

*"Specializing in the research, development and management of*
*alternative investment programs and portfolios"*

August 7, 2001

Dear M.J. Select Global, Ltd. Shareholder:

This letter is intended to provide you with an update of the MJ Select Global, Ltd. (A-Shares). There have been some significant events since our last correspondence and this letter will provide you the updated information that we have available.

## RESTATED JUNE 2001 RETURN

Yesterday afternoon we received a copy of a letter from Global Arbitrage Development, Ltd. (GAD) that was sent to the administrator for M.J. Select Global, Ltd., Oceanic Bank and Trust. This letter was sent directly to Oceanic from Landmark Management, GAD's administrator, and summarizes GAD's efforts to redeem our investment. It also indicates that they (Landmark) are restating M.J. Select Global Ltd.'s June 2001 account value to reflect a 15.78% drawdown. A copy of the letter from Landmark is included as an attachment to this letter.

It appears that this drawdown may be a culmination of trading losses since the first of the year. The 2000 year-end audit confirmed our investment and that the stated returns were accurate. GAD had previously reported that our account was (positive) +5.4%, through June 30, 2001. After restating June performance, the 2001 year-to-date return for M.J. Select Global, Ltd. is (negative) -11.17%, through June 30, 2001.

## REMAINING INVESTMENT

As you can see from GAD's letter, the remaining assets are invested in Dominion Fund, Ltd. and VC Advantage Fund, Ltd. Dominion has been operating since approximately 1996 in the area of restricted convertible securities. VC Advantage Fund, Ltd. has been operating since January 2000, trading private and public securities in the technology sector. Although it has been a hard year for the strategies used by these funds, we are hopeful that a strong market will provide positive returns as we continue the liquidation process.

## JULY RETURNS

We have attempted to contact the trading managers for Dominion and VC Advantage in order to get confirmation of July's returns. We were informed by Dominion that to date they do not have a July estimate. We were unable to speak with anyone at VC Advantage Fund, Ltd. We have also asked Oceanic to assist us in securing this information. We are hopeful that we will have a July estimate for M.J. Select Global, Ltd. (A-Shares) by the end of this week.

Continued . . .

---

1 W. Illinois Street, Suite #285   St. Charles, IL   60174   USA
Phone: (630) 587-4900   Fax: (630) 587-4909   Toll-Free: (800) 922-2055

## SECURING OUR ASSETS

As we have been telling our clients, Martin James Capital Management, Inc. has been trying to verify all the assets of M.J. Select Global, Ltd. since the relationship with GAD has deteriorated. It has been our position that if GAD could not redeem our position in cash, then the underlying positions should be transferred to M.J. Select Global, Ltd. We feel that this is the best way to protect all shareholders' interest in MJ Select Global, Ltd. (A-Shares) and will enable us to control the investment and be confident in the reported returns. This transfer request can only be executed between the two administrators (Oceanic and Landmark).

It now appears that Landmark (GAD's administrator) has confirmed the assets in the sub fund investments and has in fact taken the necessary steps toward retitling the assets in M.J. Select Global, Ltd.'s name. As their letter indicates, they have and will be sending over liquid assets as they become available. Oceanic has confirmed the receipt of $2.2 million as stated in Landmark's letter. Oceanic has also requested confirmation from GAD that they have in fact executed full redemptions from the two remaining sub funds.

## REDEMPTION PROCEDURES

Oceanic has now confirmed with us that they will honor all redemptions that were confirmed for June 30, 2001. After June 30 redemptions are paid, then a pro-rata distribution to the shareholders will follow. There are some additional details which we have requested from Oceanic. Specifically, it is important to know if they will distribute funds to shareholders as the funds become available or will they accumulate funds to a pre-determined level before making distributions. We will forward Oceanic's response to this outstanding issue when it becomes available.

We understand the importance of these issues and realize you may have additional questions concerning the liquidation of M.J. Select Global, Ltd. (A-Shares). As always, please feel free to contact our office with any questions. If you wish, you may also contact Ms. Terah Rehming at Oceanic Bank & Trust. Terah may be reached directly at: (242) 502-8869. Again, thank you for your patience and understanding over the past two weeks concerning this matter.

Respectfully,

Martin James Allamian
President
Martin James Capital Management, Inc.



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet



**DOCKETED**
**AUG 1 6 2001**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

---

**Defendant(s): MARTIN JAMES ALLAMIAN, ANDREW M. ALLAMIAN, JAMES J. MANNING, MARTIN JAMES CAPITAL MANAGEMENT, INC., M.J. DIVERSIFIED FUND, L.P., M.J. FINANCIAL ARBITRAGE, L.P., M.J. SELECT GLOBAL, LTD., ASSET ALLOCATION, L.P., JOHN DOES 1-20 (LIMITED PARTNERS OF ASSET ALLOCATION, L.P.), and OCEANIC BANK AND TRUST COMPANY LIMITED**

**Plaintiff(s): ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED**

County of Residence: Bermuda

County of Residence:

Plaintiff's Atty:  William A. Von Hoene, Jr.
Jenner & Block, LLC
330 N. Wabash Avenue,
Chicago, IL 60611
(312) 222-9350

Defendant's Atty:

**01C 6250**
JUDGE LINDBERG

---

II. Basis of Jurisdiction:    **3. Federal Question (U.S. not a party)**

MAGISTRATE JUDGE LEVIN

III. Citizenship of Principle
Parties **(Diversity Cases Only)**
Plaintiff:-**N/A**
Defendant:-**N/A**

IV. Origin :    **1. Original Proceeding**

V. Nature of Suit:    **850 Securities / Commodities / Exchange**

VI. Cause of Action:    **Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78J(b), and Securities and Exchange Act Rule 10b-5, 15 C.F.R. 240.10b-5.**

VII. Requested in Complaint
Class Action:
Dollar Demand:
Jury Demand: **Yes**

*1-2*

Civil Cover Sheet                                                                  Page 2 of 2

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number __ by Judge __)

Signature: *W Alton Hoem Jr*

Date: 8/14/01

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
Eastern Division

**DOCKETED**
AUG 1 6 2001

In the Matter of

ZCM ASSET HOLDING COMPANY (BERMUDA)
LIMITED,
v.
MARTIN JAMES ALLAMIAN, et al.

Case Number **01C 6250**

JUDGE LINDBERG

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED

MAGISTRATE JUDGE LEVIN

| (A) | (B) |
|---|---|
| SIGNATURE *William A Von Hoene Jr* | SIGNATURE *Jessica Aspen* |
| NAME William A. Von Hoene, Jr. | NAME Jessica M. Aspen |
| FIRM Jenner & Block, LLC | FIRM Jenner & Block, LLC |
| STREET ADDRESS One IBM Plaza | STREET ADDRESS One IBM Plaza |
| CITY/STATE/ZIP Chicago, IL 60611 | CITY/STATE/ZIP Chicago, IL 60611 |
| TELEPHONE NUMBER (312) 222-9350 | TELEPHONE NUMBER (312) 222-9350 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6181503 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6242445 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO ✔ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |

1-3