DOCKETED
JAN 0 7 200

FILED
JAN - 6 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

StInFnds - Recon3 - Mem.wpd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

03 JAN -8 PM 5: 27

CLERK
U.S. DISTRICT COURT

ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED, et al.,

        Plaintiffs,

        v.

MARTIN JAMES ALLAMIAN, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)

No. 01 C 6250

Hon. Amy J. St. Eve

## INTERVENORS' MEMORANDUM IN ADVANCE OF JANUARY 8 HEARING

Intervenors John Mather and Susan Mather, individually and as trustees of the Peninsula Ear Nose & Throat, Facial Plastic Surgery Pension Plan Trust, Salateen International Ltd., The James F. Boughner Foundation, and 766347 Ontario Ltd. respectfully file this Memorandum in advance of the January 8, 2002 hearing.

### RESPONSE TO ALLAMIAN MEMORANDUM

The Allamian Defendants' Written Submission and Affidavit of Mr. Allamian demonstrates that he was in grievous violation of the Preliminary Injunction (PI) in several ways. He redeemed investments without authority, opened at least one unauthorized bank account and made substantial unauthorized disbursements, all in violation of the PI. Worst of all, he dissipated approximately $420,000 of frozen funds.

However, the Allamians' Submission raises more questions than it answers. Attached as Exhibit A is a spreadsheet detailing the expenditures from the Harris Bank checking account for which there appear to be records attached to the Allamian Affidavit. Those records show that using checks made out either to "cash" or to Harris Bank, Mr. Allamian withdrew $360,741.18, but there is no documentation of where those funds went, other than the unsupported assertions that they paid legal fees.

Also missing from the supplied records is a copy of the $100,000 payment (described in ¶ 30 of the Allamian Affidavit) supposedly paid to the Allamians' counsel herein - Ross & Hardies. The February and December 2002 statements are also missing.

263

Based on these material omissions, Intervenors believe that substantial questions remain about Mr. Allamian's use of the stolen $420,000. To use the term of the Allamians' counsel during the December 26 hearing, those funds are still "missing." (Exhibit N: 12/26/02 Hearing Tr. 15).

The Allamians' Written Submission does not attempt to justify the unauthorized disbursement of the funds and other violations of the PI. Notwithstanding the purpose and uses to which those funds were put, the conduct that is disclosed by the Written Submission is an *ipso facto* violation of the PI.

To the extent that the Allamians will attempt to demonstrate that the payment of attorneys' fees is somehow a permissible use of these funds, Intervenors note the holding of *Caplin & Drysdale v. U.S.*, 491 U.S. 617, 626 (1989), that a defendant has no right to use the funds of others to pay attorneys fees and *FTC v. Think Achievement Corp.*, 312 F.3d 259 (7th Cir. Nov. 26, 2002), that it is an abuse of discretion for a court to permit frozen funds of others to be put to that use.

Intervenors await the full truth before taking a definitive position on the applicable legal doctrines.

## ARGUMENT

### 1. Reconsideration of the December 19 Order is justified.

This Court's December 19 Order stated the following:

> The Intervenors, however, have not proven that Asset Allocation will be judgment proof at the end of this case. This is especially true in light of the proposed settlement involving the funds at issue here. Under the settlement, ZCM will receive $2 million of the funds at issue and **Asset Allocation will keep $420,000. (R. 239-1, at 2-3).** In addition, ZCM will pay Asset Allocation any amounts that it recovers in excess of $12,375,000 from MJ Select Global and/or Six/Sigma LLC. (emphasis added).

The bold-faced portion of that ruling was based on false assertions by ZCM and the Allamians in their Joint Motion to approve Transfer of Funds that the $420,000 was intact and would remain with Asset Allocation.[1]

---

[1] The Joint Motion stated the following:

... **Asset Allocation would be left with the $420,000 remaining funds** subject to the Amended PI Order with which to remain in business. ...

(continued...)

2

Reconsideration of the December 19 ruling is justified on two grounds: new evidence and a manifest error of law. *Caisse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir.1996) (only new evidence or "manifest errors of law" by the court justify reconsideration).[2]

**New Evidence** -- Since the existence of the $420,000 was the linchpin of this Court's conclusion that Asset Allocation would not be judgment proof, the theft of those funds *ipso facto* establishes that showing of irreparable harm.

