## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

03 JAN 22 PM 5:30

U.S. DISTRICT COURT

**DOCKETED**
JAN 2 4 2003

**FILED**
JAN 2 2 2003
JUDGE AMY ST. EVE
United States District Court

| | |
|---|---|
| ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED, et al., | ) |
| Plaintiffs, | ) |
| v. | ) |
| MARTIN JAMES ALLAMIAN, et al., | ) |
| Defendants. | ) |
| JOHN H. WALDOCK, solely as Trustee of the JOHN H. WALDOCK TRUST U/A/D 12/1/88, et. al., | ) No. 01 C 6250 |
| Counterclaimants/Cross-Claimants, | ) Hon. Amy St. Eve |
| v. | ) |
| ZURICH CAPITAL MARKETS, INC., et al., | ) |
| Counter-defendants, | ) |
| and | ) |
| M.J. DIVERSIFIED FUND, L.P., et. al., | ) |
| Cross-defendants. | ) |

### NOTICE OF FILING

TO:   See Attached Service List

PLEASE TAKE NOTICE that on the 22nd day of January, 2003, the undersigned caused to be filed with the Clerk of the Court for the United States District Court, Northern District, Eastern Division, the **Memorandum Relating to Payment of Attorneys Fees to Ross & Hardies,** dated January 22, 2003, a true and correct copy of which is hereby served upon you via U.S. Mail, proper postage pre-paid.

\32914\00001\CH240973.DOC-1

Dated: January 22, 2003

Respectfully submitted,

ROSS & HARDIES

By: _____
        Michael A. Chabraja

Michael A. Chabraja
Tammy L. Adkins
Samantha C. Gordon
ROSS & HARDIES
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
(312) 558-1000

## SERVICE LIST

Constantine John Gekas, Esq.
Alenna K. Bolin, Esq.
Gekas & Associates, Ltd.
11 South LaSalle Street
Suite 1020
Chicago, Illinois 60603

David P. Sanders, Esq.
Chadwick O. Brooker, Esq.
Jenner & Block
45th Floor
One IBM Plaza
Chicago, IL  60611

Alan B. Vickery, Esq.
Philippe Z. Selendy, Esq.
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, New York 10022

Courtney R. Rockett, Esq.
Boies, Schiller & Flexner LLP
333 Main Street
Suite 110
Armonk, NY  10504

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED, et. al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MARTIN JAMES ALLAMIAN, et. al. | ) ) |
| Defendants. | ) ) ) |
| | ) ) |
| JOHN H. WALDOCK, solely as Trustee of the JOHN H. WALDOCK TRUST U/A/D 12/1/88, et al. | ) ) ) ) |
| Counterclaimants/Cross-Claimants, | ) ) |
| v. | ) ) |
| ZURICH CAPITAL MARKETS INC., et al., | ) ) |
| Counter-defendants, | ) ) |
| M.J. DIVERSIFIED FUND, L.P., et al, | ) ) |
| Cross-defendants. | ) ) |

Case No. 01 C 6250

Honorable Amy J. St. Eve

**DOCKETED**
JAN 2 4 2003

**FILED**
JAN 2 2 2003
JUDGE AMY ST. EVE
United States District Court

## MEMORANDUM RELATING TO PAYMENT OF ATTORNEYS' FEES TO ROSS & HARDIES

U.S. DISTRICT COURT
CLERK
03 JAN 22 PM 5: 31

EG-12

292

Michael A. Chabraja, an attorney with the law firm of Ross & Hardies, in his capacity as counsel for Defendants Martin Allamian, Martin James Capital Management, Inc., and Asset Allocation Fund, L.P., (the "Allamian Defendants"), and in response to the Court's request for a submission on the issue of payment of attorneys' fees in this matter to Ross & Hardies, states as follows:

## FACTUAL BACKGROUND

Attorneys at the law firm of Ross & Hardies serve as counsel for, among others, Asset Allocation Fund, L.P. ("Asset Allocation"), Martin James Capital Management, Inc. ("MJCM"), and Martin J. Allamian in this action as well as in *John H. Waldock et. al. v. Asset Allocation Fund, L.P., et. al.*, Case No. 02 C 7941 (the "Waldock Action"), which is also currently pending before this Court. Declaration of Michael A. Chabraja ("Chabraja Decl.") at ¶ 2, attached hereto as Exhibit 1.