Moreover, ZCM's and the Allamian's representations in the Joint Motion concerning the potential of a recovery from M.J.Select/Six Sigma are now substantially suspect. None of those representations are supported by any competent evidence, a suspicious omission made substantially more serious given the absolute bar to Intervenors' discovery of these or any other matters.[3]

Finally, Mr. Allamian's testimony in the Rule 2004 deposition demonstrates that Asset Allocation's general partner Martin James Capital Management, Inc. is out of business, insolvent and therefore judgment proof.[4] (Exhibit C: M. Allamian Rule 2004 Dep. 26-32).

---

[1] (...continued)

* * *

It is also respectfully submitted that the settlement between ZCM and the Allamian Defendants is the best possible resolution of ZCM's claims against them, given the limited financial means they have to satisfy ZCM's claims, and it has the further benefit for Asset Allocation, and the limited partners of Asset Allocation, **of leaving over $420,000 with Asset Allocation** to permit it to continue in business. (Exhibit B: R. 239: Joint Motion, pp. 2-3).

[2] To ensure that there is plenary consideration of the issues raised by the erroneous entry of the PI, Intervenors have also filed a Renewed Motion to Modify the Preliminary Injunction, set for presentment for the January 8 hearing.

[3] Intervenors as well as the other limited partners have repeatedly sought relief from the PSLRA stay to take discovery on the issues presented by these Motions and other matters. *See* Intervenors' Opposition to the Joint Motion (R. 241, p. 15) and Motion of Asset Allocation Limited Partner John H. Waldock to Modify PSLRA Stay to Permit Particularized Discovery (R. 192).

[4] Neither ZCM nor the Allamian defendants have contended that Asset Allocation's general partner might be a source of recovery in the event Intervenors obtained a judgment. That possibility was therefore not briefed by the parties, and the Court's ruling surprised Intervenors. Moreover, Intervenors were prevented from taking discovery on that and all other issues related to injunctive relief and only the fortuitous circumstance of Mr. Allamian's Rule 2004 examination uncovered the truth about this and other material

(continued...)

**Manifest error of law** – Intervenors also respectfully submit that this Court was and is without jurisdictional authority under Federal Rule of Civil Procedure 65 to enter the PI. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961 (1999). Reinstatement of the PI suffers from the same defect.[5]

In *Grupo Mexicano*, the Supreme Court held that

> the District Court **had no authority** to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages. 527 U.S. at 333, 119 S. Ct. at 1975.

As the Supreme Court explained:

> Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. *No relief of this character has been thought justified in the long history of equity jurisprudence.* 527 U.S. at 327, 119 S.Ct. at 1972, quoting *DeBeers Consol. Mines, Ltd. v. U.S.*, 325 U.S. 212, 222-223, 65 S.Ct. 1130 (emphasis added)

ZCM's claims were simply for money damages. As it contended in its Reply on its Motion for a PI, it sought to prevent the Allamian defendants from "transferring the funds beyond [ZCM's] reach **thereby frustrating the enforcement of an inevitable judgment** in [ZCM's] favor . . . ." (ZCM Reply Mem. in support of Motions for a Preliminary Injunction, p.1, Docket No. 39) (emphasis added). It has no lien over Asset Allocation's assets, nor any equitable interest in them. Therefore, under Rule 65, the issuance of the PI was, and its reinstatement is, improper.[6]

**i.     Judge Lindberg wrongly discounted the rule of *Grupo Mexicano*.**

In part based on *Grupo Mexicano*, Intervenors sought to vacate or modify the PI.

_____

[4](...continued)
issues of fact.

[5] To the extent that the PI was based upon the Illinois Uniform Fraudulent Transfer Act, the Court's authority only permitted freezing of the funds pending resolution of this case.

[6] None of ZCM's early briefs supporting its request for the PI even cited *Grupo Mexicano* or brought this adverse controlling authority to the Court's attention, and instead cited only to contrary earlier lower court decisions, a questionable tactic at the very least and one likely violative of Local Rule 83.53.3(a)(3).

4

(Intervenors Mot. to Vac. or Modify PI: R. 156).