In October 2001, Judge Lindberg entered a Preliminary Injunction (the "PI Order") in this action. The PI Order enjoined and restrained Asset Allocation, MJCM and Martin Allamian, among others, from directly or indirectly transferring, trading, selling, assigning or disposing of any funds obtained from or traceable to the redemption of Plaintiffs' (hereinafter referred to as "ZCM") interests in M.J. Diversified, L.P. ("MJD"), M.J. Financial Arbitrage, L.P. ("MJFA") or M.J. Select Global, Ltd. ("MJ Select"). See PI Order at ¶ 1; attached hereto as Exhibit 2. Under the PI Order, Asset Allocation was required to transfer any funds in any bank accounts held in its name to a segregated interest-bearing escrow account and hold such funds in the escrow account pending a final resolution of the case on the merits or, alternatively, transfer the funds directly to ZCM. See PI Order at ¶ 2.

2

In August 2001, ZCM served written discovery on Asset Allocation and MJCM which requested, among other things, the disclosure of bank accounts, investments, or other assets owned or controlled by Asset Allocation or MJCM. Chabraja Decl. at ¶ 6. The investigation conducted by counsel for defendants revealed that the only bank account owned or controlled by Asset Allocation was a checking account held at First Eagle National Bank in Hanover Park, Illinois. Id. In compliance with the PI Order, the funds from this account, approximately $490,000, were wired to an escrow account that was opened at Chicago Title Insurance Company. Id.

Asset Allocation was authorized under the PI Order to continue holding five investments made in its name in certain investment funds. Chabraja Decl. at ¶ 7; PI Order at ¶ 2. The PI Order required that Asset Allocation, or anyone acting on its behalf, obtain advance written approval from ZCM prior to giving any trading or redemption instructions to the five investment funds. PI Order at ¶ 2. Upon the issuance of the PI Order, approximately $2.5 million in assets formerly under Asset Allocation's management or control were placed under freeze.

On December 20, 2002, Martin Allamian testified in a deposition taken by counsel for the Joint Official Liquidators of MJ Select. During the course of his testimony, Mr. Allamian revealed, among other things: (a) that only $2 million of the funds subject to the PI Order remained under Asset Allocation's management or control; (b) that Mr. Allamian, in violation of the PI Order, had redeemed the fund investments held in Asset Allocation's name; and (c) that Asset Allocation was holding funds in a previously undisclosed checking account located at Harris Bank in St. Charles, Illinois. Chabraja Decl. at ¶ 12.[1] Prior to the deposition on December 20, 2002, counsel for the Allamian Defendants was unaware that Asset Allocation had

---

[1] Martin Allamian has asserted that he opened Asset Allocation's account at Harris Bank in February 2002. See Declaration of Martin J. Allamian dated January 6, 2003 at ¶ 56.

opened a bank account at Harris Bank after the entry of the PI Order in this action, or that Mr. Allamian had redeemed the fund investments that were subject to the PI Order. Id.

Martin Allamian has paid Ross & Hardies a total of $463,090.32 for professional services rendered in connection with this action. The following payments have been made to Ross & Hardies by Mr. Allamian:

(a) December 2001 – Ross & Hardies received a check in the amount of $35,000.00 drawn on an account held at MidAmerica Bank. M.J. Allamian signed the check. See Declaration of Michael T. Hoffman ("Hoffman Decl.") at ¶ 6, attached hereto as Exhibit 3;

(b) December 28, 2001 – Ross & Hardies received a wire transfer from Martin Allamian in the amount of $78,090.32. Hoffman Decl. at ¶ 7;

(c) June 20, 2002 – Ross & Hardies received an official bank check issued by Harris Banks in the amount of $50,000. Martin Allamian is listed as the remitter. Hoffman Decl. at ¶ 8;

(d) September 13, 2002 – Ross & Hardies received an official bank check issued by Harris Banks in the amount of $200,000. Martin Allamian is listed as the remitter. Hoffman Decl. at ¶ 9; and

(e) December 24, 2002 – Ross & Hardies received an official bank check issued by Harris Banks in the amount of $100,000. Martin Allamian is listed as the remitter. Hoffman Decl. at ¶ 10.