In his June 17, 2002 Minute Order denying that Motion, Judge Lindberg ruled that *Grupo Mexicano* did not apply because

> ZCM has made a claim for constructive trust against the funds received by certain Asset Allocation limited partners which constitutes a claim for equitable relief such that *Grupo Mexicano* does not prevent the Court from issuing or maintaining the injunction. (Exhibit D: 6/17/02 Minute Order: R. 179).

That was clearly wrong because the PI involves only the partnership funds held by partnership and general partner and does not touch the redemptions received by the limited partners. Indeed, the PI was issued before the limited partners were sued by ZCM, so it is difficult to understand how later claims against the limited partners -- different parties -- could support the earlier request for the PI against the partnership.

Moreover, even if that claim for constructive trust somehow devolves to a claim against the partnership funds, it is not properly an equitable claim but is merely a claim for money damages. To the extent that Judge Lindberg's April 25, 2001 Opinion and Order (R. 160) is to the contrary, it is wrong. Intervenors hereby incorporate by reference and adopt the arguments of the defendant limited partners on this point contained in their December 19, 2001 Rule 12(b)(6) Motion to Dismiss the claims of plaintiffs ZCM and Reply. (R. 130, 153).

### 2. Intervenors reiterate their prior arguments.

Intervenors incorporate by reference and thereby reiterate their prior arguments in support of their Emergency Motion to Clarify or Modify the Preliminary Injunction (R. 156) and in Opposition to the Joint Motion for Approval of Transfer of Funds (R. 241).

### 3. ZCM is not entitled to reinstatement of the PI.

Moreover, ZCM was not and is not entitled to the PI.

### a. ZCM's claims to ownership of MJD and MJFA pursuant to the Option Agreement are illegitimate.

Throughout this case, Intervenors have asserted that to the extent ZCM's claims to the frozen funds are based its asserted ownership of MJD and MJFA under the Swap Agreement, they are illegitimate for several reasons -- federal commodity and securities fraud, interference with contract, common law fraud and other reasons.

Intervenors incorporate by reference the arguments of their prior briefs on this point and add the following.

**i.     The funds in MJD and MJFA were owned by Asset Allocation and held by ZCM as custodian for the benefit of Asset Allocation.**

In the alternative, Intervenors note that there is substantial evidence that establishes that ZCM was not the owner of the MJD and MJFA limited partnership interests, but instead held those interests in trust for Asset Allocation Fund, L.P. which is therefore the true owner of the funds at issue herein.

**The deposition testimony.**

Attached as Exhibits E and F are the deposition excerpts of Martin Allamian and James Manning showing that the interests in MJD and MJFA for which ZCM now claims ownership were actually held for the benefit of Asset Allocation.

First, as Mr. Allamian testified: "everybody knew that the investments were being made for the benefit of Asset Allocation Fund." (Exhibit E: M. Allamian 9/18/01 Dep. 107). The questions of Mr. Vickery - ZCM's counsel - elicited the following basis for the understanding:

| | |
|---|---|
| QUESTION [MR. VICKERY - ZCM COUNSEL]: | And when you say, in essence, everyone knew these investments were for the benefit of Asset Allocation, is that something that you're concluding based on sort of your understanding of how – the substance of this deal; or is it based on some sort of understanding you believe you have of the legal structure that was put in place? |
| ANSWER [MR.ALLAMIAN]: | I'm basing it on the fact that four men from ZCM swooped down into my office and told me exactly how it would work and told me, you know, exactly that we sign over X amount of assets to Zurich; we will receive up to $2 worth of borrowing power to make into different investments. That's what I base it on. |
| QUESTION: | Who were the four men that you're referring to, if you recall them? |
| ANSWER: | John Lewis, Tom Prunty, Ed Ware, and I don't know the fourth gentleman's name. He was, I believe, of Asian descent. (Exhibit E: M. Allamian 9/18/01 Dep. Tr. 118-119). |

That understanding was confirmed by James Manning, a Senior Vice President of Asset Allocation's general partner, that he had the understanding that "ZCM Matched Funding Corp. held assets for the benefit of Asset Allocation." (Exhibit F: Manning Dep. p. 41).