With the exception of the payments listed above, Ross & Hardies has not received any other payments in connection with the services it has rendered in this matter. Hoffman Decl. at ¶ 11. Ross & Hardies has not received any payments for professional services rendered in the Waldock Action. Excluding services rendered in December 2002, which will be billed later this

4

month, there is a balance of $78,028.54 due Ross & Hardies for its services in this matter. Hoffman Decl. at ¶ 13.

During the hearing on the Intervenors' Motion for Rule to Show Cause, counsel for the Intervenors asserted that all of the payments made by Martin Allamian to Ross & Hardies subsequent to the entry of the PI Order must be returned. The Court directed the undersigned counsel to address the issue of the Court's authority to compel Ross & Hardies to return the fees paid to it by Mr. Allamian for its professional services rendered in this matter.

## ROSS & HARDIES SHOULD NOT BE REQUIRED TO RETURN THE PAYMENTS RECEIVED FROM MARTIN ALLAMIAN

**A.      The Court Has the Discretion To Allow Ross & Hardies to Retain the Fees Paid to It By Martin Allamian.**

First and foremost, it must be noted that the Court has discretion in this matter. An act done in violation of an injunction is not automatically a nullity. Suntex Dairy v. Bergland, 591 F.2d 1063, 1068 (5th Cir. 1979). While injunctions may be enforced by contempt hearings, they do not operate to void a transfer that was prohibited by the injunction. See Davis v. Prudential Ins. Co., 331 F.2d 346, 349-50 (5th Cir. 1964). Rather, the remedy for violation of an injunction "is a matter peculiarly within the discretion of the court to be determined in the light of the gravity and wilfulness of the particular violation complained of and the resulting injury to the property and right of the plaintiff[.]" Harthman v. Witty, 480 F.2d 337, 340 (3rd Cir. 1973).

The present case does not warrant such a drastic measure as the return of fees paid to Ross & Hardies for its services because, among other things, counsel was unaware, and had no reason to know, that the official bank checks Ross & Hardies received from Harris Bank in 2002 were being filtered from redemptions of frozen Asset Allocation assets. Indeed, the initial payments received by Ross & Hardies in 2001 came from Martin Allamian's personal bank account and there were no red flags which would have alerted counsel to the fact that subsequent

5

payments were not likewise being funded by Mr. Allamian, or that Asset Allocation's fund investments were being redeemed and used to pay for the litigation expenses.

Further, Judge Lindberg entered the PI Order in order to protect <u>ZCM</u> from the further dissipation of the proceeds from the redemptions of <u>ZCM's</u> interests in MJD and MJFA. <u>See</u> PI Order at ¶ 1. After months of serious settlement negotiations, ZCM and the Allamian Defendants reached an agreement by which $2 million of the proceeds governed by the PI Order would be transferred to ZCM, thereby leaving Asset Allocation with roughly $420,000. Upon the transfer of the redemption proceeds from Asset Allocation's investment in Waterford Multiple Advisor Fund, L.P. ("Waterford"), ZCM will have received the entire settlement payment.

Ross & Hardies is not by any means attempting to downplay the significance of Martin Allamian's conduct in violation of the PI Order. However, a question presented by Mr. Allamian's actions is whether Ross & Hardies must return payments made to it for legal services that it provided to its clients in this action. A factor that is relevant to the resolution of this issue is whether ZCM, the party on whose behalf the PI Order was entered, sustained any harm as a result of Mr. Allamian's actions. <u>Harthman,</u> 480 F.2d at 340. Notwithstanding Mr. Allamian's violations of the PI Order, it is apparent that ZCM will receive the entire settlement payment. Although the Intervenors assert a right to the funds that were to remain with Asset Allocation under the settlement agreement, the fact remains that the PI Order was intended to protect <u>ZCM</u>, not the Intervenors. For this reason, among others, Ross & Hardies should not be compelled to return the payments it has received for its services.