**The documents signed by ZCM officials corroborate that testimony and show the**

**ownership by Asset Allocation**

The fact that ZCM held the MJD and MJFA interests "for the benefit of Asset Allocation" is conclusively confirmed by agreements to subscribe in MJD and MJFA executed by Thomas Prunty, a high-ranking official of ZCM.[7]

The MJD Subscription Agreement was executed on September 29, 2000 in the amount of $500,000 and states that the Subscriber was "ZCM Asset Holding Company LLC **for benefit of Asset Allocation Fund, LP.**" (Exhibit H: 9/29/00 MJD Subscription Agreement and Cert.).

The MJFA Subscription Agreement was executed on September 29, 2000 in the amount of $1,800,000 and states that the Subscriber was "ZCM Asset Holding Company LLC **for Benefit of Asset Allocation Fund, LP.**" (Exhibit I: 9/29/00 MJFA Subscription Agreement and Cert.).[8]

As Mr. Allamian testified, this confirmed his prior understanding gained from ZCM's instructions:

| | |
|---|---|
| QUESTION [MR. VICKERY - ZCM COUNSEL]: | In your own mind, when you saw the words "for the benefit of Asset Allocation" added to the name ZCM Asset Holding on a subscription agreement, did that have any particular significance for you? |
| ANSWER [MR.ALLAMIAN]: | Again, it just -- I think it kind of puts the stamp of approval on that we -- again, that I had talked about earlier, that we all agreed that Zurich was acting as custodian making these investments on behalf of Asset Allocation Fund. So it didn't strike me as strange one way or the other. (Exhibit E: M. Allamian 9/18/01 Dep. Tr. 124-25). |

Therefore, the only evidence establishes conclusively that, contrary to ZCM's contentions herein, it was not the owner of the MJD and MJFA interests.

    **ii.    ZCM breached the Swap Agreement.**

Nor does ZCM qualify as a creditor of Asset Allocation under the Swap Agreement because

---

[7] These Subscription Agreements have been authenticated by the Paragraphs 40 and 41 Declaration of Martin J. Allamian to which they are attached as Exhibits E & F. Mr. Allamian's Declaration is attached to the September 20, 2001 Opposition of the Allamian defendants (Docket No. 25) to ZCM's Motion for a Preliminary Injunction. (Exhibit G: Excerpt of Allamian Declaration).

[8] The difference between the subscribing ZCM entities is irrelevant because all the transaction were undertaken pursuant to the Swap Agreement in accordance with paragraph 1(c) of the Master Agreement.

it was ZCM which breached the Swap Agreement and caused the partnership substantial losses.

**(1)    Background**

In early 2000, defendant Martin J. Allamian began negotiations with Zurich Capital Markets about obtaining entering into a Swap Transaction. (Exhibit G: M. Allamian Decl. ¶ 7).

The Swap was entered into on May 31, 2000 and consisted of a Confirmation and a so-called "Master Agreement" of the International Swap Dealers Association (ISDA). (M. Allamian Decl. ¶¶ ¶ 8, 9). The parties to the Swap were Asset Allocation and ZCM Matched Funding Corp.

The Swap transaction was subject to the terms and conditions of the Master Agreement. (M. Allamian Decl., ¶ 9), which explicitly provided that Asset Allocation and ZCM MFC would fulfill their respective obligations through a series of related transactions involving the investments in the Reference Portfolio. (*Id.*) Pursuant to the Master Agreement, all transactions were irrebuttably presumed to be part of one agreement as evidenced in paragraph I(c) of the Master Agreement:

> Single Agreement. All transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

Moreover, the Confirmation Letter defined "Transaction" as "Any transfer of Eligible Interests by Buyer, other than a transfer to Seller." (Exhibit J: Swap Confirmation, Ex. A to M. Allamian Decl. at p. 4). Thus, each adjustment in the Reference Portfolio, including subscription agreements, were to be part and parcel of the overall Swap.

In order for ZCM to fulfill its funding obligation in the Reference Portfolio funds, after the execution of the Master Agreement on May 31, 2000, Martin James forwarded Subscription Agreements to Jonathan Lewis and/or Thomas Prunty of ZCM Matched Funding Corp. for each of the funds in the portfolio, including MJD, MJFA and MJ Select. (Exhibit H & I: Subscription Agreements). However, when those subscription agreements were returned, they were not executed by the original party to the Swap – ZCM Matched Funding Corp. – but by another ZCM entity previously unknown to Asset Allocation and its General Partner – ZCM Asset Holding Company (Bermuda) Limited.[9] They were signed by one Kirby Smith, also previously unknown to Mr.