Moreover, if counsel had been informed that sufficient funds were not available to pay for legal fees, Ross & Hardies would have petitioned the Court for interim payments of

attorneys' fees from the frozen assets. <u>See</u> Chabraja Decl. at ¶ 16. In the present situation, the Court would have had the discretion to permit Asset Allocation and the Allamian Defendants to pay their attorneys out of the frozen assets. Although the PI Order did not specifically allow for the payment of attorneys' fees, the Court would have had authority to grant release of funds for Asset Allocation's defense or to modify the PI Order upon petition from the Defendants. <u>See</u> <u>FTC v. Amy's Travel Service, Inc.</u>, 875 F.2d 564 (7th Cir. 1989) (modifying injunction order to permit attorneys' fees); <u>FTC v. Windermere Big Win International, Inc.</u>, No. 98 C 8066, 1999 WL 608715 (N.D. Ill. Aug. 5, 1999) (finding defendants could petition for interim payments for attorneys' fees); <u>FTC v. Think Achievement Corp.</u>, 144 F. Supp. 2d 1013, 1022 (N.D. Ind. 2000) (granting interim payment of attorneys' fees from frozen assets).

Intervenors will likely assert that a petition for attorneys' fees from the funds subject to the PI Order would have been improper. However, it is undisputed that Intervenors are limited partners in Asset Allocation who have not redeemed their investments in the fund. Asset Allocation's private placement memorandum provides that the fund "will pay" on-going legal expenses. <u>See</u> Asset Allocation Private Placement Memorandum at p. 2, attached hereto in Group Exhibit 4. The Asset Allocation limited partnership agreement, which Intervenors signed, provides that the partnership "shall be obligated to pay all liabilities incurred by it." <u>See</u> Asset Allocation Limited Partnership Agreement at A-4, attached hereto as Group Exhibit 4. This expansive language clearly includes the payment of legal fees incurred by Asset Allocation. Thus, there were certainly sufficient grounds to grant a petition for attorneys' fees in the event Ross & Hardies had been informed that such a petition was necessary.

**B.** **The Present Matter Is Factually Distinguishable from Cases Requiring the Return of Attorneys' Fees**

Counsel has been unable to find any authority, on par with the present situation involving strictly private litigants, in which an attorney was ordered to return a payment received from assets subject to an injunction. Although cases do exist in which counsel has been ordered to return funds that were frozen or otherwise forfeitable, these cases are highly distinguishable. Indeed, each of the cases unearthed involved a plaintiff who has some form of statutory authority (such as a governmental body, governmental agency, or other appointed individual such as a receiver) to request the freezing of the assets as an initial matter, and either a mandatory forfeiture statute or other clear statutory scheme upon which it had the authority to seek disgorgement or to limit fee payments.

**1.** **Criminal Forfeiture Statutes**

Intervenors have cited to Caplin & Drysdale v. United States, 491 U.S. 617, 109 S.Ct. 2646 (1989), as support for their assertion that the attorneys' fees paid to Ross & Hardies to date should be returned. In Caplin, the Court had entered a freeze order on the defendant's accounts, yet he made a payment the following day to his attorney for *pre*indictment services. However, the defendant's funds, which were earned through drug trafficking, were subject to forfeiture under the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 853(a). That Act included a relation-back provision whereby, upon a determination by a court that the funds were drug proceeds, all right, title and interest in the property "vests in the United States upon the commission of the act giving rise to the forfeiture." 21 U.S.C. § 853(c). Thus, in Caplin, the United States was the *legal owner of the funds* at the time payment was made to the attorney. Caplin, 109 S. Ct. at 2652, n. 4. The defendant in Caplin argued that, under the Sixth Amendment, he should have the right to pay his counsel out of his proceeds. Caplin, 109 S. Ct. at

2652. The Court found that there was no exemption for attorneys' fees under the forfeiture statute and that the statute did not violate defendant's Sixth Amendment rights, especially given the fact that under that punitive Act, the funds belonged to the United States. Id. See also United States v. Monsanto, 491 U.S. 600, 109 S.Ct. 2657 (1989) (same).

The limitations of Caplin were explicitly acknowledged in United States v. Ferguson, 142 F.Supp.2d 1350, 1357 (S.D. Fla. 2000). Ferguson was prosecuted under the money laundering statute, 18 U.S.C. § 1957, for knowingly receiving funds subject to forfeiture, after accepting several large advances for professional services to be performed for a client who was already under indictment. Id. at 1352. The Court acknowledged that the statute at issue in Caplin had provided for absolute forfeiture without discretion or exception, such that the court had no choice but to order disgorgement (whereas Congress had created a safe harbor exception under the money laundering statute for payment of legitimate criminal defense services). Id. at 1357.