---

[9]  Under the terms of the Master Agreement, ZCM Asset Holding Corp is an "affiliate" of ZCM Matched Funding in that it is "controlled, either directly or indirectly" by ZCM Matched Funding and in that (continued...)

8

Allamian. Notwithstanding the fact that the subscription agreements were executed by a ZCM entity different than the one that was party to the Swap, these underlying investments were part and parcel to the Master Agreement, and would not have been entered into but for the Master Agreement.

**(2)** **ZCM wrongfully and unilaterally terminates the Master Agreement and issues redemption Instructions.**

In late March 2001, one of the investments in the Reference Portfolio, Six Sigma, LLC ("Six Sigma"), was discovered to be a complete fraud. (Exhibit G: M. Allamian Decl. ¶ 51). Asset Allocation's General Partner promptly notified ZCM, which as a limited partner in Six Sigma, should have already been aware of the situation.

Shortly thereafter, Thomas Prunty and Jonathan Lewis of ZCM came to the offices of Asset Allocation. (Exhibit G: M. Allamian Decl. ¶ 52.). During the course of the meeting, Thomas Prunty stated that the Swap Transaction was terminated and that all of the Reference Portfolio would be redeemed. (*Id.*). Although Prunty has denied terminating the Swap (ZCM Reply on PI, Prunty Decl. ¶ 11), in fact ZCM began issuing redemption instructions regarding all or virtually all investments in the Referenced Portfolio, essentially a *de facto* termination. (Exhibit K: Redemption Instructions, ZCM Complaint, Exs. H-L; Exhibit G: M. Allamian Decl. ¶ 44-46).

**(3)** **The consent of the general partner to the PI and the settlement agreement is totally invalid.**

Recent developments show that any consent by Asset Allocation's general partner to the PI and the settlement agreement is completely invalid and vitiated.

A substantial basis of the Court's December 19 ruling was the representations of the Joint Motion about the supposed settlement between ZCM and Asset Allocation. Indeed, the two orders for transfers of funds entered by stipulation explicitly state that the transfers are made "pursuant to a settlement reached by the parties." (Exhibit L: 12/26/02 Stip & Order; Exhibit M: 12/31/02 Stip. & Order).

If the recent revelations regarding Mr. Allamian's misconduct and ZCM's involvement therein demonstrate anything, it is that the entire settlement is invalid and part and parcel of a fraud perpetrated on the Court, on Asset Allocation, on Intervenors, and on the other limited partners.

---

[9](...continued)
ZCM Matched Funding owns a "majority of the voting power" of Plaintiff.

Under the law of Illinois, therefore, the settlement agreement is invalid as a fraud. *Cf. Carlile v. Snap-on Tools*, 271 Ill. App.3d 833, 648 N.E.2d 317 (4th Dist. 23, 1995) (settlements and releases are unenforceable if obtained by fraud or collusion even though settlements are strongly favored by the courts); *Sims v. Tezak*, 296 Ill. App.3d 503, 501-11, 694 N.E.2d 1015, 1020 (1st Dist. 1998) (same); *Luttrell v. Wyatt*, 305 Ill. 274, 137 N.E. 95 (1922) (equity may set aside a release for fraudulent misrepresentation that certain moneys would be paid at a subsequent date, where the releasee intended at the time not to perform); *Smith v. Marzolf*, 59 Ill.App.3d 635, 375 N.E.2d 995 (3d Dist. 1978) (settlement fraudulently limiting insurer's subrogation rights properly set aside); *17070 Collins Avenue v. Granite State Ins. Co.*, 720 So.2d 1132 (Fla. App. 1998) (fraud by insurer vitiates settlement agreement release).

**4.      Intervenors are entitled to a freeze of all partnership funds under the Illinois Uniform Fraudulent Transfer Act.**

Intervenors will be prepared to present testimony and other evidence at the hearing on their entitlement to a UFTA freeze of the remaining partnership assets.  In advance of that hearing, Intervenors provide the following argument:

Federal Rule 18(b) provides the following:

> **Joinder of Remedies; Fraudulent Conveyances.** . . . [A] plaintiff may state a claim for money and a claim to have set aside a conveyance fraudulent as to that plaintiff, without first having obtained a judgment establishing the claim for money.