These criminal cases are not applicable to the present situation because the Courts in those cases had no discretion on the question of attorneys' fees. Instead, the Court was required to follow a statutory scheme requiring forfeiture. In the present case, no government actors are involved with statutory authority to demand forfeiture, nor is a statutory mandate at issue. For this reason, Intervenors' reliance on Caplin in its submission to the Court prior to the hearing on the motion for rule to show cause is misplaced.

## 2. Bankruptcy Scheme

Courts have required disgorgement of fees paid to attorneys representing the debtor in bankruptcy, where the attorneys failed to submit a required statutory disclosure statement indicating fees received and the sources of those payments (In re Lewis, 113 F.3d 1040 (9th Cir. 1997)), or omitted payments from third parties. In re Boh! Ristorante, Inc., 99 B.R. 971 (9th Cir. 1989). Indeed, the courts have required the attorneys to disgorge even third-party payments to

the bankruptcy estate. <u>In re Lewis</u>, 113 F.3d 1040 (9th Cir. 1997). The courts have ordered these disgorgements based on counsel's willful violation of the statutory mandate, and have treated it along the lines of a knowing ethical violation. These cases are inapposite due to the fact that they involved the knowing receipt or retention of fees in contravention of the bankruptcy scheme. In the present case, Ross & Hardies was completely unaware that the payments it received were emanating from the assets subject to the PI Order. As the Declarations of Michael A. Chabraja and Michael Hoffman reveal, Ross & Hardies did not have any knowledge that the payments for services that it received in 2002 were ultimately traceable to the funds subject to the PI Order.

### 3. Actions Brought by Governmental Agencies

The attorneys' fees issue has also arisen in the regulatory context, wherein government agencies such as the Securities & Exchange Commission, the Federal Trade Commission, or the Commodities Futures Trading Commission have brought an action against a wrongdoer pursuant to their federal regulatory authority, to recover improperly obtained funds and seek restitution on behalf of consumers.

Generally, courts have frozen the assets of wrongdoers, but permitted them monthly or intermittent allowance to pay living expenses and, in the court's discretion, attorneys' fees. <u>See</u> <u>FTC v. Amy's Travel Service, Inc.</u>, 875 F.2d 564 (7th Cir. 1989). In some instances, however, the courts have denied the defendants' petitions for release of funds in order to pay attorneys' fees, finding that disgorgement of ill-gotten gains is remedial in nature rather than punitive, and simply deprives the wrongdoer of his ability to benefit from the ill-gotten gains of others. <u>See</u> <u>CFTC v. American Metals Exchange Corp.</u>, 991 F.2d 71, 76 (3rd Cir. 1993). This is more common when the client has already violated the order by making disbursements for debts other

10

than those authorized by the parameters of the order, or by refusing to catalog the assets. <u>SEC v.</u> <u>Quinn</u>, 997 F.2d 287, 289 (7th Cir. 1993).

There are cases where attorneys were ordered to actually return fees. However, each of these are distinguishable from the present case. In <u>CFTC v. Co Petro Marketing Group Corp.</u>, 700 F.2d 1279 (9th Cir. 1983), the Court ordered the return of fees where the attorney, fully aware that the court was entering an order appointing a receiver and freezing the client's assets, cashed a check from the client in excess of $60,000, applying the majority of it to the client's outstanding balance, and placing the remainder in trust for future services. In <u>SEC v. Comcoa</u> <u>Ltd.</u>, 887 F.Supp. 1521 (SD Fla.1995), the court found counsel in contempt because he had retained a significant amount of the clients' funds in a trust account, purportedly to pay for future services, finding that it was an attempt to circumvent the court's temporary restraining order. In both of those cases, the attorneys' knowingly and willfully retained or accepted funds that were subject to injunction.