Footnote 7 of *Grupo Mexicano* recognizes without deciding that where a fraudulent conveyance is involved, Rule 18(b) "may have altered the common-law rule that a general contract creditor has no interest in his debtor's property," 527 U.S. at 324, n.7, thus permitting Intervenors to obtain a prejudgment injunctive freeze on the partnership assets in question.

**a.      Intervenors are UFTA creditors of Asset Allocation.**

There can be no reasonable question that Intervenors are tort creditors of Asset Allocation. *Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir. 1995); *Miller v. Harding*, 1998 WL 892702 (D. Mass. 1998), *aff'd* 248 F.3d 1127 (1st Cir. 2000) (unpublished); *Scholes v. African Enterprise, Inc.* 854 F.Supp. 1315, 1325 (N.D. Ill. 1994) (investors had breach of contract claims and fraud claims against investment entities from the inception of the scheme).

Moreover, Intervenors are creditors even if their claims are contingent, *In re Martin*, 145 B.R. 933, 949 (Bankr. N.D. Ill. 1992), and even if the claims were based on pending or future litigation.

10

*Dunaway v. Robertson*, 95 Ill. 419, 1880 WL 10052 (1880) (conveyance made in apprehension of future litigation is fraudulent); *Schumacher v. Bell*, 164 Ill. 181, 45 N.E. 428 (1896) (conveyances after being sued are fraudulent).

### b. The settlement transfer was fraudulent under the UFTA.

This case presents a classic case of a fraudulent transfer within the meaning of Rule 18(b) and the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/1, *et seq.* (UFTA).

Under Section 5 of the UFTA, a transfer is fraudulent as to a creditor if the debtor made the transfer or incurred the obligation "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5 (a)(1). This is known as "fraud in fact" and requires a creditor to prove "specific intent to hinder, delay or defraud" by clear and convincing evidence. *In re Roti*, 271 B.R. 281, 301 (Bkrtcy. N.D. Ill. 2002); *In re Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill.1992), *appeal dismissed*, 151 B.R. 154 (N.D. Ill.1993).

Section 5(b) of the UFTA, 740 ILCS 160/5(b), enumerates several indicia of fraudulent intent – the so-called "badges of fraud" – from which the inference of fraudulent intent may be drawn, including the following:

- the transfer was concealed
- before the transfer was made, the debtor had been sued or threatened with suit
- the transfer was of substantially all the debtor's assets
- the debtor removed or concealed assets
- the debtor was insolvent or became insolvent shortly after the transfer was made

When these "badges of fraud" are present in sufficient number, they give rise to an inference or presumption of fraud. *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill. App.3d 241, 251, 662 N.E.2d 595, 602 (1st Dist. 1996); *In re Roti*, 271 B.R. at 301.

With or without these "badges of fraud," there is no question that the transfers pursuant to settlement -- the $2 million transfers to ZCM as well as Mr. Allamian's theft of the $420,000 -- were fraudulent in fact.

The linchpin of these transfers was an attempt to avoid Court learning that Mr. Allamian had stripped the partnership of all remaining assets, leaving it judgment-proof. Thus, the Joint Motion falsely represented that the $420,000 investment was intact and that those funds would remain with the partnership. The Joint Motion also at least impliedly represented that the remaining $2 million in cash and investments were situated in accounts and investments specified by the PI. One thing

11

is sure: the Joint Motion did not disclose that Mr. Allamian had violated the PI in several material respects and that ZCM was aware of at least some of those violations.[10] It is also clear that the theft of the $420,000 vitiates the entire settlement, including the $2 million settlement transfer to ZCM. Indeed, the validity of that $2 million payment was based substantially on the representations of the Joint Motion that the $420,000 would remain in the partnership, representations that this Court substantially based its December 19 ruling.

      c.      **Intervenors are entitled to recover funds transferred to ZCM for deposit into the registry of the Court.**

Section 8(a) of the UFTA, 740 ILCS 160/8, provides that in an action for relief against a transfer or obligation under the UFTA, a creditor may obtain:

    (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; . . . [or]

    (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

        (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property . . . [or]

        (C) any other relief the circumstances may require.