In <u>FTC v. Think Achievement Corp.</u>, 312 F.3d 259 (7th Cir. 2002), which has been cited by Intervenors, the district court had granted a petition for payment of attorneys' fees out of frozen assets *after* the court had already entered a finding of liability and determined that the assets did not in fact belong to the client. Moreover, the fees were to cover the future defense of the client in his criminal trial, rather than for services already performed. The Seventh Circuit found that the disbursement was improper, but also stated that "Our conclusion is limited, however, to situations in which the defendant is seeking to tap a fund in which he has no lawful interest to pay a lawyer for *future* services. The issue is more complicated if the lawyer rendered services before the judgment determining the defendant's lack of a lawful interest was issued." <u>FTC v. Think Achievement Corp.</u>, 312 F.3d 259, 262-63 (7th Cir. 2002) (emphasis in original).

11

This case has no application to the present case, in which the fees paid are to Ross & Hardies for services already rendered, and there has not been any determination of liability (and indeed, the parties are not even at issue yet).

In all of the above contexts, the Courts issued an injunction over assets that were stolen or to which the wrongdoer was not otherwise entitled. In those contexts, it is understandable that the Courts would not permit the offender(s) to fund their defense through the use of assets that rightfully belong to others. SEC v. Cherif, 933, F.2d 403, 417 (7th Cir. 1991) (citing Caplin). However, the present matter is distinguishable. In the present case, the $420,000 transferred from the Harris Bank account by Martin Allamian belonged to Asset Allocation. Although Intervenors may cite to case law that stands for the proposition that a defendant cannot use frozen funds belonging to *others* in order to pay legal fees, these cases are inapplicable. The money transferred from the Harris Bank account clearly belonged to Asset Allocation. Although there may be competing interests asserting a stake in the funds, and although the funds were under freeze, there is no question that the assets did not – and do not - belong to anyone but Asset Allocation.

C.      **Intervenors Do Not Have a Direct Claim to the Funds**

Intervenors appear to be under the mistaken belief that they are entitled, dollar for dollar, to any assets remaining in Asset Allocation after the ZCM settlement. Yet even if the assets at issue had been preserved in their entirety (and irrespective of whether the PI Order was violated), that does not mean that Intervenors would be entitled to those assets.

Intervenors are limited partners in Asset Allocation, and their rights are governed by the private placement memorandum and the limited partnership agreement. Intervenors are not disclaiming these documents, and in fact, have sued Defendants *on the documents* in the

12

Waldock Action separately before this Court.[2] Although Intervenors have requested redemption of all or part of their partnership interests, under the limited partnership agreement, partnership interests may only be paid if there are sufficient funds to pay them. Asset Allocation is required under its governing documents to pay liabilities such as attorneys' fees prior to redeeming its limited partners. Thus, whether paid initially or paid later, Ross & Hardies would be entitled to payment and satisfaction before the Intervenors would be entitled to redemptions.

Moreover, even if Intervenors had a claim against Asset Allocation as a creditor on equal footing to Ross & Hardies, a debtor may pay its creditors in whatever order it chooses. As long as the transfer is for consideration, it is not fraudulent, even if payment of the first creditor means that there are not sufficient assets to pay the second creditor after the first has been paid. See, e.g., Wyzard v. Goller, 28 Cal. Rptr. 2d 608 (1994); 740 ILCS 160/4. Intervenors do not have a claim to the *particular* assets at issue which would give rise to the use of this Court's equitable powers to recall the funds already paid to Ross & Hardies for the performance of professional services.

## CONCLUSION

Ross & Hardies has vigorously and zealously represented Asset Allocation and the Allamian Defendants in this complex action. Ross & Hardies has been paid, in part, with official bank checks issued by Harris Bank. Although it is apparent that the funds Ross & Hardies received are traceable to the assets under freeze, Ross & Hardies had no basis to believe that it was being paid with such funds. Under the circumstances, the Court should not order disgorgement of the fees paid to Ross & Hardies for its services rendered in this matter.

Dated: January 22, 2003

---

[2] Defendants have filed a motion to dismiss that case for failure to state federal causes of action, and thus, the parties are not even at issue yet in that action.

13

Respectfully submitted,

ROSS & HARDIES

Michael A. Chabraja
ROSS & HARDIES
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
(312) 558-1000

# SEE CASE FILE FOR EXHIBITS