**Avoidance of the transfer to the extent of Intervenors' $1.3 million claims** – pursuant to the express terms of Section 8(a)(1), Intervenors are entitled to the avoidance of the transfers made pursuant to the fraudulent settlement agreement

Furthermore, Section 9(a) of the UFTA offers ZCM no escape from returning the $2 million fraudulently transferred. At the time of the transfers on December 26, 2002, ZCM was aware of the false statements in its Joint Motion and the theft of funds by Mr. Allamian. On the basis of that knowledge, Mr. Vickery -- ZCM's lead counsel – explicitly promised the Court that ZCM would return the funds if this Court so ordered. (Exhibit N: 12/26/02 Hearing Tr. 15-16).

---

[10] It remains to be seen whether the Administrators of the investment funds holding partnership assets and the Allamian defendants had failed for some months to comply with the PI's requirement that ZCM be provided copies of monthly statements for those investments. During the December 26 hearing, ZCM's counsel informed the Court that due to the holiday and short notice he had been unsuccessful in his attempts to inquire of his client whether the statements had been sent. (Exhibit N: 12/26/02 Hearing Tr. 10-11). No doubt, ZCM's counsel will have able to advise the Court on that matter at the January 8 hearing.

Even if ZCM did not have actual knowledge of Mr. Allamian's fraudulent intent and action before they were informed by Intervenors, ZCM was nevertheless was a "a participator in the fraud" because it had knowledge of facts and circumstances sufficient to excite the suspicions of a prudent person and be put on inquiry, or to lead a person of ordinary perception to infer Mr. Allamian's fraudulent conduct. *In re Roti*, 271 B.R. 281, 298 (Bankr. N.D. Ill. 2002); *Alan Drey Co., Inc. v. Generation, Inc.*, 22 Ill. App.3d 611, 619, 317 N.E.2d 673, 680 (1st Dist. 1974).

This is so because ZCM likely knew that Mr. Allamian was violating the PI by not submitting the required monthly statements. First, it is obvious to anyone that Mr. Allamian's repeated failures to comply with those provisions necessarily meant that he was handling the frozen funds improperly. Second, ZCM explicitly failed to report those violations to the Court obviously because it was seeking to reach a collusive understanding with Mr. Allamian to defeat any potential recovery by Intervenors. Third, incredibly, ZCM joined in the Joint Motion's false statements about the frozen $420,000 and the other matters stated therein, thereby misrepresenting to the Court the state of all the frozen funds. In light of the central importance of the representation about the $420,000 and the fact that the source of the information about those funds was Mr. Allamian, it was clearly unreasonable for either ZCM or the Allamian's counsel to rely on such a shaky source. Rule 11 clearly required an independent investigation and corroboration of the continued safety of the $420,000. *See e.g. PaineWebber, Inc. v. Can Am Financial Group, Ltd.*, 121 F.R.D. 324, 332 (N.D.Ill. 1988) (reliance of client's statements unreasonable without corroborating investigation). Even under the forgiving standards of *Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co., Inc.*, 8 F.3d 441 (7th Cir. 1993), the violations of Rule 11 are clear since the actual existence of the $420,000 was so central to the Court's consideration of the settlement and reinstatement of the PI.

**Freeze of the funds** -- Second, under the UFTA's Section 8(a)(3), Intervenors are entitled to injunctive relief preserving the remaining partnership assets and funds pending resolution of this case on the merits.

Intervenors note that their UFTA claim puts them within the exception reserved by footnote 7 of *Grupo Mexicano*.

The standards for injunctive relief are those recognized by this Court's December 19 Order: (1) a reasonable likelihood of success on the merits of the underlying claim; (2) no adequate remedy of law; and (3) irreparable harm. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474 (7th

13

Cir. 2001). The Seventh Circuit has also taught that the purpose of a preliminary injunction is to minimize the hardship to the parties pending resolution of their lawsuit. *Id.* Once a Movant has established those elements, the Court must examined hardship to the other party and the public interest. *Caterpillar Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 586 -87 (C.D. Ill. 1994).

Likelihood of success – On at least two of Intervenors' underlying claims – breach of contract and commodity fraud – they have a substantial likelihood of success.

Intervenors refer the Court to their prior briefs on those matters, including especially their July 8, 2002 Opposition to the Motion to Dismiss First Amended Complaint in the related case *766347 Ontario Ltd. v. Zurich Capital Markets, Inc.*, No. 02 C 3223, and their briefs on that Motion.[11]

Adequate remedy of law/irreparable harm – The fact that Asset Allocation will be stripped of all its remaining assets and judgment-proof demonstrates both that Intervenors will have no adequate remedy at law for damages and will suffer irreparable harm. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984) (irreparable harm may exist where defendant may become insolvent before a final judgment can be collected); *Federal Trade Commission v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir.1988) (freezing defendant's assets upheld where assets had been shifted from closely-held corporate defendant to individuals who were sole shareholders of corporate defendant).

Balance of harms – A freezing of the funds would constitute no hardship to ZCM except to require it to establish that it is entitled to those funds. ZCM would not be financially endangered by a freeze and its operations would not be affected in the slightest. The impact on ZCM is obviously substantially less serious than that on Intervenors.

---

[11] In this case, Intervenors have a pending claim for breach of contract arising from the refusal of the general partner to redeem their redemptions.

They also have pending an Amended Motion for Leave to File a First Amended Cross-Claim and Counterclaim raising a claim under the UFTA, for constructive trust, for judicial dissolution of Asset Allocation and for an accounting. Given the recent developments and discoveries relating to Mr. Allamian's theft of partnership assets, denial of leave to file that First Amended pleading would be a substantial abuse of discretion. Fed. R. Civ. Pro. 15(a) (leave to amend "shall be freely given when justice so requires"); *Toth v. USX Corp.*, 883 F.2d 1297, (7th Cir. 1989) (Complaint merely serves to put defendant on notice and is to be freely amended or constructively amended as case develops, as long as amendments do not unfairly surprise or prejudice defendant); *Umar v. Johnson*, 173 F.R.D. 494 (N.D. Ill. 1997) (same) (Judge Shadur); *Arroyo v. Henderson*, 1999 WL 446700 (N.D. Ill. 1999) (same) (Mag. J. Schenkier).

<u>Public Interest</u> – Whereas this case may have previously involved a routine though heated dispute over investment fraud and other wrongdoing, it now implicates the authority of the federal courts in general and respect for this Court in particular as well as respect for the rule of law. Neither ZCM nor certainly the Allamians seem the least bit concerned about ensuring they comply with the full letter and spirit of this Court's orders if by collusive secret agreement they can avoid doing so.

Indeed, the brazen misrepresentations of the Joint Motion and the serial violations of the Court's orders are a most serious threat to the integrity of this case and this Court.

> If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.

*U.S. v. United Mine Workers of America,* 330 U.S. 258, 291, 67 S. Ct. 677, 695 (1947) quoting *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 450 (1911).

### CONCLUSION

The December 19 Order should be reconsidered. Intervenors should be granted leave to file their First Amended Cross-Claim and Counterclaim. All remaining funds of Asset Allocation should be deposited into the registry of the Court. Asset Allocation should be ordered dissolved. Martin James Capital Management, Inc. should be removed as the general partner. The Court and/or the Intervenors should be authorized to wind up the affairs of the partnership.

Respectfully submitted,

One of the attorneys for Intervenors

GEKAS & ASSOCIATES, LTD.
Suite 1020
Eleven South LaSalle Street
Chicago, Illinois 60603
(312) 726-4501

## CERTIFICATE OF SERVICE

I certify that on ___1/6/03___ , a copy of the foregoing was served on the following

persons by messenger delivery unless otherwise shown:

David P. Sanders/Chadwick O. Brooker
JENNER & BLOCK LLC
One IBM Plaza
Chicago, Illinois 60611

Alan B. Vickery/Philippe Z. Selendy (Overnight
Messenger)
BOIES, SCHILLER AND FLEXNER LLP
570 Lexington Avenue
New York, NY 10022

Courtney R. Rockett/Helen M. Maher
(Overnight Messenger)
BOIES, SCHILLER AND FLEXNER LLP
333 Main Street
Armonk, NY 10504

Michael A. Chabraja
ROSS & HARDIES
150 North Michigan Avenue - Suite 2500
Chicago, IL 60601-7567

Michael Anthony Alesia (Mail only)
ALESIA, ALLAMIAN & MENCONI
1111 Plaza Drive, Suite 690
Schaumburg, IL 60173